# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JANE DOE 12, JANE DOE 13
JANE DOE 14, JANE DOE 15,
JANE DOE 16, JANE DOE 17,
JANE DOE 18, JANE DOE 19

                                                     Case No.

                          Plaintiffs,             Hon.

vs.

EASTERN MICHIGAN UNIVERSITY
BOARD OF REGENTS (official capacity
only); MELODY WERNER, in her
official capacity as Eastern Michigan
University's Title IX Director, and individual
capacity; KYLE MARTIN, in his official capacity
as Eastern Michigan University's Greek Life
Coordinator, and individual capacity;
EASTERN MICHIGAN UNIVERSITY
POLICE DEPARTMENT, a municipal corporation;
CHIEF OF POLICE ROBERT HEIGHES,
In his official and individual capacity; DEPUTY
CHIEF DANIEL KARRICK, in his official and
Individual capacity; DELTA TAU DELTA
FRATERNITY- THETA XI CHAPTER; DELTA
TAU DELTA, INC.; SIGMA KAPPA - DELTA
ALPHA CHAPTER; SIGMA KAPPA, INC.;
THETA CHI - EPSILON MU CHAPTER;
THETA CHI FRATERNITY, INC.,

                                Defendants.

TODD F. FLOOD (P58555)
VINCENT J. HAISHA (P76506)
JOHN H. MOTT (P81990)
Attorneys for Plaintiff
Flood Law, PLLC
155 W. Congress St., Ste. 603
Detroit, MI 48227
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
vhaisha@floodlaw.com
jmott@floodlaw.com

MICHAEL D. WEAVER (P43985)
Plunkett Cooney
38505 Woodward Avenue, Ste. 2000
Bloomfield Hills, MI 48304
mweaver@plunkettcooney.com

**Complaint for Damages and Injunctive Relief and Jury Demand**

There is a civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint, Case No. 21-cv-10649 currently pending before the Honorable Linda V. Parker and filed on March 24, 2021.

NOW COME, Plaintiffs, JANE DOE 12 – 19, who hereby reallege and incorporate by reference the common allegations as stated in JANE DOE 1, et al. v.

Eastern Michigan Board of Regents, et al., case number 21-cv-10649 as though previously stated herein:

## INTRODUCTION

## EMU OFFICIALS WERE AWARE AND CONSTRUCTIVELY APPROVED OF ITS CAMPUS RAPE CULTURE BY PURPOSEFULLY DISREGARDING REPORTS OF RAPE, MISLEADING RAPE VICTIMS AND DISCOURAGING THEM FROM REPORTING THEIR ASSAULTS TO TITLE IX OR LAW ENFORCEMENT

1.      Students at EMU have been subjected to a long history of hazing, bullying, harassment, and sexual assaults. EMU, through its actions and deliberate indifference, endorsed and enabled this culture to exist within its campus community by failing to enforce the protocols of Title IX. In particular, there was an epidemic of underage drinking and sexual assaults that took place at fraternity-sanctioned events, which oftentimes was reported to EMU Officials, namely Defendants MELODY WERNER (Title IX Coordinator) and Greek Life Coordinator KYLE MARTIN.

2.      For at least six years, EMU has purposely concealed its culpability by either manipulating the investigation process or knowingly concealing sexual assaults.

3

3.      Upon information and belief, over 30 women have come forward since March 25, 2021 upon learning that, from at least 2014 to 2019, EMU officials, including Defendants MELODY WERNER and KYLE MARTIN:

      a.  Ignored repeated credible reports of sexual assault and rape;

      b.  Discounted reports of sexual assault;

      c.  Failed to report sexual assaults in compliance with the Clery Act;

      d.  Failed to trigger investigations into sexual assaults pursuant to the mandates of Title IX;

      e.  Discriminated against countless victims of rape by singling them out and aggressively discouraging them from reporting;

      f.  Wholly misrepresented the legal process; and,

4.      Defendant MELODY WERNER would aid and assist the assailants, when they were facing sexual assault claims by inappropriately meeting with them to go through their story and providing special accommodations not similarly advanced to the victims.

5.      In particular, three assailants (D'Angelo McWilliams, Thomas Hernandez, and William Bujaki) thanked Defendant MELODY WERNER for assisting them in clearing their names with Title IX. However, these cases were reviewed subsequently by trained law enforcement officers and each assailant has been criminally charged with each rape. Albeit, several years later.

6.      Upon information and belief, Defendant Melody Werner was motivated to conceal the shocking number of sexual assaults taking place at EMU in order to skew the statistics in EMU's Clery Act Report, which mandates reporting of crimes that occur "on campus."

7.      Both Defendants MELODY WERNER and KYLE MARTIN are mandatory reporters regarding all claims of sexual assault. The duty imposed is to ensure that all proper reports are made and kept in compliance with federal Statutes designed to monitor campus safety. (Clery Act 20 U.S.C. sec 1092(f) (2018)).

8.      Similarly, EMU policy mandates that officers of Defendant Fraternities and Sororities are deemed mandated reporters of sexual assault. (See Exhibit A).

9.      Upon information and belief, Defendant MELODY WERNER and KYLE MARTIN frequently and deliberately failed to memorialize reports of sexual assault. Further, under information and belief, Defendant(s) knowingly conspired and aided each other in not following the mandated reporting protocol.

10.     It was well known that Defendant KYLE MARTIN worked closely with Defendant MELODY WERNER, in the monitoring of reports of sexual assaults and underage drinking within Greek Life.

11.     Upon information and belief, Defendant KYLE MARTIN began to question the competency of Defendant MELODY WERNER in her role as Title IX Coordinator in light of her repeated failures to effectively manage reports of sexual

assault and intentionally deterring women from having access to Title IX protections.

## CONCEALMENT OF SEXUAL ASSAULTS ON EMU CAMPUS BY GREEK LIFE

12.     Defendants DELTA TAU DELTA – CHAPTER ("DTD – CHAPTER"), THETA CHI – CHAPTER ("TC – CHAPTER") and SIGMA KAPPA – CHAPTER ("SK – CHAPTER") each played a role in condoning and enabling a culture of sexual assaults on EMU's campus.

13.     Six of the rapes occurred at Defendant DELTA TAU DELTA - CHAPTER ("DTD - CHAPTER").

14.     Two of the rapes occurred at Defendant THETA CHI – CHAPTER ("TC - CHAPTER").

15.     Members of EMU sorority, Defendant SIGMA KAPPA - CHAPTER ("SK - CHAPTER") engaged in hazing, coercion, and manipulation of JANE DOE 11, rendering her vulnerable to assault and in violation MCL 750.411t.

16.     Upon information and belief, at all times relevant hereto, DTD – Chapter was required to regularly report to DTD – National regarding all matters, including but not limited to incidents of harassment and sexual assault.

17.     Upon information and belief, DTD – National was on notice of DTD – Chapter's probationary status for previous violations, including but not limited to alcohol consumption on its premises in direct violation of its bylaws.

18.     Officers and members of Defendant DTD - CHAPTER, TC - CHAPTER, and SK - CHAPTER were all duty-bound and obligated to ensure that all sponsored events included safety protocol such as installing a "sober monitor". This was rarely done and often if a "sober monitor" was put in place they were intoxicated.

19.     SK – National's Policy Handbook ("The Handbook") requires every collegiate chapter, including SK - CHAPTER to follow, adhere to, and promote the rules, policies, bylaws, and regulations as set forth by SK – NATIONAL. (See applicable sections of Exhibit B - SK– National's Policy Handbook).

20.     Similarly, SK – National's bylaws provide explicit rules and regulations regarding hazing and alcohol consumption on SK – Chapter's premises. (See relevant portions of Exhibit C – Sigma Kappa Bylaws).

21.     On its own website, SK – Chapter and/or SK National discusses Risk Management, in which it provides:

a. "Sigma Kappa has a number of policies designed to reduce the potential for harm to our members and to address situations where issues have occurred."
b. "Sigma Kappa expects that all members will follow Sigma Kappa policy, college/university policy, and all local, state, and federal laws."
c. "The Sorority expects her members will make informed, reasonable, and responsible choices regarding their personal safety."
d. "Our policies include detailed information about risk incidents, hazing, social events, transportation, and practices for self-governance."

22.     Defendant Fraternities would encourage and pressure students to drink excess amounts of alcohol at sanctioned events.

23.     Whereby, Defendant Fraternities, through members and officers, aided and abetted in hazing, bullying, coercing, furnishing alcohol to minors and/or vulnerable female students, and encouraging them to become intoxicated at parties rendering them vulnerable to fraternity members who were both unmonitored and encouraged to assault women.

24.     It was well known by Defendant KYLE MARTIN and MELODY WERNER, that members in Greek Life were at a higher risk of underage drinking and sexual misconduct.

## CONCEALMENT OF SEXUAL ASSAULTS ON EMU CAMPUS BY EMUPD

25.     Several assailants have been criminally charged with assaulting and/or raping numerous victims including, but not limited to, Plaintiffs.

26.     Upon information and belief, beginning in at least December 2014, EMU Police Department ("EMUPD") had knowledge of the rape culture at EMU and the prevalence of sexual assaults on EMU's campus and in the surrounding area.

27.     Upon information and belief, EMUPD officers and/or investigators deliberately failed to enter reports from sexual assault victims into the police CRISnet system and/or other EMUPD reporting systems and/or software utilized by EMUPD to create police reports from complaining victims and/or witnesses.

28.     Defendant EMUPD deliberately failed to notify the Ypsilanti Police Department ("YPD") about the brutal rapes against Plaintiffs that reportedly occurred within YPD's jurisdiction. As will be explained more thoroughly herein, Defendants REGENTS and EMUPD concealed the assaults from YPD for nearly two years, and thus thwarted a proper investigation into Plaintiffs' sexual assault which resulted in catastrophic psychological and physical harm to them, as well as Defendant REGENTS and EMU's community as a whole.

29.     YPD did not become aware of several sexual assaults to Plaintiffs until 2020 whereupon it initiated and conducted a thorough investigation.

30.     Defendants are responsible for Plaintiffs' damages stemming from the sexual assaults by Dalton Brosnan ("Brosnan"), William Bujaki ("Bujaki"), Thomas Hernandez ("Hernandez"), Cameron Layne ("Layne"), D'Angelo "DJ" McWilliams ("McWilliams"), and Clayton Sigmann ("Sigmann") against Plaintiffs, as Defendants placed vulnerable female students like Plaintiffs in harm's way by 1) covering up several reports of sexual assault despite knowing the same were continuing, thereby creating an ongoing and increased risk of danger for EMU's female students; 2) acting in a manner that was deliberately indifferent to the knowledge of reported and suspected sexual assaults against EMU's female students; 3) failing to follow Defendant REGENTS' Title IX policies and/or protocols; 4) failing to sufficiently train EMU staff and/or related personnel to

properly investigate sexual assaults, and 5) committing overt acts of misfeasance and malfeasance. In essence, Defendants effectively and repeatedly provided members of Defendant DTD - CHAPTER with a "Get Out of Jail Free" card.

31.    Plaintiffs file this case anonymously because of the extremely sensitive nature of the case as Plaintiffs were victims of sexual assault, and the suit will require disclosure of information "of the utmost intimacy;" Plaintiffs are therefore entitled to protect their identities in this public filing by not disclosing their names. *Doe v. Porter,* 370 F.3d 558, 560 (6th Cir., 2004), citing *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir., 1981).

32.    Plaintiffs seek to establish a Truth and Reconciliation Commission, or similar government-sanctioned public forum requiring all Defendants and their agents and employees to fully and unequivocally admit their responsibility for permitting, condoning, and promoting a culture of sexual assaults at EMU as well as admitting to their own culpability for the unspeakable harm caused to Plaintiffs.

## **PARTIES**

33.    Plaintiffs JANE DOE 12, JANE DOE 13, JANE DOE 14, JANE DOE 15, JANE DOE 16, JANE DOE 17, JANE DOE 18, and JANE DOE 19 (hereinafter collectively referred to as "Plaintiffs" unless otherwise identified) reside and/or at all times relevant hereto resided in the State of Michigan within the Eastern District of Michigan.

10

34.     At all relevant times hereto, Plaintiffs were students at EMU located within the Eastern District of Michigan.

35.     Defendant EMU BOARD OF REGENTS ("Regents") is the governing body of EMU, a public university and Michigan Corporation that receives Federal financial assistance and is, therefore, among other reasons, subject to Title IX of the Education Amendments of 1972, 20 U.S.C. §1681, *et seq*., and is a body corporate, with the right to be sued, vested with the government of the University. MCL 390.551, *et seq*.

36.     At all relevant times hereto, Defendant MELODY WERNER ("Werner") resided in the Eastern District of Michigan and was EMU's Title IX Director.

37.     Werner is being sued in both her individual and official capacity.

38.     At all relevant times hereto, Werner was acting in her official capacity, within the course and scope of her employment as EMU's Title IX Director, employed by Regents, and under color of law.

39.     At all relevant times hereto, Defendant KYLE MARTIN ("Martin") resided in the Eastern District of Michigan and was EMU's Greek Life Coordinator, employed by Regents.

40.     Martin is being sued in both his individual and official capacity.

41.     At all relevant times hereto, Martin was acting in his official capacity, within the course and scope of his employment as EMU's Greek Life Coordinator, employed by Regents, and under color of law.

42.     Defendant EMUPD, with its principal location at 1200 Oakwood Street, City of Ypsilanti, County of Washtenaw, State of Michigan, is located within the Eastern District of Michigan.

43.     At all relevant times hereto, EMUPD was deputized by the Washtenaw County Sheriff, expanding EMUPD's jurisdiction beyond the borders of EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority.

44.     Upon information and belief, the officers from each agency within the Eastern Washtenaw Safety Alliance, including EMUPD, share jurisdictional authority and have county-wide arrest powers.

45.     EMUPD's primary mission is to "provide for the safety and security of all . . . students . . . at our great [Eastern Michigan] University."

46.     At all relevant times hereto, Defendant DEPUTY CHIEF DANIEL KARRICK ("Karrick") resided in the Eastern District of Michigan and was employed by Regents and EMUPD as EMUPD's Deputy Chief of Police.

47.     Karrick is being sued in both his individual and official capacity.

48.     At all relevant times hereto, Karrick was acting in his official capacity, within the course and scope of his employment as EMUPD's Deputy Chief of Police, employed by Regents and EMUPD, and under color of law.

49.     At all relevant times hereto, Defendant CHIEF OF POLICE ROBERT HEIGHES ("Heighes") resided in the Eastern District of Michigan and was employed by Regents and EMUPD as EMUPD's Chief of Police.

50.     Heighes is being sued in both his individual and official capacity.

51.     At all relevant times hereto, Heighes was acting in his official capacity, within the course and scope of his employment as the EMUPD Chief of Police, employed by Regents and EMUPD, and under color of law.

52.     Defendant DELTA TAU DELTA FRATERNITY – THETA XI CHAPTER ("DTD – Chapter") is a Michigan corporation with its Chapter location at 720 Lowell Street, City of Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

53.     At all relevant times hereto, DTD – Chapter was registered with EMU and/or Regents.

54.     DTD – Chapter has specific bylaws governing its operation and management. (See applicable sections of Exhibit D - DTD Bylaws.)

55.     Defendant DELTA TAU DELTA, INC. ("DTD – National") is a foreign corporation that conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

56.     At all relevant times hereto, DTD – National governed, controlled, and/or maintained DTD – Chapter via its bylaws, constitution, and/or code of conduct.

57.     Defendant SIGMA KAPPA – DELTA ALPHA CHAPTER ("SK– Chapter") is a Michigan corporation with its Chapter location at 455 W. Forrest Ave., Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

58.     At all relevant times hereto, SK – Chapter was registered with EMU and/or Regents.

59.     Defendant SIGMA KAPPA, INC. ("SK – National") is a foreign corporation that conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

60.     At all relevant times hereto, SK – National governed, controlled, and/or maintained SK – Chapter via its bylaws, constitution, and/or code of conduct.

61.     Upon information and belief, at all times relevant hereto, SK – Chapter was required to regularly report to SK – National regarding all matters, including

but not limited to incidents of excessive alcohol consumption, harassment, sexual assault, and hazing.

62.     SK – National has specific policies, bylaws and regulations governing the operation and management of SK – National and its local chapters, including SK – CHAPTER.

63.     Defendant THETA CHI – EPSILON MU CHAPTER ("TC – Chapter") is a Michigan corporation with its Chapter location at 900 Oakwood St., Ypsilanti, State of Michigan, and is located within the Eastern District of Michigan.

64.     At all relevant times hereto, TC – Chapter was registered with EMU and/or Regents.

65.     Defendant THETA CHI FRATERNITY, INC. ("TC – National") is a foreign corporation that conducts business in the City of Ypsilanti, County of Washtenaw, State of Michigan.

66.     At all relevant times hereto, TC – National governed, controlled, and/or maintained TC – Chapter via its bylaws, constitution, and/or code of conduct.

67.     Upon information and belief, at all times relevant hereto, TC – Chapter was required to regularly report to TC – National regarding all matters, including but not limited to incidents of excessive alcohol consumption, harassment, sexual assault, and hazing.

68.   TC – National has specific policies, bylaws, and regulations governing the operation and management of TC – National and its local chapters, including TC – Chapter. (See relevant portions of Exhibit E – Theta Chi Bylaws).

69.   TC – National's Safety Standards Manual outlines the regulations and duties of its local chapters, including TC – Chapter, pertaining to alcohol consumption and sexual assaults on Theta Chi premises. (See relevant portions of Exhibit F – Theta Chi Safety Standards Manual).

## JURISDICTION AND VENUE

70.   This action arises under the United States Constitution, and jurisdiction belongs to this Honorable Court pursuant to 28 U.S.C. §§ 1331 and 1343, as these matters pertain to federal questions posed by 42 U.S.C. §§ 1988.

71.   Jurisdiction further belongs to this Honorable Court because this is, in part, an action for deprivation of civil rights pursuant to 42 U.S.C. §§ 1983.

72.   This Honorable Court maintains jurisdiction over Plaintiffs' state law claims pursuant to Fed. R. Civ. P. 18 and 28 U.S.C. § 1367.

73.   This is an action for the hostile environment created by Defendants and Defendants' failure to protect Plaintiffs in violation of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681, *et seq*., 34 C.F.R. § 106.31 *et seq*., and 42 U.S.C. § 1983, and the Jeanne Clery Disclosure of Campus Security

Policy and Campus Crime Statistics Act of 1990, 20 U.S.C. § 1092(f) (2018) ("Clery Act").

74.     Plaintiffs also seek redress under the 14th Amendment right to bodily integrity.

75.     Defendants are not immune from suit under the Governmental Tort Liability Act, MCL 691.1401 *et seq*., or any other statute.

76.     Venue is proper in the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. § 1391(b), as all of the events giving rise to this action occurred in the County of Washtenaw, State of Michigan, which is located within the Southern Division of the Eastern District of Michigan.

77.     The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), excluding interest, costs, and attorney fees.

78.     Plaintiffs' Complaint is timely filed within the applicable statutes of limitations.

## **TITLE IX**

79.     Defendants' acts and failures to act, as it relates to each Plaintiff, amount to unlawful sexual harassment and discrimination on the basis of gender. The harassment and discrimination endured were sufficiently severe and pervasive to create an abusive and sexually hostile educational environment for each Plaintiff. One or more of EMU's administrators, agents, and/or officials, with authority to take

corrective action on Plaintiffs' behalf, had actual notice of Plaintiffs' sexual assaults but discriminated and/or failed to adequately respond in accordance with their own policies. These failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that occurred, was occurring, or was likely to occur. As a result, each Plaintiff was subject to continuing harassment and loss of educational opportunities.

80.    Additionally, and in the alternative, EMU failed to implement proper procedures to discover, prohibit or remedy the kind of gender-based discrimination that each Plaintiff suffered. These failures included non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation, and correction of unlawful gender-based discrimination, as well as the failure to properly vet and monitor the operation of fraternities; the failure to report allegations of sexual activity to law enforcement and/or relevant EMU administrator's; the policy and/or practice of engaging in ad-hock, internal disciplinary procedures that resulted in a lack of discipline for members of fraternities that engaged in sexual misconduct; the policy and/or practice of engaging in unequal investigatory procedures that improperly favored fraternities over female student victims; the policy and/or practice of discrediting female victims of sexual assault, abuse and/or misconduct committed by fraternity members; the policy and/or practice of tolerating and/or tacitly approving sexual violence committed by fraternity members; and the creation

of a sexually hostile atmosphere whereby the rules applicable to all students did not apply to fraternity members. Defendants acted with deliberate indifference in response to this knowledge. Even worse, Defendants intentionally and fraudulently concealed their knowledge of sexual assaults committed by members of EMU fraternities and other EMU students.

81.     Upon information and belief, as early as 2015, Defendants had actual knowledge of sexual assaults perpetuated by members of EMU fraternities and other EMU students but acted with deliberate indifference, in part, by failing to take appropriate actions in response to this knowledge.

82.     Defendants acted with deliberate indifference in deviating significantly from the standard of care outlined by the Doe in the Dear Colleague Letter of 2011 and contrary to their own policies.

83.     As a result of Defendants' deliberate indifference, Plaintiffs were forced to endure a sexually hostile environment on campus. In addition, Plaintiffs suffered losses of educational opportunities and/or benefits and incurred, and will continue to incur, attorney fees and other costs of litigation.

84.     At all times relevant hereto, Plaintiffs were unaware of Defendants' pervasive failings with respect to their response to known issues of sexual misconduct within the EMU's Greek system dating back several years prior to the sexual assaults endured by these Plaintiffs. Because Defendants concealed this

information from Plaintiffs and the general public, Plaintiffs could not, with reasonable diligence, have learned this information independently.

85.     At all times relevant hereto, Plaintiffs were unaware of Defendants' deliberate indifference to the actual knowledge that members of EMU's fraternities and other EMU students had been accused of sexually assaulting multiple female students. Because Defendants concealed this information and failed to report the same, contrary to the Clery Act, Plaintiffs could not, with reasonable diligence, have discovered this information independently.

## FRAUDULENT CONCEALMENT

86.     EMU and its employees and/or agents fraudulently concealed the wrongful conduct of EMU and the EMU Individual Defendants. Moreover, through policies and/or practices, Defendants tacitly permitted and/or constructively enabled members of EMU's fraternities and others to commit repeated sexual assaults with relative impunity.

87.     The fraudulent concealment rule states:

> If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although

the action would otherwise be barred by the period of
limitations. MCL § 600.5855.

88.    Plaintiffs did not discover their concealed causes of actions against

Defendants until at least March 25, 2021, upon learning that EMU Defendants had

concealed its knowledge of ongoing criminal conduct and that Defendants had failed

to report sexual assaults in an effort to suppress their own culpability based on

permitting and enabling this horrendous activity.

89.    Defendants cannot escape liability for fraudulent concealment because

by arguing that they did not directly make any fraudulent statements to Plaintiffs in

an effort to conceal Plaintiffs' causes of actions against them because EMU had an

affirmative duty to disclose to Plaintiffs its wrongful conduct based on fiduciary

relationships.

90.    Defendants also owed a heightened duty of care to Plaintiffs who were,

by and large, under the legal drinking age at the time they were provided alcohol by

members of DTD – Chapter, SK – Chapter, TC – Chapter and others and then

sexually assaulted.

91.    Defendants had a duty to warn and a duty to protect Plaintiffs and all

students enrolled at EMU.

92.    Defendants and their employees, agents and/or representatives

concealed this information from those who had the ability to investigate, sanction,

prevent and/or otherwise prosecute sexual misconduct.

93.    In doing so, Defendants continued to perpetuate the image of EMU and Greek life at EMU as a safe place for a young female to reside and earn a diploma.

94.    Such statements and representations were false, and those who made, perpetuated, and/or affirmed them, including Defendants, knew or should have known they were false, yet continued to perpetuate the same in order to preserve the comfortable status quo.

95.    Such statements and representations, as more thoroughly described herein, were made with the intention that Plaintiffs and others would rely on them for the proposition that EMU provided a safe environment for young female students to reside and earn a diploma.

96.    Plaintiff and others did reasonably rely on said statements and representations.

97.    Defendants' actions constituted fraudulent concealment of Plaintiffs' causes of action against them.

98.    Such fraudulent concealment reasonably prevented Plaintiffs from knowing that they had a cause of action against Defendants and others until March 25, 2021, when news broke of EMU's cover-up of serial sexual assaults and the Ypsilanti Police Department's investigation of the same.

99.    Plaintiffs have not contributed to their own injuries, have at all times made good faith efforts to mitigate their own considerable damages, and are otherwise not at fault.

## FACTUAL ALLEGATIONS

100.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

## JANE DOE 12

101.    On December 23, 2014, JANE DOE 12, was 18 years old. JANE DOE 12 along with a friend went to an Eastern Michigan University (EMU) basketball game.

102.    After the game, JANE DOE 12 went to a party hosted by members of DTD – Chapter at an "annex" with her friend.

103.    When JANE DOE 12 and her friend arrived at the party, they stayed on the upper level for a period of time. The atmosphere of the party was consistent with all DTD – Chapter functions: alcohol games, partying and pressure to consume alcohol.

104.    JANE DOE 12 was pressured to drink hard liquor, but she didn't like it, so she faked drinking it just to pacify others in her surroundings.

105.   JANE DOE 12 and her friend decided to go downstairs where the members of DTD – Chapter were. When JANE DOE 12 and her friend went downstairs, they were the only two females in that area.

106.   The members were playing drinking games and drinking beer. The guys offered JANE DOE 12 a beer and she took one.

107.   Executive officers and members of DTD - Chapter will confirm that it was commonplace at parties to both supply and pressure others into drinking.

108.   While JANE DOE 12 was in the lower level she was approached by Brosnan (her assailant). Brosnan attempted to engage with JANE DOE 12 by engaging in conversation acting as though he knew her. JANE DOE 12 didn't fall for it and acted like she was texting with another person. Brosnan handed her a second beer and went back to his drinking games.

109.   Further, not only did DTD - Chapter and/or DTD - National knowingly disregard regulations and rules, this was commonly known to EMU, Werner, and Martin.

## SOMETHING WAS NOT RIGHT

110.   JANE DOE 12 suddenly became confused and disoriented. She noticed that it was only her and Brosnan in the basement. JANE DOE 12 knew something

was wrong and nothing made sense to her. JANE DOE 12 didn't have much to drink, but she felt as though she was completely out of it.

111.   JANE DOE 12 blacked out. When she came to, JANE DOE 12 remembered looking up to seeing her assailant pulling off her pants. As JANE DOE 12 saw her surroundings, she noticed she was on a mattress on the floor, (later to be discovered in the attic of the DTD – Chapter's fraternity house).

### THE RAPE

112.   JANE DOE 12 told Brosnan to stop, repeatedly pleaded with him to leave her alone and attempted to push him off. However, JANE DOE 12 was no match for Brosnan in her fight to stop the rape.

113.   Brosnan got on top of JANE DOE 12, as she tried to push him off, he inserted his penis inside her **taking away her virginity.**

114.   JANE DOE 12 begging Bronson to stop as she was crying telling him he was hurting her. In a horrific space in time JANE DOE 12, stopped with her plea and just wanted the assault to end.

115.   Once Bronson finished, he rolled over and fell asleep. JANE DOE 12 put her clothes on and found her way downstairs to a living room where there were three guys and two girls. One of the guys asked JANE DOE 12 if she was ok and got her a glass of water.

116.   JANE DOE 12 asked the gentleman, who was a member of DTD –
Chapter, if he could help her find her phone. They both went back up to the attic
where Brosnan was sleeping. The member pulled off the sheets where there was
JANE DOE'S 12 blood all over the mattress. Also, it appeared as though Brosnan
and urinated in the bed as well. Unfortunately, they were not able to find the phone,
so they went back downstairs.

117.   JANE DOE 12 used the members phone to call her friend, but she didn't
answer. JANE DOE 12 was stranded and ended up falling asleep in the living room
of DTD – Chapter's fraternity house.

## THE MORNING AFTER

118.   JANE DOE 12 awoke the next morning still writhing in pain from
Brosnan's rape with bruising and bleeding.

119.   On Christmas Day, two days after Brosnan's rape, JANE DOE 12 went
to the emergency room at University of Michigan Hospital.

## THE COVER UP
## REPORT TO TITLE IX AND FRAUDULENT CONCEALMENT
## SUBSEQUENT HARASSMENT

120.   Brosnan sent a series of text messages to JANE DOE 12 wherein
Brosnan apologized to JANE DOE 12 at least eight (8) times.

121.   Further, the text messages contradict the statements by the assailant not remembering what happened. Under information and belief, the exchange that took place on Christmas Eve 2014 in part went as follows:

> **By the Assailant:** "Hey I am so sorry about last night. Seriously like I don't know what happened and idk wtf was going on. Sorry about everything.
>
> **By JANE DOE 12:** Did you use a condom?
>
> **By the Assailant:** Yes it was on the floor this morning when I cleaned his room up. I didn't finish last night anyways though because I stopped when you said it hurt and I fell asleep.
>
> **By the Assailant:** Is everything okay though? Like I really just want to make sure you are alright.
>
> **By JANE DOE 12:** Honestly, no.
>
> **By the Assailant:** I'm so sorry...Like I was too messed up for that. What is bothering you the most?? And is there anything I can do to help?
>
> **By the Assailant:** Yeah that was not a good night...I barely remember anything at all and there were no good decisions made..Like fuck..Do you remember anything at all?
>
> **By JANE DOE 12:** Yeah I remember crying and telling you to get off of me….
>
> **By the Assailant:** What the hell?! You were crying?? I ended up getting off of you right? I am so fucking sorry I dont remember that at all..

## TITLE IX FAILURE AND TIMELINE OF COVERUP AND MISMANAGEMENT

122.   Plaintiffs do not have to advance further argument to show that Brosnan violated the rights of JANE 12 pursuant to EMU "Policy" and Title IX protocols.

123.   Werner incompetently told[1] the students of EMU that when it comes to alcohol and sex it is a complicated topic, making students believe that if you are intoxicated consent can be given. This could not be further from the truth or the law. Consent can't be given when either intoxicated or drugged.

124.   **Notice was given to a mandated reporter of Title IX on JANUARY 16, 2015, Karrick takes a report from a clinical social worker regarding the sexual assault of JANE DOE 12.**

125.   This date of January 16, 2015 is the starting point of when Title IX is given notice. As will be explained in more depth to follow in the factual statements below, Werner, under information and belief attempts to cover up the timing of when the notice of this sexual assault comes into her office in a written memo.

126.   Karrick, under information and belief, notes that **JANE DOE 12 wanted to pursue charges against her assailant Bronson.** Karrick, only after hearing that several adults, a social worker, U of M hospital and Ann Arbor PD had known about the incident, tells JANE DOE 12: "because this happened at DTD – Chapter's fraternity house off campus, it was not within Eastern Michigan University PD jurisdiction, and he would have to turn it over to Ypsilanti PD." This is contrary to both prior and subsequent acts by Karrick.

---

[1] *See* https://www.youtube.com/watch?v=0mM2P1oQl4k&trk=organization-update-content_share-video-embed_share-article_title.

127. After notice was given to YPD, notice was also given to Title IX in January of 2015 and investigations started on both fronts.

128. Through skilled criminal defense counsel, both cases, the criminal prosecution and the Title IX investigation are denied and closed respectively. **However, JANE DOE 12 IS NEVER CONTACTED BY TITLE IX REGARDING THE INVESTIGATION BEING CLOSED. ONLY THE DEFENSE ATTORNEY IS.**

129. JANE DOE 12 rights under Title IX were clearly violated as she was never told about the closing of the investigation and never received any due process that should have been afforded to her.

130. Upon making contact with Werner in the later months of 2015, JANE DOE 12 was told by Werner that the investigation was still "ongoing" and that **it was difficult to pursue because there was alcohol consumed on the night of the assault.** Werner's statement was both incorrect (based on Werner's statements to Brosnan regarding the closure of the investigation) and misleading JANE DOE 12 into believing that nothing would happen due to the fact that she had consumed alcohol prior to her rape.

131. Consistent with a common scheme and plan, Werner's actions were consistent with how she influenced and dissuaded other JANE DOE's from pursuing their constitutional rights.

## THE STALL AND DELAY TACTICS ALMOST WORKED FOR DEFENDANTS TO SWEEP THE RAPE UNDER THE RUG

132.   JANE DOE 12 repeatedly requested updates from Werner and became confused by EMU's Title IX process and the continual delays.

133.   In late 2016 and early parts of 2017, JANE DOE 12 sought advice through her therapist of what she should do about the Title IX investigation and was advised by her therapist something was not right. The advice was to contact another Title IX Director at a different university.

134.   JANE DOE 12 heeded the advice and sought counsel from a Title IX counselor at the University of Toledo who in turn made contact with Werner.

135.   Upon information and belief, after getting called by another Title IX Director, Werner is put into a position where she must attempt to answer why JANE DOE 12's constitutional rights were violated.

136.   Upon information and belief, Werner writes a letter sometime in August of 2017 to a review panel member regarding JANE DOE 12's investigation and attempts to explain away why EMU failed JANE DOE 12.

137.   Upon information and belief, Werner told the following information to the panel member:

   a. First, that the purpose of the letter was to explain why there was a delay beyond the typical 60-day timeframe for a Title IX investigation of JANE DOE 12's rape.

b.     Second, that the case was not opened until **APRIL 27, 2017**.[2]

c.     Third, that Werner had to hire an outside investigator to work the case.

d.     Fourth, that the investigation was given to an outside investigator because the original EMU investigator had quit her position due to not being paid by EMU.

138.   Werner, by her overt acts of misconduct and/or deliberate misfeasance, not only violated the protections of Title IX but also illuminated how Defendants used a common scheme and plan to violate the rights of students at EMU.

139.   Brosnan objected to the 2017 "reopening" of the Title IX investigation into the rape of JANE DOE 12 and stated to EMU that the same was a violation of his constitutional protection against double jeopardy. Upon information and belief, at this time, Brosnan resided outside of Michigan.

140.   EMU's Title IX department continued its investigation and ultimately prepared a draft investigation report for both JANE DOE 12 and Brosnan to review **in person**, per EMU's policies. When Werner reached out to both JANE DOE 12 and Brosnan to inform them of the same, both JANE DOE 12 and Brosnan requested that Werner email them copies of the draft report, as they each lived outside of Michigan. **Despite the fact that the investigator's report found that Brosnan did, in fact, violate EMU's sexual misconduct policies, Werner agreed to email the**

_____

[2] Werner's representation that the case was not opened until April of 2017 is a complete fabrication of the truth. In fact, as of April 27, 2015, criminal charges against Brosnan stemming from the rape of JANE DOE 12 were denied by the prosecutor.

**draft report to Brosnan, but denied the same accommodation to JANE DOE 12, who instead had to drive to EMU's campus from Ohio**.

141. Moreover, due to Werner's intentional and/or negligent delays, Brosnan faced no repercussions from EMU for his brutal assault of JANE DOE 12.

142. Brosnan has since been criminally charged for the rape of JANE DOE 12 on December 23, 2014 and is awaiting a preliminary exam in district court sometime in July of 2021.

## **DAMAGES**

143. As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 12, JANE DOE 12 suffered severe and permanent damages which include but are not limited to:

      a. Loss of scholarship;
      b. Loss of education;
      c. Loss of employment;
      d. Loss of economic gain;
      e. Depression;
      f. Anxiety;
      g. Loss of Sleep;
      h. PTSD;
      i. Loss of trust in people;
      j. Loss of trust in institutions, universities, and employment;
      k. Distant from friends and family;
      l. Distracted and struggle to complete tasks;
      m. Drop in grades;
      n. Loss of desire to work or go to school;

    o.  Bullied, and;

    p.  Counseling.

## JANE DOE 13

144.  JANE DOE 13 enrolled at EMU in the Fall of 2018.

145.  During the Fall of 2018, JANE DOE 13 pledged at the sorority SK–Chapter.

146.  In the pledging process, there are certain rules and guidelines that must be followed by SK – Chapter to ensure the anti-hazing protocol is followed, including but not limited to alcohol consumption.

147.  Members of SK – Chapter, namely Yoheny Yanes and Mia Arnold, knowingly and negligently violated those rules as it related to JANE DOE 13, specifically section VII of the National Sorority Handbook, in coercing her to consume excessive amounts of alcohol on October 12, 2018. At the time, JANE DOE 13 was eighteen (18) years old.

148.  As a result, JANE DOE 13 was savagely raped in the early morning hours of October 12, 2018.

## NIGHT OF THE ASSAULT

149.  The names of the witnesses to the assault:

- Yoheny Yanes ("Yanes")
- Mia Arnold ("Arnold")
- David Galvan ("Galvan")
- Addison Bank ("Bank")

● Assailant William Bujaki ("Bujaki")

150.   Prior to her assault, JANE DOE 13 knew of her assailant, Bujaki, from a brief encounter at a sanctioned intramural sports game at EMU.

151.   On or about October 11, 2018, JANE DOE 13, a pledge of SK – Chapter, was taken by Yanes and Arnold, two senior members of SK – Chapter, to an off-campus location to drink alcohol in violation of the hazing protocol. Thereafter, Yanes and Arnold took Jane Doe 13 to a Delta Zeta sorority after-party at an apartment back on EMU's campus to have Jane Doe 13 consume more alcohol.

152.   It was at this after-party that JANE DOE 13 met fraternity members of DTD – Chapter, including her assailant, Bujaki.

153.   After leaving the party, said members of DTD - Chapter, including Bujaki, escorted JANE DOE 13, Yanes, and Arnold to DTD – Chapter's fraternity house.

154.   While *en route* to DTD – Chapter's fraternity house, Yanes and Arnold admitted to the group that they would not be allowed to return to SK – Chapter because of how intoxicated they got JANE DOE 13 - a violation of SK – Chapter and/or SK – Nationals' anti-hazing policy.

155.   Once at DTD – Chapter's fraternity house, Yanes, Arnold, Galvan, Bank, and Bujaki escorted JANE DOE 13 into Bujaki's room. JANE DOE 13 was

continually coerced to imbibe alcohol by members of SK – Chapter and DTD – Chapter, including but not limited to Yanes, Arnold, Galvan, Bank, and Bujaki.

156.   During this time, JANE DOE 13 became even more intoxicated and visibly unsteady.

157.   During this state of intoxication, JANE DOE 13 participated in a game of "spin the bottle." JANE DOE 13 was sitting on the floor with Galvan, Bank, and Bujaki next to a bed while the game was being played; Yanes was sitting on the bed next to where the others were on the floor.

158.   During the game, the aforementioned witnesses noticed the aggressiveness that Assailant Bujaki was exhibiting.

159.   At one point, when Bujaki spun the bottle in the direction of JANE DOE 13, he moved in an eerily aggressive manner towards JANE DOE 13, and forcefully kissed her.

## THE RAPE

160.   As the game progressed, Yanes, while still sitting on Bujaki's bed, was attempting to say something to JANE DOE 13; however, JANE DOE 13 could not hear what Yanes was saying. It appeared to JANE DOE 13 as though Yanes wanted JANE DOE 13 to come closer to tell her something.

161.   JANE DOE 13 got up off the floor, put her knees against the bed, and placed her hands on the bed leaning into Yanes to hear what she was saying. JANE DOE 13 was in a vulnerable position where her back was to Bujaki.

162.   While JANE DOE 13 was bent over, Bujaki suddenly ripped her pants down off her body, pulled her thong to the side, and inserted his penis inside JANE DOE 13. While in shock at what was happening, JANE DOE 13 tried to scream but no words would come out.

163.   Upon information and belief, Bank became very uncomfortable with the scene and ugliness of Bujaki's actions and started to exit the room. Instead, it is understood that Bank stood outside the bedroom door listening to the sound of "skin hitting skin."

164.   As the brutal rape occurred, JANE DOE 13 summoned as much energy as possible to tell her assailant, Bujaki, to stop; but again, no words could come out of her mouth.

165.   Bujaki continued with his assault while forcefully shoving JANE DOE 13's head into a crack between the bed and the wall, to the point where JANE DOE 13 could barely breathe and could not speak as Bujaki's assault was ongoing.

166.   After Bujaki had his way with JANE DOE 13, which felt like an eternity to her, JANE DOE 13 was physically unable to escape being brutally

traumatized and intoxicated. JANE DOE 13 could only curl up into a ball, shaking and crying while lying on the bed.

167.   JANE DOE 13, overwhelmingly exhausted, intoxicated, and in a state of shock, was unable to stay awake while still in a fetal position on the bed.

## THE SECOND ROUND OF RAPE

168.   Shockingly, JANE DOE 13 was brought out of a state of sleep by Bujaki violently raping her again. Once more, JANE DOE 13 tried to scream but nothing would come out as Bujaki continued to have his way.

169.   JANE DOE 13 attempted to physically stop Bujaki, but she was no match to thwart his persistent attack.

170.   At some point, JANE DOE 13 noticed that Galvin and Yanes were in the bed next to where she was being raped.

171.   After this second assault, JANE DOE 13 again passed out in exhaustion as she was left on the bed at DTD – Chapter's fraternity house.

## MORNING AFTER

172.   In the morning after the assaults, JANE DOE 13 attempted to leave DTD but was told by Yanes that she had to wait there until the coast was clear back at SK – Chapter's sorority house.

173.   As soon as JANE DOE 13 was allowed to leave DTD – Chapter's fraternity house she confided to members of SK – Chapter that she had been raped

by Bujaki. JANE DOE 13, a pledge and holding lower status as a new member to the sorority, was strong-armed into believing it was her fault and should be ashamed.

174.   JANE DOE 13 was experiencing physical pain from injuries that she sustained as a result of the rape.  Further, members of SK – Chapter informed her that Bujaki was "dirty." JANE DOE 13 thereafter obtained a blood and urine test at a local urgent care clinic in Ann Arbor.

175.   JANE DOE 13 went several days without telling anyone else about the sexual assault and, as a result, became increasingly depressed and outwardly anxious. When her two closest friends confronted her about this dramatic change in her demeanor, JANE DOE 13 broke down and revealed the details of the brutal assault that she endured on October 12, 2018.

## DEFENDANT MELODY WERNER MISLEADS JANE DOE 13

176.   On or about October 16, 2018, JANE DOE 13 and her two friends reported to Ethan Antonishak ("Antonishak"), the President of DTD - Chapter at the time, that Bujaki had raped JANE DOE 13 on October 12, 2018.

177.   Upon information and belief, on or about October 16, 2018, Kaley Austin, the president of SK – Chapter at the time, wrote an email to both Antonishak and Defendant Martin, EMU's Greek Life Coordinator, and mandated reporter to both Title IX and EMUPD under EMU's policies, notifying Antonishak and Martin

that JANE DOE 13 had been raped by Bujaki on October 12, 2018, at DTD -
Chapter's fraternity house.

178.   Upon information and belief, on or about that same date, **Antonishak
submitted an online sexual misconduct reporting form to EMU's Title IX
Department, including Werner, stating that Bujaki had raped a pledge of SK
– Chapter on October 12, 2018, at DTD – Chapter's fraternity house** and
requesting Werner to contact him. A day later, **Werner replied to Antonishak
indicating that she had recently received another sexual misconduct report
regarding the same incident.**

179.   Upon information and belief, in the days following Bujaki's rape of
JANE DOE 13, Bank provided his eye-witness account of JANE DOE 13's assault
to both DTD – Chapter's President and Vice President of Internal Affairs, placing
DTD – Chapter on further notice of sexual assaults committed by its members.

180.   Within ten days of being sexually assaulted, JANE DOE 13 and her
friend met with Werner. At the meeting, JANE DOE 13 went through the details of
the sexual assaults with Werner.

181.   Upon information and belief, Werner is not trained forensically in
conducting sensitive interviews of rape victims. However, consistent with a pattern
of conduct, Werner proceeded in having JANE DOE 13 go through the facts and
circumstances of the rape JANE DOE 13 suffered.

182.   Werner had been given several red flags and notice about the assailant Bujaki prior to meeting JANE DOE 13 as noted above.

183.   After JANE DOE 13 went through the details of the rape, Werner typed something into her computer in front of JANE DOE 13. After a brief pause, Werner looked at JANE DOE and her friend and stated: that because Bujaki is not in the system she is not required to report this to the police.

184.   During this meeting, Werner told JANE DOE 13 that she could report her rape to the police **but said that not much could be done at the time** and that it would be difficult to prove anything because of the support the fraternity would give to Bujaki.

185.   Werner's counsel to JANE DOE 13 violated EMU's Title IX policies, as well as the applicable laws in the State of Michigan.

186.   Due to intimidation by Bujaki and the misleading statements of Werner, JANE DOE 13 thought that it was useless for her to go to law enforcement.

187.   Upon information and belief, on several occasions between October 30, 2018, and November 5, 2018, Werner worked with Bujaki regarding his sexual assault of JANE DOE 13.

188.   Upon information and belief, Werner's pattern of conduct, working with the assailant, was followed with the same common scheme and plan used in JANE DOE 1, when she met with Hernandez and McWilliams.

189.   Upon information and belief, during these communications, Bujaki was assisted in not being expelled from EMU nor punished by Title IX immediately thereafter.

190.   Upon information and belief, Werner never reported Bujaki as a potential suspect of sexual assault to EMUPD nor did she report the same to YPD (where the law enforcement jurisdiction would have been appropriate).

191.   Upon information and belief, on or about November 5, 2018, Werner informed Bujaki that there was no pending Title IX complaint against him.

192.   Upon information and belief, Bujaki thanked Werner for assisting him through the Title IX investigation.

193.   Upon information and belief, a three-page anonymous letter was also addressed to Martin, the Greek Life Coordinator at the time of the assault, stating that multiple issues regarding sexual assault had been brought to Martin and EMU's fraternities, but nothing had been done.

194.   Unsurprisingly, in November 2018, Bujaki sexually assaulted JANE DOE 14. This assault took place less than 30 days after Bujaki was reported, by JANE DOE 13 and several others, to EMU and Werner.

195.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual

assaults and rapes of countless victims, Including JANE DOE 13, JANE DOE 13 suffered severe and permanent damages which include but are not limited to:

      a.     Loss of scholarship;
      b.     Loss of education;
      c.     Loss of employment;
      d.     Loss of economic gain;
      e.     Depression;
      f.     Thoughts of suicide;
      g.     Anxiety;
      h.     Loss of sleep;
      i.     Vivid nightmares;
      j.     PTSD;
      k.     Loss of Interest in relationships;
      l.     Loss of trust in institutions, universities;
      m.     Drop-in grades; and
      n.     Counseling.

## JANE DOE 14

196.   JANE DOE 13 AND JANE DOE 14 were sexually assaulted on the same night by two different assailants at DTD – Chapter's Fraternity house. That night was October 12, 2018.

197.   As in all assaults committed on the property of and/or by members of DTD – Chapter, alcohol, and minors were a common denominator.

198.   JANE DOE 14 enrolled at EMU in the fall of 2018, when she was eighteen (18) years old. Thus, at the time, JANE DOE 14 was under the age of twenty-one (21).

199.   JANE DOE 14 had not met the assailant in person prior to October 12, 2018. However, they had connected through text messages and social media.

## NIGHT OF THE ASSAULT

200.   On or around October 12, 2018, JANE DOE 14 attended a registered party at DTD – Chapter's fraternity house.  JANE DOE 14 arrived after the party had started.

201.   Upon information and belief, DTD – Chapter habitually supplied excessive alcohol for their parties, including the evening of October 12, 2018. Although possessing alcohol is in direct violation of DTD – Chapter's bylaws, EMU's rules and regulations, as well as local, state, and federal laws, were nonetheless commonplace at DTD – Chapter.

202.   At some point during DTD - Chapter's party, Cameron Layne ("Layne"), an EMU student, walked up to JANE DOE 14 asking to dance.  At this time, Layne was visibly intoxicated. JANE DOE 14 declined his offer to which Layne became upset and stormed off into the crowd of partygoers.

203.   Sometime later, Layne reapproached JANE DOE 14 insisting she dance with him. Again, JANE DOE 14 declined, which made Layne more upset.

## THE ASSAULT

204.   Unbeknownst to JANE DOE 14, Layne walked up behind her a third time and began sexually molesting JANE DOE 14.

205. Layne groped JANE DOE 14's butt and breasts while grinding his genitals on her backside.

206. At or around the same time, Layne proceeded to put his hand down JANE DOE 14's pants touching the outside of her vagina.

207. While doing all of this, Layne urged JANE DOE 14 to leave the party with him. JANE DOE 14 declined.

208. Upon information and belief, Layne became more agitated and pugnacious towards JANE DOE 14 for repeatedly being turned away by JANE DOE 14.

209. When JANE DOE 14 refused to leave with Layne, he aggressively grabbed her wrist to forcefully take her with him.

210. JANE DOE 14's friend, having witnessed Layne sexually assault JANE DOE 14 and his attempt to take her away from the party, helped her escape from Layne's grip.

## SUBSEQUENT HARASSMENT

211. Between the early morning hours of 1:00 am and 4:00 am on October 13, 2018, JANE DOE 14 received harassing text messages from Layne.

212. In his text messages, Layne stated that JANE DOE 14 was "fat and disgusting, should get pregnant, stop having sex with people, and that he wished there were fewer people like her in the world because she was a hoe."

213. JANE DOE 14 immediately blocked Layne from social media in an attempt to stop Layne's harassment.

## DAMAGES

214. As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, Including JANE DOE 14, JANE DOE 14 suffered severe and permanent damages which include but are not limited to:

  a. Loss of scholarship;
  b. Loss of education;
  c. Loss of employment;
  d. Loss of economic gain;
  e. Anxiety;
  f. Depression;
  g. PTSD;
  h. Loss of interest in relationships;
  i. Loss of interest in institutions and universities;
  j. Distracted and struggle to complete tasks;
  k. Loss of desire to work or go to school, and;
  l. Bullied.

## JANE DOE 15

215. JANE DOE 15 enrolled at EMU in the Fall of 2017 when she was 18 years old.

216. JANE DOE 15 met her assailant, William Bujaki ("Bujaki"), in 2017. JANE DOE 15 and Bujaki were in a consensual relationship for roughly a year prior to her assault.

217.   During their relationship, JANE DOE 15 became aware of Bujaki's romantic involvement with another female. JANE DOE 15 also discovered that Bujaki had sexually assaulted someone in DTD – Chapter's fraternity house. Further, JANE DOE 15 noticed Bujaki was becoming more aggressive, especially when he consumed alcohol. Thus, JANE DOE 15 wanted to end her relationship with Bujaki.

## NIGHT OF THE ASSAULT

218.   Bujaki requested to meet with JANE DOE 15 in the early morning hours of November 1, 2018, to discuss the status of their relationship. JANE DOE 15, determined to end her relationship with Bujaki, agreed to meet with him at DTD – Chapter's fraternity house where he resided.

219.   Upon information and belief, DTD – Chapter members hosted a Halloween Party at DTD – Chapter's fraternity house earlier that same evening. At the time, JANE DOE 15 was under the age of twenty-one (21).

220.   Upon information and belief, Bujaki consumed a significant amount of alcohol at the Halloween Party with other members of DTD – Chapter.

221.   Upon information and belief, prior to the Halloween Party, members of EMU's Inter-Fraternity Council ("IFC"), the governing board that regulates activities within Greek Life at EMU, were aware of the allegation that Bujaki had

sexually assaulted JANE DOE 13 and were investigating the same. Despite this awareness, IFC sanctioned the Halloween Party.

## THE RAPE

222.   JANE DOE 15 met Bujaki at DTD – Chapter's fraternity house where he brought her to his bedroom.

223.   In the room, Bujaki pleaded with JANE DOE 15 to continue their relationship; however, JANE DOE 15 repeatedly told him no. Soon after, JANE DOE 15 attempted to leave, but Bujaki demanded she stay longer and became increasingly aggressive as JANE DOE 15 tried to go. Ultimately, JANE DOE 15 decided her safest course of action was to leave after Bujaki fell asleep.

224.   Bujaki did not go to sleep. Instead, he proceeded to grope JANE DOE 15, placing his hands on her body in an attempt to engage in sexual activities with her. Bujaki began by touching JANE DOE 15's stomach, eventually moving his hand down onto her pubic bone.

225.   JANE DOE 15 promptly removed Bujaki's hand and told him that she did not want to have sex.

226.   Bujaki refused to comply and continued groping JANE DOE 15.

227.   JANE DOE 15, for a second time, removed Bujaki's hands and again told Bujaki to stop and that she did not want to have sex.

228.   Bujaki refused JANE DOE 15's commands and began groping JANE DOE 15's breasts.

229.   As JANE DOE 15 attempted to remove Bujaki's hands from her body, he suddenly forced himself onto her, straddling JANE DOE 15's torso as she laid on her back, restricting her movement.  Bujaki then began kissing JANE DOE 15's neck and cheek as JANE DOE 15 attempted to push him off of her, to no avail.

230.   Bujaki continued his assault as JANE DOE 15 attempted to push him off of her, but Bujaki's weight and strength were too much for JANE DOE 15 to overcome. Each time JANE DOE 15 resisted, Bujaki pushed back even harder using his body weight to overcome JANE DOE 15's resistance to the point where JANE DOE 15 felt like she was suffocating. JANE DOE 15, realizing her life was in danger, continued to resist.

231.   Bujaki, overpowering JANE DOE 15's resistance, forcefully pulled down her pants and underwear.

232.   JANE DOE 15 attempted to kick Bujaki, but he grabbed her legs, pinned them down with his knees, and began kissing her neck again as JANE DOE 15 repeatedly pleaded with him to stop.

233.   JANE DOE 15 attempted to gain distance between her and Bujaki by pushing her forearm into his throat. However, due to Bujaki's size and strength, JANE DOE 15 could not gain enough leverage to push him off.

234.   Feeling defeated and in great fear for her life, JANE DOE 15 reasoned that if she ceased resisting and laid limp, Bujaki's assault would end sooner.

235.   At the same time, Bujaki used his legs to pry apart JANE DOE 15's legs, at which time Bujaki proceeded to insert his penis into her vagina, causing JANE DOE 15 excruciating pain as Bujaki raped her.

236.   Bujaki eventually removed his erect penis from JANE DOE 15's vagina and ejaculated onto her sweatshirt. Bujaki then fell asleep next to JANE DOE 15.

237.   Upon realizing Bujaki was asleep, JANE DOE 15 immediately got dressed and left DTD – Chapter's fraternity house. When she arrived back at her dormitory, she cried until she fell asleep.

## DEFENDANT MELODY WERNER'S INACTION

238.   Upon information and belief, less than three weeks before Bujaki raped JANE DOE 15, Werner received **an online sexual misconduct reporting form stating that Bujaki had raped a pledge of SK – Chapter (JANE DOE 13) on October 12, 2018, at DTD – Chapter's fraternity house** from Ethan Antonishak ("Antonishak"), the President of DTD – Chapter at the time.

239.   Upon information and belief, Werner replied to the inquiry **indicating that she had recently received another sexual misconduct report regarding the same incident.**

240.   Upon information and belief, Werner met with the victim of Bujaki's October 12, 2018 rape (JANE DOE 13) less than one week after Antonishak's online sexual misconduct report and provided Werner with details of her assault, including her assailant's name (Bujaki) and the location where her rape occurred (DTD – Chapter's fraternity house).

241.   Upon information and belief, Werner told JANE DOE 13 that she was not required to report her rape to the police because Bujaki's name was not in the system.

242.   Upon information and belief, during the three weeks between Bujaki's rape of JANE DOE 13 and JANE DOE 15, Werner met with Bujaki and worked with him to help clear his name regarding his sexual assault of JANE DOE 13.

243.   This pattern of conduct by Werner–namely, deterring sexual assault victims from reporting and investigating their assailant(s) and then, in turn, working with the victims' alleged assailant(s) to help vindicate them– was followed with the same common scheme and plan used in prior claims of assault, particularly when she met with Hernandez and McWilliams.

244.   Upon information and belief, during these communications with Bujaki, Werner kept Bujaki from being expelled from EMU's campus.

245.   Upon information and belief, Werner did not report Bujaki as a potential suspect of sexual assault to either EMUPD or to YPD.

246.   Werner's failure to report Bujaki to proper authorities violated EMU's Title IX policies as well as the applicable laws in the State of Michigan and constituted misconduct of her duties as EMU's Title IX director.

247.   Because Werner never reported Bujaki as a potential suspect of sexual assault to proper authorities, Bujaki was free to rape other females, including JANE DOE 15.

248.   Upon information and belief, less than a month elapsed between Bujaki's rape of JANE DOE 13 and his rape of JANE DOE 15.

249.   Upon information and belief, JANE DOE 15 confided in her aunt about Bujaki's rape, telling her that she could not report the assault because she was afraid of the process, indicating that she had no protection or recourse.

## BUJAKI

250.   Upon information and belief, Bujaki went to high school with Hernandez, and that it was Hernandez who influenced Bujaki to become a member of DTD – Chapter.

251.   Upon information and belief, Bujaki sought and received guidance from Hernandez to "clear his name" in regard to his sexual assault of JANE DOE 13.

252.   Upon information and belief, Hernandez told Bujaki that Werner helped him (Hernandez) a lot when he and McWilliams were reported to have raped a woman in 2018.

253.   Upon information and belief, Bujaki was aware of the fact that he had sexually assaulted JANE DOE 15.  Further, Bujaki was aware he had been accused of a previous sexual assault during his sophomore year at EMU.

254.   Upon information and belief, Bujaki sent JANE DOE 15 a message via Snapchat during the summer of 2019. JANE DOE 15 had blocked all contact with Bujaki following the rape and thus, did not reply.

255.   Upon information and belief, around the same time, Bujaki sent a personal message to JANE DOE 15 via Instagram again attempting to make contact with her.

256.   Although EMU and DTD – Chapter and/or DTD – National had been made aware of Bujaki's rape of JANE DOE 13 on October 16, 2018, no steps were taken to ensure that women on campus were protected, permitting Bujaki to remain at DTD - Chapter where he went on to assault other women, including JANE DOE 15.

**DAMAGES**

257.  As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual

assaults and rapes of countless victims, including JANE DOE 15, JANE DOE 15

suffered severe and permanent damages which include but are not limited to:

      a.     Loss of scholarship;
      b.     Loss of education;
      c.     Loss of employment;
      d.     Loss of economic gain;
      e.     Depression;
      f.     Thoughts of suicide;
      g.     Anxiety;
      h.     Loss of sleep;
      i.     Vivid nightmares;
      j.     PTSD;
      k.     Loss of Interest in relationships;
      l.     Loss of trust in institutions, universities;
      m.     Drop-in grades; and
      n.     Counseling.

## JANE DOE 16

258.  JANE DOE 16 enrolled at EMU in the Fall of 2017.

259.  JANE DOE 16 met her assailant, Clayton Sigmann ("Sigmann"), in the

Fall of 2017 during her freshman year at EMU as the two lived on the same floor of

Wise Hall on EMU's campus.

260.  Prior to her assault, JANE DOE 16 and Sigmann had consensual sex on

approximately two occasions.

261.  However, JANE DOE 16 hadn't seen or spoken with Sigmann for

approximately one year prior to her assault.

## NIGHT OF THE ASSAULT

262.   On or around September 23, 2018, JANE DOE 16 attended a registered fraternity party at TC – Chapter's fraternity house located at 510 West Cross Street in the city of Ypsilanti, Michigan.

263.   On information and belief, the party at TC – Chapter's fraternity house ("Theta Chi party") was the first IFC-sanctioned party of the school year, meaning TC – Chapter had to first seek approval and permission for the party, as well as subsequently following rules and regulations put into place by IFC. Per the rules and regulations, TC – Chapter was required to have "sober monitors" at the side door to the house - the side door was the sole entry and exit point, no doors were to be locked, the basement cellar was off-limits, all partygoers were required to bring and consume their own alcohol, and all partygoers were required to be on a list to gain entry.

264.   Upon information and belief, the Theta Chi party was TC – Chapter's first social event of the year and the first IFC-sanctioned Greek Life party of the school year.

265.   Upon information and belief, the Theta Chi party was the first Greek Life party to follow EMU's ban on Greek Life parties.

266.   Upon information and belief, TC – Chapter had been disbanded approximately twenty (20) years prior to the Theta Chi party due to a sexual assault

incident. TC – Chapter was recolonized and officially recognized as a sanctioned fraternity on EMU's campus on or around March 2017, approximately eighteen (18) months prior to the Theta Chi party.

267.   Upon information and belief, Sigmann was a "founding father" of TC – Chapter on EMU's campus. In other words, Sigmann was instrumental in reestablishing TC – Chapter's presence at EMU.

268.   During the Theta Chi party, JANE DOE 16 consumed a large amount of alcohol, provided and offered by members of TC – Chapter, and became inebriated to the point of "blacking out." At the time, JANE DOE 16 was under the age of twenty-one (21).

269.   Prior to her assault, JANE DOE 16 had been in the common area of TC – Chapter's fraternity house dancing with friends when JANE DOE 17 suddenly approached JANE DOE 16, aggressively grabbed her by the wrist and pulled her towards the front door. At the same time, JANE DOE 17 was being pulled by Sigmann.  JANE DOE 16 was not aware that JANE DOE 17 was being pulled by Sigmann, creating a chain between Sigmann, JANE DOE 17, and JANE DOE 16.

270.   Upon information and belief, Sigmann knowingly violated IFC Rules by leading JANES DOES 16 and 17 out the front door, an undesignated and unmonitored point of exit.

271.   Without explanation, Sigmann dragged both women out of the front door and beyond the sight of the "sober monitors," who were required to overlook the safety of partygoers, including but not limited to JANE DOE 16 and JANE DOE 17.

272.   Sigmann led JANE DOE 16 and JANE DOE 17 to the rear of the house and down a staircase into the basement cellar, a locked area only accessible from the exterior of the house.

273.   Sigmann unlocked the cellar door, led both women into the cellar, and immediately locked the door behind them.  At this point, JANE DOE 16 was not free to leave.

274.   JANE DOE 16 looked around the cellar and noted that the room consisted of only a small table and a dirty sectional couch. JANE DOE 16 further noted that the walls of the cellar were made of fieldstones and the floor was dirt.

275.   JANE DOE 16, at that point very inebriated and unable to consent to sexual activity, immediately became anxious and uncomfortable upon realizing that no other partygoers were present in the cellar.

276.   Due to her intoxication, anxiety, and sudden panic, JANE DOE 16 lost consciousness. When JANE DOE 16 awoke, she found Sigmann naked and fully erect lying on the couch. JANE DOE 16 blacked out again from intoxication and panic.

277.   Moments later, JANE DOE 16 regained consciousness. When she came to, JANE DOE 16 realized that she was fully nude and that Sigmann had his erect penis inside of her. JANE DOE 16 could not remember how she became undressed.

278.   JANE DOE 16 began to experience the initial stages of a panic attack. She then stood up and placed distance between herself and Sigmann.

279.   Sigmann peered over to JANE DOE 17 and proclaimed, "it's her turn."

280.   JANE DOE 16 quietly walked towards the side of the room in an attempt to locate her phone and message for help.

281.   JANE DOE 16 sent a message via Snapchat to her friend and member of TC – Chapter, Andrew Guillaume ("Guillaume"), who was also a sober monitor at the Theta Chi party. In the message, JANE DOE 16 asked Guillaume to rescue her and JANE DOE 17 from the cellar.

282.   As JANE DOE 16 began putting her clothes back on in the corner of the cellar, she noticed that JANE DOE 17 was with Sigmann and that JANE DOE 17 appeared to be in and out of consciousness. JANE DOE 16 witnessed Sigmann insert his erect penis into JANE DOE 17.

283.   At some point shortly thereafter Sigmann began masturbating, eventually ejaculating onto JANE DOE 17's hands and face whereupon JANE DOE 17 objected, yelling, "gross."

284.   Guillaume then started to bang on the cellar door, demanding that Sigmann let him inside. Sigmann refused.   and attempted to barricade the door from inside, preventing Guillaume from entering.

285.   As Guillaume continued banging on the door and demanding to be let inside, Sigmann attempted to coerce JANE DOE 16 and 17 into telling Guillaume that the two women came to the cellar with Sigmann of their own volition and that "everything was fine."

286.   Guillaume began to break down the door as Sigmann continued to barricade it from inside. Guillaume eventually gained entry by bending the door off of its hinges.

287.   Guillaume forced his way into the cellar while Sigmann hid behind the door. Both women were escorted out of the cellar stunned and in shock from what had just occurred.

288.   After a brief conversation, Guillaume left JANE DOE 16 alone in a gravel lot near the top of the cellar. JANE DOE 16 collapsed and began to sob over what had just occurred. JANE DOE 16 and JANE DOE 17 were eventually escorted to the Alpha Sigma Phi – Chapter's fraternity house by members of Alpha Sigma Phi – Chapter.

289.   Upon arrival at Alpha Sigma Phi – Chapter's fraternity house, both JANE DOE 16 and JANE DOE 17 sat in silence as members tried to console them.

A member of Alpha Sigma Phi – Chapter eventually drove both women to JANE DOE 17's home.

## THE AFTERMATH

290.   The following morning, JANE DOE 16 experienced the worst hangover of her life. In addition, her urine was full of blood, which was concerning because JANE DOE 16 was not on her menstrual cycle. JANE DOE 16 attributed the vaginal bleeding to her sexual assault the previous evening.

291.   JANE DOE 16 also suffered from bruising in her inner thigh and a sprained wrist from being aggressively dragged out of TC – Chapter's fraternity house.

## JANE DOE 16 REPORTS HER RAPE TO TITLE IX AND YPD

292.   JANE DOE 16 and JANE DOE 17 initially avoided talking about the assault until JANE DOE 16, just two days later, broke down and became unable to control the flashbacks, depression, and crying fits she was experiencing post-assault. Both women then agreed to go to the Ypsilanti Police Department ("YPD") to report their assaults.

293.   During the investigation, YPD advised JANE DOE 16 to have a Sexual Assault Nurse Examination ("SANE") performed after the interview.

294.   The morning following the assault, JANE DOE 16 began to receive messages via Snapchat from Sigmann.

295.   In the messages, Sigmann asked JANE DOE 16 if she had spoken with Guillaume about the rape and again badgering her to lie and tell Guillaume that Sigmann and the two women had gone to the cellar consensually so that they could smoke.

296.   Because JANE DOE 16 also came into contact with Sigmann multiple times during Greek life events, she no longer attended those events.

297.   JANE DOE 16 continued to see Sigmann throughout campus, including at a baseball game and at Walmart. She eventually began skipping class and staying out of the public so as to avoid seeing him.

298.   At some point, JANE DOE 16 and JANE DOE 17 go together to report their sexual assaults to Martin, EMU's Greek Life Coordinator.

299.   The two women provide details to their respective rapes in an effort to obtain protection and assistance from EMU's Title IX department.

## **DAMAGES**

300.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, Including JANE DOE 16, JANE DOE 16 suffered severe and permanent damages which include but are not limited to:

a.   Loss of scholarship;
b.   Loss of education;
c.   Loss of employment;
d.   Loss of economic gain;

e.    Extreme emotional trauma;

f.    Depression;

g.    Self-injurious;

h.    Loss of appetite;

i.    Anxiety and paranoia;

j.    Unable to be alone with men;

k.    Loss of sleep;

l.    Vivid nightmares;

m.    PTSD;

n.    Loss of interest in relationships;

o.    Loss of trust in individuals;

p.    Loss of trust in institutions, universities, and employment;

q.    Addiction;

r.    Distant from friends and family;

s.    Distracted and making it difficult to complete tasks;

t.    Drop-in grades;

u.    Withdrawal from education; and

v.    Loss of desire to work or go to school.

## **JANE DOE 17**

301.    JANE DOE 17 enrolled at EMU in the Fall of 2016.

302.    On or about September 23, 2018, JANE DOE 16 was attending a registered fraternity party at TC – Chapter's fraternity house ("Theta Chi party") located at 510 West Cross Street, City of Ypsilanti, State of Michigan. Prior to the Theta Chi party, JANE DOE 17 had never before met Sigmann.

303.    During the Theta Chi party, JANE DOE 17 consumed large amounts of alcohol with partygoers and her fellow sorority sisters, including JANE DOE 16, and became extremely intoxicated. At the time, JANE DOE 17 was under the age of twenty-one (21).

304.   At or around 1:00 a.m., as JANE DOE 17 was in the common room of the fraternity house where the Theta Chi party was taking place, she was abruptly and forcibly grabbed by an unknown male, who later turned out to be Sigmann.

305.   JANE DOE 17 had never previously met Sigmann and did not know why he was forcibly dragging her through the crowd of partygoers and towards the front of the house. As Sigmann continued aggressively escorting JANE DOE 17 to the front exit, a fearful JANE DOE 17 grabbed the wrist of JANE DOE 16.

306.   Sigmann continued to drag both women beyond the sight of the "sober monitors," to the rear of the house and down a staircase leading into the fraternity's basement cellar.

307.   Sigmann unlocked the cellar door, brought both women down into the cellar, and immediately locked the door behind them.

308.   JANE DOE 17, was very intoxicated and looked at JANE DOE 16 in bewilderment as she heard Sigmann tell the two women, "don't start without me."

309.   JANE DOE 17 then observed Sigmann sitting naked on the couch with an erection as he asked the women, "who's first?"

310.   JANE DOE 17 then lost consciousness. Moments later, when JANE DOE 17 came to, she observed that JANE DOE 16 was naked.

311.   Sigmann then turned to JANE DOE 17 and announced, "it's her turn." The next thing JANE DOE 17 remembered was being naked and looking down at Sigmann with his erect penis inside her.

312.   JANE DOE 17 forced herself off of Sigmann, but he continued to assault her, masturbating to the point of ejaculation onto JANE DOE 17's hand and face.

313.   In shock, JANE DOE 17 began to wipe off the seminal fluid on her face using her hands and clothes.

314.   As JANE DOE 17 was getting dressed, Guillaume kicked in the cellar door and escorted both her and JANE DOE 16 out of the cellar and upstairs where they were met by several partygoers.

315.   JANE DOE 17 and JANE DOE 16 were then escorted to the Alpha Sigma Phi – Chapter's fraternity house. A member of the fraternity eventually took both women back to JANE DOE 17's home.

316.   The following morning, JANE DOE 17 noticed bruising on her inner thigh, bruising on her arm where Sigmann had grabbed her, and bleeding in her anus.

## JANE DOE 17 REPORTS HER RAPE TO TITLE IX AND YPD

317.   JANE DOE 17 and JANE DOE 16 initially avoided talking about the assault until JANE DOE 16, just two days later, broke down and became unable to control the flashbacks, depression, and crying fits she was experiencing post-assault.

Both women then agreed to go to the Ypsilanti Police Department ("YPD") to report their assaults.

318.   During the investigation, YPD advised JANE DOE 17 to have a Sexual Assault Nurse Examination ("SANE") performed after the interview.

319.   At some point, JANE DOE 16 and JANE DOE 17 go together to report their sexual assaults to Martin, EMU's Greek Life Coordinator.

320.   The two women provide details to their respective rapes in an effort to obtain protection and assistance from EMU's Title IX department.

## **DAMAGES**

321.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, Including JANE DOE 17, JANE DOE 17 suffered severe and permanent damages which include but are not limited to:

        a.     Loss of scholarship;
        b.     Loss of education;
        c.     Loss of employment;
        d.     Loss of economic gain;
        e.     Depression;
        f.     Anxiety;
        g.     PTSD;
        h.     Loss of interest in relationships;
        i.     Loss of trust in people;
        j.     Loss of trust in institutions, universities, and employment;
        k.     Distant from friends and family;
        l.     Distracted and struggles to complete tasks;
        m.    Drop-in grades; and
        n.    Loss of desire to work or continue education.

## JANE DOE 18

322.    JANE DOE 18 enrolled at EMU in the Fall of 2014.

323.    JANE DOE 18 pledged at the Alpha Xi Delta sorority in the Fall of 2014 during her first semester at EMU. As a result, JANE DOE 18 became friends with members of local fraternities, including Thomas Hernandez ("Hernandez") and D'Angelo McWilliams ("McWilliams").

324.    Prior to her first sexual assault at DTD – Chapter's fraternity house, JANE DOE 18 had been romantically involved with Hernandez. As such, JANE DOE 18 had visited Hernandez at his residence on various occasions and knew that Hernandez and McWilliams shared a room at DTD – Chapter's fraternity house.

325.    Prior to her first assault at DTD – Chapter's fraternity house, JANE DOE 18 and McWilliams had developed a friendly but platonic relationship. The two shared many classes together at EMU as both were criminal justice majors.

## FIRST RAPE

326.    On or about the end of September 2016 or the beginning of October 2016, JANE DOE 18 attended a party at DTD – Chapter's fraternity house.

327.    During the party, members of DTD – Chapter served alcohol to JANE DOE 18 and others. At the time, JANE DOE 18 was under the age of twenty-one (21). Throughout the night, JANE DOE 18 consumed a large amount of said alcohol and became extremely intoxicated.

65

328.   As the party was winding down, JANE DOE 18 began feeling sick and went to lay down in Hernandez's bed, who also shared a room with McWilliams. When she arrived, she noticed that McWilliams was asleep in his own bed. JANE DOE 18 then joined Hernandez in his bed, and the two started to engage in sex.

329.   At this point, JANE DOE 18 "blacked out" from the effects of the alcohol she consumed. When she briefly came to, JANE DOE 18 became horrified as she realized that McWilliams was sexually penetrating her from behind and Hernandez was sexually penetrating her from the front. Moments later, JANE DOE 18 "blacked out" again.

330.   Despite her prior relations with Hernandez, JANE DOE 18 had neither consented to engage in group sex with Hernandez and McWilliams nor to engage in sexual relations in any capacity with McWilliams.

331.   The next day, JANE DOE 18 asked Hernandez to explain his account of what occurred the previous night with her, Hernandez, and McWilliams. Hernandez replied, "nothing happened."

332.   Within days of JANE DOE 18's first sexual assault by Hernandez and McWilliams, JANE DOE 18 was approached by various members of DTD - Chapter saying that they did not realize JANE DOE 18 was the "type of girl" to engage in group sex with Hernandez and McWilliams. Upon information and belief, the "type of girl" references meant to imply that JANE DOE 18 was sexually promiscuous.

333.   On or around Homecoming 2016 at EMU, JANE DOE 18 approached Hernandez at a tailgate to ask why members of his fraternity were suggesting that she had engaged in consensual group sex with Hernandez and McWilliams when Hernandez had told JANE DOE 18 that "nothing happened." In response, Hernandez maintained that nothing happened that evening.

**SECOND RAPE**

334.   A few weeks later, on or around the end of October 2016, JANE DOE 18 and her roommate went to DTD – Chapter's fraternity house for a social gathering.

335.   JANE DOE 18 and her roommate consumed alcohol prior to arriving at DTD – Chapter's fraternity house but were nonetheless served alcohol by members of the DTD - Chapter upon arrival.

336.   Shortly after arriving, the roommate and her boyfriend left JANE DOE 18 inside of a random bedroom, alone. JANE DOE 18, although mildly intoxicated, realized she was lost inside DTD – Chapter's fraternity house, so she sent a message to McWilliams saying she was drunk and asking him to come to find her.

337.   Minutes later, McWilliams arrived at the bedroom JANE DOE 18 was in and told her to come with him. At this point, JANE DOE 18 believed McWilliams to be a friend and assumed he wished to take her back to where her friends were inside the house.

338.   McWilliams then took JANE DOE 18 by the arm and forcefully pulled her out of the room and up multiple flights of stairs until they reached the upper level of the fraternity house. McWilliams then brought JANE DOE 18 into the attic of DTD – Chapter's fraternity house which contained a single mattress on the floor. McWilliams then demanded that JANE DOE 18 perform oral sex on him.

339.   JANE DOE 18 cried and told McWilliams "no."

340.   McWilliams ignored JANE DOE 18's pleas and instead pulled down his pants and exposed his penis to JANE DOE 18.

341.   McWilliams then forced JANE DOE 18's head down onto his penis so hard that she vomited.

342.   JANE DOE 18 continued sobbing as she told McWilliams that she did not want to do anything.

343.   McWilliams only stopped his sexual assault of JANE DOE 18 upon receiving a text message from his girlfriend.  McWilliams pulled up his pants and told JANE DOE 18 that his girlfriend messaged him saying that she was downstairs in his room. McWilliams then left.

344.   JANE DOE 18, distraught from being raped for a second time by McWilliams at DTD – Chapter's fraternity house, sat alone in the attic and cried until she was able to gather herself to leave.

345.   JANE DOE 18 was 'blacklisted' from Delta Tau Delta parties following the assault.

## **DAMAGES**

346.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 18, JANE DOE 18 suffered severe and permanent damages which include but are not limited to:

    a.    Loss of scholarship;
    b.    Loss of education;
    c.    Loss of employment;
    d.    Loss of economic gain;
    e.    Depression;
    f.    Anxiety;
    g.    Loss of Sleep;
    h.    PTSD;
    i.    Loss of trust in people;
    j.    Loss of trust in institutions, universities, and employment;
    k.    Distant from friends and family;
    l.    Distracted and struggle to complete tasks;
    m.    Drop-in grades;
    n.    Loss of desire to work or go to school;
    o.    Bullied, and;
    p.    Counseling.

## **JANE DOE 19**

347.   JANE DOE 19 entered her freshman year at EMU in the fall of 2015 with the dream of entering the medical field.

348. JANE DOE 19 met one of her assailants, Hernandez, as they were in the same orientation group and they both resided in the same dorm at EMU as Freshman.

349. The following year, in the Fall of 2016, Hernandez was a Greek Life Member at DTD – Chapter. JANE DOE 19 was in the process of going through sorority recruitment.

350. JANE DOE 19 built a friendship with Hernandez as they shared the Greek Life orientation at EMU during the Fall of 2016.

351. JANE DOE 19 was trusting of Hernandez as they became friends throughout their freshman year, along with the shared experiences of Greek Life at the beginning of the 2016 school year.

**WITHIN 30 DAYS OF EACH OTHER JANE DOE 18 AND 19 ARE VISCOUSLY RAPED BY HERNANDEZ AND MCWILLIAMS**

352. On the night of September 25, 2016, Hernandez invited JANE DOE 19 over to DTD – Chapter's fraternity house to "hang out." This was not unusual as JANE DOE 19 had hung out at the DTD – Chapter's fraternity house before.

353. JANE DOE 19 knew that Hernandez, although a minor, had been drinking that evening. Further, she knew that it was common for DTD - Chapter to allow minors to drink.

354.    JANE DOE 19 and Hernandez agreed to watch a movie in Hernandez's room. When JANE DOE 19 got to the room, she met Hernandez's roommate McWilliams.

355.    When JANE DOE 19 introduced herself to McWilliams she stated, "I never met you before." McWilliams then introduced himself to JANE DOE 19 and he oddly displayed his police badge.

356.    Hernandez turned on a movie and then turned the lights off in the room. JANE DOE 19 felt something was off and stated that she was going to leave because she had to get up early for a recruitment function.

357.    Hernandez told JANE DOE 19 that she did not have to go because they were doing a joint function the next morning with DTD - Chapter.

358.    Hernandez then grabbed JANE DOE 19's arms pulling her down onto his bed.

359.    Thereafter, Hernandez quickly moved his hand sliding down her inner thigh on the outside of her clothing, rubbing her vaginal area with his hand. JANE DOE 19 immediately told Hernandez "**NO! This is not ok! I have a boyfriend!**"

360.    JANE DOE 19 sat up from the bed and stated: "I am going home." Hernandez ordered, "No you're not!" and grabbed her arm pulling her back down to the bed. Hernandez then grabbed her leggings, forcefully stripping her of her clothes as JANE DOE 19 yelled, "No, don't do this!"

361.   JANE DOE 19 could not believe this was happening while McWilliams stood idly. JANE DOE 19 was struggling to stop Hernandez, but she was no match for his strength as Hernandez got on top of her. At this point, JANE DOE 19 noticed that Hernandez had no pants on. JANE DOE 19 was pleading with Hernandez to stop, telling him multiple times: "No, No, Stop, No!" Hernandez would not stop as he inserted his erect penis inside her.

362.   While Hernandez was raping JANE DOE 19, McWilliams was shouting encouragement to Hernandez by yelling: "Yeah bro yeah! Way to go bro!"

363.   As in earlier accounts, Hernandez and McWilliams began howling like dogs as JANE DOE 19 was enduring the assault.

364.   Once Hernandez ejaculated, he rolled off JANE DOE 19 and said, "Hey, how about giving some to my boy [McWilliams]?" JANE DOE 19, screamed NO and got up immediately to leave the room. At this time, McWilliams exclaimed, "Yeah, hey I didn't get anything!" McWilliams then grabbed and forced JANE DOE 19's head in his groin area by placing both hands on her head, shoving his penis in her mouth.

365.   While McWilliams was forcing JANE DOE 19 to perform oral sex, Hernandez came up from the rear and raped JANE DOE 19 again by inserted his penis inside of her.

366.   As JANE DOE 19 was enduring this unimaginable assault, both Hernandez and McWilliams started to howl like dogs and encourage each other with statements like: "way to go bro!"

367.   Upon information and belief, following the assault, McWilliams posted a photo of himself to DTD – Chapter's social media page with the caption: "Literally fucked a girl and kicked her to my roommates bed 5 minutes later and he fucked her." (See Exhibit G – Photo).

368.   The howling from McWilliams and Hernandez could be heard throughout DTD – Chapter's fraternity house. However, none of the members of DTD – Chapter attempted to stop Hernandez and McWilliams' rape of JANE DOE 19. Under information and belief, they called that room "The Dog Pound."

369.   Vivid in JANE DOE 19's mind is how both McWilliams and Hernandez were laughing when they finished.

370.   JANE DOE 19, being part of Greek Life, was intimidated by both Hernandez and McWilliams and their status. Further, JANE DOE 19 was led to believe that nothing would happen to them because of past claims made by other victims.

371.   Upon information and belief, Martin had direct knowledge about the sexual assault of JANE DOE 19 and gave the information to Werner.

372.   Upon information and belief, even though Martin and Werner had actual knowledge of this sexual assault, they made no contact with law enforcement, failed to reach out to JANE DOE 19, and did not follow protocol regarding sexual assaults.

373.   Following the rape, Hernandez would walk in the direction of JANE DOE 19 every time he saw her on EMU's campus. In turn, JANE DOE 19 would continuously have to walk in different directions from Hernandez; this caused her daily distress and fear.

374.   Subsequent to the Rape, McWilliams came into contact with JANE DOE 19 while wearing a law enforcement uniform. JANE DOE 19 working in a position at the hospital was required to escort McWilliams to a separate room with a prisoner. JANE DOE 19 immediately went into a major panic attack and cried huddling by herself over the next hour.

375.   A few close friends noticed severe changes in JANE DOE 19 and made a CARES report through EMU.

**DAMAGES**

376.   JANE DOE 19, spiraled into an unimaginable spot of darkness after being raped. There was a serious drop in her grades, dropped classes, difficulty with sleep and eating, loss of work because she became unable, and an increase of trying to drown her grief in over drinking.

377.   As a result of Defendants' actions, inactions, omissions, and/or detrimental conduct surrounding the knowledge of continuous and systematic sexual assaults and rapes of countless victims, including JANE DOE 19, JANE DOE 19 suffered severe and permanent damages which include but are not limited to:

      a.     Loss of scholarship;
      b.     Loss of education;
      c.     Loss of employment;
      d.     Loss of economic gain;
      e.     Post-Traumatic Stress Disorder;
      f.     Depression;
      g.     Anxiety;
      h.     Ideation of suicide;
      i.     Vivid Nightmares;
      j.     Loss of interest in human contact;
      k.     Loss of trust in institutions/betrayal of trust;
      l.     Therapy/Counseling;
      m.     Paranoia;
      n.     Severe Anxiety when being alone with men;
      o.     Addiction; and,
      p.     Loss of the ability to focus.

## COUNT I
## SEXUAL HARASSMENT/ASSAULT IN VIOLATION 20 U.S.C. § 1681
## (TITLE IX)

378.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

379.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex,
> be excluded from participation in, be denied the benefits
> of, or be subjected to discrimination under any education
> program or activity receiving Federal financial
> assistance." 20 USC §1681.

380. Plaintiffs are "persons" under the Title IX statutory language.

381. Plaintiffs were students at EMU when they were subjected to sexual assaults, abuse, and/or otherwise prohibited conduct by members of DTD – Chapter and TC – Chapter.

382. Plaintiffs were participants in activities and programs of EMU at the time they were subjected to sexual assaults, abuse, and/or otherwise prohibited conduct by members of DTD – Chapter and TC – Chapter. These "activities" and/or "programs" were part of the operations of EMU.

377. EMU is and was, at all times relevant hereto, a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, *as amended*, 20 USC §1681, *et seq.*, 34 CFR §106.31.

378. Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick were required, under Title IX and/or EMU's policies, to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

379. Pursuant to the U.S. Department of Education's Office of Civil Rights, Title IX applies to all programs and activities of a school, **including fraternities**

**and sororities**, and prohibits sexual harassment and assault by employees, students, and third parties.

380.   Pursuant to Title IX, EMU is prohibited from discriminating on the basis of sex.

381.   Pursuant to Title IX, an appropriate person, upon receipt of a report of sexual misconduct, must investigate the reported claims and document the findings.

382.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick were appropriate persons and/or mandated reporters pursuant to Title IX and/or EMU's policies because they had the authority to:

      a.     Address and/or report sex discrimination;

      b.     Address and/or report sexual misconduct and/or sexual abuse;

      c.     Request investigations; and/or

      d.     Institute corrective measures.

383.   Plaintiffs were subjected to known sexually hostile environments, systemic sexual harassment, and/or sexual assaults by members of DTD – Chapter and TC – Chapter, constituting Title IX violations.

384.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick had actual knowledge sex discrimination, sexual harassment, sexual assaults, and/or other prohibited conduct against female EMU students, including Plaintiffs by members of DTD – Chapter and/or TC – Chapter.

385.   The sex discrimination, sexual harassment, sexual assaults, and/or other prohibited conduct suffered by Plaintiffs was severe, pervasive, and objectively offensive.

386.   One or more administrators or officials of Regents and/or EMUPD, including but not limited to Werner, Heighes, Karrick, and Martin, possessed the authority to take corrective and preventive action on Plaintiffs' behalf, had actual notice of said discrimination, failed to adequately respond, and/or failed to provide security in violation of Title IX and policies designed, drafted, and enacted by Defendants. Those failures amounted to deliberate indifference toward the repeated sex discrimination, sexual harassment, sexual assaults, rapes, and/or other prohibited conduct suffered by Plaintiffs.

387.   Pursuant to Title IX, Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick were required to investigate reported, known, and/or repeated sex discrimination, sexual harassment, sexual assaults, and/or other prohibited conduct by Bujaki, Brosnan, Hernandez, McWilliams, Layne, Sigmann and DTD – Chapter and TC – Chapter.

388.   Werner gave a PowerPoint presentation to incoming students during orientation explaining EMU's Title IX policies and procedures. During the presentation, Werner admitted[3] that:

---

[3] *See* https://www.youtube.com/watch?v=0mM2P1oQl4k&trk=organization-update-content_share-video-embed_share-article_title.

a.  "[Title IX] requires schools to have a Title IX coordinator (Defendant Werner) **whose job is to respond effectively to** *any* **complaints of sexual discrimination**." (Emphasis added).

b.  "If something were to happen to you, **or if you hear about something happening to one of your friends,** simply contact [Defendant Werner]." (Emphasis added).

c.  "When should you talk to [Defendant Werner]?  If something has happened to you, **if something has happened to a friend**, or if you have a concern or a question." (Emphasis added).

d.  "Also please be aware there is **no time limit**." (Emphasis added).

e.  "It is **very common** for individuals who have experienced some type of sexual violence **to hold it in and not tell anybody for quite a while**.  It could be a week, it could be a month, **it might be three years later** before they're ready to come and talk and get the help that they might need. And **that is OK**.  **There is no time limit**." (Emphasis added).

389.  Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick failed to adhere to the policies described above. These failures included but were not limited to maintaining and/or implementing improper customs, policies, and/or procedures for the identification, reporting, investigation, and prevention of unlawful discrimination and/or prohibited conduct; ignoring and/or turning away victims attempting to report sexual assault; ignoring and/or turning away advocates reporting on behalf of victims of sexual assault; and failing to properly investigate any and all claims of sexual assault. These failures constitute deliberate indifference toward

instances of repeated sex discrimination, sexual harassment, and/or other prohibited conduct.

390.   When presented with a complaint of sexual assault, Werner acted as the final decision-maker as to which complaints justified a Title IX investigation.

391.   Defendants' conduct, coupled with the repeated failure to investigate reports of sexual harassment and assaults, prevent such actions, and protect female students, demonstrated deliberate indifference resulting in systemic sex discrimination and further sexual harassment, sexual assaults, and/or other prohibited conduct of countless female EMU students, including Plaintiffs. Moreover, Defendants' conduct deviated significantly from the requirements and obligations contained in both federal laws as well as EMU's policies and procedures.

392.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick had actual knowledge that sexual misconduct, abuse, and/or otherwise prohibited conduct was pervasive among EMU's Greek community. Defendants acted with deliberate indifference by failing to act in response to this knowledge.

393.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick, with actual knowledge of repeated Title IX complaints, acted with deliberate indifference, resulting in Plaintiffs being "excluded from participation in" and/or "denied the benefits of" EMU's educational programs and activities.

394.  DTD – Chapter and/or TC – Chapter demonstrated policies and practices of covering up sexual misconduct by its members; failed to report sexual misconduct committed by its members to law enforcement and/or relevant EMU administrators, including but not limited to Werner, Martin, Heighes, and/or Karrick (in violation of DTD – Chapter, DTD – National, TC – Chapter, and/or TC – Nationals' bylaws); engaged in ad-hoc, internal disciplinary procedures that failed to properly discipline members who engaged in sexual misconduct; engaged in unequal investigatory procedures that improperly favored male Greek community members accused of engaging in sexual misconduct over their female student victims; discredited student victims of sexual misconduct committed by its members; tolerated and tacitly approved of systemic sexual violence committed by fraternity members; created an atmosphere whereby the rules applicable to all students did not apply to fraternity members, especially those members of Defendants DTD – Chapter and Theta Chi – Chapter.

395.  Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick further acted with deliberate indifference to known acts of sexual assault, abuse, and molestation on its premises by:

      a.    Failing to adequately investigate and address allegations of sexual assault as required by Title IX;

b.   Failing to adequately investigate and address multiple complaints regarding the conduct of members of DTD – Chapter and TC – Chapter; and

c.   Failing to institute corrective measures to prevent members of DTD – Chapter and TC – Chapter from violating and sexually abusing other students and individuals, including Plaintiffs.

396.   Defendants' responses were clearly unreasonable in light of the known circumstances, as members of EMU Greek system and others continued to sexually assault female EMU students until 2020 when YPD began its investigation.

397.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karricks' failure to promptly and appropriately investigate, respond to and remedy the sexual assaults after receiving notice subjected Plaintiffs to further harassment and a sexually hostile environment, effectively denying their access to educational benefits and opportunities at EMU, including but not limited to, Title IX protections.

398.   As a direct and proximate result of Defendants' Title IX violations, actions, and/or inactions, Plaintiffs have suffered and continue to suffer the pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, and enjoyment of life, were prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and have sustained and will continue to sustain a loss of earnings and earning capacity, and have required and

will continue to require mental health treatment, therapy, and counseling to address the mental anguish and despair caused by Defendants' actions.

## COUNT II
## GENDER DISCRIMINATION
## IN VIOLATION OF 20 USC §1681 (TITLE IX)

399.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

400.   Defendants were on notice of misconduct in the form of violent, gender-based hazing and sexual misconduct within EMU's Greek system prior to the assaults of Plaintiffs.

401.   By their actions and inactions, Defendants created a climate in which misconduct was tolerated, thus encouraging continued and repeated misconduct and proximately causing injury to Plaintiffs.

402.   Upon information and belief, Regents, through its employees Martin, Werner, Heighes, Karrick, and/or members of EMUPD, were also on actual notice of violent gender-based hazing within the EMU fraternities prior to the assault of Plaintiffs.

403.   By their actions and inactions, Defendants created a climate in which misconduct was tolerated, thus encouraging continued and repeated misconduct and proximately causing injury to Plaintiffs.

404.    Defendants and/or its members and/or employees had actual knowledge of the discrimination and harassment of Plaintiffs.

405.    The individuals with actual knowledge had the authority to investigate and take meaningful corrective action to end the discrimination and harassment but failed to do so.

406.    The discrimination and harassment occurring within the EMU fraternities, including the sexual assaults and violent, gender-based hazing, effectively barred Plaintiffs and others access to an educational opportunity and benefit.

407.    Plaintiffs suffered repeated student-on-student harassment, and violent, gender-based hazing, harassment, and intimidation, including sexual assault, which is considered discrimination based on sex and is prohibited by Title IX.

408.    The gender-based hazing and sexual harassment suffered by Plaintiffs was severe, pervasive, and objectively offensive.

409.    The gender-based hazing and sexual harassment suffered by Plaintiffs created a hostile environment at EMU.

410.    By its actions and inactions, Defendants acted with deliberate indifference toward the rights of Plaintiffs and other female students to a safe and secure educational environment, thus materially impairing Plaintiffs' abilities to pursue their education at EMU in violation of the requirements of Title IX.

411.   Specifically, Defendants violated Title IX by, *inter alia*:

a.   Choosing to take no action to protect Plaintiffs, despite knowledge of a need to supervise, warn, or take other corrective action to prevent discrimination and harassment, including violent, gender-based hazing and sexual assault occurring within EMU's fraternities;

b.   Being deliberately indifferent to and failing to take action on known discrimination and harassment suffered by Plaintiffs prior to their sexual assaults;

c.   Being deliberately indifferent to the known allegations of violent, gender-based hazing, harassment, intimidation and the unique dangers to younger female students;

d.   Failing to maintain and enforce an adequate policy against hazing and sexual misconduct or, alternatively, being deliberately indifferent thereto;

e.   Creating a climate which tolerated violent, gender-based hazing, harassment, and intimidation, including sexual assault and rape within EMU's fraternities, or, alternatively, being deliberately different thereto;

f.   Failing to take appropriate action against the TC – Chapter, DTD – Chapter, and/or SK – Chapter and their members for misconduct occurring before and following the rape of Plaintiffs, or, alternatively, being deliberately indifferent thereto, and thereby providing implicit approval, encouragement, and ratification to continued misconduct;

g.   Failing to provide policy or training for its employees, faculty members, coaches, or volunteers about sexual harassment and assault, sexual abuse, or mandatory reporting, despites years of

allegations of abuse within EMU's fraternities, thereby creating a climate where such misconduct was tolerated and encouraged to continue without consequence;

h.    Failing to report prior known abuse, as required by EMU policy, thereby creating a climate where such misconduct was tolerated and encouraged to continue without consequence;

i.    Failing to conduct their own internal investigation into Plaintiffs' assaults and other allegations of misconduct and maintaining a policy of refusing to conduct internal investigations in contexts where law enforcement becomes involved;

j.    Failing to investigate, inform parents, and report harassment, intimidation, and sexual abuse occurring within EMU's fraternities;

k.    Failing to report the rape of Plaintiffs to any and all appropriate regulatory authorities having jurisdiction over the matter as a matter of law; and

l.    Through other actions, inactions, and deliberate indifference.

412.   As a direct and proximate result of said Defendants' actions, inactions, and deliberate indifference, Plaintiffs sustained and continued to sustain injuries for which they are entitled to be compensated.

## COUNT III
## RETALIATION IN VIOLATION 20 USC §1681 (TITLE IX)

413.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

414.   Title IX states, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681

415.   Plaintiffs are "persons" under the Title IX statutory language.

416.   EMU is and was, at all times relevant hereto, a recipient of federal funds and, as such, is subject to Title IX of the Education Amendments of 1972, as amended, 20 USC §1681, et seq., 34 CFR §106.31.

417.   Regents, EMUPD, Martin, Werner, Heighes, and/or Karrick were required, under Title IX and/or EMU's policies, to investigate allegations of sexual assault, sexual abuse, and sexual harassment.

418.   The above-named Defendants, together with executive members of DTD – Chapter and TC – Chapter were "appropriate persons" as it pertained to reporting Title IX complaints.

419.   Plaintiffs engaged and/or attempted to engage in protected activity under Title IX by complaining about and opposing Title IX discrimination to appropriate persons and/or mandated reporters at EMU.

420.   Plaintiffs' protected activity was, upon information and belief, actually known to Defendants, who failed to respond and/or concealed Plaintiffs' repeated Title IX complaints.

421.   Regents, Werner, Heighes, Karrick, and/or Martin took adverse action against Plaintiffs by denying them, as sexual assault victims, proper avenues to report their assaults; failing to provide safety from known assailants; ignoring reports of sexual assault by advocates of victims; maintaining a gross misunderstanding of Title IX policy based upon known prevalent sexual assaults; tacitly and/or constructively approving prohibited by Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann; and failing to properly investigate any and all sexual assault claims, whether reported through Tile IX, EMU fraternities, EMU sororities, or on social media accounts of EMU students.

422.   As set forth above, there is a causal connection between Plaintiffs' protected activity and Defendants' adverse actions against them. Once Plaintiffs came forward and/or attempted to come forward with Title IX complaints of known sexual misconduct by Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or

Sigmann, Defendants made a concerted effort to conceal and/or prevent investigations of the same.

423. These adverse actions against Plaintiffs were calculated to and did cause irreparable harm, injury, and damages, including but not limited to physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages.

424. As a direct and proximate cause of Defendants' unlawful actions, Plaintiffs have suffered irreparable harm, injury, and damages, including but not limited to physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, and economic damages, as well as any and all other damages and injuries, learned through the course of discovery.

<u>**COUNT IV**</u>
<u>**VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – UNLAWFUL CUSTOM, POLICY, OR PRACTICE – *MONELL***</u>

425. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

426. EMUPD has been deputized by the Washtenaw County Sheriff expanding EMUPD's jurisdiction beyond the borders of EMU's campus as a part of the Eastern Washtenaw Safety Alliance and in collaboration with the Washtenaw

County Sheriff's Office, YPD, and the Ann Arbor Transportation Authority. The officers from each agency in the alliance share jurisdictional authority, meaning they all have county-wide arrest powers.

427. At all times relevant hereto, EMUPD's actions occurred under the color of law, under color of statutes, ordinances, regulations, policies, customs, and usages of the County of Washtenaw and/or the State of Michigan.

428. EMUPD's primary mission is to "provide for the safety and security of all …students…at our great University."

429. If a governmental agency or agent thereof has a policy, custom, or practice that tolerates the commission of unconstitutional acts by its officers and/or employees, then the agency and/or the employees who are in a position to set the policy, custom, or practice may be held liable directly for the consequences of any unconstitutional acts by said persons.

430. A local governmental entity may be also liable if it has a policy of inaction, and such inaction amounts to a failure to protect constitutional rights.

431. The Due Process Clause of the 14th Amendment provides that the State may not deprive a person of life, liberty, or property without due process of law. Therefore, Plaintiffs have a constitutionally protected right to be free from sexual assaults.

432.   Plaintiffs have a constitutionally protected right to report sexual assaults and have those reports properly investigated pursuant to Title IX.

433.   EMUPD personnel are directly involved with and/or respond to EMU's Title IX department and is required to investigate reports of sexual assault, especially those which occur on EMU's campus.

434.   EMUPD's conduct constituted and/or evidenced a custom of toleration and/or acquiescence regarding the investigation of Title IX complaints by its officers, agents, and/or employees, which custom was or became a *de facto* official policy.

435.   EMUPD's conduct constituted and/or evidenced a custom of toleration and/or acquiescence regarding the lack of investigation of Title IX complaints by its officers, agents, and/or employees, which custom was or became a *de facto* official policy.

436.   Discovery will bear out and provide further support of such policy, custom, or practice. EMUPD's allowing a policy, custom, or practice of failure to adhere to Title IX rules and regulations regarding the proper investigation of Title IX complaints constitutes deliberate indifference to Plaintiffs' rights and safety.

437.   At all times relevant hereto, EMUPD, by its failure to train, supervise, discipline, and/or correct the behavior of the employees and/or agents, including but not limited to Heighes, Karrick, Martin and/or Werner under its supervision, knew

or should have known, created the potential for the intentional, willful and wanton, reckless, deliberately indifferent, grossly negligent, and/or negligent acts and/or omissions of its employees and/or agents, including but not limited to Heighes, Karrick, Martin and/or Werner, allowed, acquiesced in, and/or encouraged said employees and/or agents to function as appropriate persons for purposes of reporting sexual assaults under Title IX and their respective misfeasance and/or malfeasance pertaining to Title IX inquiries, thereby proximately causing Plaintiffs to be deprived of their liberty, right to bodily integrity and their right to be free from sexual assaults as enumerated herein without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Title IX, and the Clery Act.

438.   At all times relevant hereto, EMUPD, by its violation of statutory duties, allowed and/or encouraged its employees and/or agents, including but not limited to Heighes, Karrick, Martin, and/or Werner to function as appropriate persons for purposes of reporting sexual assaults under Title IX and their respective misfeasance and/or malfeasance pertaining to Title IX inquiries, thereby proximately causing Plaintiffs to be deprived of their liberty, right to bodily integrity and their right to be free from sexual assaults as enumerated herein without due process of law, in violation of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Title IX, and the Clery Act. EMUPD's actions, inactions, omissions,

misfeasance, and/or malfeasance as outlined herein was the moving force behind Plaintiffs' constitutional violations.

439.   Heighes, Karrick, Martin, and/or Werner acted with deliberate indifference to Plaintiffs' sexual assault claims under Title IX. EMUPD knew about such conduct existing within its department as well as EMU's Title IX department, and EMUPD acted with deliberate indifference to the known conduct thereby acting with deliberate indifference to Plaintiffs' rights and safety. Had EMUPD not been deliberately indifferent or acquiesced as to the known unlawful conduct, Plaintiffs' sexual assaults would have been prevented and their constitutional rights protected.

440.   As a direct and proximate result of EMUPD's aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and emotional injuries, all past, present, and future, loss of freedom, loss of enjoyment of life, humiliation, degradation, and any and all other damages and injuries learned through the course of discovery.

## COUNT V
## VIOLATION OF CIVIL RIGHTS UNDER
## 42 U.S.C. § 1983 – STATE CREATED DANGER

441.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

442.   The Due Process Clause of the 14th Amendment provides that the state may not deprive a person of life, liberty, or property without due process of law.

443.   Plaintiffs enjoyed a substantive due process right guaranteed by the Fourteenth Amendment to avoid the risk of harm or danger created or increased by an affirmative act of the state.

444.   Defendants deliberately exposed Plaintiffs to known dangerous sexual predators and serial rapists, Bujaki, Brosnan, Hernandez, McWilliams, Layne, Sigmann and other members of TC – Chapter and DTD – Chapter, knowing these individuals and fraternities could and would cause serious damage by sexually assaulting female students on campus.

445.   This conduct was culpable in the extreme.

446.   Plaintiffs were foreseeable and certain victims of Defendants' decisions to not investigate the complaints from students, to not take corrective actions, and to allow Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann to remain on campus despite known pervasive, sexual misconduct.

447.   Thus, Plaintiffs' sexual assaults were foreseeable and direct.

448.   The decisions and actions to deprive Plaintiffs of a safe campus constituted affirmative acts that caused and/or increased the risk of harm, as well as physical and emotional injuries, to Plaintiffs.

449.   Defendants acted in willful disregard for the safety of Plaintiffs.

450.   Defendants had a fiduciary duty to protect students, like Plaintiffs, from harm.

451.   Defendants breached that duty, allowing Plaintiffs' sexual assaults, by placing students in proximate danger of known and reported sexual predators.

452.   Defendants created the opportunity for Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann to sexually assault Plaintiffs–an opportunity that they would not otherwise have had but for Defendants' failure to investigate the complaints from students and Defendants' failure to take corrective actions in regard to known sexual predators and serial rapists.

453.   At all relevant times hereto, Defendants were acting under color of law, to wit, under color of statutes, ordinances, regulations, policies, customs, and usages of the State of Michigan and/or Defendants.

454.   As a direct and proximate result of Defendants' aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and emotional injuries, past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, and any and all other damages and injuries, learned through the course of discovery.

**COUNT VI**
**VIOLATION OF CIVIL RIGHTS – EQUAL PROTECTION**
**PURSUANT TO 42 U.S.C. § 1983**

455.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

456.   Plaintiffs had a right to fair and equal treatment as females, a member of a protected class, under the laws as guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

457.   Heighes, Karrick, Martin, and/or Werner violated this right when they intentionally treated Plaintiffs less favorably than other similarly situated persons, without a rational basis for that treatment, and when they failed to intervene in constitutional violations.

458.   At all times relevant hereto, Regents and/or EMUPD were tasked with training, screening, and supervising Heighes, Karrick, Martin, and/or Werner in response to Title IX complaints.

459.   Heighes, Karrick, Martin, and/or Werner were supervisory personnel engaged in the course of their supervisory duties.

460.   Heighes, Karrick, Martin, and/or Werner intentionally and deliberately promulgated and/or carried out the aforementioned acts, orders, practices, customs, and directives, with wanton and reckless disregard for Plaintiffs' civil and constitutional rights.

461.   As a direct and proximate result of Defendants' aforementioned unlawful conduct and constitutional violations, Plaintiffs suffered physical and severe emotional injuries, all past, present, and future, as well as loss of freedom, loss of enjoyment of life, humiliation, degradation, loss of reputation, economic

damages, and all other damages and injuries, learned through the course of discovery.

## COUNT VII
## FAILURE TO TRAIN AND SUPERVISE UNDER 42 U.S.C. § 1983

462. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

463. Regents and/or EMUPD had the ultimate responsibility and authority to train and supervise their employees, agents, and/or representatives including Heighes, Karrick, Martin and/or Werner, and all faculty and staff regarding their duties toward students, faculty, staff, and visitors, particularly as they pertain to Title IX complaints and subsequent investigations.

464. Regents and/or EMUPD failed to train and supervise their employees, agents, and/or representatives including all faculty and staff, regarding the following duties:

    a.    Perceive, report, and stop inappropriate sexual conduct on campus;

    b.    Provide diligent supervision over students and other individuals, including Heighes, Karrick, Martin, and Werner;

    c.    Report suspected incidents of sexual abuse or sexual assault;

d.   Ensure the safety of all students, faculty, staff, and visitors to EMU's premises;

e.   Provide a safe environment for all students, faculty, staff, and visitors to EMU's premises free from sexual harassment;

f.   Properly train faculty and staff to be aware of their individual responsibility for creating and maintaining a safe environment;

g.   Properly and diligently investigate and address other victim's allegations as required by Title IX;

h.   Properly and diligently investigate and address the complaints regarding members of TC – Chapter and/or DTD – Chapters' conduct;

i.   Institute corrective measures to prevent members of TC – Chapter and/or DTD – Chapter from violating and sexually abusing other students and individuals, including Plaintiffs; and

j.   The above list of duties is not exhaustive.

465.   Regents and/or EMUPD's failure to adequately train and/or supervise was the result of Defendants' deliberate indifference toward the well-being of students, including Plaintiffs, regarding numerous claims of sexual assaults and was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

466.   Regents and/or EMUPD's failure to adequately train and/or supervise is closely related to or actually caused Plaintiffs' injuries.

467.  As a result, Regents and/or EMUPD deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

468.  As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, emotional distress, and all other damages and injuries learned through the course of discovery.

## COUNT VIII
## SEX DISCRIMINATION IN VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

469.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

470.  EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (ELCRA).

471.  Defendants are "person(s)" as that term is defined in ELCRA and were agents of Defendant Regents and EMU.

472.  ELCRA prohibits discrimination in the terms, privileges, and conditions of housing on the basis of sex, which specifically defines sex discrimination to include unwelcome sexual physical conduct and advances. M.C.L. §§ 37.2103(i), 37.2502.

473. Defendants' acts and omissions constitute sexual harassment and violate Plaintiffs' rights under ELCRA by subjecting Plaintiffs to unwelcome sexual advances, assault and other conduct, both verbal and physical, of a sexual nature.

474. Defendants were aware, or should have been aware, that a sexually hostile environment existed on the EMU campus.

475. Despite notice of the sexually hostile environment, Defendants failed to take prompt and adequate remedial action to end the ongoing sexual assaults and harassment of the Plaintiffs and other female students.

476. Defendants violated ELCRA and deprived Plaintiffs of their civil rights by, among other things, subjecting Plaintiffs, because of their sex, to conduct of a physical and sexual nature that had the purpose or effect of denying Plaintiffs the full benefit of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

477. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, lost earning capacity, humiliation, degradation, intimidation, confusion, loss of self-esteem, depression, physical manifestations of emotional distress and loss of enjoyment of life.

## COUNT IX
## AIDING AND ABETTING IN VIOLATION OF THE ELCRA

478.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

479.   EMU is a place of public accommodation, a public service, and an educational institution as defined in Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* (ELCRA).

480.   All Defendants are "person(s)" as that term is defined in ELCRA and were agents of Defendant Regents and EMU.

481.   Through the exercise of reasonable care, Defendants could have limited the accessibility of sexual predators to the female students.

482.   By creating and condoning an environment in which sexually predatory individuals were allowed access to female students, Defendants aided and abetted the creation of a sexually hostile environment in violation of MCL 37.2701(b).

483.   Defendants' actions have deprived Plaintiffs of the full and equal enjoyment of the educational programs of EMU and full and equal access to the use and privileges of public accommodations, public service, and educational opportunity.

484.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, loss of earning capacity

humiliation, degradation, intimidation, confusion, loss of self-esteem, depression, physical manifestations of emotional distress and loss of enjoyment of life.

## COUNT X
## STATE CREATED DANGER 42 U.S.C. § 1983

485.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

486.   Plaintiffs enjoyed a substantive due process right guaranteed by the Fourteenth Amendment to avoid the risk of harm or danger created or increased by an affirmative act of the State.

487.   This right is violated when the State:

   a.   Engages in an affirmative act which either created or increased the risk that a plaintiff would be exposed to an act of violence by a third party;

   b.   Created or enhanced a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and

   c.   The State knew or should have known that its actions specifically endangered the plaintiff.

488.   The EMU Individual Defendants' acts consisted of 1) permitting and condoning out of control fraternity parties where under-aged individuals were encouraged to consume alcohol such that they could not consent to sexual activity or advances allowing fraternity members to have sexual access to female EMU

students and 2) lying about or concealing their knowledge that fraternities and their members were permitted to carry out his unlawful and abhorrent behavior.

489.   These affirmative acts created or increased the risk that Plaintiffs would be exposed to an act of sexual violence.

490.   Defendants' conduct created a special danger to Plaintiffs with whom Defendants had a special relationship as described above. The actions of Defendants specifically put this discrete group at increased risk in that the individual EMU Defendants knew that fraternity members were causing females to become intoxicated and then sexually assaulting them.

491.   Defendants knew or should have known that its affirmative acts specifically endangered Plaintiffs.

492.   Defendants acted in ways that permitted, condoned, and promoted sexually hostile behavior.

493.   These actions included Defendants':

   a.   failing to supervise, train and educate fraternities and their members about alcohol, service of alcohol to minors, sexually assaulting intoxicated females so that, in the absence of this supervision, training, and education Nassar's, unlawful activities could be carried out;

   b.   actively concealing the fraternity members' abhorrent behavior;

   c.   outright lying to students, parents, investigators, and law enforcement when confronted with the allegations against

various fraternity members prevented the detection of the repeated and subsequent sexual misconduct and served to cover up Defendants' liability for the damage they caused; and

d.      promoting EMU as a safe campus for females, in so, Defendants were enabling fraternity members to gain unfettered sexual access to more females.

494.   Defendants' acts of permitting, condoning, and promoting Greek life as a safe enhancement of the EMU educational experience, granted fraternity members unfettered sexual access to female students and to unspeakable invasions of their bodily integrity which were so egregious and outrageous that it shocks the conscience.

495.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, and emotional distress.

## COUNT XI
## VIOLATION OF BODILY INTEGRITY 42 U.S.C. 1983

496.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

497.   Plaintiffs, as females, are members of a protected class under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

498.   Plaintiffs also enjoy the constitutionally protected Due Process right guaranteed by the Fourteenth Amendment to be free from the invasion of bodily integrity through sexual assault, abuse, or molestation.

499.   At all times relevant hereto, the EMU Individual Defendants were acting under color of law.

500.   The acts as alleged above amount to a violation of these clearly established constitutionally protected rights, of which reasonable persons in the Individual Defendants' positions should have known.

501.   At all times relevant hereto, Werner, Heighes, Karrick, and/or Martin had the ultimate responsibility and authority to train and supervise their employees, subordinates, agents, and/or representatives in the appropriate manner of detecting, reporting, and preventing sexual abuse, assault, and molestation and as a matter of acts, custom, policy, and/or practice, failed to do so with deliberate indifference.

502.   As a matter of custom, policy, and/or practice, Werner, Heighes, Karrick, and/or Martin had the ultimate responsibility and authority to investigate complaints against their employees, subordinates, and representatives from all individuals including, but not limited to students, visitors, faculty, staff, or other employees, agents, and/or representatives, and failed to do so with deliberate indifference.

503.   At all times relevant hereto, the Defendants had a duty to prevent sexual assault, abuse, and molestation on their campus and premises, that duty arising under the above-referenced constitutional rights, as well as established rights pursuant to Title IX.

504.   EMU's internal policies provided that all University employees were expected to promptly report sexual misconduct or relationship violence that they observed or learned about and that involved a member of the University community (faculty, staff, or student) or occurred at a university event or on university property.

505.   EMU's above-mentioned internal policies were violated when the EMU Individual Defendants took no actions to address the complaints regarding sexual assaults at the hands of fraternity members, including those by JANE DOE 12 in 2014.

506.   The EMU Individual Defendants' failure to address these complaints led to an unknown number of individuals, including Plaintiffs, being victimized, sexually assaulted, abused, and molested by members of multiple fraternities.

507.   The Defendants acted with deliberate indifference and these failures and the harm they caused shock the conscience.

508.   These EMU Individual Defendants, who had or should have had knowledge of sexual misconduct, were the moving forces or causes of repeated constitutional injuries to Plaintiffs and others based on their failures to report, train,

supervise, investigate, or otherwise act in response to complaints of alcohol-fueled sexual misconduct by fraternities and their members.

509.   Ultimately, the EMU Individual Defendants failed to adequately and properly investigate complaints of abuse including but not limited to failing to:

a.   Perform a thorough investigation into sexual misconduct by fraternities and their members dating back to at least 2014;

b.   Thoroughly review and investigate all policies, practices, procedures, and training materials related to the circumstances surrounding the conduct of fraternities and their members;

c.   Recognize sexual assault when reported in 2014 and permitting University officials to deem a sexual assault as "medically appropriate" and "not of a sexual nature;" and

d.   Ensure all institutional guidelines issued following the 2014 reported rape were satisfied.

510.   By failing to prevent the above-mentioned sexual assaults and abuse, and by failing to appropriately respond to reports of alcohol-fueled sexual assaults and abuse, in a manner that was so clearly unreasonable it amounted to deliberate indifference, the EMU Individual Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983.

511.   The EMU Individual Defendants' conduct and failures to act deprived Plaintiffs of rights secured by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. §1983.

512.   Werner, Heighes, Karrick, and/or Martin tolerated, authorized, and/or permitted a custom, policy, practice, or procedure of insufficient supervision and failed to adequately screen, counsel, monitor, or discipline the fraternities and the fraternity members, with the result that the fraternity and its members could violate the rights of persons such as Plaintiffs with impunity.

513.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, and emotional distress.

## COUNT XII
## GROSS NEGLIGENCE NOT SUBJECT TO IMMUNITY, MCL §691.1407

514.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

515.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National owed Plaintiffs a duty to use due care to ensure their members abstained from sexual assault, abuse, and molestation students and guests alike interacted with their members, representatives, and/or agents.

516.   As agents and/or representatives of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann owed Plaintiffs a duty of due care as guests of TC – Chapter and/or DTD – Chapter. These include but are not limited to:

a.      Reduce exposure to risk and liability of the Chapter and its members;

b.      Aims to reduce risk;

c.      Completes an incident report and submits to Headquarters for all incidents;

d.      Educate members on the TC – National and/or DTD – Nationals' alcohol policies;

e.      To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

f.      To not abuse, nor support the abuse of, alcohol or controlled substances;

g.      To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.      To familiarize and comply with Theta Chi and/or DTD Health and Safety Policies. These Policies forbid any form of hazing or assault;

i.      Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.      Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

517.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – Nationals'
failure to adequately supervise Bujaki, Brosnan, Hernandez, McWilliams, Layne,
and/or Sigmann, especially after TC – Chapter, TC – National, DTD – Chapter
and/or DTD – National knew or should have known of complaints regarding their
nonconsensual sexual assaults and sexual penetrations occurring on TC – Chapter
and/or DTD – Chapters' premises was so reckless as to demonstrate a substantial
lack of concern for whether an injury would result to Plaintiffs.

518.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – Nationals'
conduct demonstrated a willful disregard for precautions to ensure Plaintiffs' safety
and bodily integrity.

519.   TC – Chapter, TC – National, DTD – Chapter, and/or DTD – Nationals'
conduct as described above, demonstrated a willful disregard for the substantial risk
of injuries to Plaintiffs.

520.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – Nationals'
breached duties owed to Plaintiffs and were grossly negligent when they conducted
themselves by the actions described above, said acts having been committed with
reckless disregard for Plaintiffs' health, safety, constitutional and/or statutory rights,
and with a substantial lack of concern as to whether an injury would result.

## COUNT XIII
## NEGLIGENCE

521.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

522.  TC – Chapter, TC – National, DTD – Chapter and/or DTD – National owed Plaintiffs a duty of ordinary care to ensure their safety and freedom from sexual assault, abuse, and molestation while students and guests alike interacted with their members, representatives, and/or agents.

523.  As agents and/or representatives of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann owed Plaintiffs a duty of due care. These include but are not limited to:

a.  Reduce exposure to risk and liability of the Chapter and its members;

b.  Aims to reduce risk;

c.  Completes an incident report and submits to Headquarters for all incidents;

d.  Educate members on the TC – National and/or DTD – Nationals' alcohol policies;

e.  To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

f. To not abuse, nor support the abuse of, alcohol or controlled substances;

g. To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional. This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h. To familiarize and comply with Theta Chi and/or DTD Health and Safety Policies. These Policies forbid any form of hazing or assault;

i. Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j. Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

524. TC – Chapter, TC – National, DTD – Chapter and/or DTD – Nationals' failure to adequately supervise Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann, especially after TC – Chapter, TC – National, DTD – Chapter and/or DTD – National knew or should have known of complaints regarding their nonconsensual sexual assaults and sexual penetrations occurring on TC – Chapter and/or DTD – Chapters' premises was so reckless as to demonstrate a substantial lack of concern for whether an injury would result to Plaintiffs.

525.  Upon information and belief, TC – Chapter, TC – National, DTD – Chapter and/or DTD – National had notice, through its own members, agents, and/or representatives, of complaints of a sexual nature related to Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmanns' predatory and criminal sexual misconduct of female students and guests.

526.  Upon information and belief, TC – Chapter, TC – National, DTD – Chapter and/or DTD – National did or should have known of the foreseeability of Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmanns' sexual abuse of female students and guests.

527.  TC – Chapter, TC – National, DTD – Chapter and/or DTD – National's failure to properly investigate, address, and/or remedy complaints regarding Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmanns' conduct was a breach of their duty to use ordinary care.

528.  Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmanns' conduct in sexually assaulting, abusing, and molesting Plaintiffs during their membership, agency, and/or representation of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National was a breach of the duty to use ordinary care.

## COUNT XIV
## VICARIOUS LIABILITY

529.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

530.   Vicarious liability is indirect responsibility imposed by the operation of law where a principal is bound to keep its agents within their proper bounds and is responsible if it fails to do so.

531.   Vicarious liability essentially creates agency between the principal and its agent, so that the principal is held to have done what the agent has done.

532.   Upon information and belief, TC – Chapter, TC – National, DTD – Chapter and/or DTD – National provided membership and/or held Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann out to be their agent and/or representative.

533.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National had the right to supervise Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmanns' conduct.  Indeed, TC – Chapter, TC – National, DTD – Chapter and/or DTD – National had an obligation and/or duty to supervise Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann following claims, reports, and/or investigations of alleged sexual misconduct.

534.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National is vicariously liable for the actions of Bujaki, Brosnan, Hernandez, McWilliams,

Layne, and/or Sigmann as described above that were performed during his membership, representation, and/or agency with TC – Chapter, TC – National, DTD – Chapter and/or DTD – National.

## COUNT XV
## NEGLIGENT SUPERVISION

535.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

536.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National had a duty to provide reasonable supervision of their fraternity members, agents, and/or representatives, in particular Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann, during membership, agency, or representation with Defendants TC – Chapter, TC – National, DTD – Chapter and/or DTD – National and while they interacted with guests of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, including Plaintiffs.

537.   It was reasonably foreseeable, given Defendants', that Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmann were sexual predators of young college female students at the time Defendants received complaints regarding sexual misconduct involving the same (members of TC – Chapter and/or DTD – Chapter) in at least 2014, upon information and belief.

538.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, by and through their members, agents, managers, and/or assigns, knew or reasonably should have known of Bujaki, Brosnan, Hernandez, McWilliams, Layne, and Sigmanns' conduct and/or that Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann were unfit members, agents, and/or representatives of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National because of their repeated sexual misconduct of female guests, including Plaintiffs.

539.   Per TC – Chapter, TC – National, DTD – Chapter, and/or DTD – Nationals' rules, regulations, and bylaws, its members are to conduct themselves in the following, non-exhaustive ways:

a.   Reduce exposure to risk and liability of the Chapter and its members;

b.   Aims to reduce risk;

c.   Completes an incident report and submits to Headquarters for all incidents;

d.   Educate members on the TC – National and/or DTD – Nationals' alcohol policies;

e.   To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

f.   To not abuse, nor support the abuse of, alcohol or controlled substances;

g.      To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.      To familiarize and comply with Theta Chi and/or DTD Health and Safety Policies. These Policies forbid any form of hazing or assault;

i.      Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.      Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

540.  TC – Chapter, TC – National, DTD – Chapter and/or DTD – National breached their duty to provide reasonable supervision of Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann, thus permitting them to commit pervasive acts of sexual abuse against Plaintiffs.

541.  The sexual abuse occurred while Plaintiffs and Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann were on the EMU's premises, specifically the premises of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, and while Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann were acting in the course of their membership, agency, and/or

representation of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National.

542.  TC – Chapter, TC – National DTD – Chapter and/or DTD – National tolerated, authorized, and/or permitted customs, policies, practices, or procedures of insufficient supervision and failed to adequately screen, counsel, or discipline such individuals, with the result that Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann were allowed to violate the rights of persons such as Plaintiffs with impunity.

## COUNT XVI
## NEGLIGENT FAILURE TO WARN OR PROTECT

543.  Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

544.  TC – Chapter, TC – National, DTD – Chapter and/or DTD – National knew or should have known that Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann posed a risk of harm to Plaintiffs or those in Plaintiffs' situation.

545.  Upon information and belief, TC – Chapter, TC – National, DTD – Chapter and/or DTD – National had direct and/or constructive knowledge as to the dangerous conduct of Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann and other fraternity members and failed to act reasonably and responsibly in response.

546.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National knew or should have known Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann and other fraternity members committed sexual assaults, abuse, and molestations and/or were continuing to engage in such conduct.

547.   TC – Chapter, TC – Nationa, DTD – Chapter and/or DTD – National had a duty to warn or protect Plaintiffs and others in Plaintiffs' situation against the risk of injury by Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann and other fraternity members. These include but are not limited to:

a.   Reduce exposure to risk and liability of the Chapter and its members;

b.   Aims to reduce risk;

c.   Completes an incident report and submits to Headquarters for all incidents;

d.   Educate members on the TC – National and/or DTD – Nationals' alcohol policies;

e.   To respect the dignity of all persons, and therefore, will not physically, psychologically, or sexually abuse any human being;

f.   To not abuse, nor support the abuse of, alcohol or controlled substances;

g.   To not tolerate or condone any form of sexist or sexually abusive behavior on the part of its members, whether physical, mental, or emotional.  This is to include any actions, activities, or events, whether on chapter premises or an off-site location which are

119

demeaning to women or men, including but not limited to verbal harassment, sexual assault by individuals or members acting together;

h.   To familiarize and comply with Theta Chi and/or DTD Health and Safety Policies. These Policies forbid any form of hazing or assault;

i.   Prohibition of alcohol and/or illegal substances, which is punishable by fine and/or expulsion; and

j.   Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

548.   The duty to disclose this information arose by the relationship between Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann, as members, agents, and/or representative of TC – Chapter, TC – National, DTD – Chapter and/or DTD – National, and Plaintiffs.

549.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National breached said duties by failing to warn Plaintiffs and/or by failing to take reasonable steps to protect Plaintiffs from Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmann.

550.   TC – Chapter, TC – National, DTD – Chapter and/or DTD – National breached their duties to protect Plaintiffs by failing to:

a.   Respond to allegations of sexual assault, abuse, and molestation;

b.   Act on evidence of sexual assault, abuse, and molestation; and

    c.    Investigate, adjudicate, and terminate Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmanns' membership with TC – Chapter, TC – National, DTD – Chapter and/or DTD – National.

551. TC – Chapter, TC – National, DTD – Chapter and/or DTD – National willfully refused to notify, give adequate warning, and implement appropriate safeguards to protect Plaintiffs from Bujaki, Brosnan, Hernandez, McWilliams, Layne, and/or Sigmanns' conduct.

552. As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, emotional distress, and all other damages and injuries learned through the course of discovery.

## COUNT XVII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

553. Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

554. TC – Chapter, TC – National, DTD – Chapter, and/or DTD – National were aware that their members committed and/or were committing sexual assaults of female students and guests of EMU.

555. SK – Chapter and/or SK – National were aware that its members committed and/or were committing hazing of its pledges.

556.  TC – Chapter and DTD – Chapter tolerated and/or permitted their members to sexually, abuse, and rape female students and guests of EMU after they knew or should have known of complaints and claims of sexual assaults occurring since 2014.

557.  SK – Chapter tolerated and/or permitted its members to engage in hazing of its pledges after they knew or should have known of complaints and claims of hazing occurring since 2018.

558.  DTD – Chapter and TC – Chapters' supplying and serving of excessive amounts of alcohol to patrons known, expected, accepted, or acquiesced as commonplace among DTD – Chapter and TC – Chapter's parties.

559.  Members of DTD – Chapter, TC – Chapter and SK – Chapter threatened, misled, and otherwise discouraged victims from reporting hazing and/or sexual assaults by members of Defendants DTD – Chapter, TC – Chapter and SK – Chapter, to the appropriate persons at EMU, Title IX, or other law enforcement.

560.  Defendants chose to not adequately supervise its members and/or prevent its members from committing acts of hazing, sexual assaults, and rapes.

561.  By routinely ignoring, disregarding, and failing to investigate evidence of hazing and sexual assaults by members of DTD – Chapter, TC – Chapter, and SK – Chapter, Defendants created a culture and environment in which victims understood and/or were told that their complaints would be met with disbelief,

indifference, and a cold shoulder, and thus victims understood and/or were told that no measures would be reasonably calculated to end the abuse.

562.   Defendants' conduct as described above has been consistently condemned as outrageous and intolerable in modern society by state and federal legislature, EMU student policies, bylaws, and regulations of DTD – Chapter, TC – Chapter, and SK – Chapter, and other members of the public.

563.   Defendants' conduct as described above was intentional and/or reckless.

564.   Defendants conduct as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

565.   Any reasonable person would know that emotional distress would result from DTD – Chapter, TC – Chapter, and SK – Chapter's reckless conduct described above.

566.   The EMU Defendants abused their positions to bolster and sustain EMU's national reputation.

567.   The EMU Defendants threatened, misled, and otherwise discouraged women from reporting sexual assault to the appropriate persons at EMU or to law enforcement.

568.   By routinely ignoring, disregarding, and failing to investigate sexual assault allegations, the EMU Defendants created a culture and environment in which

sexual abuse victims understood that their complaints would be met with hostility, disbelief and indifference, and thus victims understood that the university would not take any measures reasonably calculated to end the abuse.

569.   EMU Defendants performed a deficient and biased investigation into sexual assaults and allowed perpetrators to remain on campus, where they were permitted access to female students and, in some cases, they continued to sexually assault.

570.   Defendants' conduct as described above has been consistently condemned as outrageous and intolerable in modern society by members of the public, members of the media, students, alumni, and other members of the public.

571.   The EMU Defendants' conduct as described above was intentional and/or reckless.

572.   The EMU Defendants' conduct as described above was extreme, outrageous, and of such character as not to be tolerated by a civilized society.

573.   Any reasonable person would know that emotional distress would result from the EMU Defendants' reckless conduct described above.

574.   As a direct and/or proximate result of Defendants' actions and/or inactions, Plaintiffs have suffered and continue to suffer pain and suffering, pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, humiliation, loss

of enjoyment of life, post-traumatic stress disorder resulting in physically manifested injuries including anxiety, depressions, sleep disorders, nightmares, psychological injuries, and physical injuries. Plaintiffs have been prevented and will continue to be prevented from performing their daily activities and obtaining the full enjoyment of life and have sustained and continue to sustain a loss of earnings and earning capacity; and have required and will continue to require treatment, therapy, counseling, and hospitalization to address the mental anguish and despair caused by Defendants' actions.

### COUNT XVIII
### SOCIAL HOST LIABILITY
### VIOLATION OF MCL §436.1701

575.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

576.   All Plaintiffs were under the age of 21 and could not legally drink alcohol in the State of Michigan.

577.   DTD – Chapter, TC – Chapter, and SK – Chapter repeatedly supplied and served alcohol at functions on EMU's campus, in direct violation of local and national bylaws and regulations, as well as policies as set forth by Defendant Regents.

578.  DTD – Chapter, TC – Chapter, and SK – Chapter knowingly, intentionally, and/or recklessly created a dangerous environment by serving excessive amounts of alcohol.

579.  DTD – Chapter, TC – Chapter, and SK - Chapter were negligent when they failed to make diligent inquiry into whether Plaintiffs were of the age that allowed her to legally drink in violation of MCL §436.1701.

580.  DTD – Chapter, TC – Chapter, and SK - Chapter served alcohol to Plaintiffs at all chapter parties including those attended by Plaintiffs.

581.  Defendant's actions and/or inaction constitute a violation of MCL §436.1701.

582.  Defendants' actions and/or inactions in violation of MCL §436.1701 necessarily led to Plaintiffs' sexual assaults.

583.  As a direct and proximate result of DTD – Chapter, TC – Chapter and SK - Chapter serving alcohol to minors, in direct violation of MCL §436.1701, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, emotional distress, and any and all other damages and injuries learned through the course of discovery.

## COUNT XIX
## VIOLATION OF ANTI-HAZING STATUTE,
## MCL §750.411t

584.   Plaintiffs reallege and incorporate by reference the allegations contained in the previous and subsequent paragraphs.

585.   SK – National and/or SK – Chapter intentionally, knowingly, and/or recklessly permitted conduct as described above that endangered the physical health and/or safety of its pledges, in violation of MCL §750.411t Michigan's anti-hazing statute.

586.   SK – National and/or SK – Chapter knew or should have known that conduct as described above was commonplace and endangered the physical health and/or safety of its pledges.

587.   SK – National and/or SK – Chapter knowingly, intentionally, and/or recklessly created a dangerous environment through the conduct described above.

588.   SK – National and/or SK – Chapter engaged in conduct as described above for purposes of pledging, being initiated into, affiliating with, and/or participating in membership Defendants SK – National and SK – Chapter.

589.   JANE DOE 13 was a pledge at the time of her assault.

590.   JANE DOE 13 was provided alcohol by members of SK – Chapter.

591.   JANE DOE 13 was subsequently prevented from the safe harbor by members of SK – Chapter because of JANE DOE 13's intoxication that was brought on by members of SK – Chapter.

592.   Members of SK – Chapter induced JANE DOE 13 into imbibing in alcohol and understanding that JANE DOE 13 could not return back to SK – Chapters' sorority house until she was sober.

593.   The conduct as described above by members of SK – Chapter, coupled with the deliberate disregard of the same by SK – Chapter and SK – National, constituted hazing violating MCL §750.411t.

594.   As a direct and proximate result of DTD – Chapter, TC – Chapter and SK - Chapter serving alcohol to minors, in direct violation of MCL §436.1701, Plaintiffs suffered, among other things, humiliation, degradation, intimidation, confusion, emotional distress, and any and all other damages and injuries learned through the course of discovery.

WHEREFORE, Plaintiffs JANE DOE 12 – 18, respectfully request that this Honorable Court enter a judgment against Defendants, jointly and severally, in an amount in excess of $75,000.00, together with interest, costs, attorney fees, and all other equitable relief, including but not limited to exemplary and/or punitive damages, that this Honorable Court deems just and proper.

Respectfully submitted,

*/s/ Todd F. Flood*

Todd F. Flood (P58555)

Flood Law PLLC

Attorneys for Plaintiff

155 W. Congress St., Ste. 603

Detroit, MI 48227

Tel: (248) 547-1032

tflood@floodlaw.com

Date: May 25, 2021

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs JANE DOE 12-19, by and through counsel, Todd Flood and Flood Law, PLLC, and Michael Weaver and Plunkett Cooney, PLC, hereby demand a trial by jury in the above-captioned matter.

Respectfully submitted,
*/s/ Todd F. Flood*
Todd F. Flood (P58555)
Flood Law PLLC
Attorneys for Plaintiff
155 W. Congress St., Ste. 603
Detroit, MI 48227
Tel: (248) 547-1032
tflood@floodlaw.com

Date: May 25, 2021

## <u>INDEX OF EXHIBITS</u>

Exhibit A – EMU Policies, Rules and Regulations

Exhibit B - SK– National's Policy Handbook

Exhibit C – Sigma Kappa Bylaws

Exhibit D - DTD Bylaws

Exhibit E – Theta Chi Bylaws

Exhibit F – Theta Chi Safety Standards Manual

Exhibit G – Photo

# **EXHIBIT A**

# THE CONSTITUTION OF THE INTERFRATERNITY COUNCIL

## Eastern Michigan University

(Revised 12-21-2015)

*We, the members of the Interfraternity Community at Eastern Michigan University, come together to promote and protect the interests of the Greek fraternal organizations of this campus. We must foster academic excellence, brotherhood, integrity, and a commitment to both the campus and greater Ypsilanti communities. We hereby establish this Constitution and its Bylaws to serve as the guiding document for our organization and its members.*

## ARTICLE 1: NAME, PRINCIPLES, AND DEFINITIONS

### SECTION 1 - NAME

The name of the organization shall be the Interfraternity Council at Eastern Michigan University.  Member organizations shall be referred to as fraternities (or chapters) and the individual representatives from each fraternity shall be referred to as delegates.

## SECTION 2- Fundamental Principles

The purposes of the Interfraternity council are as follows:

**2.1**  To develop and maintain fraternal life, such that the Greek experience is a positive influence in the daily lives of the men who choose to become a member of a fraternity.

**2.2**  To promote superior scholarship among its members.

**2.3**  To promote productive inter-fraternal relations between all Greek organizations.

**2.4**  To promote and serve Eastern Michigan University and the Ypsilanti community at large.

**2.5**  To maintain the highest of moral and social standards.

**2.6**  To set forth policies promoting continuous improvement amongst all members.

**2.7**  To establish policy and to discipline fraternity groups for acts perpetuated by those groups (either in part or all of one or more fraternities) through due process in accordance with the provisions granted by this Constitution.

## SECTION 3-Rules of Construction and Definitions

The rules set forth in this Section shall be used in interpreting The Constitution of the Interfraternity Council at Eastern Michigan University.

**3.1  THE CONSTITUTION OF THE INTERFRATERNITY COUNCIL.** The Governing documents that preside over all social Fraternities at Eastern Michigan University; may be referred to as the Constitution.

**3.2  INTERFRATERNITY COUNCIL.** The governing body over all social fraternities consisting of no more than seven Executive Board members, faculty advisor, and two delegates from each active fraternity at Eastern Michigan university may be referred to as IFC.

**3.3  CHAPTER**. Any collegiate fraternity that has been granted membership by the IFC in accordance with the Constitution of the Interfraternity Council at Eastern Michigan University.

**3.4  FACULTY ADVISOR.** The advisor of the IFC who is a full-time employee of Eastern Michigan University; may be referred to as the Advisor.

**3.5  FINANCIAL OBLIGATIONS.** All fees, dues, taxes, and other payments levied or authorized by the Constitution or its bylaws.

**3.6  MAJORITY VOTE.** Unless it is otherwise specified, when a vote is required a majority of votes cast shall be necessary to take affirmative action.

**3.7  DELEGATES.** Representatives from each collegiate chapter recognized by IFC that are either elected or assigned by their respective organizations.

**3.8  EXPULSION.** The permanent removal of a chapter's rights and privileges in the IFC. An expelled chapter is not released from its financial obligations.

**3.9   FRATERNITY.** Any organization located at Eastern Michigan University whose membership is recognized by the IFC in accordance with the Constitution; and which is chartered by, or affiliated with, a local, national, or international fraternity organization.

**3.10  GOOD STANDING.** A chapter that is neither expelled, nor on suspension.

**3.11 MATRICULATE.** A student admitted by, enrolled in, and attending Eastern Michigan University.

**3.12  PROBATION**. The denial of any privileges as prescribed by the Constitution, the IFC, the Advisor, the Greek Judicial Board, or Eastern Michigan University.

**3.13 SUSPENSION.** The temporary removal of all of a chapter's rights and privileges. A suspended chapter remains a member of the IFC, and is subject to all the responsibilities and obligations either stated or implied by the Constitution.

**3.14 RESIGNATION.** The permanent and voluntary removal of an Executive Board member, delegate, or chapter's rights and privileges in the IFC.

**3.15 EXECUTIVE BOARD**. The Executive Board will consist of no more than six officers; the President, Executive Vice-President, Vice-President of Internal Affairs, Vice-President of External Affairs, Vice-President of Membership, and the Vice-President of Scholarship. Each officer will be elected to serve in their respective positions as prescribed by the Constitution.

**3.16 COUNCIL MEMBER.** Any Executive Board member or delegate of the IFC; may be referred to as a member.

**3.17 GREEK JUDICIAL BOARD.** The acting council that is responsible for trial proceedings within the IFC.

**3.18 QUORUM.** A majority of the total members of the Interfraternity Council who are eligible to vote. Quorum must be present in order to  conduct any voting procedure.

**3.19 ACADEMIC PROBATION.** Any fraternity that fails to maintain a cumulative 2.5 GPA on a 4.0 GPA scale, as determined by the chapter's semester average GPA, or by a fall/winter cumulative chapter average, will automatically be placed on academic probation for one semester. If the fraternity fails to raise the cumulative GPA above a 2.5 within one semester, the chapter is then suspended and may apply for associate membership. Academic probation status constitutes the following:

    A.  The chapter will be obligated to create a scholarship plan that is approved by the Vice-President of Scholarship, and will be obligated to follow the approved scholarship plan.

    B.  The academic chair of the chapter will be obligated to have monthly meetings with the Vice-President of Scholarship.

    C.  The chapter shall have no delegate serve on the Executive Board of the IFC.

    D.  The chapter shall have no delegate on the Greek Judicial Board.

E.  The chapter may not participate in any social Greek events or other social activities.

F.   The chapter shall have no vote on any matter of IFC affairs.

# ARTICLE 2: Rights and Obligations

The authority vested in the IFC, is derived from the Student Code of Conduct and the Guidelines for Student Organizations set forth by Campus Life.

## SECTION 1 - Rights

The fundamental rights that belong to every chapter recognized by the IFC shall be:

**1.1  EXPULSION.** No member or chapter shall be expelled from the IFC unless pursuant to the Greek Judicial Board as set forth in the Constitution; providing the acts do not violate any university, local, state, or federal laws. Violation of any of the aforementioned policies may lead to immediate expulsion at the discretion of the chapter's national organization, university, Advisor, or the Executive Board of the IFC.

**1.2  MEMBERSHIP.** Membership into the IFC may be granted to any all male fraternal organization recognized by Eastern Michigan University, provided they are accepted into the IFC through the procedure outlined in the Constitution.

**1.3  PROTEST.** Any IFC recognized member or chapter has the right to protest any resolution, ratification, or decision of the IFC as long as the acts of protest are not in conflict with the Constitution.

**1.4  FREE SPEECH**. Any member or chapter recognized by the IFC has the right to be heard, and that right shall not be abridged.

## SECTION 2 - OBLIGATIONS

The members of the IFC shall be responsible to/for:

**2.1**  The IFC Advisor(s) and the Greek Life Advisor

**2.2**  The Director of Campus Life at Eastern Michigan University

**2.3**  The Vice President of Student Affairs and Enrollment at Eastern Michigan University

**2.4**   The President of Eastern Michigan University

**2.5**  The Board of Regents of Eastern Michigan University

**2.6**  All active and associate members of the IFC will act in accordance with the Constitution, the Greek Life Social Policy, as well as university, local, state, and federal law.

**2.7**  Ignorance shall not be an excuse for any violation of the Constitution

**2.8**  No bylaws, rules, or orders shall be enacted in violation of the Constitution.

**2.9**  The IFC, members, delegates, or collegiate chapters governed by the IFC shall not conduct hazing, rough, undignified exercises or activities at any

time. The Executive Board shall automatically suspend any chapter whose members are guilty of hazing or threatening an initiate, active member, pledge, candidate, or any member protected by the Constitution. Hazing is any action taken or situation created intentionally, on or off the Eastern Michigan University premises, to produce mental or physical discomfort, embarrassment, harassment, or ridicule.

**2.10** For general and chapter purposes, a chapter may levy and collect fees, taxes and duties.

# ARTICLE 3: MEMBERSHIP

Membership into the IFC may be granted to any fraternal organization recognized by Eastern Michigan University.

## SECTION 1: REQUIREMENTS OF ACTIVE MEMBERSHIP

A fraternity must remain in good standing with the IFC and Eastern Michigan University at all times to be considered an Active Chapter. To remain in good standing, an organization must:

**1.1** Be current with all financial obligations to the IFC.

**1.2** Maintain a chapter grade point average of at least 2.50 on a 4.00 scale determined by a chapters semester average, or determined by a fall/winter cumulative chapter average, as it coincides with the academic calendar and the Executive Board's office term.

**1.3** Remain in good judicial standing with Eastern Michigan University.

**1.4** Register annually with Campus Life.

**1.5** Maintain a current roster of all chapter members, officers, advisors, corporation board members with the Student Organizations and Greek Life programs office of Campus Life.

**1.6** Maintain a current file of all affiliation forms for all associate members, as well as bylaws, with the Student Organizations and Greek Life Programs Office of Campus Life.

**1.7** Proper attendance, which constitutes forty percent of entire chapter membership, is required at all mandatory IFC functions. The Executive Board of the IFC, or a majority of the general assembly, will determine mandatory functions.

**1.8** Be recognized by a national fraternal organization as an active chapter of their organization, or be recognized by the IFC of Eastern Michigan University as a local chapter.

## SECTION 2: ASSOCIATE MEMBERSHIP

Organizations not fulfilling obligations to remain an Active Chapter may petition the IFC for an Associate Member status. Associate Member status constitutes the following exceptions to Active Chapter status:

**2.1**  Organization shall have no vote on any IFC business.
**2.2**  Organization shall have no delegate serve on the Executive Board of the IFC.
**2.3**  Organization shall have no delegate on the Greek Judicial Board.

An organization may not petition the IFC for Associate Member status more than once per semester. To petition the IFC for Associate Member status:

**2.4**  Must meet national requirements for colonization of their specific organization, or provide proof that there is no existing Greek letter organization with the same letters.

**2.5**  Submit a document outlining the name of the organization, a written commitment to Eastern Michigan University, a constitution and bylaws, proof of a faculty advisor, roster of officers, and a minimum of twenty completed IFC affiliation forms to the Executive Board of the IFC.

**2.6**  Be approved by a ¾ vote of Active Chapters of the IFC. Upon approval, the organization shall gain all the rights and privileges of Associate Member.

**2.7**  Once Granted associate member status, the group must pay appropriate dues to the IFC.

**2.8**  The petitioning group has a maximum of two calendar years from the date of Associate Member status recognition to be chartered by their respective national letter organization. Organizations choosing not to belong to a national fraternity do not need to meet this requirement. If this requirement is not met within the prescribed timeframe, Associate Member status shall be revoked. The petition process must be completed to regain the Associate Member status.

**2.9**  Any group attaining Associate Member status must remain an Associate Member for an appropriate probationary period to be determined by the IFC before the group will be eligible for Active Member status.

**2.10**  The chartered organization shall inform the Executive Board of the IFC of their intent to receive Active Member status at which time:

**A.** A decision of the IFC, by a 3/4 vote, shall be sufficient to grant Active Member status.
**B.** Upon receipt of Active Member status all rights and privileges granted herein are afforded to the organization.

# ARTICLE 4: CONVOCATIONS

The IFC will hold mandatory meetings at least monthly throughout the fall and winter semesters. However, an emergency meeting of the General Assembly or the Executive Board may be called with a minimum of 24 hours notice at the discretion of the IFC President.

## SECTION 1: ORDER OF BUSINESS

The Order of Business for the Convocation of an IFC meeting shall be:

**1.1** Roll Call
**1.2** Initiation of new Active/Associate Members
**1.3** Proposition for Membership
**1.4** Election of Members and Officers
**1.5** Unfinished Business
**1.6** Reports of Committees and Officers
**1.7** New Business

## SECTION 2: Obligations

Any fraternity that misses two unexcused meetings within one semester will be placed on social probation. Upon missing the third unexcused meeting the fraternity will be placed on suspension for a two-week period. The suspension will start the Monday after the third missed meeting.

# ARTICLE 5: Executive Board

The Executive Board shall set the agenda of ~~the~~ IFC and serve as the primary functioning arm of the body when the general assembly is not in session. All subsidiary bodies will report to the executive board during these times.

No officer serving on the executive board may incur more than three excused or unexcused absences. If this occurs, the officer shall be removed from office.

The Executive Board reserves the power to appoint committees to carry out the responsibilities of the IFC.

**SECTION 1: Officers and Duties**

**1.1** The Executive Board officers of the IFC, ranking in the order named, shall be:
   **i.** President
   **ii.** Executive Vice-President
   **iii.** Vice-President of Internal Affairs
   **iv.** Vice-President of External Affairs
   **v.** Vice-President of Membership
   **vi.** Vice-President of Scholarship
   **vii.** Member at Large

**1.2** Respond to emails and phone calls pertaining to chapter and the general community within 48 business hours.
**1.3** Be on time and in attendance at all executive board and council meetings.
**1.4** Meeting with the Greek Life advisor weekly and when necessary.
**1.5** Adhere to the Greek Life social policy at all times.
**1.6** Not support other chapters or members of the community who decide not to adhere to the Greek Life social policy.

**1.7** Adhere to all national, state, and local laws.
**1.8** Meet with your respective CPC counterpart once a week.
**1.9** Hold three office hours weekly (one hour will include your counterpart meeting).  These office hours are to be set for the semester, consistent, and advertised on agendas and outside of the Greek Life office.
**1.10** Cooperate with the Member at Large to complete all AFLV applications pertaining to your position.
**1.11** Complete a transition binder for each position respectively.


## SECTION 2: President

The duties and responsibilities for the President shall be as follows:

**2.1**  Preside over all meetings of IFC and shall call emergency meetings whenever deemed necessary.
**2.2**  Reserve rooms, set agenda, and be the chair for all IFC executive board and General Assembly meetings.
**2.3**  Represent IFC on any university or student committees deemed necessary, or designate another member of the executive board to be a representative.
**2.4**  Appoint and disband committees with the aid of the executive board
**2.5**   Work closely with the Director of Campus Life, the Greek Life Advisor, the President of the Panhellenic Council, the President of the National Pan Hellenic Council, and any other faculty or administrative personnel as an official representative of IFC.
**2.6**  Act as spokesperson for IFC, and the only one who may enter into contractual agreements, verbal or written, on behalf of the IFC.
**2.7**  Complete designated AFLV applications.
**2.8**  Act as liaison between IFC and the NIC.
**2.9**  Hold weekly meetings with IFC and CPC executive board members.
**2.10** Regular meetings with CPC and NPHC presidents.
**2.11** Hold monthly presidents' meetings
**2.12** Attend Presidents' Retreat each semester.
**2.13** Visit individual IFC chapter meetings once per semester to promote IFC and current council and community initiatives.
**2.14** Coordinate selection of UIFI and Leadershape scholarship applicants.
**2.15** Coordinate annual executive board transition process.
**2.16** Track fraternal absences.

**SECTION 3: Executive Vice-President**

The duties and responsibilities for the Executive Vice-President shall be as follows:

**3.1**   Assume all responsibilities of the President if they cannot do so.

**3.2**   Attend any meetings that the President deems necessary.

**3.3**   Act as Chief Justice and spokesperson of the Greek Judicial Board with the Executive Vice President of the College Panhellenic Council, and shall be responsible for all Greek Judicial Board meetings and hearings as outlined in the Greek Judicial Board Constitution.

**3.4**   Coordinate GLASS and all other alcohol education programs in collaboration with Snow Health and the Women's Resource Center.

**3.5** Coordinate the annual Anti-Hazing week programming in collaboration with the Executive Vice President of the College Panhellenic Council.

**3.6** Plan and execute the Social Policy Conference.

**3.7** Keep accurate and timely records of GLASS certification.

**3.8** Act as parliamentarian during IFC general body meetings.

**3.9** Hold chair meetings with Risk Management chairs and Social Chairs once per semester.

**SECTION 4:  Vice-President of Internal Affairs**

The duties and responsibilities for the Vice-President of Internal Affairs shall be as follows:

**4.1**   Be responsible for all revisions of the Constitution passed by IFC.

**4.2**   Keep an accurate record of all IFC financial transactions.

**4.3** Distribute invoices for IFC dues by the first meeting of the second month every semester.

**4.4**   Collect all IFC dues and apply late fees when necessary.

**4.5**   Prepare, propose, and enforce a budget.

**4.6**   Take minutes and keep records of all general body meetings, and send all minutes to Greek Life Coordinator to be posted online.

**4.7**   Plan the Greek Awards Ceremony.

**4.8** Review chapter websites and social media accounts, and conduct audits of both each semester.

**4.9** Manage the Greek Life calendar.

**4.10** Hold regular meetings with secretaries, historians, and treasurers.

**4.11** Plan fundraisers to benefit IFC.

**4.12** Coordinate council-wide socials for members of IFC.

**SECTION 5: Vice-President of External Affairs**

The duties and responsibilities for the Vice-President for External Affairs
shall be as follows:

> **5.1**  Oversee at least one Greek wide philanthropy and community service project
> each semester in partnership with VISION and the VP of External Affairs from
> the College Panhellenic Council.
> **5.2**  Chair philanthropy and service chair meetings once per semester.
> **5.3**  Serve as Greek Week co-chair along with the VP of External Affairs from
> the College Panhellenic Council.
> **5.4** Maintain the annual Provost's 365 Days of Service Challenge.
> **5.5** Track and report service hours and philanthropy dollars raised for each
> chapter.
> **5.6** Maintain relationship with the Make-a-Wish Foundation.
> **5.7**  Coordinate all fraternity intramural activities.
> **5.8**  Ensure the maintenance of the All-Sports Trophy.

**SECTION 6: Vice-President of Membership**

The duties and responsibilities for the Vice-President for Membership shall be as follows:

> **6.1**  Coordinate IFC fall and winter recruitment programs.
> **6.2**  Create a semi-structured recruitment for fall semester.
> **6.3**  Oversee recruitment chair meetings.
> **6.4**  Create, update, and distribute list of potential new members to all IFC chapters.
> **6.5**  Offer scholarship to unaffiliated Eastern Michigan University students.
> **6.6**  Coordinate staffing of FastTrack tables.
> **6.7**  Create a year round marketing plan.
> **6.8**  Coordinate summer mailing with Campus Life Office.
> **6.9**  Coordinate IFC participation in Move in Magic and Explore EMYou.
> **6.10** Oversee recruitment chair meetings.
> **6.11** Establish council wide recruitment goals each semester together with the
> recruitment chairs, track progress, and help chapters strive to achieve those goals.
> **6.12** Seek out and bring external recruitment programs to Eastern Michigan University as
> needed.
> **6.13** Distribute recruitment manual explaining IFC recruitment resources.
> **6.14** Coordinate the expansion of IFC at Eastern Michigan University
> **6.15** Coordinate welcome events for newly colonized IFC organizations.

**SECTION 7: Vice-President of Scholarship**

The duties and responsibilities for the Vice-President for Education shall be as follows:

**7.1**  Organize at least two educational programs for all IFC members.
**7.2**  Hold chair meetings for chapter programming chairs, scholarship chairs, and new member educators.
**7.3** Coordinate New Member Institute in collaboration with the VP of Education from the College Panhellenic Council.
**7.4**  Coordinate annual PhotoVoice event with the VP of Education from the College Panhellenic Council.
**7.5** Provide an annual academic scholarship.
    i. Open to all active non graduating IFC members.
    ii. A first committee of all chapters academic chairs and IFC Vice President of Scholarship will select the top 3 candidates.
    iii. Second committee formed of any combination of pro staff members and IFC executive board members will choose the winner of the top 3 candidates.
    iv. The money will be funded initially by allocating 1 dollars of every active member's dues
    v. The VP of scholarship will also seek additional funding options
**7.6** Host programs once per semester on issues related to diversity and inclusion in collaboration     with the Department of Diversity and Community Involvement.
**7.7** Create a council-wide scholarship plan in cooperation with chapter scholarship chairs.
**7.8**  Ensure maintenance of the Academic Trophy.

**SECTION 8: Member at Large**

The duties and responsibilities for the Member at Large shall be as follows:

**8.1** Represent IFC at College Panhellenic Council general body meetings.
**8.2** Help coordinate special events for IFC
**8.3** Communicate with Panhellenic delegates outside of the general body meetings.
**8.4** Act as a liaison between the campus community and IFC.
**8.5** Facilitate the completion of the annual AFLV application and collect all records of IFC events and programs throughout the year.
**8.6** Attend AFLV conference.
**8.7** Inform the College Panhellenic Council and NPHC on IFC chapter and council events.
**8.8** Coordinate IFC executive board members participation in GSAP interviews and binder completion.
**8.9**  Implement socials between executive board members of IFC, CPC and NPHC.
**8.10** Should any executive board positions become vacant, other than president, the Member at Large shall assume all of the responsibilities of that position.

# ARTICLE 6: ELECTIONS

## SECTION 1: NOMINATIONS

The process for the nomination of Executive Board officers shall be:

**1.1** Candidates for office for the Executive Board of the IFC must have been active for a minimum of one semester in their respective chapter

**1.2** Be from an active IFC chapter according to the Constitution

**1.3** Be in good judicial standing with the IFC, and have a minimum cumulative GPA of 2.5 or minimum semester GPA of 2.7.

**1.4** All requirements must be met the entire term of office.

**1.5** Only two members of the same chapter may hold offices on the Executive Board concurrently.

**1.6** Nominations shall be taken as early as one month prior to elections.

**1.7** Those persons seeking nomination must be present to accept such.

## SECTION 2: ELECTION

**2.1** Nominees must be present on the day of the election to run for office. Each nominee will be given a specified period of time to address the general assembly and answer inquiries. Following said procedures, debate shall proceed in a "two for, two against" method.

**2.2** The nominee receiving a majority of the votes cast shall win the election. If no one candidate receives a majority of the vote, then the two Candidates who had received the highest number of votes will participate in a runoff election in which the person receiving the majority of the votes will receive the position.

# ARTICLE 7: REPRESENTATION AND VOTING

After quorum has been established, each active chapter of the IFC in good standing, and with both delegates in attendance, shall receive one vote to be cast by the chapter's senior delegate.

# ARTICLE 8: COROLLARY POLICIES

The IFC will not tolerate or condone any form of sexually abusive behavior on the part of its members, whether it be physical, mental, or emotional. This includes any actions that are demeaning to women explicitly, but not limited to, date rape, gang rape, or verbal harassment.

The IFC and its active chapters shall not discriminate on the basis of race, national origin, age, ethnicity, class, ability, creed, religion, sexual orientation, gender identity or expression at any time.

Any chapter found in violation of the Eastern Michigan University Student Code of Conduct, Greek Social Policy, and/or FIPG Risk Management Guidelines shall be charged and faced with mediation as outlined in the Greek Judicial Board Constitution.

There shall be no alcohol, drugs, or sexual harassment at council events.

# ARTICLE 9: VIOLATIONS

A violation will be defined as an act that contradicts the policies and regulations set forth in the Constitution. The President of the chapter in violation of said policies of will meet with the President of the Interfraternity Council and the Greek Life Advisor to act as mediators to determine a course of action for the violation. If the chapter is not satisfied with the sanctions registered against them from the mediation they may request a Judicial Board hearing.

Social Probation shall be defined as a loss of all social privileges. Privileges include social events with other organizations recognized by Eastern Michigan University, parties, chapter sponsored events, and all rights allowed to them under the Campus Life Policies. Philanthropic, educational, fundraising, and recruiting events may still be held. A letter must be submitted and approved by the Interfraternity Council Executive Board prior to the end of the social probation. Upon approval the chapter will be removed from social probation at the end of the designated time set by the Interfraternity Council Executive Board. In the event the letter is not approved, mediation with the Greek Life Advisor, the President of the Interfraternity Council and the President of the chapter on social probation must be held.

Suspension shall be defined as a chapter's loss of all privileges that are given to a chapter of the Interfraternity Council at Eastern Michigan University. These privileges include all social privileges (see above). The chapter will also be restricted from holding any event including, but not limited to, fundraisers, philanthropies and recruitment. A formal letter must be submitted to the Interfraternity Council Executive board prior to the end of the suspension. If the Executive Board approves the letter, the suspension will be lifted. If the letter is not approved, further mediation with the Greek Life Advisor, Interfraternity Council Executive Board President and the President of the chapter in question will be held in which the future of the chapter on Eastern Michigan University's campus will be discussed.

# ARTICLE 10: AMENDMENT AND RATIFICATION

Any amendment or ratification shall require a 3/4 vote of the general assembly

# ARTICLE 11: EXPANSION

## SECTION 1: PURPOSE

Realizing the importance of controlled growth to the continuance of the fraternity system, the Eastern Michigan University Interfraternity Council hereby sets forth the following policy and procedures for expansion and colonization on the Eastern Michigan University campus:

**1.1** The IFC and the university jointly reserve the right to invite specific national fraternities to colonize at the university.

**1.2** New social fraternities shall be subject to the expansion policy from the time of first contact with the IFC and/or the fraternity advisor until accepted as a member of the IFC.

**1.3** Expansion is a systematic process and the completion of one or more steps in no way guarantees a commitment to extend an invitation to colonize.

**1.4** With the exception of those organizations already established, the University will not recognize local fraternities. All fraternities who desire membership in the IFC at EMU must be affiliated with an inter/national organization recognized as a member of the North-American Interfraternity Conference (NIC).

## SECTION 2: EXPANSION COMMITTEE

The IFC Executive Board may appoint at its discretion an Expansion Committee each year to examine the feasibility of expansion of the fraternity system.

**2.1** The IFC Vice President of Membership will serve as the committee chairman.

**2.2** The committee will consist of four members from IFC-affiliated fraternities represented at EMU, including one representative from the most recently chartered fraternity.

**2.3** The university fraternity advisor will act as an ex officio committee member.

**2.4** The committee chairman may request that Campus Life appoint an additional Student Affairs staff member to serve as ex officio committee member to assist with the committee's final decision.

**2.5** The committee shall deal with all matters pertaining to expansion of the IFC. All action in the area of colonization must be approved and sanctioned by this committee.

**2.6** As their primary mission, the committee shall review the current climate of the fraternity system at EMU. This review should focus on the interest of unaffiliated male-identified students on campus and their interest in a new opportunity for fraternity membership.

**2.7** If the committee determines that expansion is a possibility, the committee will notify national fraternities, which have inactive EMU chapters and

send a general interest letter to all other NIC-affiliated fraternities not currently represented on campus.

**2.8** If the committee determines that expansion is not feasible, all interested parties will be notified in writing by the Vice President of Members, in conjunction with Campus Life.

## SECTION 3: INQUIRY STAGE

**3.1** The Vice President of Membership shall compose a letter to all NIC-affiliated fraternities not established on campus extending the invitation for each to submit a letter of interest of expansion to the university. The invitation should include a copy of pertinent campus policies, including Article 11 of the IFC constitution regarding expansion.

**3.2** Upon invitation, any interested fraternity shall provide to the Expansion Committee the following information:

  **A.** Number of alumni within a 100-mile radius of Ypsilanti, MI
  **B.** Number of colonization attempts in the last five (5) years, their respective status, and the names of the institutions at which they are located
  **C.** Number of colonization attempts presently pending and the names of the respective institutions
  **D.** Name of the institution housing the nearest chartered chapter of the fraternity and its status
  **E.** The ratio of field staff/consultants to chapters/colonies and the set visitation program
  **F.** Reason for interest in colonizing at Eastern Michigan University
  **G.** Status of housing corporation/alumni boards and plans for facilities in Ypsilanti, MI

**3.3** The fraternity's constitution and governing documents shall be in compliance with the latest edition of the EMU Code of Student Conduct

**3.4** The committee shall give consideration to the following instances in the decision for invitation to colonize:

  A. Inter/national fraternities who have previously had a chapter on campus, which was removed for non-disciplinary measures
  B. Inter/national fraternities who have filed letters with the committee, IFC, or fraternity advisor expressing previous or continuing interest in the campus.

**3.5** All members of the committee shall take time to review all materials received in order to familiarize themselves with all the respective fraternities' programs and philosophies prior to any discussion on such information

**3.6** Based on the information received, the committee shall prioritize those fraternities from which they wish to receive further information.

**3.7** The committee shall develop a final list of an appropriate number of general fraternities to discuss fully their merits for further consideration.

## SECTION 4: VISITATION STAGE

**4.1** Upon review of submitted information, The Expansion Committee, through open discussion and dialogue, should develop a small fixed group no larger than three (3) candidate fraternities to invite to visit the campus and give presentations before the Expansion Committee and the IFC Executive Board and any Campus Life staff for the purpose of mutual evaluation.

**4.2** The committee chairman shall compose a letter to those finalists inviting them to campus for the purpose of educating the full **IFC** on the philosophies and programs of the fraternity

**4.3** The visits by the fraternities should be individual and distinct for each invited fraternity

**4.4** The committee shall prepare ranking sheets for the evaluating members to use in determining fraternity rankings towards potential colonization. The following criteria shall be considered in selection of colonizing fraternities (in no particular order):

    **A.** Ratio of colonies to groups that subsequently activate chapters
    **B.** Number of alumni within a 100-mile radius of Ypsilanti, MI
    **C.** Location of national headquarters and respective staff members
    **D.** Completeness of requested application materials
    **E.** Timeliness of application materials
    **F.** Former affiliation with Eastern Michigan University
    **G.** Specific student, faculty, and/or staff interest in establishing a new chapter
    **H.** Demonstrated interest by the fraternity
    **I.** Quality of presentation by those fraternities invited to appear before the selection committee and IFC Executive Board.
    **J.** Unique programs that offer something currently not in place at EMU

**4.5** The committee shall formulate a prioritized list of those fraternities to invite to expand on campus. Only those fraternities who were invited to visit shall be considered. If no consensus is reached to invite one or more of the visiting fraternities to campus, the process should begin anew.

**4.6** The two possible recommendations from the committee are:

    **A.** No invitation should be extended
    **B.** An invitation to colonize should be extended to a particular fraternity or fraternities

**4.7** At the first regular meeting of IFC following presentations to the IFC Executive Board, the entire IFC shall vote to recommend or not recommend admission of a particular fraternity. A three-fourths (3/4) vote of the members in attendance, provided that a quorum of full status members is in attendance, will grant a positive recommendation. The committee shall meet after all invited groups have visited. The formal review should focus on philosophy and programming.

**4.8** The IFC approval authorizes the Vice President of Membership and President to present to the Director of Campus Life their recommendation and desire to extend an invitation to the selected fraternity. With the Director's agreement, a joint invitation will be extended to the approved fraternity. The fraternities

receiving top priority shall be referred to the Director of Campus Life for approval of the IFC recommendations.

**4.9** The Director of Campus Life shall have the opportunity to review the IFC decision in an open forum and make the final decision to approve or disapprove the IFC recommendations.

**4.10** After university approval is granted, the Vice President of Membership shall compose a letter of invitation to the selected fraternity to expand on campus.

**4.11** If the invited fraternity declines, the committee shall then invite the next fraternity on the priority list.

**4.12** The Expansion Committee shall keep the information submitted by all fraternities not selected for colonization on file for two calendar years.

## SECTION 5: PETITION-INTEREST GROUP STAGE

**5.1** Upon receipt of the fraternity's acceptance, the IFC and fraternity advisor shall work with the appropriate fraternity staff member(s) to offer any assistance possible to ensure the success of the colonization.

**5.2** The beginning date of the colonization will be decided by the IFC and fraternity advisor in consultation with the respective fraternity.

**5.3** The approved fraternities will submit to the IFC and fraternity advisor a plan for their colonization at Eastern Michigan University within thirty (30) days of approval.

**5.4** Upon receiving permission of colonization, the new colony shall be a non-voting member of the IFC, recognized as a petitioning status member.

**5.5** The rights and privileges afforded the colony shall include the below-listed items. If necessary the Expansion Committee may waive any of the following requirements. The colony shall:

    **A.** Attend all IFC meetings as a petitioning status member

    **B.** Receive all services granted to the full status members of the IFC, except for voting privileges

    **C.** Pay 50% regular dues to the IFC

    **D.** Comply with all university and IFC rules and regulations, policies and procedures

    **E.** Maintain an active alumni advisory committee as prescribed through the national fraternity

    **F.** As represented by the colony president, meet with the fraternity advisor and the IFC president on a monthly basis

    **G.** Provide the IFC Executive Board and fraternity advisor with a report three (3) times per semester on the status of the colony

    **H.** Be encouraged to participate in all Fraternity/Sorority community activities

    **I.** Have a national representative visit a minimum of once each semester for as long as it exists as a colony of the national fraternity or a petitioning status member of the IFC, whichever is longer

    **J.** Function as a petitioning status chapter for not less than three academic months and not more than two years

## SECTION 6: Full Status Membership

**6.1** A petitioning status chapter or colony may petition the IFC for full membership after being an officially recognized petitioning status member for full semester or upon being granted a charter from the national fraternity. A petition for recognition as a full status member must be made no later than one month after the chartering of the chapter.

**6.2** The petition shall be presented at any official IFC meeting and voted upon at the next meeting.

**6.3** Acceptance of the petition by a three-fourths (3/4) vote of the total membership of the IFC shall admit the chapter as a full status member of the IFC.

**6.4** Full membership is contingent upon approval by the IFC, or the fraternity advisor if the petitioning colony has shown exemplary potential and has met all requirements for full membership.

**6.5** At the time of acceptance, the group shall pay a one-time two hundred fifty-dollar ($250) admission fee.

## SECTION 7: Interest Groups

**7.1** An interest group shall be defined as those fraternities formed independent of IFC with no pre-determined national fraternity affiliation.

**7.2** The interest group should seek IFC approval for assistance in selecting a national fraternity.

**7.3** The Expansion Committee shall work with the interest group to ensure sound investigation of interested fraternities.

**7.4** The interest group should express their choice to the Expansion Committee for support and approval.

**7.5** The IFC Expansion Policy should be following at the point of Expansion Committee approval.

## SECTION 8: Interest Groups with Pre-Determined Fraternity Association

**8.1** The Expansion Committee shall ask the interest group to provide written documentation from the chosen national fraternity that the fraternity does support and desire to expand with the interest group as their base.

**8.2** The Expansion Committee shall clearly state that the interest group must abide by the stated IFC Expansion Policy.

**8.3** The IFC shall clearly inform the fraternity of the IFC Expansion Policy which the affiliate group and national fraternity must follow.

**8.4** If the fraternity and interest group seek and receive Expansion Committee approval then the IFC shall proceed with the formal approval.

## SECTION 9: General Fraternity Expanding Without an Invitation

**9.1**  Upon being notified of a fraternity's attempts at on-campus fraternity expansion outside of the guidelines established by the IFC Expansion Policy, the IFC should communicate to the with the fraternity, the university, and the Expansion Committee

**9.2**  The fraternity shall be notified of the Expansion Policy and be requested to follow it.

**9.3**  The IFC shall understand the right of association that fellow students have on a public university, such as Eastern Michigan University.

## SECTION 10: POLICY RE-EXAMINATION

The procedures and policy on expansion shall be reviewed, and if necessary, revised each year by the Expansion Committee with the approval of the IFC.

# **<u>EXHIBIT B</u>**

# Sigma Kappa

# National Policy Handbook
## 2016

# NATIONAL POLICY HANDBOOK

# FOR

# SIGMA KAPPA CHAPTERS

# 2016

prepared by
**NATIONAL COUNCIL**

For use by
**COLLEGIATE CHAPTERS, ALUMNAE CHAPTERS,
ADVISORY BOARDS, CORPORATION BOARDS, NATIONAL OFFICERS
AND MEMBERS AT LARGE**

**All policies may be petitioned to the national council
with a special dispensation form.**

**These policies are binding on all chapters and members and
can be amended only by the national council.**

**This handbook is to be reviewed by collegiate chapters at the beginning
of each school year at a joint meeting of new members and initiated members,
and by alumnae chapters annually.**

**Changes from previous editions are indicated in *italics*.**

| | | |
|---|---|---|
| I. | RECRUITMENT | 3 |
| II. | PLEDGING | 5 |
| III. | INITIATION | 6 |
| IV. | MEMBERSHIP STATUS | 9 |
| V. | TERMINATION/SUSPENSION OF MEMBERSHIP | 14 |
| VI. | ACADEMIC REQUIREMENTS | 20 |
| VII. | RISK MANAGEMENT FOR COLLEGIATE CHAPTERS | 22 |
| VIII. | INTERNET AND RELATED TECHNOLOGY POLICY | 32 |
| IX. | COLLEGIATE CHAPTERS | 36 |
| X. | COLLEGIATE CHAPTER OFFICERS | 39 |
| XI. | ADVISORY BOARD | 40 |
| XII. | HOUSING AND CORPORATION BOARD POLICIES | 42 |
| XIII. | ALUMNAE CHAPTERS | 47 |
| XIV. | NATIONAL OFFICERS | 49 |
| XV. | FOUNDERS' DAY | 50 |
| XVI. | ~~REGIONAL LEADERSHIP CONFERENCES~~ *SIGMA KAPPA-SPONSORED CONFERENCES* | 51 |
| XVII. | CONVENTION | 52 |
| XVIII. | SELECTED NPC UNANIMOUS AGREEMENTS AND GENERAL GOVERNING POLICIES | 54 |
| XIX. | BADGES AND JEWELRY | 60 |
| XX. | LICENSING | 62 |
| XXI. | SHARING OF MEMBER INFORMATION POLICY | 63 |
| XXII. | DOCUMENT RETENTION POLICY | 66 |
| XXIII. | *SIGMA KAPPA TRIANGLE* DEATH NOTICES | 69 |
| | INDEX | 70 |

## I.  RECRUITMENT

A.  The national recruitment supervisor for each collegiate chapter is appointed by the national council at the request of the national vice president for membership. She has the authority to delay the bidding of any potential member until sufficient further information, satisfactory to the national recruitment supervisor, has been obtained if she deems it is in the best interest of the chapter. In addition, she has the authority to set up procedures to enable the chapter to reach quota.

B.  **Sigma Kappa Legacy Policy**

Importance of legacies: It is the belief of Sigma Kappa Sorority that our legacies are extremely important to the success of our sorority. When the chapter is determining whom they wish to pledge, the chapter shall give careful consideration to the following relatives/step-relatives of collegiate members and active Sigma Kappa alumnae: sister, daughter, granddaughter, niece. ~~While we believe all Sigma Kappa relatives are to be given special consideration, it is necessary to be even more careful in our consideration of those specifically listed above.~~ *While Sigma Kappa strongly encourages chapters to invite legacies to join our membership, legacy status does not guarantee membership and chapters are not required to pledge legacies.*

**Procedure**

~~Whenever possible,~~ *A* Sigma Kappa legacy should be invited to the first invitational event *during formal and informal recruitment.* If a legacy attends Sigma Kappa's preference event, her name must appear on the first bid list. If a legacy is in danger of being released, the ~~national~~ recruitment supervisor shall assess the situation and has the authority to reverse the chapter decision. A full explanation should be given *by the chapter to the recruitment supervisor of why the legacy should not be a member of the chapter. If the* ~~to the chapter by the national~~ recruitment supervisor *reverses the decision to release, a full explanation should be given to the chapter* of why the legacy should be a member of the chapter. When a chapter participates in a *formal or informal* recruitment format with only **one** invitational event ~~(typically to preference)~~, the chapter will work with the recruitment supervisor to invite back only legacies to whom they intend to extend a bid.

Potential new members with multiple Sigma Kappa legacy relationships should be given additional consideration. They must be invited to round 3 in a 4-round recruitment format or round 2 in a 3-round recruitment format. These women may not be released without permission from a national recruitment team volunteer. *In the event a legacy is released from formal or informal recruitment, only alumnae who completed and indicated on the Recruitment Introduction Form that they wish to receive release notification will be contacted. This release notification is a courtesy and reasons for the release cannot be discussed, as all membership selection business is confidential for the privacy of our members and potential new members.*

3

C.      The Membership Selection Committee (MSC) shall be authorized by a ¾ majority vote of the chapter members.

**Procedure:**
1. Prior to the first Membership Selection Committee meeting, the chapter must conduct a meeting to vote with a ¾ majority to authorize the Membership Selection Committee to invite potential new members and to approve the invited potential new members to be members of Sigma Kappa.
2. The voting members of the Membership Selection Committee are president, vice president of membership, assistant vice president of membership, continuing membership chairman, and rotation group leaders.
3. The Membership Selection Committee is advised by the recruitment supervisor, vice president of membership advisor, and/or national headquarters staff person (when applicable). If the RS/VPM advisor is not available then the recruitment coordinator, collegiate coordinator or advisory board supervisor will attend.
4. The Membership Selection Committee meeting is chaired by the recruitment supervisor.

## II.  PLEDGING

**Policy**

Collegiate new members: Any woman who qualifies for membership under the constitution and is pursuing a course at a college or university in which a chapter is located shall be eligible to be pledged only under **ALL** of the following conditions:

1. ~~If an undergraduate,~~ She shall be pursuing a *bachelor's* degree. ~~If a graduate student, she shall have a college degree, be pursuing graduate studies, and taking not less than three (3) hours per week.~~

2. She shall receive an affirmative vote of the membership selection committee.

3. She should have at least one written recommendation from an initiated member in good standing.

4. A woman shall have a 2.8 grade point average (based on a 4.0 system) from high school and a 2.5 grade point average from college to be eligible to pledge. All exceptions require approval of the advisory board supervisor and collegiate coordinator.

5. A woman shall be formally pledged no later than seven calendar days upon accepting a bid. All exceptions must be approved by the advisory board supervisor and the collegiate coordinator.

## III.  INITIATION

### A.  Initiation Policy

1.  Chapters do not vote on new members prior to Initiation. When a college student has been formally pledged to Sigma Kappa, she is eligible to be initiated PROVIDED she meets educational, financial, and new member education requirements. However, the vice president of new member education in her capacity as new member educator may recommend to the chapter that the initiation of any new member be deferred or terminated if, in her opinion, the new member has not met the Sigma Kappa requirements for Initiation. Prior to such recommendation to the chapter, the vice president of new member education must secure approval of her recommendation from her advisor and her collegiate coordinator. A **two-thirds** vote of the chapter is necessary for the recommendation to be accepted.

2.  The Promise new member education program is comprised of two components. The new member program lasts for seven weeks, including Inspiration Week which immediately precedes Initiation. The new initiate program, implemented after Initiation, is three weeks long. Initiation should occur immediately after the first seven meetings are complete and prior to the new initiate meetings.

3.  The following requirements for Initiation shall be completed by each new member prior to Initiation:

    a.  Fulfill all chapter new member education duties and requirements.

    b.  Pass the initiate's exam with a score of at least 90%.

    c.  File with the finance advisor written consent to the financial obligations involved in membership.

    d.  Pay all chapter debts, including the initiation fee and badge fee.

    e.  Sign the badge affirmation card to be sent to national headquarters.

    f.  Meet scholastic standards as follows:

        1.  When Initiation occurs after a grading period (semester, quarter, etc.), maintain at least a 2.5 or higher grade point average as established by the collegiate chapter.

        2.  When Initiation occurs before a grading period ends, meet scholastic standards as set by the collegiate chapter in collaboration with the advisory board and collegiate coordinator.

    g.  During the seven-week new member period, maintain acceptable scholastic achievement.

    h.  Should have one (1) written recommendation from an initiated member in good standing in the chapter files.

    i.  Have proved herself worthy of full Sigma Kappa membership through a cooperative and positive attitude toward Sigma Kappa.

4.  Chapters with a new member class of one to twelve initiates must initiate one at a time.

New member classes of thirteen to twenty-four initiates may be initiated two at a time. Chapters with twenty-five to thirty-six members may initiate three at a time. New member classes with thirty-seven to forty-eight may be initiated four at a time, and similarly, chapters may initiate each multiple of twelve new members in corresponding groups, ie. 5 at a time up to 60 or 6 at a time up to 72. Alumna and honor initiates must always be initiated one at a time. Legacies should be initiated with all other new members in alpha order. A legacy may be pinned by her family member during the Initiation ceremony.

5.   Parents and special guests may attend Initiation banquets/receptions upon approval of the advisory board.

6.   Smoking and alcoholic beverages are prohibited at Initiation receptions/banquets.

7.   Only initiated Sigma Kappas are permitted to remain in the house during Initiation. No other persons are allowed, except by special permission of the advisory board.

## B.   Honor Initiate Policy

Prospective honor initiates are those women chosen and approved by the national council to become members of Sigma Kappa Sorority. The qualifications of an honor initiate are:

1.   To be a woman who has received distinction in her community, and whose membership will add distinction to our organization.

2.   To have demonstrated her interest in Sigma Kappa.

### Procedure

1.   Alumnae and collegiate chapters may present honor initiate candidates to national council by contacting the national vice president for alumnae.

2.   National council approves the collegiate chapter of initiation for a prospective honor initiate.

3.   Prospective honor initiates shall be initiated at a national convention, a collegiate chapter installation, a collegiate chapter Initiation, or at another national council approved occasion.

4.   The national treasury pays honor initiate fees.

5.   Honor initiates are members of Sigma Kappa with all the rights, responsibilities, and privileges.

## C.   Alumnae Initiate Policy

Prospective alumnae initiates are those women chosen by alumnae and collegiate chapters to become members of Sigma Kappa Sorority. Membership is an honor to be conferred with careful consideration of its requirements and responsibilities as well as its privileges. The qualifications of an alumna initiate are:

1.   To have a college degree. This should not be considered an absolute requirement.

7

2. To have demonstrated her interest in assisting college women.
3. To have given service in community affairs.
4. To be sponsored by two initiated members in good standing.
5. To be willing to acquire knowledge of Sigma Kappa.
6. To be willing to give service to Sigma Kappa.

**Procedure**

1. An affirmative vote shall be secured from the Membership Selection Committee of the collegiate chapter of initiation for each alumna initiate.
2. Alumnae chapters wishing to present an alumna initiate candidate for Initiation should contact national headquarters.
3. A petition for alumna initiation and alumna initiation application should be submitted to the collegiate alumnae relations coordinator supervising the chapter of initiation.
4. National alumnae dues, alumnae initiation fee and badge fee must be paid.
5. Alumnae initiates are members of Sigma Kappa with all the rights, responsibilities, and privileges.
6. In order to avoid conflicts, collegiate chapters are asked to refrain from inviting to membership their house director until such time as the house director is no longer employed by the corporation.
7. In some cases, selected women from the community in which there is a new colony, or a collegiate chapter being recolonized, may be asked to become alumnae initiates. In these cases, national council gives approval for Initiation. At the discretion of national council, these initiates may or may not be asked to pay the national alumnae dues, alumnae initiation fee or the badge fee.

## IV.  MEMBERSHIP STATUS

### A.  Membership Policy

1. No person who is or has been an initiated member of any sorority or fraternity belonging to the National Panhellenic Conference or any similar national college or university fraternity, except honorary and professional, shall be eligible for membership in Sigma Kappa.

2. A Sigma Kappa is a "member in good standing" for purposes of this handbook so long as she is not suspended, withdrawn or expelled and she is above the minimum academic requirement in section VI.B. for collegiate members.

### B.  Social Privileges and Social Membership Policy

1. Sigma Kappa does not permit social privileges or social membership. Regular participation in chapter activities and social events is limited to new members and members of Sigma Kappa. Guests may be invited to social activities on special occasions with advisory board approval, but not because of any social privileges or social membership accorded to them as individuals.

2. ~~Big/Little Brother and Little Sister Policy~~ *Auxiliary Groups/Big/Little Brothers*
   ~~In support of the 1973 NPC resolution,~~ *Pursuant to the National Panhellenic Conference Unanimous Agreement X.,* Sigma Kappa does not recognize auxiliary groups to Sigma Kappa for men, commonly called Big or Little Brothers or women's auxiliary groups for men's fraternities, commonly called Little Sisters. ~~It is the opinion of Sigma Kappa that the activities of~~ *Such* groups are inconsistent with the purpose and *philosophy* of ~~the National Panhellenic Conference and~~ Sigma Kappa Sorority. Sigma Kappa chapters are not to spend time or financial resources in the formation of Big or Little Brother or Little Sister groups.

3. *Participation in Men's Recruitment*
   *Pursuant to the National Panhellenic Conference Unanimous Agreement X., NPC members shall not participate in men's fraternity recruitment activities; therefore Sigma Kappa chapters and members may not participate in any of these events, including bid day.*

### C.  Collegiate Members Policy

1. ALL COLLEGIATE members of Sigma Kappa shall be participating members of their chapter based on the following: Freshman initiates are required to participate for eight full semesters or twelve quarters. Sophomores are required to participate in six full semesters or nine quarters. Juniors are required to participate for four full semesters or six quarters. Seniors are required to participate for two full semesters or three quarters. If a member is initiated during the second semester or second quarter, one term should be subtracted from the total. If a member is initiated during the third quarter, two terms should be subtracted from the total. Enrollment in summer classes does not count toward chapter participation.

2. All collegiate members are expected to participate in at least one co-curricular activity.

3. In order for a collegiate member to have full voting and chapter privileges, she shall be

9

pursuing a degree at the institution where the chapter holds its charter.

4. Any new member or member whose conduct or habits are found to be seriously detrimental to the welfare of individuals or the chapter will be subject to disciplinary action by the chapter and/or the national council.

## D. Transfer of Membership Policy

Members transferring from one college /university to another may transfer their membership to the Sigma Kappa chapter at the new college/university under the transfer of membership procedure.

### Procedure

1. In order to affiliate with another chapter, a member wishing to transfer shall have paid all financial obligations, including full payment of the housing/furnishing fee, to the chapter and/or corporation board of her Initiation.

2. When a member wishes to affiliate with a different chapter, that chapter's president shall complete the "Member Transfer Recommendation Form" and send it to the advisory board supervisor and the collegiate coordinator for approval. The form is then sent to national headquarters for final processing.

3. The member may be admitted to membership in the different chapter by a majority vote of the chapter when she has participated in the activities of the chapter for a month and the "Member Transfer Recommendation Form" has been approved by the advisory board and the collegiate coordinator.

4. Members from dormant chapters shall meet the requirements of number 1 and should petition the national vice president for collegiate chapters.

## E. Special Membership Status Policy

Special status may be granted **ONLY** under the following conditions:

1. **Married members** of a chapter will remain active collegiate members.

### Procedure

If they wish to assume alumnae status, a written petition to the chapter is necessary and may be granted upon a two-thirds (2/3) affirmative vote of the chapter followed by the Petition for Special Dispensation approved by the advisory board and the collegiate coordinator. She must be a member in good standing. After approval, the change of status shall be noted in the minutes and on Dove Hub.

2. **Members that pursue full-time professional programs/degrees** as an undergraduate member, who have not graduated or participated in the required number of terms as previously mentioned in NPH IV.C.1., are to remain active in their collegiate chapters.

**Procedure**

If they wish to assume alumnae status, a written petition to the chapter is necessary and may be granted upon a two-thirds affirmative vote of the chapter followed by the Petition for Special Dispensation approved by the advisory board and the collegiate coordinator. She must be a member in good standing. After approval, the change of status shall be noted in the minutes and on Dove Hub.

3. **Graduate student members** of a chapter, those that have graduated with an undergraduate degree.

   **Procedure**

   They may remain active in their collegiate chapter upon a two-thirds (2/3) vote of approval by the chapter. If granted, the change of status should be listed on Dove Hub and the members should comply with the qualifications of an undergraduate member in NPH IV.C. Otherwise, the student is considered an alumna member.

4. **Members graduating/leaving school** before graduation automatically become alumnae members provided the member is in good standing with the collegiate chapter and the corporation board/property committee (if applicable) for all local and national financial obligations. Participation in the Order of the Triangle does not change member status to alumna and member status can be addressed as long as the member is on campus. The Order of the Triangle ceremony should be the last chapter activity of the semester/term.

   **Procedure**

   The member's status should be marked accordingly on Dove Hub as having left school. Marking of alumna status on a Member Status Change Report or Dove Hub or participation in the Order of the Triangle does not relieve a member of any outstanding financial obligations.

5. **Members returning to school** who have been absent less than one (1) school year shall return to active collegiate membership.

6. **Returning undergraduate members** who return after an absence of **one or more years** from the campus (excluding members on leaves of absence) will be considered alumnae members of Sigma Kappa

   **Procedure**

   A petition to return to collegiate membership can be presented. In this case, a member may return to active status after a two-thirds (2/3) affirmative vote of the chapter followed by the Petition for Special Dispensation approved by the advisory board and the collegiate coordinator.

11

7. **A leave of absence** can be granted for ~~only one~~ *a maximum of two (2)* school term**s** **during the member's college career** and is to be granted only under any of the following circumstances:

   a.  Serious illness or serious personal problems on the part of the member or her immediate family.

   b.  Extreme financial difficulties.

   c.  Extreme scholastic difficulties.

   d.  Internships.

   e.  Study abroad.

   f.  Student teaching.

   **Procedure**

   1.  Member must apply in writing, giving detailed reasons for requesting this status and providing documentation when possible supporting the need for a leave of absence.

   2.  Upon approval by the executive council, an application must be submitted on a Petition for Special Dispensation for consideration by the advisory board *supervisor. Typically, only one leave will be granted. The petition must be submitted to the collegiate coordinator for approval if the member is seeking a second term.*

   3.  In order for the application to the approved, the member shall be a fully participating member of the chapter and in good financial standing. She shall pay her national collegiate dues and national insurance assessment.

   4.  When the status is granted, the member shall have the same privileges and responsibilities of an alumna member. ~~If granted, the change of status shall be noted on Dove Hub.~~ A leave of absence does not relieve the member from any contractual obligations she may have with respect to housing matters.

   5.  Upon returning to active status, the member shall return to full participation in all chapter activities. Failure to automatically resume all membership obligations shall result in voluntary withdrawal. If steps are not taken to begin voluntary withdrawal proceedings one month from the start of the term following the leave, expulsion shall result. A leave of absence may not be granted in the last term of her undergraduate career with the exceptions of internships for academic requirement, study abroad, and student teaching.

**8. Special alumnae status for collegians from dormant chapters** – Collegians who are placed on special alumnae status prior to the recolonization of their collegiate chapter by the national council may, after a period of one year from the date of the recolonization, petition the chapter for collegiate status.

**Procedure**

If a member wishes to return to collegiate status, she shall apply in writing to the recolonized chapter. Active collegiate status may be resumed upon a two-thirds affirmative vote of the chapter followed by a Petition for Special Dispensation approved by the advisory board supervisor, the collegiate coordinator, and the collegiate district director. In the event that a collegian on special alumna status transfers to a college or university where a Sigma Kappa chapter exists, transfer of membership procedures should be followed if affiliation with another chapter is desired.

## V.   TERMINATION/SUSPENSION OF MEMBERSHIP

### A. Automatic financial suspension

Applies only in case of failure to pay bills. Any member 30 days in arrears to the chapter or the corporation board shall be automatically suspended.

#### Procedure

1. The vice president of finance and her advisor meet with the member to notify her that she is on automatic financial suspension and set a time limit for the debt to be cleared. The advisory board supervisor shall hold her badge and membership certificate. Copies of the Automatic Financial Suspension Form shall be sent to the advisory board supervisor, the financial advisor, the collegiate coordinator, the collegiate finance coordinator and national headquarters. If the member does not clear the financial indebtedness by the set date, expulsion procedures shall be initiated per NPH V.D., and the debt shall be referred to a collection agency.
2. During such suspension:
   a. The member's parents may be asked to sign an interest-bearing note for the amount involved. This should be handled by the financial advisor.
   b. The member is responsible for all bills and fees, both local and national, incurred during the time of suspension.
   c. The member shall attend meetings, recruitment events, new member ceremonies, and Initiations, but has no vote or social privileges and cannot hold office.
3. Any member who leaves school or graduates while indebted to the chapter should be placed on AFS by the above procedures.
4. **Reinstatement** of the member and return of her badge and membership certificate are automatic upon payment of all outstanding bills. The member must furnish the national headquarters with documentation by the chapter, which is endorsed by the advisor and the collegiate coordinator, that all indebtedness has been rectified.

### B. Suspension

A disciplinary sanction imposed for the reasons set out below. Suspension requires the setting of a time limit of no more than 12 months from the time of the chapter vote.

Any of the following constitutes reason for suspension:

1. Suspension by the university.
2. Failure to attend chapter meetings without being excused by the executive council.
3. Contempt of authority.
4. Misconduct.
5. Undermining the chapter spirit.
6. Other valid reasons.

**Procedure**

1. A chapter may place a member on suspension by a two-thirds (2/3) secret written ballot of the chapter followed by a Petition for Special Dispensation approved by the advisory board and collegiate coordinator.

2. The national council may place a member on suspension upon recommendation of the collegiate coordinator, the collegiate district director (if applicable), and the unanimous vote of national council.

3. Penalties for suspension
   a. Suspended members shall not attend any Sigma Kappa meetings or social events.
   b. The badge and membership certificate of the suspended member are surrendered to the chapter and sent to the national headquarters for safekeeping.
   c. When a member does not petition at the end of a suspension or if her request for reinstatement is refused at the end of the period, expulsion paperwork shall be submitted.
   d. Such suspension shall be recorded in the official documents of the chapter (minutes, member's card in vice president of alumnae relations' file and beside the constitution book signature of the member) with date and reason for suspension.
   e. The member is responsible for all bills and fees, both local and national, incurred during the time of suspension.
   f. See Section XII. B. on housing.

4. **Reinstatement**
   a. If suspended by a chapter, a letter shall be presented to the chapter by the suspended member which contains detailed evidence that reasons for the suspension no longer exist.  This member shall have shown through interest, actions, and fine spirit that she is again ready to be a loyal, participating member with the good of the chapter at heart.
   b. If a member is on academic suspension by a chapter and is not eligible to be reinstated, a letter may be presented to the chapter by the suspended member to request a withdrawal of her membership. (See Section V.E. Procedure.)
   c. After the letter is received, there shall be a two-thirds (2/3) secret written ballot of the chapter in order to reinstate the suspended member. A Petition for Special Dispensation shall be submitted to the advisory board, collegiate coordinator, and collegiate district director for approval. The collegiate district director then submits the petition to national headquarters.
   d. If suspended by the national council, a letter shall be presented to the national council by the suspended member which contains evidence that reasons for the suspension no longer exist. This member shall have shown through interest, actions, and fine spirit that she is again ready to be a loyal, participating member with the good of the Sorority at heart.
   e. Following consideration of the request by the national council, the member will be

notified by national headquarters of the decision.

    f.   When reinstatement follows, the fact and date shall be recorded in each document where suspension is noted (see #3c under penalties above), and badge and membership certificate are returned.

## C. Expulsion

For all reasons, except financial, expulsion is the complete, final and permanent severance of relations, participation, and mutual obligations between Sigma Kappa and one of its members. There is no reinstatement.

### Procedure

1. The national council may withdraw the privilege of membership from any collegiate member upon recommendation of the collegiate coordinator, collegiate district director, and the unanimous vote of national council.

2. A collegiate chapter may withdraw the privilege of membership from one of its members by a two-thirds (2/3) affirmative secret written ballot of the chapter followed by a Petition for Special Dispensation approved by the advisory board, the collegiate coordinator, collegiate district director, and unanimous vote of national council.

3. Expulsion of a collegiate member shall be recorded in the official documents of the chapter and date and reasons given (minutes, member's card in vice president of alumnae relations' file and beside the constitution book signature of the member) and on Dove Hub. If a member is expelled for financial reasons, such expulsion does not relieve the member of her financial obligation.

4. The national council may withdraw the privilege of membership from any alumna member upon the recommendation of five alumnae members, with full particulars surrounding the reason for the request (either civil judgment involving Sigma Kappa or criminal conviction), and the unanimous vote of the national council. Upon such a vote, the member's collegiate chapter will be notified by national headquarters.

5. The member's badge and membership certificate are forfeited and shall be sent to national headquarters.

6. See Section XII. B.

## D. Financial expulsion

Occurs when a member on AFS fails to pay her indebtedness by the date set in the notification of automatic financial suspension.

### Procedure

1. The vice president of finance sends a Petition for Special Dispensation requesting financial expulsion to the advisory board supervisor for approval. The petition must be accompanied by the AFS paperwork and member financial records. No chapter vote is required if the member has signed the AFS form.

16

2. If the member has not signed the AFS form acknowledging the indebtedness, the chapter must vote by a two-thirds (2/3) affirmative secret written ballot to expel the member for financial reasons. A copy of the minutes with this information must accompany the petition form.

3. The petition requires approval by the advisory board supervisor, collegiate coordinator, collegiate district director, and unanimous vote of national council.

4. The badge and membership certificate are forfeited and shall be returned to national headquarters.

5. Upon approval of the petition, national headquarters will notify the member of the financial expulsion and reinstatement procedures.

6. See Section XII. B.

7. The chapter shall send the debt to a collection agency.

8. The date and the reason of financial expulsion shall be recorded in the official documents of the chapter (member's card in vice president of alumnae relations' file and beside the constitution book signature of the member) and on Dove Hub.

9. **Reinstatement**

    a. A member expelled for financial reasons may petition national council for reinstatement when she is no longer a collegian and at least three (3) years have passed from the date of the financial expulsion. The petition must demonstrate that the expelled member has paid the outstanding financial obligations or include payment for outstanding financial obligations. The petition must also demonstrate that the expelled member is again ready to be a financially responsible and participating member with the good of Sigma Kappa at heart, specifically through membership in the Sigma Kappa Foundation Violet Club giving level.

    b. A petition for reinstatement is approved upon the unanimous vote of national council.

    c. For final processing of the reinstatement, a reinstatement fee shall be paid which may include the purchase of a basic badge and membership certificate.

    d. When reinstatement occurs, national headquarters will notify the chapter of reinstatement. The financial reinstatement shall be recorded on each document where the expulsion was previously noted (member's card in vice president of alumnae relations file and beside the constitution book signature of the member). The member's status is modified to alumna.

## E. Voluntary withdrawal of membership

The severance of relations, participation, and mutual obligations between Sigma Kappa and one of its members at the voluntary request of the member.

**Procedure**

1. The member shall be in good standing with the chapter including all local and national financial obligations. Pending approval by the chapter and the advisory board supervisor, the member will not be responsible for any local financial obligations accruing after the request for withdrawal and the badge and the membership certificate have been received by the chapter.

2. The member shall request withdrawal through a dated written letter to the chapter, accompanied by her badge and membership certificate.

3. A two-thirds (2/3) affirmative secret written ballot vote of the chapter is necessary followed by a Petition for Special Dispensation approved by the advisory board supervisor. The original letter of request from the member wishing to withdraw shall accompany the petition to the national headquarters along with her badge and membership certificate.

4. Upon receipt of acknowledgment from the advisory board supervisor that the withdrawal has been approved, the chapter shall send the badge and membership certificate to national headquarters. Such severance is recorded in the official documents of the chapter and the date (minutes, member's card in vice president of alumnae relations' file and beside the constitution book signature of the member) and on Dove Hub.

5. **Reinstatement**

   a. A letter shall be presented to national council by the withdrawn member which contains detailed evidence that the reasons for the withdrawal no longer exist. The member must have shown through interest, actions, and a fine spirit that she is again ready to be a loyal, participating member with the good of Sigma Kappa at heart, specifically through membership in the Sigma Kappa Foundation Violet Club giving level.

   b. A petition for reinstatement is approved upon a unanimous vote of national council. When reinstatement occurs, national headquarters will notify the chapter of reinstatement. The withdrawal reinstatement shall be recorded on each document where the withdrawal was previously noted (member's card in vice president of alumnae relations file and beside the constitution book signature of the member). The member's status is modified to alumna. It is the exception that national council will approve a reinstatement until such time as the applicant is no longer in college.

   c. Reinstatement is not effective until approved by unanimous vote of national council, and proper notification is received by the chapter and advisory board. For final processing, a reinstatement fee shall be paid, which may include the purchase of a basic badge and membership certificate.

   d. When reinstatement occurs, the fact and date shall be recorded on each document where the withdrawal is noted (minutes, member's card in the vice

president of alumnae relations' file and beside the constitution book signature of the member).

**F. Depledging**

The releasing of a new member from her pledge prior to her initiation.

> **Procedure**
> 1. A new member who has participated in the new member ceremony shall request depledging through a dated ~~written letter~~ *correspondence* to the vice president of new member education.
> 2. A chapter may depledge a woman by two-thirds (2/3) affirmative secret written ballot vote with the consent of the advisory board and collegiate coordinator.
> 3. The national council may depledge a woman upon the recommendation of the collegiate coordinator, collegiate district director, and the unanimous vote of the national council.
> 4. All financial obligations of a new member who has depledged cease at the time the woman is depledged.
> 5. The new member's change of status must be noted in the chapter minutes and in Dove Hub.

## VI.  ACADEMIC REQUIREMENTS

### A.  Collegiate Chapter Scholarship Policy

A chapter must maintain at least a 3.0 grade point average or be above the all sorority women's average (based on a 4.0 scale).

**Procedure**

1. When a chapter falls below this standard for two consecutive terms, they will be notified in writing by the programming coordinator. The chapter will be required to develop and implement an immediate action plan to bring the chapter into compliance with the scholastic requirement.
   a. The vice president of scholarship will submit the scholarship program evaluation form to the programming coordinator, advisory board supervisor, and collegiate coordinator for review and further recommendations.
   b. The vice president of scholarship will work directly with the programming coordinator to initiate the action plan once it is presented in writing to the entire chapter.
2. When a chapter fails to meet the standard for three consecutive terms, or four of six terms, the chapter is considered to be "not in good academic standing." The chapter will be notified in writing by the programming coordinator.
3. Chapters which are "not in good academic standing" will be required to complete, but are not limited to, any of the following:
   a. File a scholarship action plan on all chapter and new member academic activities with the programming coordinator, vice president of scholarship advisor, advisory board supervisor, collegiate coordinator, collegiate district director and national headquarters at the beginning and end of each academic term for one year.
   b. Mandatory participation by the entire chapter in a national scholarship workshop facilitated by a national officer with all travel and related expenses provided by the chapter.
   c. Mandatory presentation of scholastic programs at informal meetings. The final content and number of programs may be determined by the programming coordinator, advisory board supervisor, and collegiate coordinator and communicated to the entire chapter.
   d. Ineligibility for certain national awards.

**B. Collegiate Member Scholarship Policy**

A member must maintain a 2.5 cumulative grade point average (based on a 4.0 scale).

**Procedure**

1. When a member falls below a 2.5 cumulative grade point average, she is considered to be "not in good academic standing" by the advisory board and the collegiate coordinator for that term or until the standard is met. Credit obtained during the summer session is figured into cumulative grade point average.

2. When new members are not initiated because they do not meet the minimum requirements on that campus, they will also be considered "not in good academic standing."

3. The terms of "not in good academic standing" are as follows:

   a. Limited social events – two (2) per term (Social events include fraternity parties, date parties, and formals).

   b. Participate in the National Scholarship Program for members "not in good academic standing" as outlined in the *Handbook for the Vice President of Scholarship.*

   c. As an initiated member, not eligible to serve as a Big Sister or Heart Sister.

## VII.   RISK MANAGEMENT FOR COLLEGIATE CHAPTERS

### A. Risk Incident Policy

<u>All risk incidents must be reported to the national organization per the risk incident procedure.</u>

Definition of Risk Incidents

The following is a non-exclusive list of risk incidents. When a member is aware of a potential risk incident, please err on the side of caution and report it.

(The starred items are emergency incidents for which the member should first call 911.)

1.  Member incidents

    - hazing
    - illegal use or possession of alcohol
    - use or possession of illegal drugs
    - mental health problems (depression, eating disorders, etc.),
    - injury requiring hospitalization*
    - tragic accident*
    - rape*
    - assault*
    - battery*
    - suicide*
    - homicide*

2.  Chapter property incidents

    - theft
    - embezzlement
    - burglary
    - robbery
    - accidental fire or arson*

**Procedure**

Members will use the following procedure with all risk incidents. Individuals with first-hand knowledge of the incident should make the report, but if that person cannot or will not, then the member with the most knowledge of the incident should make the report. Reporting should take place in the following order:

1.  Call 911 or the appropriate emergency number if the incident is an emergency.
2.  Call the risk management 24-hour toll-free hotline at national headquarters.
3.  Contact the advisory board supervisor first or call through the list of advisors until one has been reached. An advisor should immediately report to the chapter property. If no advisor can be reached, continue with the procedure by contacting the risk management coordinator, collegiate coordinator, collegiate district director, or national vice

22

president for collegiate chapters in that order.

4. Establish authority based on the following ranking of collegiate officers: president, executive vice president, vice president of programming, vice president of new member education, vice president of membership, vice president of alumnae relations, vice president of scholarship, vice president of finance, vice president of communication, vice president of philanthropic service, Panhellenic delegate, all Greek delegate (where applicable). The ranking collegiate officer (and/or the advisor when she arrives) will immediately do the following:

   a. Close the chapter property to all non-members and ensure that any evidence is preserved, if applicable.

   b. Assign a responsible member to answer the chapter phone where applicable and take messages. This member should not answer any questions - she should only take messages.

   c. Confirm with the police or medical officials that they have contacted or will contact the family of the member(s) involved. Members should not contact the family, as this is something for which the police have been specially trained.

   d. Assemble the members for an informational meeting at the earliest possible time and instruct members not to make a statement to the media (including campus media) or to discuss the incident with non-members. Members of the chapter who may be members of the campus media should be specifically instructed not to disclose any information.

   e. Coordinate any necessary follow-up or arrangements.

5. The executive assistant at national headquarters monitors the hotline and notifies the appropriate national officers, the executive director, and the director of collegiate services, and an appropriate person will call the chapter within 24 hours.

6. When a member, an advisory board member, or national officer suspects or is made aware that a risk management policy violation is occurring or has occurred, the incident shall be reported immediately to the risk management toll free hotline at national headquarters as soon as possible.

## B. Hazing Policy

1. Sigma Kappa Sorority considers hazing to be a destructive and degrading activity which is inconsistent with our ideals and standards. The dignity of every individual is recognized and all forms of hazing are opposed.

2. Every chapter shall follow the Promise new member education program as outlined in the *Handbook for the Vice President of New Member Education* without additions, deletions or alterations. This program is designed to educate new members in the purposes and ideals of Sigma Kappa.

3. Hazing is defined as any action, activity, or attitude directed toward a new member, member or any individual because of his/her relationship with Sigma Kappa or any other

campus organization with or without their consent which ridicules, humiliates, embarrasses, confuses, frustrates or causes undue stress as well as any action that may cause physical or mental discomfort and has the potential to cause bodily injury or psychological damage. This includes the harassment, intimidation, degrading or lack of respect from one member(s) to other member(s) and may include verbal, written, implied, physical or through email, text, and/or any type of social media. The following list includes examples of hazing by category and is not intended to be all-inclusive.

a.  Subtle hazing: any action, activity, or attitude which ridicules, humiliates, or embarrasses. Examples include, but are not limited to: purposely alienating new members, referring to new members in a demeaning manner such as "pledge," silence periods, any form of demerits, requiring new members to address initiated members in a different manner, scavenger hunts, phone duty or house duty if only assigned to new members, requiring new members to carry objects that initiated members don't carry, deprivation of privileges, withholding the date of Initiation or big sister revealing, not allowing new members to wear Greek letters, requiring new members to complete signature books, requiring new members to do meaningless activities in order to earn membership such as "pearl" points or separating sprinkles, requiring new members to wear new member pins/ribbons at all times.

b.  Harassment hazing: any action, activity, or attitude which confuses, frustrates, or causes undue stress as well as any action that may cause physical or mental discomfort. Examples include, but are not limited to: Requiring new members to sleep over at chapter housing or other locations, drawing any unnecessary attention to new members through a form of critique or criticism, scaring new members with what might happen at Initiation or during Inspiration Days, any form of questioning under pressure or in an uncomfortable atmosphere, verbal abuse, personal servitude, moving into the chapter house/suite/residence hall for Inspiration Days, requiring new members to wear ridiculous costumes or special clothing, requiring new members to enter through the back door or not allowing them to see certain parts of the house/suite/residence hall, new member activities with demeaning or crude themes, withholding good grooming or personal hygiene, requiring new members to memorize irrelevant information about initiated members, yelling at new members.

c.  Dangerous hazing: any action, activity, or attitude which has the potential to cause bodily injury or psychological damage. Examples include, but are not limited to: suggesting or requiring new members acquire paraphernalia from another chapter, leaving campus secretly, requiring new members to do physical exercise for the sake of membership, withholding food or sleep, late work sessions which interfere with scholastic responsibilities, transporting new members against their will, restricting bodily movement in any way, blindfolding, requiring touching any unpleasant substance, hitting, paddling, tuck-ins, kidnaps, requiring new members to drink or eat, marking or branding, requiring a new member to take items from places or deface property, new member sneaks or walkouts.

4. The naming of new member classes or allowing new member class officers does not promote chapter unity and is not recommended.

5. Auxiliary groups such as big brothers, little sisters, or fraternity dads are prohibited in support of the NPC Unanimous Agreement. For further clarification, see NPH XVIII. G.

6. As a general rule, a member or new member who hazes shall be suspended or expelled from the organization following the appropriate procedures. This applies to alumnae as well as collegiate members. Failure to sanction individuals involved in hazing activities may result in sanctions of the chapter as outlined in national policy section VII.G.

**C. Social Events and Functions Policy**

1. General Policies

All Sigma Kappa *collegiate* members and new members and their invited guests must be aware of and comply with the following policies:

a. All members, new members, alumnae, and guests must be in compliance with federal laws, state laws, university regulations, local ordinances, and national policies.

b. In compliance with the 1979 NPC resolution, all Sigma Kappa social events with other organizations or non-members shall not involve overnight accommodations.

c. In compliance with the NPC resolution on alcohol-free functions, all Sigma Kappa events held at a men's fraternity facility must comply with the fraternity's national/local rules and resolutions and any campus-wide alcohol-free initiatives. (See NPH XVIII.F. for further clarification.)

d. Open parties are prohibited. There shall be a defined and restricted guest list available at every sponsored or co-sponsored Sigma Kappa event, *listing all attending Sigma Kappa collegiate members, advisory board representatives and other invited guests.* Anyone visibly intoxicated should not be allowed admittance to a Sigma Kappa event.

e. Pre- and post-social function parties are never approved. Such parties and the attendance by Sigma Kappa members and new members are not condoned.

f. Co-sponsored social function attendees are limited to members and new members of both sponsoring groups and their dates.

g. Each chapter shall have adequate liability and other acceptable insurance protection through the national organization.

h. A chapter may not sponsor or co-sponsor a function or event with an alcohol distributor or bar/tavern where alcohol is given away, sold, or provided nor may a chapter accept as a prize or raffle for fund raising projects.

i. A chapter may not sponsor or co-sponsor a function or event where firearms will be made available for use.

j. Social functions that involve traveling to multiple venues, i.e. bar crawls, are prohibited.

k. *Chapters may not purchase or rent inflatable devices for use at social or philanthropic events.*

2. Contract Policy
   a. All contracts must be reviewed prior to signing by the advisory board supervisor or the risk management coordinator.
   b. Only the chapter president or vice president of finance may sign contracts on behalf of the chapter. Other officers or members who sign contracts may be personally liable.
   c. All themes, merchandise, t-shirt/logo designs, and favor artwork associated with a social event must be in good taste and reviewed by the advisory board supervisor and/or the risk management coordinator prior to the event. See Section XX.B.
   d. Chapter officers shall not sign releases or waivers on behalf of the chapter. Signing a contract with an *additional insured provision*, hold harmless or indemnification clause in a contract may carry additional legal responsibilities and is not recommended.

3. Social Function Review Form (SFRF) Policy
   a. The social function review form (SFRF) must be completed by the event planner/social chairman for the following social events and functions:
      -Any event where alcohol will be present.
      -Any event that requires signing a contract of any kind.
      -Any Sigma Kappa-sponsored philanthropy event involving sports.
   b. Failure to complete the SFRF accurately may result in the event being considered a "not officially recognized Sigma Kappa event." This is considered a risk management policy violation and is subject to the sanctions of section VII.G.

   **Procedure**
   1. The completed SFRF shall be sent to the advisory board supervisor and/or the risk management coordinator at least three weeks prior to the event to allow adequate time for revisions, if necessary. Any exceptions to this timeframe must be approved by the risk management coordinator.
   2. Advisory board members or their approved representatives must be present at each event requiring a SFRF and instructed as to their responsibility. There must be one representative for every 50 people in attendance at the event and at least one representative on each vehicle when common carriers are utilized.

4. Events Involving Alcoholic Beverages
   a. Underage drinking is prohibited.
   b. Sigma Kappa social events held outside the city in which the college/university is located require the use of common carrier such a buses, taxis, hotel shuttle, university transportation, etc. Events held in the same city as the college/university may use common carrier or the designated driver program. All attendees must utilize the designated transportation plan to and from the event.
   c. A cash bar shall be utilized for serving alcohol. Use of an outside vendor possessing

adequate liquor liability insurance is required. Alcoholic beverages must be sold/served by a bartender who is not a member or new member of the sponsoring or co-sponsoring organizations.

d.  Security personnel shall be hired for any event at which alcohol is served/sold.

e.  Chapter funds shall not be used to purchase alcoholic beverages.

f.  Activities/themes must be tasteful and not promote alcohol use/abuse. Drinking games, toga parties, the purchase or use of alcohol in bulk quantities (kegs, etc.), and/or use of drink tickets are strictly prohibited.

g.  Non-alcoholic beverages and food/snacks shall be available and served throughout the duration of the event.

h.  In the event a cash bar policy contradicts the published university/Panhellenic or all-Greek regulations for a co-sponsored event, a controlled BYOB function may be requested by petition and reviewed by the risk management coordinator.

**Procedure**

Alcoholic beverages may be allowed at Sigma Kappa sponsored or co-sponsored events involving the chapter provided all of the following criteria, in addition to the general guidelines, are met:

a.  A three-fourths (3/4) secret written vote of approval by the chapter shall be obtained and documented in the chapter minutes for each Sigma Kappa sponsored or co-sponsored event at which alcoholic beverages are to be served/sold. A copy of the minutes shall be attached to the SFRF.

b.  A detailed procedure for monitoring alcohol consumption and ascertaining the age of each participant shall be written on the SFRF.

c.  The means of transportation shall be defined on the SFRF. Common carrier is the preferred form of transportation for Sigma Kappa events. No alcohol shall be allowed during transportation.

d.  When a bartender is hired by the chapter, the bartender's agreement must be signed and attached to the SFRF.

e.  Valid identification with a photograph shall be checked for admission to the event as well as by the bartender each time an alcoholic beverage is served. No one deemed to be inebriated should be served.

f.  There should be one security guard for every 50 persons and the guard(s) shall not be a member or new member of the sponsoring or co-sponsoring organizations. Security personnel shall be instructed to take effective steps to prevent excessive consumption of alcohol and to prevent alcohol from being served/sold to minors.

g.  The criteria required for BYOB events, in addition to compliance with all other stated policies regarding alcoholic beverages, are:

1. A bartender shall be hired to take custody of all alcohol and transport it to the event. The bartender shall not be a member or new member of the sponsoring or

co-sponsoring organizations.

   2. The bartender shall have absolute custody and discretion over dispensing alcohol and shall dispense the alcoholic beverage only to the individual who brought it to the event. Unused alcoholic beverages will be disposed of by the bartender and not returned to those who brought them.

h. Three and four way events involving three and four total organizations (including Sigma Kappa) and alcoholic beverages are strongly discouraged; however, if three or four way events where alcohol is served are desired, the following criteria must be met:

   1. Follow all national policies and procedures.
   2. Must be allowed by and comply with the college/university policies and procedures.
   3. Must be attended by at least one advisory board member for the duration of the event.
   4. Written proof of insurance from all other sponsoring groups must be included with the SFRF.
   5. A four way event is the maximum allowed under any circumstance. Attendees to be limited to chapter members and new members of all sponsoring groups.
   6. Three or four way date functions, where each organization invites guests outside of the organization, are prohibited.

## D. Transportation Policy

1. When transporting members to and from Sigma Kappa events, the use of appropriate safety precautions is <u>required</u>, including using such modes of transportation where the driver has not been consuming alcohol and no alcohol is being consumed during transportation.

2. Common carrier, such as a taxi, bus, and/or university or hotel transportation, is the preferred method of transportation to and from all Sigma Kappa events, whether the event is a social function, a sisterhood event, or other chapter gathering.

3. If a designated driver program is coordinated by the collegiate chapter for a chapter event, all participants must comply with the chapter's designated driver guidelines and responsibilities. The model designated driver guidelines can be found in the chapter president's annual supplies.

4. Collegiate chapter coordination of transportation to or from a non-Sigma Kappa event is prohibited.

5. Collegiate chapter participation in a designated driver program implemented by the university or other organizations for non-Sigma Kappa events is prohibited.

### Procedure

A signed copy of the Designated Driver Guidelines and Responsibilities form must be on file with the chapter's coordinator of the designated driver program for each driver in the

program.

**E. Housing Safety Policy**

1. There shall be no conduct which is in violation of state law, college/university regulations, or Sigma Kappa national policy on Sorority property at any time.
2. All new members, collegiate members, and alumnae shall observe all house, lodge, suite, apartment, or Sorority room rules.
3. All facilities shall be in compliance with all applicable laws, ordinances, and regulations.
4. There shall be no possession or use of alcohol, firearms, explosive devices, marijuana (even if permitted by state law), illegal drugs, or illegal use of prescription drugs on Sorority property at any time. Pets of any kind shall not be permitted on Sorority property.
5. Chapter participation in, or sponsorship of, any activities related to child care is not approved. In addition, individual members are encouraged not to engage in activities related to child care on Sorority property.
6. The chapter property to include a house, lodge, suite, apartment, or room shall be locked at all times. Propping open doors is strictly prohibited.
7. All chapters with housing shall schedule a disaster/fire drill at the beginning of each term to include practice of the posted evacuation plan.
8. The use of candles, incense, halogen lamps/lights, or oil burning items, including lamps, on Sorority property is prohibited. This includes common areas, individual member rooms, and outdoors. Candles are also prohibited during recruitment and ritual events that are held on Sorority property. Electric or battery candles are recommended.
9. There shall be no access to or occupation of fire escapes or roofs except for their designated purposes.
10. The Sorority property is not open to the public. Non-members are allowed by invitation only and when accompanied by a member or new member.
11. Non-members shall be restricted to the public areas of chapter housing.
12. Any member or new member who engages in disruptive, illegal, or otherwise unacceptable behavior may be asked by the executive council, the advisory board and/or the corporation board to move out of the sorority property within seven days and will forfeit her room and board for the duration of the contract.

**Procedure**

1. All facilities must follow appropriate fire and emergency procedures, must be periodically inspected, and must have a written evacuation and emergency plan.
2. Hours of visitation in the public areas are to be set by the chapter with the approval of the advisory board and in consultation with the corporation board. Visitation in the private areas of sorority property may be petitioned to the advisory board and collegiate coordinator and in consultation with the corporation board. A petition to include the rationale for the request, proposed hours of visitation, detailed hours of visitation for all

other NPC groups on campus, and plans for enforcement of the requested visitation hours shall be sent each year to the collegiate coordinator after obtaining the signature of the advisory board supervisor. If no petition is received, there shall be no visitation allowed in the private areas of the chapter house.

### F.  Standards Council Policy

1.  Each chapter shall establish a standards council for the purpose of upholding the chapter Code of Conduct and Sigma Kappa national policies. Further information on the standard's council may be found in the *Handbook for the Executive Vice President.*
2.  A chapter who handles policy violations appropriately through their standards council will not be penalized in the Sigma Kappa standards of excellence process. Documentation may be requested to ensure appropriate action has been taken.
3.  Failure to utilize the chapter's standards council may result in national council action.
4.  Code of Conduct
    a.  Every chapter shall establish a Code of Conduct to be reviewed by the standards council and approved by a chapter vote on an annual basis. All amendments/changes to the Code of Conduct must be approved by a two-thirds (2/3) affirmative chapter vote. All members must sign a form indicating that they have read the chapter Code of Conduct and *National Policy Handbook* VII. Risk Management for Collegiate Chapters
    b.  Chapters may strengthen national policy in their Code of Conduct but never weaken it.

### G.  Sanction Policy for Risk Management Policy Violations

1.  Sigma Kappa Sorority is a private, self-governed, single-sex organization. The *National Policy Handbook* is binding for all chapters, new members, and members of Sigma Kappa Sorority. This section specifically addresses violations of policies VII B. - VII.F.
2.  The national vice president for collegiate chapters and the national president may determine any and all action to be taken.

**Sanction Procedure**

Sanctions for risk management policy violations not appropriately handled by the chapter's standards council may include any or all of the following:

a.  A letter of reprimand or letter of probation to the chapter from national council.
b.  The filing of regular reports of chapter and new members activities with the vice president for collegiate chapters, the director of risk management, the collegiate district director, the collegiate coordinator, risk management coordinator, national headquarters, and/or the advisory board supervisor.
c.  National council probation of level one, two or three for a period to be determined.
d.  Ineligibility for national awards.
e.  A required workshop facilitated by a national council member or their approved

representative with all travel and expenses paid by the chapter.

f.   Removal of chapter officers and election of new officers.

g.   Members involved in the incident disciplined as appropriate.

h.   Withdrawal of charter by national council.

i.   A thorough analysis of the chapter's risk management education program by a committee of not less than five (5) chapter members appointed by the executive council, with the approval of the advisory board and risk management coordinator, meeting every two weeks and no less than four (4) times. A report of the committee's findings with recommendations for improving the program and bringing it into compliance with national expectations is due to the risk management coordinator, collegiate district director, national vice president for collegiate chapters, and legal counsel no later than two weeks after the delivery of the letter. The findings of these reports and its recommendations are to be presented in informal chapter meetings and noted in the chapter minutes.

j.   Any other action which may be deemed necessary.

## VIII.   INTERNET AND RELATED TECHNOLOGY POLICY

**A.**  This policy applies to the Sigma Kappa Internet, which is defined as any website which references Sigma Kappa or uses Sigma Kappa marks, where members identify themselves as Sigma Kappa members, and any emails, social media sites, applications or instant messaging services referencing membership in Sigma Kappa, any collegiate or alumnae chapter websites, and the public and private sides of the sigmakappa.org website.

**B.  Trademarks**

1. Sigma Kappa Sorority is the rightful owner of the name "Sigma Kappa," the Greek letters ΣK, the coat-of-arms, the graphical heart logo, the badge and other insignia of the organization.

2. The Sorority retains control over the nature, quality of goods and services rendered under any of the above. Use of trademarks requires approval under the Sigma Kappa Licensing Policy, Section XX of this handbook.

3. These marks have acquired a secondary meaning and have engendered good will associated with the marks which Sigma Kappa must protect and maintain in order to preserve its intellectual property rights.

**C.  Impermissible Use**

1. The Sigma Kappa Internet may not be used for any purpose which is illegal, immoral, unethical, dishonest, damaging to the reputation of Sigma Kappa Sorority, inconsistent with the mission of the Sorority, or likely to subject the Sorority to liability. Impermissible uses include but are not limited to the following:
   a. Harassment
   b. Libel or slander
   c. Fraud or misrepresentation
   d. Unauthorized copying or transmission of copyright-protected items
   e. Use of Sigma Kappa Sorority's trademarks, logos, insignia, or copyrights without prior approval
   f. Use of Sigma Kappa Sorority's membership information for non-social (i.e. commercial) purposes
   g. Posting or sending obscene, pornographic, or offensive material
   h. Posting or sending material that does not comply with the mission or values of Sigma Kappa Sorority (including references to drugs, alcohol, or other illegal behavior, or references to ritual).

2. Posting pictures or other content on general Internet websites can constitute impermissible use and therefore discretion should be used in posting to such sites. Pictures or content that are found on general websites which depict possible violations of national

risk management policies by collegiate members or chapters will be referred to the national vice president for collegiate chapters to address under NPH VII.G., Sanctions Policy for Risk Management Policy Violations.

### D.  Social Media

a.  Each Sigma Kappa member is encouraged to join the Sigma Kappa official Facebook page and become a follower of @SigmaKappa on www.twitter.com, as well as any other social media sites on which Sigma Kappa may have an official presence. Chapters also have Facebook pages through the GIN system and members should participate on those pages. While participation in these communities falls within the above-stated guidelines, special attention must be given to the image portrayed.

b.  If the page allows its members to make wall postings or add photos/videos, then two to three active administrators are required. Administrators should keep the page in compliance with the following:

   a.  The page may not be dedicated to or allow posts that demean any group, including but not limited to other Greek organizations, minorities, ethnicities, cultural segments, religions, men or women.

   b.  There may not be any postings or references to alcohol/drugs/illegal substances. This includes those in party photos, t-shirts, event names and/or beverage containers.

   c.  All posts must be free of profanity and should be appropriate for public consideration.

   d.  The created content of the page, as well as member/fan posts, may not include endorsements for products or product advertisements (unless approved by Sigma Kappa national headquarters).

   e.  No one may post personal member information without her written consent, information that can jeopardize the safety of any chapter members, private chapter or Sorority business, or information on Sigma Kappa rituals or ceremonies, including photographs of equipment.

   f.  The page should not include copyrighted material from other sources or trademarks owned by third parties unless authorization has been obtained.

c.  Use of Sigma Kappa insignia must follow the rules as outlined in the Visual Standards Manual in Live Sigma Kappa.

d.  Any Sigma Kappa page that is not administered by the staff at national headquarters MUST include the following text:

   a.  "This is not an official site of Sigma Kappa Sorority. Official sites include www.facebook.com/sigmakappa."

e.  The owners of all Sigma Kappa related Facebook applications, groups and pages will be held responsible if they are not in compliance with these outlined expectations.

**Procedures:**

Chapter websites must:

1. Comply with all applicable federal, state, and local laws, university policies, Panhellenic rules, Sigma Kappa Sorority National Policy, and these requirements.

2. Follow current Sigma Kappa Sorority policies and procedures, Sorority style guidelines (see the Sigma Kappa Style Sheet), all campus Panhellenic rules and university policies, including those pertaining to membership recruitment.

3. Be registered with national headquarters and include name, date of last update, email address, and/or other contact information for the Web master on the homepage of the website. Contact information must be kept current and readily accessible.

4. Provide a link to the official Sigma Kappa Sorority website (www.sigmakappa.org).

5. Portray the image of the chapter, Sigma Kappa Sorority and the organization's environment (university, college, city, state) in a positive manner. For example, photographs, text, or graphics must not be defamatory or depict or reference vulgar or offensive material, foul language, nudity, criminal activity, alcohol, or drugs.

6. Use the Sorority's correct terminology, examples include: "alumnae" rather than "alumni;" "members, collegians, sisters, initiated members" when referring to initiated members, not "actives;" "recruitment" rather than "rush;" "new members" rather than "pledges;" "potential new members" rather than "rushees;" "national headquarters" rather than "nationals."

7. Not refer to and/or publish ritual materials or other confidential information.

8. Not be used for personal, commercial, political, or religious purposes, including product endorsements or other advertisements, or link to any licensed or non-licensed vendor of Sigma Kappa Sorority.

9. Adhere to Graphic Standards to ensure consistency with the national organization.

10. Limit the posting of personal information in consideration of the personal safety and privacy concerns of members. In general, personal information should be kept in a password protected area. A password protected area is permissible on a collegiate/alumnae chapter website. The chapter's president is responsible for providing a user name and password to the chapter's assigned public relations coordinator to monitor the password protected area.

11. Not post any confidential Sorority/chapter ritual/business.

12. Not post any Sigma Kappa publications, official correspondence, or sections of the *Sigma Kappa Triangle* without express written permission from the director of communication at national headquarters.

13. Not violate the rights of other copyright and trademark owners. Permission must be obtained from the owner prior to using material protected by copyright or trademark law.

14. Convey only correct and current information about the national organization and the chapter.

15. Include a disclaimer on the website indicating the pages are not "official" and the author is solely responsible for the content. Sigma Kappa Sorority does not accept

responsibility for the content of chapter and individual websites.

16. Not link to any other collegiate chapter, alumnae chapter, or individual member website other than the chapter's sister collegiate/alumnae chapter

17. Comply with these requirements in order to use the Sorority's marks on a website. Such permission may be revoked under trademark or copyright laws.

**Monitoring Procedure:**

1. Chapter websites will be monitored by the appropriate public relations coordinator (collegiate or alumnae) on a regular basis.

2. Each alumnae chapter is responsible for contacting the public relations coordinator with the website URL, webmaster name, and webmaster email address upon the website's completion. Collegiate chapters should utilize the GIN website.

3. The public relations coordinator will review the website for compliance with the most current website guidelines.

4. If the website is in compliance with the guidelines, the public relations coordinator will notify the digital media and marketing specialist that the chapter website can be linked from the online directory. Collegiate chapter websites through GIN are automatically linked but will be reviewed periodically.

5. If the website is not in compliance with the guidelines, the public relations coordinator will immediately contact the chapter to discuss how the chapter can fix the problem (i.e. remove offending language or pictures, change colors to follow graphic standards, etc.).

6. The public relations coordinator will monitor the chapter website at least quarterly for continued compliance with the guidelines. Should the public relations coordinator (collegiate or alumnae) find the website is not in compliance with the guidelines, she should immediately contact the digital media and marketing specialist at national headquarters to have the link removed from the national website. The chapter's president is responsible for providing a user name and password to their assigned public relations coordinator to monitor any password protected area.

## IX.   COLLEGIATE CHAPTERS

A.  The national council feels that all chapters should respect the fact that each has its own financial objectives and problems. Therefore, **no** college chapter should solicit monetary aid from another collegiate chapter.

B.  Sorority membership directories or general solicitation of members via any means, including the Internet, ~~are not to~~ *may not* be used for ~~chapter/~~individual/university/college financial gain or to promote any ~~chapter/~~individual/university/college financial program or activity that has not been approved by the national council. This does not apply to a college chapter/corporation board/property committee solicitation of the chapter's alumnae *for chapter projects*.

C.  **Request for Information, Surveys, Standards Documents, Relationship Statements**
Chapter officers and members are not authorized or permitted to sign, or act on behalf of the national organization of Sigma Kappa Sorority and cannot bind the Sorority. All items, including standards documents, requests for information, evaluations, recognition agreements, membership selection process, surveys, or other similar or related items, presented to a chapter for consideration on a college or university campus, should be submitted to the national president of Sigma Kappa Sorority for review prior to submission or signature.

D.  **Media Requests**
Chapter officers and members are not authorized to speak on behalf of the national organization of Sigma Kappa Sorority. Any media requests presented to a chapter member or officer should be submitted to the national president of Sigma Kappa Sorority prior to response. Only the chapter president should provide a response once directed to do so by the national president.

E.  Every collegiate chapter shall maintain the minimum standards as outlined in the Sigma Kappa's Standards of Excellence.

F.  Every collegiate chapter shall follow the procedure outlined in the *Sigma Kappa Visual Standards Manual.*

G.  Each collegiate chapter shall hold meetings once a week during the college year. Said meetings shall at all times be limited to members of the Sorority. Twice a month a chapter shall conduct informal meetings for the benefit of the chapter.

H.  All fundraising events/activities of collegiate chapters must be in compliance with national policies and shall be approved at least three weeks in advance of the event by the advisory board supervisor and the risk management coordinator. Fundraisers are to be used for philanthropic endeavors only and cannot be used to supplement or cover chapter operating

expenses of any kind.

**I.** Chapter participation in or sponsorship of any activities related to child care is not recommended. In addition, individual members are encouraged not to engage in activities related to child care on Sorority property.

**J. Commercial Endorsements**
No member or new member will authorize or permit the use of Sigma Kappa writings, photographs, pictures, or other likeness for commercial purposes or for publicity purposes in any way identifying herself with Sigma Kappa sorority unless such use is first approved by national council.

**K. Corporation Board, Property Committee, and Decorating Committee**
1. All chapters must have and maintain an operating corporation board, property committee, or decorating committee.
2. When a chapter is required to have a corporation board, property committee, or decorating committee, the initial personnel shall be selected and organized by the housing coordinator assigned to the chapter.

    **Procedure**
    Chapters without housing may seek approval for not having a corporation board, property committee, or decorating committee from the appropriate housing coordinator. Such approval is subject to an annual review by the housing coordinator and may be revoked at any time.

**L. Outstanding Business**
All chapters shall clear outstanding business each year. Outstanding business is defined as having no outstanding fees, fines, loan payments, petitions, badge orders, or initiation numbers.

**M. Housing and Furnishing Fees**
1. All chapters must establish this fee to be used for building/decorating/furnishing. The established fee must comply with national minimum requirements.
2. Expenditures for all projects in living areas, dining rooms, dormitory areas, or for the purchase of equipment of any kind, or for construction shall be submitted to the corporation coordinator or corporation liaison. The approval of such expenditures will be contingent on the chapter being current with housing/furnishing fee payments and/or establishing a payment plan, with housing coordinator or corporation liaison approval, to make the chapter current.

**Procedure**

Minimum national housing/furnishing fees are as follows:

|   |   |   |
|---|---|---|
| a. | No housing or single chapter room: | $75 |
| b. | Suite without living arrangements: | $150 |
| c. | Suite with living arrangements: | $200 |
| d. | Lodge (independent building without living arrangements) | $200 |
| e. | Chapter house: | $250 |

Total fees due must be paid within one year of a woman's initiation date.

**N.** At the end of each school year enough funds for chapter needs in the fall should be retained. *The chapter should vote on any reallocation of excess funds.* ~~The balance of~~ *Any excess* funds remaining ~~are to be~~ *may be donated to the Sigma Kappa Foundation, Inc. or may be* turned over to the corporation board or placed in the housing and furnishing fees fund when there is no corporation board.

**O.** *Chapters may not utilize chapter funds to subsidize individual member dues, either as a scholarship or otherwise. Any exceptions to this policy must be approved by the collegiate district director.*

**~~O~~P.** Any collegiate member, new member, or alumna wishing to borrow any house, lodge, chapter room furnishings, or equipment shall submit a written request to the corporation board (or advisory board if there is no corporation board) before anything may be loaned and receive written permission with any terms specified.

**~~P~~Q.** All collegiate chapters shall participate in the national insurance program.

**~~Q~~R.** All collegiate chapters shall participate in the national headquarters accounting program and follow the fiscal year June 1 to May 31.

## X.   COLLEGIATE CHAPTER OFFICERS

**A.** No member may hold a major office whose grades are not satisfactory. To be eligible to hold and maintain any executive office, a member shall have a 2.7 overall GPA (based on a 4.0 system), as well as a 2.7 the prior school term. To be eligible to hold any other office, a member shall have a 2.5 overall GPA (based on a 4.0 system) as well as a 2.5 the prior term.

> **Procedure**
> Any exceptions to the chapter officer grade requirement policy (X.A.) require written approval from the advisory board, collegiate coordinator, and collegiate district director.

**B.** Each member selected for office shall realize the seriousness of her obligations and be prepared to resign if she does not perform her duties.

**C.** The chapter president, executive vice president, and vice president of finance should be upper class members of the chapter and have been initiated for at least one year. The ritual chairman shall be a member that has been initiated for at least one year. Any exceptions to this policy require written approval from the advisory board, collegiate coordinator, and collegiate district director.

**D.** No member shall hold a major office whose local or national financial obligations are in arrears.

**E.** The national council does not approve of paying any chapter officer, through waiving of all or a portion of the dues or any other charges made on members by the chapter. Being an officer is considered an honor and recognition of ability, interest, loyalty, and cooperation toward the Sorority. The experience gained through training in such office is valuable to the individual and considered sufficient recompense.

> **Procedure**
> 1. The advisory board and the collegiate coordinator may remove an officer from office for failure to perform her duties.
> 2. Upon the vacancy of an elected officer, the chapter may elect her successor pending approval of the advisory board and collegiate coordinator. If the chapter fails to elect a successor, the advisory board and collegiate coordinator may appoint a replacement to finish the term of office if it is deemed necessary.

## XI.  ADVISORY BOARD

**A.**  The advisory board supervisor will be selected and approved by national council. All other advisory board members shall be approved by the collegiate coordinator prior to being asked to serve on the board.

**B.**  To be eligible for advisory board membership, an alumna shall have been out of college at least two years. Any exception to this policy shall have the approval of the collegiate coordinator before the member is asked.

**C.**  Each advisory board member shall be in good standing nationally and shall pay national alumnae dues, either to a local alumnae chapter or directly to the national headquarters.

**D.**  All advisory board members ~~shall~~ *are encouraged to* be dues paying members of a local Sigma Kappa alumnae chapter. ~~If there is not a local alumnae chapter, dues shall be paid to any alumnae chapter. While attendance at meetings is desirable, an alumnae chapter should not expect maximum participation from advisory board members because they are giving service to Sigma Kappa through the collegiate chapter.~~

**E.**  No alumna shall serve on the advisory board during the time her relative/step-relative (sister, daughter, granddaughter, niece) is a collegiate member or new member of that chapter without special permission of the collegiate coordinator, the collegiate district director, and national council.

**F.**  If, in the opinion of the collegiate coordinator, the collegiate district director, and the national council, any chapter is in need of assistance in selecting its advisory board members, the appointment of the board may be made by the national council and the chapter notified of its personnel.

**G.**  If, in the opinion of the collegiate coordinator, the collegiate district director, and national council, an advisory board member is not functioning in the best interests of the collegiate chapter she is advising, the national council may replace the advisor.

**H.**  When a chapter is installed or re-colonized, the advisory board personnel shall be selected and organized by the national council.

**I.**  No alumna shall serve on a chapter advisory board while she is serving as collegiate coordinator for that chapter. Any exception to this policy shall have national council approval.

**J.**  Advisory board members may not serve on the corporation board of the chapter in which she is

an advisor. No alumna shall serve on both boards at the same time.

**K.** All advisory boards shall participate in the national insurance program.

## XII.   HOUSING AND CORPORATION BOARD POLICIES

### A.  Live-In Policy

All collegiate members and new members, unless college rules prevent, shall live in the sorority house when the chapter or corporation owns or rents a house, suite, or residence hall floor and there is space available.

> **Procedure (live out)**
> 1.  A collegiate member or new member wishing to live out of the house when the house is not fully occupied may do so under the following conditions:
>     a.  She must submit a written petition to and receive approval from the chapter, advisory board, and the collegiate coordinator
>     b.  She must pay the amount equivalent to the room rent each term to the house corporation in addition to adjusted local chapter obligations. This amount is to be credited against the rent due to the house corporation from the chapter.
> 2.  A member or new member not following this policy must withdraw or be expelled from the Sorority. Her badge and membership certificate must be returned to national headquarters by the chapter, or the new member pin returned to the chapter.
> 3.  Chapters not following this policy (XII.A.) are responsible for any resulting room rent for each term to the house corporation.

### B.  Housing Policy for Withdrawn, Suspended, Expelled, and Depledged Members

Members who have withdrawn, been expelled, or placed on suspension under NPH V., and new members who have terminated their membership may not occupy chapter quarters. A member or new member assuming a status listed above shall move off chapter property within seven days (or within the timeframe dictated by state or local laws) and forfeit her board and room payment for the duration of her contract.

### C.  House Directors

1.  All collegiate chapters with live-in housing shall have a live-in house director.
2.  Collegiate chapter members are permitted and encouraged to express opinions and present recommendations to the corporation board/property committee with respect to the renewal of contracts and the hiring of a house director.
3.  Corporation boards may not hire male live-in employees except as required by law.

**Procedure**

Exemptions from the house director requirement may be petitioned to the collegiate coordinator and collegiate district director with approval of the advisory board and corporation board. Approved petitions will remain in effect until any housing circumstances change for the chapter.

**D. Housing Policy for Members not in good standing**

Any collegiate member, new member, alumna, or guest who does not remain in good standing with the Sorority or the college/university may be asked to leave Sorority property. The advisory board and/or the corporation board reserves the right to refuse house occupancy to any applicant who has violated the Sorority standards, house, or university rules.

**E. Corporation Board, Property Committee, and Decorating Committees Policies**

1. Personnel
   a. All corporation board, property committee, and decorating committee members shall be *in good standing nationally and shall pay national alumnae dues, either to a local alumnae chapter or directly to the national headquarters. Corporation board, property committee and decorating committee members are encouraged to be* dues paying members of a local Sigma Kappa alumnae chapter. ~~If there is no local alumnae chapter, national alumnae dues shall be paid to any alumnae chapter. While attendance at meetings is desirable, an alumnae chapter should not expect maximum participation from corporation board members because they are giving service to Sigma Kappa through the collegiate chapter.~~
   b. To be eligible for corporation board membership, it is recommended that an alumna shall have been out of college at least two years. Any exception to this policy shall have the approval of the corporation coordinator/liaison before the member is asked.
   c. Two members of the collegiate chapter shall automatically be voting members of the corporation board. These may be any combination of the following: chapter president, vice president of finance, house manager. If the chapter president is not one of the two officers chosen, she attends the meeting as an ex officio member of the board.
   d. No alumna shall serve on the corporation board, property committee, and decorating committee during the time her relative/step-relative (sister, daughter, granddaughter, niece) is a collegiate member or new member of that chapter.
   e. Mother-daughter or sister-sister combinations cannot serve on the corporation board, property committee, and decorating committee at the same time.
   f. Corporation board and property committee members may not serve on the advisory board of the chapter in which she is a corporation board or property committee member. No alumna shall serve on both boards at the same time.
   g. All corporations and property committees shall participate in the national insurance program.

2. Management
    a. All plans and proposals for new construction, additions, or remodeling shall have the approval of the appropriate housing coordinator or corporation liaison.
    b. All contracts for sale, conditional sales contracts, or other forms of conveyance shall be approved by the appropriate housing coordinator or corporation liaison.
    c. All projects involving more than $3,500 expenditure in living areas, dining rooms, or dormitory areas, or for the purchase of equipment of any kind or for construction shall be submitted to the appropriate corporation coordinator or corporation liaison for approval before any contracts are let or purchases are made.
    d. 990 (and 990T where applicable) shall be submitted to national headquarters simultaneous with submission to the Internal Revenue Service.
    e. The Articles of Incorporation, *the Bylaws*, and all amendments thereto for the corporation shall be filed with national headquarters. *Each corporation's bylaws should reference Sigma Kappa Bylaw Article II. Section 3.a.*
    f. If the corporation is dissolved, all of its property remaining after payments and discharge of its obligations shall be transferred and conveyed to Sigma Kappa Sorority, a Maine corporation, pursuant to Article II, Section 3 a. of the Bylaws of Sigma Kappa Sorority. The national council may transfer that property to the National Housing Corporation to hold in trust should the chapter be re-established within ten (10) years pursuant to Article II, Section 3 b.
    g. When a local corporation does not maintain standing within their state; becomes insolvent; commits acts that cause substantial deterioration to property; fails to file appropriate tax returns (990, 1099, W-2, payroll deposits, etc.); or fails to hold annual meetings, and conduct election of officers properly, the corporation will be required to transition to the National Housing Corporation or will lose its right to utilize the Sorority trademarks and national insurance program. See Housing and Corporation Board Policies XII.F.
    h. *Corporations which no longer own land or facilities and/or have contracts or employees should dissolve.*
    i. *All corporations must be in compliance with insurance dual control requirements.*

3. Fire/Life Safety
    Entities providing housing and/or meeting space for Sigma Kappa collegiate chapters shall:
    a. Meet or exceed all federal, state, local, and university policies regarding fire/life safety.
    b. Hold one fire safety meeting per semester with all residents to identify problem areas, maps, proper use of locks, kitchen safety rules, location of emergency numbers, etc.
    c. All facilities should be equipped with an adequate security system with a monitoring service encouraged.
    d. Post escape route maps in a visible location in all common areas indicating fire extinguishers, doors, windows, etc.

e.  Provide written safety policies with each housing contract with signature required upon receipt. Name, address, and phone number of corporation board president, house director, and corporation coordinator or corporation liaison should be included.

f.  Know and adhere to Sigma Kappa's emergency procedure for communication

g.  Maintain a current registry of residents and their room assignments, cell phone numbers, emergency contact names and phone numbers.

h.  Schedule and maintain at least annually electrical and mechanical maintenance, cleaning, and inspections including all kitchen appliances, grease hood, and all electrical outlets. Chimneys should be inspected and cleaned annually. Extension cords should be avoided.

i.  Remove all unnecessary storage items from the building, i.e. old mattresses, furniture, clothing, paper products. Recycle bins for paper and combustible items must be removed from areas where heat-producing objects exist.

j.  Flammable items must be stored properly in original containers and in an appropriate location outside of the building.

k.  All indoor premises should be designated as nonsmoking. Fire resistant smoke containers must be located in all areas designated as smoking areas.

l.  Maintain and report to national organization updated inventory – pictures of additions should be included.

m.  Maintain sufficient exterior lighting around property parameter.

n.  Consider adding sprinkler systems to the five or ten year plans as the plans are developed. Also consider other important safety items to be added to the property such as hard wiring monitoring systems and auto battery-powered emergency exit lights.

**F.  National Housing Corporation**

1.  Any corporation is eligible to be a participant of the National Housing Corporation.

2.  All collegiate chapters that are not incorporated must place their housing/furnishing fees with the National Housing Corporation.

3.  All new local corporations after July 1, 1994 must become a participator in the National Housing Corporation.

4.  Any local corporation requesting a loan or guarantee must be a participator in the National Housing Corporation.

**Procedure**

1.  Chapter House Insignia Procedure
    Any exterior insignia for a chapter house, lodge, suite, or room shall be approved by the appropriate housing coordinator or corporation liaison.

2.  Procedures for Corporations in Violation of National Policy XII.E.2.
    (Housing Management)

a. When a corporation liaison determines that a National Housing Corporation (NHC) non-participating corporation board is in violation of national policy as stated in Section XII.E.2.g, the national vice president for finance (NVPF) should be informed in writing detailing the specific violation(s) within one week of the determination

b. The NVPF will write the corporation board president to inform of the violation of national policy and to request that the matter be resolved immediately. The corporation liaison and legal counsel are copied on the correspondence. Within 30 days of the NVPF's letter, the corporation board must inform the NVPF in writing of all action taken to correct the violation and must send a copy to the corporation liaison and legal counsel.

c. If the corporation board fails to correct the violation within 30 days or inform the NVPF of action being taken to correct the violation, the NVPF will notify the corporation board that a special meeting of the corporation must be called according to the Bylaws of the corporation. Additionally, all parents of current residents of the property must be invited to the meeting, although they will have no vote. At this meeting, all corporation members will be informed of the violation and asked to either instruct the corporation board to correct the violation within 30 days, or vote to begin the process to join the NHC. Either the NVPF or her designee will be present at the meeting to explain the situation.

d. Failure to correct the violation within 30 days of the special corporate meeting (if the corporation did not vote to join the NHC) will result in notification from the NVPF that national insurance for the property will be canceled effective the beginning of the next semester or term and that authorization for use of the Sorority's trademarks will be withdrawn immediately.

## XIII.   ALUMNAE CHAPTERS

**A.**  Organization and establishment of more than one alumnae chapter in a geographical area shall be permitted.

**B.  Alumnae Chapter Membership**
1. Alumnae are encouraged to join an organized alumnae chapter in their area and/or a chapter of her choice.
2. Any alumna may join more than one alumnae chapter.
3. Any alumna who lives in an area where there is no organized chapter may contact a member of the alumnae team about starting a new chapter.

**C.  Request for Information, Surveys, Standards Documents, Relationship Statements**
Chapter officers and members are not authorized or permitted to sign, or act on behalf of the national organization of Sigma Kappa Sorority and cannot bind the Sorority. All items, including standards documents, requests for information, evaluations, recognition agreements, membership selection process, surveys, or other similar or related items, presented to a chapter for consideration on a college or university campus, should be submitted to the national president of Sigma Kappa Sorority for review prior to submission or signature.

**D.  Media requests**
Chapter officers and members are not authorized to speak on behalf of the national organization of Sigma Kappa Sorority. Any media requests presented to a chapter member or officer should be submitted to the national president of Sigma Kappa Sorority prior to response. Only the chapter president should provide a response once directed to do so by the national president.

**E.  National Insurance**
1. All alumnae chapters **shall** participate in the national insurance program. The expense of such insurance shall be prorated over all chapters.
2. Chapter officers shall not sign releases or waivers.

**F.**  Sorority membership directories or general solicitation of members via any means, including the Internet, are not to be used for chapter/individual/university/college financial gain or to promote any chapter/individual/university/college financial program or activity that has not been approved by the national council. This does not apply to a college chapter/corporation board/property committee solicitation of chapter's alumnae.

**G.**  Every alumnae chapter shall follow the procedure outlined in the *Sigma Kappa Visual Standards Manual.*

**H.** All fundraisers of alumnae chapters shall be approved by the respective national officers as indicated on the approval form.

**I.  Commercial Endorsements**

No member or new member will authorize or permit the use of Sigma Kappa writings, photographs, pictures, or other likeness for commercial purposes or for publicity purposes in any way identifying herself with Sigma Kappa Sorority unless such use is first approved by national council.

**J.  National Accounting Program**

All alumnae chapters shall participate in the national accounting and bill payment program.

## XIV.   NATIONAL OFFICERS

**A.**  No alumna shall serve as an advisory board supervisor or district coordinator during the time her relative/step-relative (sister, daughter, granddaughter, niece) is a collegiate member or new member of a chapter under her supervision without special permission of the collegiate district director and national council.

**B.**  All national officers shall pay national alumnae dues, either to a local alumnae chapter or directly to national headquarters. While attendance at local alumnae chapter meetings is desirable, an alumnae chapter should not expect maximum participation from national officers because they are giving service to Sigma Kappa through their national positions.

**C.**  Any national officer making an official visit or inspection of a chapter shall submit a report of such a visit within 14 days.

**D.**  All national officers are encouraged to make an annual financial contribution and/or planned gift to the Sigma Kappa Foundation, Inc.

**E.**  Request for Information, Surveys, Standards Documents, Relationship Statements. National officers are not authorized or permitted to sign, or act on behalf of the national organization of Sigma Kappa Sorority and cannot bind the Sorority. All items, including standards documents, requests for information, evaluations, recognition agreements, membership selection process, surveys, or other similar or related items, presented to a chapter for consideration on a college or university campus, should be submitted to the national president of Sigma Kappa Sorority for review prior to submission or signature.

**F.**  Media requests

Chapter officers and members are not authorized to speak on behalf of the national organization of Sigma Kappa Sorority. Any media requests presented to a chapter member or officer should be submitted to the national president of Sigma Kappa Sorority prior to response. Only the chapter president should provide a response once directed to do so by the national president.

## XV.  FOUNDERS' DAY

**A.**  Celebration of Founders' Day is a required function for alumnae and collegiate chapters. Whenever possible, joint participation by alumnae and collegiate chapters is highly desirable.

**B.**  A special program shall be held as close to November 9th as possible and shall include a tribute to each of the Founders.

**C.**  Non-Sigma Kappa guests may attend Founders' Day celebrations.

## XVI. ~~REGIONAL LEADERSHIP~~ *SIGMA KAPPA-SPONSORED* CONFERENCES

### A. Collegiate Chapters

1. Each collegiate chapter is required to have executive council representation at a regional leadership conference (RLC). National council may designate additional representatives to attend each RLC *and may designate other conference attendance as appropriate.*

2. All chapter representatives shall be in good financial standing, both locally and nationally, at the time of registration for the RLC.

3. Collegiate chapters shall clear all outstanding business in order to be eligible to receive a RLC reduced all-inclusive attendance fee. Outstanding business is defined in NPH IX.L.

### B. Advisory Boards

1. Each collegiate chapter is ~~encouraged~~ *required* to send at least one advisory board representative to a regional leadership conference (RLC). *National council may designate other Sigma Kappa-sponsored conferences for advisors to attend as well.*

2. Requirements to receive an advisory board reduced all-inclusive attendance fee for an RLC *or other Sigma Kappa-sponsored conference* will be established by national council.

3. All advisory board representatives shall be in good financial standing which includes the payment of national alumnae dues, either to a local alumnae chapter or directly to national headquarters, at the time of ~~RLC~~ registration in order to receive a reduced all-inclusive attendance fee to ~~an RLC~~ *a Sigma Kappa-sponsored conference.*

### C. National Officers

1. *National council may designate national officer attendance at Sigma Kappa-sponsored conferences, including but not limited to regional leadership conferences and volunteer development conferences.*

2. National officers shall be in good financial standing which includes the payment of national alumnae dues, either to a local alumnae chapter or directly to national headquarters, at the time of ~~the regional leadership conference (RLC)~~ registration in order to receive an allowance to ~~an RLC~~ *a regional leadership conference or other Sigma Kappa-sponsored conference.*

## XVII.  CONVENTION POLICY

### A.  Collegiate Chapters

1. Each collegiate chapter is entitled to have two collegiate delegates to every national convention as voting delegates.
2. All voting delegates registering for convention shall be in good financial standing, both locally and nationally, at the time of registration.
3. Collegiate chapters shall clear all outstanding business in order to be eligible to receive a convention allowance and to be eligible to vote during convention. Outstanding business is defined in NPH IX.L.

### B.  Alumnae Chapters

1. Each alumnae chapter is entitled to have one voting delegate for each ten members in good standing, based upon paid national alumnae dues, but the total number of delegates cannot exceed three.
2. All voting delegates shall be in good financial standing, both locally and nationally. The delegate shall be in good financial standing at the time of registration for convention.
3. An alumnae chapter shall qualify for a convention allowance as determined by national council, if the alumnae chapter meets the following annual requirements:
   a. Pays national alumnae dues to national headquarters annually by specified date.
   b. Sends donations to national headquarters for Sigma Kappa philanthropies and/or Foundation funds with Alumnae Chapter Contribution Form annually by specified date.
   c. Submits Annual Report annually by specified date.
   d. Conducts membership recruitment drive annually.
   e. Celebrates Founders' Day.
   f. Supports assigned collegiate chapter (if applicable).
   g. Has four (4) activities or meetings each year.
   h. Submits Election of Officers Report annually.

### C.  Advisory Boards

1. Each collegiate chapter is entitled to have at least one advisory board delegate to every national convention as a voting delegate.
2. Requirements to receive an advisory board allowance for convention will be established by national council.
3. All advisory board delegates shall be in good financial standing, which includes the payment of national alumnae dues, either to a local alumnae chapter or directly to national headquarters, at the time of convention registration in order to receive a convention allowance.

**D. Corporation Boards/Property Committees**

1. Each corporation board/property committee is entitled to have at least one representative to every national convention as a voting delegate.

2. Requirements to receive a corporation board/property committee allowance for convention will be established by national council.

3. All corporation board/property committee delegates shall be in good financial standing, which includes the payment of national alumnae dues, either to a local alumnae chapter or directly to national headquarters, at the time of convention registration in order to receive a convention allowance.

**E. National Delegates**

1. Sigma Kappa Bylaw IV. Convention of the Grand Chapter, Section 7.a. lists the following national delegates that help comprise the voting body of the convention: each member of the National Council, the delegate and alternates to the National Panhellenic Conference, assistant editors of the Sigma Kappa Triangle, all national chairmen, each of the directors, all coordinators, and each of the Past National Presidents of the Grand Chapter.

2. National delegates, as listed above, shall be in good financial standing which includes the payment of national alumnae dues, either to a local alumnae chapter or directly to national headquarters, at the time of convention registration in order to receive a convention allowance.

XVIII. **SELECTED NPC UNANIMOUS AGREEMENTS AND GENERAL GOVERNING POLICIES**

A. **NPC Unanimous Agreement III.  The Panhellenic Compact**

1. A woman who is or who has ever been an initiated member of an existing NPC sorority shall not be eligible for membership in another NPC sorority.

2. To be eligible to participate in Panhellenic recruitment and pledge an NPC sorority *as a collegiate member*, a woman shall:

    a. Not be simultaneously enrolled in high school and attending college.

    b. Be *an undergraduate* regularly matriculated according to the definition of matriculation established by that institution.

3. An undergraduate woman ~~shall not be asked to~~ *may* pledge an NPC sorority *only* during *a regular academic term and not during* any school recess *or summer academic term* except during a primary membership recruitment period and the ensuing continuous open bidding (COB) process when held immediately before an academic term.

4. Each College Panhellenic Council shall establish a Bid Day to conclude the primary membership recruitment period. A Bid Day is the scheduled time when invitations to membership are issued.

5. If through the primary membership recruitment process, a potential new member receives a bid and declines it, then she is ineligible to be pledged to another NPC sorority on the same campus until the beginning of the next year's primary membership recruitment period.

6. At a later date but before the next primary membership recruitment period, if the potential new member who declined her bid expresses interest in being pledged to the chapter with which she originally matched, she may do so only if the chapter extends another bid and has quota or total spaces to fill.

7. If a potential new member does not receive a bid at the end of the primary membership recruitment period, she is eligible immediately to participate in COB.

8. If through the primary membership recruitment process a potential new member accepts a bid and then has her pledge broken by an NPC sorority or breaks her pledge, then she is ineligible to be pledged to another NPC sorority on the same campus until the beginning of the next year's primary membership recruitment period.

9. A COB acceptance is a binding agreement. If a potential new member accepts a bid, then signs a COB acceptance or goes through the member organization's official pledging ceremony and has her pledge broken by an NPC sorority or breaks her pledge, then she is ineligible to be pledged to another NPC sorority on that campus until the beginning of the next primary membership recruitment period.

10. A woman who has accepted a bid either through primary or COB membership recruitment and who has had her pledge broken by an NPC sorority or has broken her pledge, may be repledged by the same NPC sorority chapter on the campus at any time before the beginning of the next year's primary membership recruitment period, even if the chapter is over total.

11. When a woman who has been pledged but not yet initiated transfers to another campus, her pledge is broken, and she is eligible to pledge an NPC sorority on that campus at the earliest opportunity.

12. Women who have been pledged but not yet initiated into a chapter whose charter has been rescinded or relinquished or of a colony that has been dissolved shall be eligible to pledge another NPC sorority immediately following the official release by the NPC sorority.

## B. NPC Unanimous Agreement IV. Standards of Ethical Conduct

1. National Panhellenic Conference (NPC) sororities shall impress upon their undergraduate and alumnae members that they shall respect and obey the letter and the spirit of all NPC Unanimous Agreements.

2. In case of Panhellenic difficulties, all chapters involved shall do their utmost to restore harmony and to prevent publicity, both in the college and the community.

3. NPC denounces the arbitrary priority rating of women's sororities.

4. NPC denounces the ranking or categorization of chapters determined by administrative personnel, according to a chapter's compliance with university standards or guidelines.

5. NPC sorority members shall not suggest to any potential new member that she refuse a bid from one organization in order to wait for a bid from another organization or suggest that a potential member list only one choice on her membership recruitment acceptance binding agreement (MRABA).

6. It is in accord with the dignity and good manners of sorority women to:
   a. Avoid disparaging remarks about any sorority or college woman.
   b. Create friendly relations between sorority and nonsorority women.
   c. Avoid negative publicity on Panhellenic matters.

7. NPC discourages the use of Greek-letter sorority names and insignia in inappropriate or distasteful commercial advertising.

8. NPC has no affiliation or connection with any high school sorority.

9. NPC supports all efforts to eliminate hazing.

## C. NPC Unanimous Agreement V. Agreement on Extension

1. NPC believes that it is unethical for an NPC sorority to contact an institution and/or its students concerning the establishment of a chapter where the institution fails to meet the NPC requirements for a host institution. The institution must be a senior college or university that is authorized to confer a bachelor's degree and that has received a satisfactory rating by the pertinent recognized regional association of colleges and secondary schools or other recognized agency and/or entity that confers accreditation in the relevant jurisdiction.

2. The proper authority shall be defined as follows:
   a. Where there are two or more NPC sororities present on campus, then a vote of those NPC sororities as evidenced in written minutes of the College Panhellenic Council (if organized) shall constitute the proper authority. If there is no College

Panhellenic Council, then a separate vote of the NPC chapters present on campus shall constitute the proper authority.

   b. On campuses where there is one or no NPC sorority and where the administration is willing to recognize women's sororities, a letter from a senior-level student affairs administrator shall constitute the proper authority.

   c. The NPC Extension Committee is the proper authority on campuses where there is one or no NPC sorority and the college administration does not grant recognition to women's sororities but does not discipline students for joining.

3. Contact regarding extension by NPC sororities, volunteers, staff, collegiate and alumnae members shall include the following:

   a. NPC sororities may contact the administration of any college or university that meets the criteria listed in Unanimous Agreement V, No. 1 and serves as the proper authority.

   b. When a campus has two or more NPC sororities and is open for extension, NPC sororities can communicate with a student(s), an interest group or a local sorority only with prior permission of the proper authority.

   c. NPC sororities that are contacted by student(s), local sororities or interest groups from campuses with two or more NPC sororities must refer the student(s), local sorority or interest group to the proper authority.

   d. NPC sororities should not be in contact with students of any college or university concerning membership where the administration disciplines students for joining women's sororities.

   e. When a local sorority or interest group is in discussions with an NPC sorority regarding affiliation after approval by the proper authority, no other group shall be in communication with that local sorority or interest group.

4. Any colony of an NPC sorority shall become a provisional member of the College Panhellenic Association and shall conform to the association's established rules, regulations and policies.

5. When an NPC sorority has installed a chapter, that chapter shall become a regular member of the College Panhellenic Association.

## D. NPC Unanimous Agreement VI. College Panhellenic Association Agreement

2. Establishment and Regulation of Membership Recruitment

   a. Each College Panhellenic Council shall establish rules governing membership recruitment activities.

   b. Each NPC sorority chapter has the right to use continuous open bidding (COB) to reach quota or its total allowable chapter size during the regular school year as defined by the school calendar. To accommodate a chapter colonization or to allow a chapter to build its membership, the College Panhellenic Council may vote to suspend COB for a period not to exceed three weeks.

   c. Each College Panhellenic Association shall prohibit the use of alcoholic beverages in membership recruitment and Bid Day activities.

    d.   Each College Panhellenic Association shall prohibit the participation of men in membership recruitment and Bid Day activities.

    e.   All members, including alumnae and new members, shall be bound by College Panhellenic Association rules governing membership recruitment.

    f.   Regardless of recruitment style, a potential new member shall sign a binding membership agreement.

3.  Preferential Bidding

When a preferential bidding system is used, the College Panhellenic Association shall observe the following:

    a.   When a woman receives a bid under the preferential system, her signing the membership acceptance is binding to the extent that she shall be considered ineligible until the next primary recruitment to accept a bid from any other NPC sorority on the same campus. However, she may be repledged by the same NPC sorority chapter at any time prior to the next primary recruitment.

    b.   The person in charge of preferential bidding shall be required to safeguard all records and keep them for one year from the date of signing.

4.  Continuous Open Bidding (COB)

    a.   During COB, the proof of a woman's membership acceptance shall be a dated COB acceptance signed by the woman and witnessed by a member of the NPC sorority chapter.

    b.   The person in charge of record keeping shall be required to safeguard all COB records and keep them for one year from the date of signing.

## E.  NPC Unanimous Agreement VIII. Agreement on Questionnaires

Questionnaires, oral and written, shall not be answered until they have been reviewed by the NPC office staff and research subject matter experts. The necessary information will then be released to the member organizations to provide a coordinated response that protects individual and group freedom of association and the right to privacy.

## F.  NPC Unanimous Agreement IX. NPC Declaration of Freedom

Knowledge is essential to preserving the freedoms provided in the first 10 amendments of the U. S. Constitution, known as the Bill of Rights, and as provided by the Canadian Charter of Rights and Freedoms (Part 1, Constitution Act, 1982), known as the Guarantee of Rights and Freedoms.

Citizens of both the United States and Canada are guaranteed the rights of peaceful assembly and freedom of association. NPC is dedicated to preserving the freedom of citizens to choose their associates.

We, the members of the National Panhellenic Conference, agree that we have a responsibility to contribute to accurate and thorough knowledge of the freedoms guaranteed by the U.S. Constitution and the Canadian Charter of Rights and Freedoms, and of any forces, organizations and ideologies that are potentially destructive to these freedoms.

**G.  NPC Unanimous Agreement X.  Protecting the Right of NPC Members to Remain Women-Only Organizations**

NPC member groups exist as women-only private social organizations. We believe that the right to enforce such membership restrictions is rooted in the freedom of association protected by the First Amendment of the U.S. Constitution. The U.S. Congress has recognized that right by providing in Title IX of the Education Amendments of 1972 that social fraternities and sororities are exempt from the prohibition against discrimination on the basis of sex in participation in educational programs or related activities (20 USC 1681) and in exempting "bona fide private membership clubs" from the general prohibition against sex discrimination in employment practice (26 USC 501(c)). To further protect the right to maintain our membership policies, NPC reaffirms its long held beliefs and policies in the form of a Unanimous Agreement.

1. The women's sororities of the National Panhellenic Conference have the right to confine their membership to women and shall defend their right to exist as single-sex organizations.
2. Auxiliaries. Each College Panhellenic shall denounce the participation of undergraduate Panhellenic women in auxiliary groups to men's fraternities.
3. Men's Recruitment. Each College Panhellenic shall denounce the participation of Panhellenic women in men's fraternity events when or where the primary purpose is recruitment.

**H.  WHEREAS:** Sigma Kappa Sorority recognizes that the misuse of alcohol by students is a serious concern on college and university campuses throughout the country, and;

**WHEREAS:** Sigma Kappa Sorority respects the alcohol-free initiatives adopted by men's and women's fraternities and college and university campuses, and;

**WHEREAS:** Sigma Kappa Sorority supports the alcohol-free resolution adopted by the National Panhellenic Conference that individual NPC member fraternities will work toward co-sponsoring only alcohol-free functions in men's fraternity facilities by the fall term of 2000;

**RESOLVED:** That where campuses are voting on alcohol-free functions in men's fraternity facilities, Sigma Kappa collegiate chapters will vote in favor of an initiative to address the co-sponsorship of alcohol-free functions in men's fraternity facilities, and;

**RESOLVED:** That Sigma Kappa collegiate chapters will observe the policies of all fraternities and sororities when co-sponsoring events with them or when a chapter is a guest in their facility, and;

**RESOLVED:** That all collegiate chapter members be educated on Sigma Kappa, Panhellenic or campus legislation regarding the co-sponsorship of alcohol-free functions in men's fraternity facilities.

**I.** In cooperation with all NPC member groups, **NO SIGMA KAPPA CHAPTER, CHAPTER OFFICER, OR MEMBER** shall reply to any questionnaire, etc. **until such questionnaire has been submitted to the national president and cleared for completion.**

**J.** College Panhellenic Constitutions and Bylaws

Any changes in college Panhellenic Constitutions and Bylaws must be submitted to and approved by the National Panhellenic Conference delegate before the college Panhellenic delegate may vote on any change.

**K.** The following was adopted by NPC in April, 2013.

NPC member groups agree to advise their collegiate chapters to plan or participate in events with men's fraternities only when those men's fraternities are not suspended for reasons of organizational misconduct and are:

1.) chapters or colonies recognized and in good standing with both their national organization and the college/university; or

2.) chapters or colonies recognized and in good standing with their national organization, but have been denied recognition or have had recognition rescinded by the college/university for reasons other than organizational conduct; or

3.) chapters or colonies recognized and in good standing with their national organization, but where the entire Interfraternity Council community lacks recognition from the college/university; or

4.) local fraternities recognized and in good standing with the college/university.

## XIX.   BADGES AND JEWELRY

**Member Badge Policy**
All members' badges are the property of the national organization. The payment made at the time of Initiation is considered to be a reasonable sum for the privilege of using the badge during the member's lifetime

### Procedure
1. Each initiate must pay the Sigma Kappa badge fee.
   a. If the loan or gift of a badge is made by a relative or Sigma Kappa alumna, the initiate receiving the badge must send the fee for a scroll badge to the Sigma Kappa national headquarters.
   b. If the badge is an honorary award that is to be returned to the chapter, the initiate is required to pay the Sigma Kappa badge fee for her own badge.
   c. If a member desires, she may obtain an additional badge at any time.
2. If membership in Sigma Kappa is permanently terminated due to withdrawal or expulsion or temporarily terminated due to suspension, the badge and membership certificate shall be returned to national headquarters.
3. A badge of a deceased member may be donated to a chapter with the approval of the collegiate coordinator. It is suggested such a badge be used by the chapter for special recognition. In such case, the initiate receiving the badge must send the fee for a scroll badge to the national headquarters.
4. A badge of a deceased member shall be returned to national headquarters or may be buried with the body.

**Proper Use of Badges**
1. The Sigma Kappa badge shall be worn above all other pins. Fraternity jewelry, either honorary, professional, or social shall not be worn above the Sigma Kappa badge.
2. The badge will be worn with pride by members who reflect the high standards of Sigma Kappa in dress and conduct.
3. The new member pin and the badge of a collegian shall be worn only as badges/pins over the heart and on the outer-most layer of clothing and shall be worn only for the purpose of identifying the wearer as a member or new member of Sigma Kappa.
4. No Sigma Kappa may give her badge to anyone not a member of Sigma Kappa.
5. An alumna member may use her badge as jewelry for example as a ring, charm, or necklace so long as the badge is not changed in any way.
6. Only current and former national council members are permitted to wear the alternate diamond and pearl Sigma Kappa badge.

**Other Official Jewelry Procedure**

1. New member pin
   a. Since the new member pin is the property of the national organization, it is returned to the college chapter at the time of Initiation or when pledgeship is terminated.
   b. A new member pin may be purchased from national headquarters by an initiated member for her personal use.
2. The Order of the Triangle Pin may be worn by an initiated member leaving her collegiate chapter in good financial standing and may be purchased from national headquarters.
3. Twenty-Five-Year Pin – Any Sigma Kappa who has been initiated for twenty-five or more years is eligible for a twenty-five-year pin and certificate.
4. Fifty-Year Pin – Any Sigma Kappa who has been initiated for fifty or more years is eligible for a fifty-year pin and certificate.

## XX.  LICENSING

**A.**  As specified in the *Constitution and Bylaws*, the ownership of all insignia and emblems including the name Sigma Kappa and/or its Greek letters ΣK shall be owned by Sigma Kappa Sorority, a corporation. These insignia and emblems, including but not limited to the name Sigma Kappa and its Greek letters ΣK, shall not be manufactured, created, used, or offered for sale by any person, company, or firm except as specifically authorized in writing and administered by national council.

**B.**  Members wishing to acquire merchandise containing the sorority's insignia and emblems should obtain those items only from vendors which are currently authorized to produce or market official Sigma Kappa Sorority licensed merchandise.

> **Procedure**
>
> A.  Collegiate chapters, alumnae chapters, advisory boards, corporation boards, and property committees may utilize local commercial firms to produce material for their own entities needs from time to time so long as such material is pre-approved. Prior to ordering such material, approval shall be obtained from the executive ~~assistant~~ *director* at national headquarters *or her designee*. The executive ~~assistant~~ *director* shall not approve any text or design which casts the Sorority in a negative light or is otherwise contrary to the ideals of the Sorority.
>
> B.  The executive ~~assistant~~ *director* may delegate the responsibility for approval of material (*including t-shirts, favors, banners, etc.*) ~~produced by local commercial firms~~ as follows:
>
> 1.  ~~The collegiate public relations coordinator~~ *The recruitment supervisor for recruitment items, the risk management coordinator for all social function favors and apparel, and the advisory board supervisor for all other items* for collegiate chapters and advisory boards,
>
> ~~2.  The corporation coordinator/corporation liaison for corporation boards and property committees, and~~
>
> ~~3~~2.  The alumnae ~~public relations coordinator~~ *district directors* for alumnae chapters.

## XXI.  SHARING OF MEMBER INFORMATION POLICY

Sigma Kappa membership directory information is private business of the Sorority and may only be shared according to the following procedure.

### Procedure

The sharing of directory information of procedure will provide direction for staff members and volunteers in answering requests for information. This procedure addresses the sharing of a member's directory information (i.e., name of member, title within Sigma Kappa, address, email address, telephone number, and fax number).

1. Generally, the sorority will provide members with other members' directory information, as we are sharing this information among members within an organization whose purposes are social and recreational in nature. However, common sense should always be used in responding to a request for a member's directory information.

2. Whenever possible, verify that the requestor is a member in good standing (i.e., prior to looking up the member requested, look up the member requesting the information). If the response is in writing to a written request for information, such as via email or mail, then we should also include a statement that "the member's directory information is being provided in furtherance of our sorority's social, spiritual, and intellectual purposes."

3. National officers should be more easily accessible to other members by reason of their appointment or election as an officer with duties within the organization. National officer appointment letters will include a statement notifying the officer that their directory information may be shared with other members and that they are expected to be accessible to the organization's members.

4. The Sorority will be open with our members about our policy of sharing directory information to other members via the *Sigma Kappa Triangle*, the website, or other Sigma Kappa publications annually. If a member wishes not to have her information provided to other members, the organization should respect those wishes and make all reasonable efforts to accommodate the request.

5. The Sorority will make reasonable efforts to not disclose member directory information (or any other information) to non-members. The Sorority will contact the member and relay the message that a non-member is trying to contact them and provide the member the information of the non-member.

6. The name, title, address, and email address of national officers will be shared:
   a. On the private side of the website since it will only be accessible to members in good standing; and
   b. In the *Sigma Kappa Triangle.*

7. The name, title, address and email address of the presidents of the alumnae chapters and collegiate chapters will be shared:
    a. On the website (except the address will only be shared on the private side of the website); and
    b. In the *Sigma Kappa Triangle*
8. The executive assistant shall continue to approve mailing of licensed vendors to members per established procedure of signing confidentiality agreements to ensure that the list is not being used or sold for purposes other than what was agreed upon.
9. On a case by case basis and upon approval of the national vice president of alumnae, in consultation with Sorority legal counsel and the national president, national headquarters may share with colleges, universities, and Panhellenic associations the directory information of alumnae members upon written request from the college, university, or Panhellenic association.
10. The procedure for sharing directory information of the following members in accordance with the above guidelines is as provided below.
    **a. National Officers**:
        1. Website – Name and title
        2. *ΣK Triangle* and private side of website – Name, title, address, email
        3. Information requests coming to the website shall be forwarded to the proper staff member or volunteer for a timely response in accordance with the above policy.
        4. Telephone requests for information about a national officer from a member at large, advisor, corporation board or alumnae chapter member, upon verification of member status shall be shared, unless otherwise specified in the database.

**b. Alumnae Chapters**:
    1. Website– Name, title, email
    2. *ΣK Triangle* and private side of website – Name, title, address, email
    3. Alumnae chapter websites are created and maintained by the alumnae chapter. Alumnae chapters that provide a link to the national website shall comply with Sorority website Guidelines.
    4. Requests for information that come into NHQ via email, voice mail, telephone, or mail will be acknowledged and responded to by providing directory information upon verification of requestor's membership status, unless otherwise specified in the database.

**c. Collegiate Chapters**:
    1. Website– Name, title, email
    2. ΣK Triangle and private side of website – Name, title, address, email

3. Collegiate chapter websites are created and maintained by the collegiate chapter. Collegiate chapters that provide a link to the national website shall comply with Sorority website Guidelines.

4. Requests for information that come into NHQ via email, voice mail, telephone, or mail will be acknowledged and responded to by providing directory information upon verification of requestor's membership status, unless otherwise specified in the database.

**d. Members At Large:**

1. The executive assistant reserves the right to approve mailings of licensed vendors to members per the established procedure of signing confidentiality agreements to ensure that lists are not being used or sold for purposes other than what was agreed upon.

2. Telephone, email, and mail requests for directory information of a member at large for a member at large shall be handled as follows:
The staff member or volunteer shall take the requestor's name, telephone number and email address, verify membership status, and shall provide the directory information (except telephone number), unless otherwise specified in the database.

3. On a case by case basis and upon approval of the NVPA in consultation with Sorority legal counsel, NHQ may share with colleges, universities, and Panhellenic associations the directory information of alumnae members upon written request from the college, university, or Panhellenic association.

4. On the private side of the website, the members name, address, and email address may be shared, unless the member has requested otherwise.

**e. Requests by Non-Members**:

The Sorority will contact the member and relay the message that a non-member is trying to contact them and provide the member the information of the non-member.

## XXII. DOCUMENT RETENTION POLICY

Sigma Kappa chapters, officers, and headquarters staff shall conduct document retention on an annual basis utilizing the document retention procedure below.

### Procedure

a.  It is important that the above records be retained no longer than the specified time by anyone who has a copy of the document – not just the entity listed as the "responsible party." So where the retention period is for a set number of years, then the document (and all copies of the document) must be destroyed at the end of the retention period.

b.  If an item bears a member's name along with her address and/or social security number, it should be destroyed (shredded) and not simply discarded at the end of the retention period.

c.  If the retention period is shown as "permanently", then the responsible party is to keep the document permanently. Anyone else with a copy may retain the document as long as they wish.

d.  Documents not identified in this policy should be routinely discarded after their useful life has ended.

e.  All documents relating to a risk management issue with litigation potential should be stored electronically on separate disks and kept by legal counsel until the litigation has ended. If a staff member or volunteer becomes aware of a risk management issue, they should forward that knowledge to legal counsel immediately

f.  Documents should be retained for the time period listed below by the record keeper listed below.

### Alumnae Record Files

| | | |
|---|---|---|
| Alumna initiate application | 1 year | NHQ |
| Annual reports | permanently | NHQ |
| Chapter financial records | | |
|     Bank statements | 7 years | alumnae chapter |
|     Correspondence | 7 years | alumnae chapter |
|     Ledgers | 7 years | alumnae chapter |
|     Foundation contribution forms | 7 years | alumnae chapter |
|     Alumnae national dues forms | 7 years | alumnae chapter |
| Chapter minutes | permanently | alumnae chapter |
| General correspondence | 3 years | alumnae chapter |
| Report of Officers to Serve | 3 years | NHQ |

### Collegiate Record Files

| | | |
|---|---|---|
| Badge affirmation cards | permanently | NHQ |
| Calendars | current copy | collegiate chapter |
| Chapter financial records | | |

| | | |
|---|---|---|
| Bank statements | 7 years | collegiate chapter |
| Correspondence | 7 years | collegiate chapter |
| Financial suspension records | 4 years | collegiate chapter |
| Ledgers | 7 years | collegiate chapter |
| Monthly reports | permanently | collegiate chapter |
| Chapter minutes | permanently | collegiate chapter |
| Chapter newsletters | 4 years | collegiate chapter |
| Current Panhellenic Council Bylaws | current copy | collegiate chapter |
| New Member Fee Remittance Forms | 1 year | NHQ |
| Petitions for Special Dispensation | | |
| Suspension | 1–4 years* | NHQ |
| Financial suspension | 1–4 years* | NHQ |
| Expulsion | permanently | NHQ |
| Leave of absence | 1–4 years* | ABS/CC |
| Parietal hours | 1 year | CC |
| Voluntary withdrawal | permanently | NHQ |
| Recruitment Introduction Form | 1 year | collegiate chapter |
| Risk Management Policy signatory pages | 4 years | NHQ |
| Social Function Review Forms | 6 years | RMC |
| Standards Council Documentation | 1–4 years* | CC |
| University Correspondence | 4 years | collegiate chapter |
| University rules | current copy | collegiate chapter |
| University constitution | current copy | collegiate chapter |

      *retain as long as member is in college

**Correspondence and Reports**

| | | |
|---|---|---|
| Collegiate Officer reports | 2 years | National officers |
| Colonization/recolonization correspondence and information | permanently | NVP Extension |
| Committee meeting minutes | permanently | Committee Chair |
| Convention and meeting correspondence | 7 years | NHQ |
| Convention proceedings | permanently | NHQ |
| General correspondence | 3 years | National officers |
| Council correspondence | 3 years | National officers |
| Council meeting minutes | permanently | NVP Communication |
| Leadership Consultant Reports | 2 years | National officers |
| National Officer reports | 2 years | National officers |
| Recruitment statistics reports | 2 years | Dir. of Recruitment |

**Employment Records**

| | | |
|---|---|---|
| Employee/personal records | 3 years after termination | NHQ or corporation |
| Employment applications | 3 years | NHQ or corporation |
| Time sheets | 6 years | NHQ or corporation |

**Financial Records**

| | | |
|---|---|---|
| Accounts payable ledgers | 7 years | NHQ |
| Accounts receivable ledgers | 7 years | NHQ |
| Account reconciliation | 3 years | NHQ |

| | | |
|---|---|---|
| Audit reports | permanently | NHQ |
| Bank reconciliation | 1 year | NHQ |
| Cash books – daily income records | permanently | NHQ |
| Chart of accounts | permanently | NHQ |
| Canceled checks | 4 years | NHQ |
| Expense vouchers | 3 years | NHQ |
| Financial statements monthly, annual | permanently | NHQ |
| Invoices to members/chapters | 7 years | NHQ |
| Invoices from suppliers | 7 years | NHQ |
| Journal entry support | 7 years | NHQ |
| Payroll records and summaries | 3 years | NHQ |
| Payroll records / W-2 forms | permanently | NHQ |
| Tax returns and worksheets | permanently | NHQ |

**Legal Documents**

| | | |
|---|---|---|
| Contracts and Leases | 7 years after expiration | NHQ |
| Corporate documents (constitution, bylaws, annual reports, etc.) | permanently | NHQ |
| National officer intellectual property agreements | permanently | NHQ |
| Insurance policies | 10 years | NHQ |
| Insurance records (reports, claims, etc.) | 10 years | NHQ |
| Legal documents and filings | permanently | NHQ |
| Risk Management Reports | until litigation ends | NHQ |
| NHQ opening/closing checklists | 2 years | NHQ |

**Publications**

| | | |
|---|---|---|
| Sorority annual report | permanently | NHQ |
| Award information | 4 years | NHQ |
| Convention/RLC handouts | 6 years | NHQ |
| Convention/RLC programs | permanently | NHQ |
| Annual supplies | 2 years | NHQ |
| Handbooks | current copy | NHQ |
| *National Policy Handbook* | permanently | NHQ |
| Monthly mailings | 3 years | NHQ |
| Newsletters | 3 years | NHQ |
| *Sigma Kappa Triangle* article notes | 4 years | NHQ |
| *Sigma Kappa Triangle* magazine | permanently | NHQ |

**Electronic Files**

Electronic files, including emails, containing the above referenced items should be retained as outlined above.

68

## XXIII.  *SIGMA KAPPA TRIANGLE* DEATH NOTICES

**A.**  Death notices for past national presidents shall include a story and picture.

**B.**  Death notices for all present national council members shall include a story and picture.

**C.**  Death notices for all past national council members shall include a story and, if available, a picture.

**D.**  Death notices for national officers of very long standing shall include a story and, if available, a picture.

**E.**  Death notices for members with national public status shall include a story and, if available, a picture.

**F.**  Death notices for Colby Award recipients shall include a story and, if available, a picture.

**G.**  Death notices for all other Sigma Kappas will be listed in the "In Memoriam" column.

**INDEX**

**A**

Academic Requirements                                      19

Advisory Board Requirements                                40

Alcoholic Beverages                                        26

Alumnae Chapters                                           47

Alumnae Initiates                                          7

Automatic Financial Suspension                             14

**B**

Badges & Jewelry                                           62

    Fifty-Year Pin                     63

    New Member Pins                    63

    Proper Use of Badges               62

    The Order of the Triangle Pin      63

    Twenty Five-Year Pin               63

Big/Little Brother and Little Sister Policy                25

**C**

Candles                                                    29

Chapter House Insignia                                     45

Code of Conduct                                            30

Collegiate Chapter Officers                                39

Collegiate Chapters                                        36

    Advisory Boards                    40

    Corporation Boards/Property

        Committees/Decorating Committees   42

College Panhellenic Constitution                           56

    and Bylaws

Contracts                                                  26

Convention                                                 52

**D**

Death Notices                                              71

Depledging                                                 19

Document Retention Policy                                  68

Drugs                                                      29

**E**

Expulsion                                                    16

**F**

Fifty-Year Pin                                               63
Financial Expulsion                                          16
Fire/Life Safety                                             44
Founders' Day                                                50
Fundraising                                                  37

**G**

Graduate Student Members                                     11

**H**

Hazing                                                       23
Honor Initiates                                               7
House Occupancy                                              43
Housing Safety                                               29
    Use of Candles                       29
Housing and Corporation Board Policies                       42
    Chapter House Insignia               45
    Corporation Board, Property          43
      committees, and Decorating
      committees
    Corporation Violation Procedures      28
    Expelled, Withdrawn, and              42
      Suspended Members
    Fire/Life Safety                      44
    National Housing Corporation          45
    National Insurance                    38, 47
Housing and Furnishing Fees                                  37
House Directors                                              42

**I**

Initiation                                                    6
Initiation Requirements                                       6
Initiates, Alumnae                                            7
Initiates, Honor                                              7
Internet and Related Technology Policy                       32

**L**

Leave of Absence                                             12
Legacy Policy                                                3
Licensing                                                    64
Locking of Chapter Property                                  29

**M**

Married Members                                              10
Member Badges                                                58
Members, Collegiate                                          9
Membership Selection Committee                               3
Membership Status                                            9
    Big/Little Brother and Little Sister Policy    25
Membership, Social Privileges                                9
Membership, Transfer of                                      10

**N**

National Housing Corporation                                 45
National Officers                                            49
NPC Unanimous Agreements                                     54

**O**

The Order of the Triangle Pin                                63
Outstanding Business                                         37

**P**

Panhellenic Constitution and Bylaws                          56
Pins, New Member                                             62
Pledging                                                     5
Policy Statement on Hazing                                   22
Professional Programs/Degrees                                10
Proper Use of Badges                                         62

**R**

Recruitment                                              3
Sigma Kappa Legacy Policy                                3
Regional Leadership Conferences                          51
Reinstatement                                            15
Returning Undergraduate Members                          11
Risk Management Policies                                 22
    Alcoholic Beverages                 26
    Contracts                           26
    Housing Safety                      29
    Policy Statement on Hazing          22
    Risk Incident Procedure             22
    Sanctions for Violation of
       of Risk Management Policy    30
    Social Events and Functions         30
    Social Function Review Form         27
    Standards Council                   30
    Transportation                      28
    Visitation                          29

**S**

Scholarship                                              20
Sharing of Member Information Policy                     65
Social Privilege and Social Membership                   9
Special Membership Status                                10
    Professional Programs/Degrees       10
    Graduate Student Members            11
    Leave of Absence                    12
    Married Members                     10
    Returning Undergraduate Members     11
    Special Alumnae Status/Dormant Chapters   12
Standards Council                                        30
Standards of Excellence                                  36
Surveys                                                  36, 47
Suspension                                               14

**T**

Termination/Suspension of Membership                14
    Automatic Financial Suspension                14
    Depledging                19
    Expulsion                19
    Financial Expulsion                19
    Reinstatement                15
    Suspension                14
    Voluntary Withdrawal of Membership                17
Transfer of Membership                10
Transportation                28
Twenty Five-Year Pin                63

**V**

Visitation                29
Visual Standards                33, 36
Voluntary Withdrawal of Membership                17

# **EXHIBIT C**

# BYLAWS OF SIGMA KAPPA SORORITY

## ARTICLE I
## NAME

**Section 1.** The name of this organization shall be SIGMA KAPPA SORORITY, a nonprofit corporation organized under the laws of the State of Maine (hereinafter "Sorority").

**Section 2.** The official founding of Sigma Kappa was November 9, 1874.

**Section 3.** ALPHA CHAPTER of Sigma Kappa Sorority was chartered at Colby College, Waterville, Maine, and the name ALPHA CHAPTER shall not be used by any other chapter.

**Section 4.** The collegiate chapters shall be named by letters from the Greek alphabet, as assigned by the National Council.

**Section 5.** Each alumnae chapter may select a name to be approved by the National Council by which it shall be known.

## ARTICLE II
## PURPOSE AND AUTHORITY

**Section 1.** The purpose of Sigma Kappa Sorority is to provide women lifelong opportunities and support for social, intellectual, and spiritual development by bringing women together to positively impact our communities.

**Section 2.** The Sorority shall have the authority to perform all acts necessary, convenient or expedient to accomplish aforesaid purposes, including but not limited to:

   a.   Establish collegiate and alumnae chapters, make rules and regulations governing them, and promulgate programs for their development;
   b.   Establish and collect such dues and assessments from its members and chapters as shall from time to time be necessary to cover the cost of attaining the purposes and powers herein set forth;
   c.   Invest and reinvest any and all funds it receives by way of dues, fees, assessments, contributions or otherwise; and
   d.   Appoint or employ such persons as the organization may require, define their duties, and fix and pay their compensation.

**Section 3.** The Sorority shall be authorized to exercise and enjoy all powers and authority granted by Title 13-B, the Maine Nonprofit Corporation Act, as enacted by Laws 1977, c.525 & 13, (formerly Chapter 50 of Maine Revised Statues of 1944 and Chapter 55 of Maine Revised Statues of 1903) to corporations organized thereunder and all the powers and authority conferred by all laws heretofore or hereafter amendatory of or supplemental to the said Act.

**Section 4.** Only the membership of the Sorority shall have the authority to

1

determine the membership and to lawfully conduct the other affairs of the Sorority in accordance with the provisions of the Bylaws.

**Section 5.** No pecuniary profit or dividend shall result to any member of this corporation, except her proportionate share of the assets of this corporation upon the dissolution thereof, when its purpose cannot be further carried on, with the reservation that no member can receive as her proportionate share upon dissolution a sum larger than the amount paid in or contributed by such member by way of a membership fee.

# ARTICLE III
# MEMBERSHIP

**Section 1.** The members of the Sorority shall be those persons whose qualifications comply with the purposes and ideals of the Sorority as defined in Article II, Section 1 of these Bylaws and who have been initiated into the Sorority.

No person who is or has been an initiated member of any fraternity belonging to the National Panhellenic Conference or any similar National College or University Fraternity, honorary or professional excepted, shall be eligible for membership in Sigma Kappa.

**Section 2.** Sigma Kappa Sorority values individuality and diversity in her membership. In furtherance of our purpose and in our membership selection practices, we recognize the importance of each individual member within an atmosphere of care, respect, and tolerance.

**Section 3. Membership of the Grand Chapter.**
The membership of the Grand Chapter of Sigma Kappa Sorority shall be comprised of all the initiated members of the Sorority.

**Section 4. Classifications of Membership**
  a.  Collegiate members shall be those who are pursuing a bachelor's degree at colleges and universities where Sigma Kappa chapters are established.
  b.  Alumnae members shall consist of initiated members who have left college in good standing, honor initiates, and alumna initiates.

**Section 5. Qualifications for Membership.**
  a.  Collegiate Members: Any woman who qualifies for membership under the Bylaws and is pursuing a bachelor's degree at a college or university in which Sigma Kappa chapter is located shall be eligible to be pledged only under all of the following conditions:
    1.  She shall receive an affirmative vote of the appointed membership selection committee under the pledging requirements of the *National Policy Handbook*.
    2.  She should have at least one written recommendation from an initiated member in good standing.

2

    b.    Collegiate Initiates. The following requirements for Initiation shall be completed by each new member prior to Initiation:
1. Fulfill all new member education duties and requirements.
2. Pass the initiate's exam with a score of at least 90%.
3. File with the finance advisor a written consent to the financial obligations involved in membership.
4. Pay all debts to the chapter, including the initiation fee and badge fee.
5. Sign the badge affirmation form and send it to National Headquarters.
6. Meet the scholastic standards established by national policy and/or by the collegiate chapter, whichever is greater.
7. Prove herself worthy of full Sigma Kappa membership through a cooperative and positive attitude toward Sigma Kappa.
8. In the event the initiated member recommendation was not received prior to pledging, the written recommendation shall be in the chapter files prior to Initiation.

    c.    Honor Initiates. Those women chosen and approved by the National Council for Initiation. The fees are paid by the national treasury.

    d.    Alumnae Initiates. Those women chosen and initiated by a chapter who are not enrolled at the college or university where the chapter is located and who have received two written recommendations from initiated members in good standing. The fees are paid by the local chapter or the individual.

## Section 6. Transfer of Membership.

A collegiate member who transfers to a different college/university may affiliate with the chapter at her new college/university.

## Section 7. Termination of Collegiate Membership.

    a.    The National Council may withdraw the privilege of membership from any collegiate member upon the recommendation of the Collegiate Coordinator, or Collegiate District Director and the unanimous vote of the National Council.

    b.    A collegiate chapter may withdraw the privilege of membership from one of its members by a two-thirds (2/3) vote with the consent of the advisory board, Collegiate Coordinator, Collegiate District Director, and National Council.

    c.    In a case of termination of membership, the member's badge and membership certificate shall accompany notification of the termination sent to the National Headquarters of the Sorority by the chapter.

    d.    The National Council may depledge a woman upon the recommendation of the Collegiate Coordinator, Collegiate District Director, and the unanimous vote of National Council.

    e.    A chapter may depledge a woman by two-thirds (2/3) vote with the consent of the advisory board and/or the Collegiate Coordinator.

## Section 8. Termination of Alumna Membership.

    a.    The National Council may withdraw the privilege of membership

from any alumna member upon the recommendation of five (5) alumnae members, with full particulars surrounding the reason for the request (either civil judgment involving Sigma Kappa or criminal conviction), and the unanimous vote of the National Council.

b.   In a case of termination of membership, the membership certificate (if available) and the member's badge shall accompany the notification of the termination sent to the National Headquarters of the Sorority by the National Council.

# ARTICLE IV
# CHAPTERS

## A.   NEW CHAPTERS
### Section 1. New Collegiate Chapter.

a.   The National Council shall confer upon a group of college women a charter of Sigma Kappa Sorority, provided that a formal petition for the establishment of such collegiate chapter has been approved by the unanimous vote of the National Council.

b.   A prescribed initiation fee, to be set in each case by the National Council, shall be paid in advance to Sigma Kappa at the National Headquarters of the Sorority by each member of the group after its acceptance.

c.   An alumna member of a local petitioning group shall be eligible for alumnae membership in Sigma Kappa Sorority.

### Section 2. New Alumnae Chapters.

a.   Six (6) alumnae members of Sigma Kappa Sorority may unite to form an alumnae chapter provided that permission has been granted by National Council.

b.   Any alumna member of the Sorority in good standing may become a member of an alumnae chapter.

## B. ADMINISTRATION OF COLLEGIATE CHAPTERS
### Section 1. Elected Officers. Each collegiate chapter shall annually elect by ballot a President, an Executive Vice President, *a Vice President of Standards and Values,* a Vice President of Programming, a Vice President of New Member Education, a Vice President of Membership, a Vice President of Alumnae Relations, a Vice President of Scholarship *Academic Excellence,* a Vice President of Philanthropic Service, a Vice President of Communication *and Operations,* a Vice President of Finance, and a Panhellenic Delegate, with the approval of the advisory board, to serve until their successors are elected and assume office.*

### Section 2. Duties.

a.   The President shall:
   1.   preside at meetings of the chapter,
   2.   call special meetings as needed;
   3.   officiate at pledgings, Initiations and other ritual services;
   4.   exercise general supervision of the chapter;
   5.   see that the provisions of the Bylaws, Standing Rules, and other regulations and rules are enforced and obeyed; and

6. *supervise the ritual chairman; and* \*

7. shall perform other such duties as may be specifically assigned to her in a handbook or other set of rules relating to the office of President as adopted by the National Council.

b. The ~~Executive Vice President~~ *Vice President of Standards and Values*\* shall:

1. exercise the powers of the President in her absence or at her request,

2. be responsible for standards and risk management; ~~and~~

3. *supervise the work of the social chairman, and*\*

4. perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by National Council.

c. The Vice President of Programming shall:

1. be responsible for ~~ritual,~~ educational, *ritual,* and committee programming, ~~and~~

2. *supervise the sisterhood chairman; and*\*

3. perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by National Council.

\* *All italicized changes to Article IV.B. are effective January 1, 2019.*

d. The Vice President of New Member Education shall:

1. act as supervisor of new member education;

2. memorize the vice president's portion of the ritual for pledgings and Initiations;

3. collect new member pins immediately preceding Initiations; and

4. perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by the National Council.

e. The Vice President of Membership shall:

1. be in charge of membership selection procedures *and supervise the continuous open bidding (COB) chairman*\*; and

2. perform such other duties as may be specifically assigned to her in a handbook or other set of rules pertaining to the office as adopted by the National Council.

f. The Vice President of Alumnae Relations shall:

1. be in charge of chapter-alumnae relations;

2. promote with each member of the chapter a lifetime commitment to Sigma Kappa Sorority;

3. make and maintain an updated personal record of each member of the chapter;

4. prepare an annual newsletter; and

5. shall perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by the National Council.

g. The Vice President of ~~Scholarship~~ *Academic Excellence*\* shall:

1. be in charge of the chapter's scholarship program;

2. provide the chapter with academic and counseling resources

5

              provided by the college or university;

3.     counsel members experiencing academic difficulty; and
4.     shall perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by the National Council.

h.     The Vice President of Communication *and Operations*\* shall:

1.     make and keep an accurate record of the meetings of the chapter, to be approved by the chapter and signed by the Vice President of Communication *and Operations* and President each week;
2.     *participate in and document*\* ~~record~~ all pledging and Initiation services;
3.     ~~participate in pledging and Initiation services;~~ *identify attendance issues and supervise retention efforts for the chapter;*\*

\* *All italicized changes to Article IV.B. are effective January 1, 2019.*

4.     compile all general reports for the proper officers of the Grand Chapter;
5.     *manage chapter communication and social media efforts*\* ~~file a list of advisory board members and their addresses with the proper officers;~~
6.     publish all notices and acknowledge the official correspondence of the chapter; ~~and~~
7.     *supervise the public relations chairman and Sigma Kappa Triangle correspondent; and*\*
8.     perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by the National Council.

i.     The Vice President of Philanthropic Service shall:

1.     be responsible for all philanthropic activities of the chapter, including support of the Sigma Kappa Foundation, as well as the philanthropies of Sigma Kappa Sorority; and
2.     perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by National Council.

j.     The Vice President of Finance shall:

1.     collect and keep all funds belonging to the chapter;
2.     disburse funds under the direction of the chapter;
3.     present an itemized financial report each month or at such times as may be required by the chapter;
4.     prepare an annual budget to be adopted by the chapter; ~~and~~
5.     *supervise the House Manager as applicable;*\*
6.     *serve as a collegiate representative to the local corporation board, as applicable; and*\*
7.     perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by the National Council.

k.     The Panhellenic Delegate shall:

1.     represent the chapter at all Panhellenic meetings; and
2.     perform such other duties as may be specifically assigned to her

in a handbook or other set of rules relating to the office as adopted by the National Council.

**Section 3. Other Officers**. Each collegiate chapter shall have a ritual chairman, *continuous open bidding (COB) chairman\**; sisterhood chairman, social chairman, public relations chairman, and a *Sigma Kappa Triangle* Correspondent. *Chapters with living facilities are required to have a house manager\**. Each may be elected by the chapter or appointed by the President of the chapter with the advice of the Executive Council and the advisory board.
*\* All italicized changes to Article IV.B. are effective January 1, 2019.*
**Section 4. Committees**. Each collegiate chapter shall utilize a committee system with each member and new member participating in a committee. Each chapter must have committees for membership, ritual and sisterhood. Chapters may utilize additional committees as necessary, including but not limited to committees for *alumnae, academic excellence\**, new member education, activities, ~~scholarship~~, social, philanthropic service, programming, and public relations. Each committee shall have a chairman elected by the chapter or appointed by the President of the chapter with the advice of the Executive Council and the advisory board.

**Section 5. Executive Council**. Each collegiate chapter shall have an Executive Council.
    a.    The Executive Council shall be comprised of the President, ~~Executive~~ Vice President *of Standards and Values\**, Vice President of Programming, Vice President of New Member Education, Vice President of Membership, Vice President of Alumnae Relations, Vice President of ~~Scholarship~~ *Academic Excellence\**, Vice President of Philanthropic Service, Vice President of Finance, Vice President of Communication *and Operations, and\** Panhellenic Delegate~~, and All-Greek Delegate where applicable~~.
    b.    The duties of the Executive Council shall be to assist the chapter President and shall have the power to enforce the National Bylaws and Standing Rules pertaining to collegiate chapters and chapter regulations.

**Section 6. Advisory Board**. Each collegiate chapter shall have an advisory board of five (5) alumnae members in good standing except when authorization to have a different number has been given by the Collegiate Coordinator. The purpose of the advisory board shall be to counsel and guide the membership of the chapter.

## C. MEETINGS OF THE COLLEGIATE CHAPTERS
**Section 1.** Each collegiate chapter shall hold meetings once a week during the regular college terms. Said meetings shall at all times be limited to members of the Sorority. In addition, twice a month a chapter shall conduct informal meetings for the benefit of the chapter.

**Section 2.** Collegiate members are required to attend all meetings and functions of the chapter at the appointed time and place.

**Section 3.** No member shall leave the room during a chapter meeting without the permission of the President.

7

*\* All italicized changes to Article IV.B. are effective January 1, 2019.*

**Section 4.** Each collegiate chapter, with the approval of its advisory board, may make such chapter regulations as shall be deemed necessary, provided that these do not conflict with the Bylaws and Standing Rules of Sigma Kappa Sorority.

**Section 5.** A majority of the collegiate members in good standing of a chapter present shall constitute a quorum for the transaction of business, unless otherwise required by the Bylaws or statute.

## D. ADMINISTRATION OF ALUMNAE CHAPTERS

**Section 1. Elected Officers.** Each alumnae chapter shall annually elect by ballot a President, a Vice President of Membership, a Vice President of Programming, a Vice President of Communication, a Vice President of Philanthropic Service, and a Vice President of Finance or such combination thereof to fulfill the duties of the officers to serve for one (1) year or until their successors are elected and assume office.

**Section 2. Duties.**
- a.   The President shall:
    1.   preside at all meetings of the alumnae chapter; and
    2.   perform such other duties as may be specifically assigned to her in a handbook or other set of rules as adopted by the National Council.
- b.   The Vice President for Membership shall:
    1.   serve as membership chairman;
    2.   be responsible for the recruiting and/or induction of new alumnae;
    3.   publish an annual directory of the members; and
    4.   perform such other duties as may be specifically assigned to her in a handbook or other set of rules as adopted by the National Council.
- c.   The Vice President for Programming shall:
    1.   serve as chairman of the program committee; and
    2.   perform such other duties as may be specifically assigned to her in a handbook or other set of rules by the National Council.
- d.   The Vice President of Communication shall:
    1.   keep an accurate record of all meetings held by the chapter;,
    2.   keep an accurate list of members' names and addresses;
    3.   send notices of meetings and other communications;
    4.   attend to the general correspondence of the chapter;
    5.   file all reports to the proper officers; and
    6.   perform such other duties as may be specifically assigned to her in a handbook or set of rules as adopted by the National Council.
- e.   The Vice President of Philanthropic Service shall:
    1.   be responsible for all philanthropic activities of the chapter, including support of the Sigma Kappa Foundation as well as the philanthropies of Sigma Kappa Sorority; and

    2.    perform such other duties as may be specifically assigned to her in a handbook or other set of rules relating to the office as adopted by National Council.

  f.    The Vice President of Finance shall:

    1.    collect and keep all chapter funds in accounts designated by the chapter and disburse them under the chapter's direction;

    2.    prepare an annual budget for adoption;

    3.    present an annual financial report; and

    4.    perform such other duties as may be specifically assigned to her in a handbook or other set of rules as adopted by the National Council.

## Section 3. Committees.

  a.    There shall be an Audit Committee to annually examine the accounts of the chapter and to provide an annual report of the examination to the chapter.

  b.    There shall be such other committees as are deemed necessary to conduct the business of the chapter. Committees shall be appointed by the Chapter President.

## E. MEETINGS OF ALUMNAE CHAPTERS

**Section 1.** Each alumnae chapter shall hold at least four (4) activities or meetings each calendar year. Business meetings shall be limited to members of the Sorority.

**Section 2.** Each alumnae chapter may make such chapter regulations as shall be deemed necessary provided that these do not conflict with the Bylaws and Standing Rules of Sigma Kappa Sorority.

## F. FINANCES

As prescribed in Article V of these Bylaws.

# ARTICLE V
# FINANCES

## Section 1. Collegiate Chapter National Fees.

  a.    Each collegiate chapter shall pay to Sigma Kappa at the National Headquarters of the Sorority, a fee determined by the National Council for each woman pledged. This fee is due immediately upon pledging.

  b.    Each collegiate chapter shall pay to Sigma Kappa at the National Headquarters of the Sorority an annual per capita fee determined by the National Council for each member of the chapter for all or any part of the year she may be a member. This payment is due November 1.

  c.    Each collegiate chapter shall pay in advance to Sigma Kappa at the National Headquarters of the Sorority a fee determined by the National Council for each initiate. This payment includes the fee for a lifetime subscription to the *Sigma Kappa Triangle* and a membership certificate.

9

**Section 2. Collegiate Chapter Local Fees.**
    a.    The expenses of a collegiate chapter shall be met by dues or assessments, the amount of which shall be determined by the chapter.
    b.    Each new member shall pay to her chapter a new member fee to be determined by the chapter, which includes the national new member fee which shall be remitted to Sigma Kappa at the national headquarters of the Sorority, as by these Bylaws.
    c.    Each initiate shall pay to her chapter an initiation fee, the amount to be determined by the chapter, which includes the national fee which shall be remitted in advance to Sigma Kappa at the national headquarters of the Sorority, as prescribed by these Bylaws.

**Section 3. Disposition of Collegiate Chapter Assets and Liabilities.**
    a.    In the event the charter of a collegiate chapter is relinquished or is withdrawn by the national Sorority, or in the event the college/university authorities should require sororities to be disbanded on any campus, the ownership and title of all net assets and property of the chapter concerned and house corporation, if any, of whatever nature, after provision for any liabilities associated therewith, shall be vested in and become the property of Sigma Kappa Sorority.
    b.    In the event that such collegiate chapter, and house corporation, if any, is re-established on said campus within ten (10) years from the date of such relinquishment, withdrawal, or disbanding, the Sorority will provide an amount equal to the value of such assets and property at the time of such relinquishment, withdrawal or disbanding, to such chapter, and house corporation, if any, to assist in the re-establishment process. The ten-year time period may be extended at the sole discretion of the National Council of the Sorority.

**Section 4. Alumnae Chapter National Dues.**
Each alumnae chapter shall pay to Sigma Kappa at the national headquarters of the Sorority an annual fee per dues paying member. This fee and date of collection shall be determined by the National Council

**Section 5. Alumnae Chapter Local Fees.**
The expenses of the chapter shall be met in such ways as may be determined by the chapter members.

# ARTICLE VI
# OFFICERS OF THE GRAND CHAPTER

## A.    ELECTED OFFICERS
**Section 1.** The elected officers of the Grand Chapter shall be a President, a Vice President for Alumnae, a Vice President for Collegiate Chapters, a Vice President for Membership, a Vice President for Extension, a Vice President for Programming, a Vice President for Communication, and a Vice President for Finance.

10

**Section 2. Qualifications.**
    a.      Each candidate for office shall have paid her life membership.
    b.      Each candidate shall have been an alumna in good standing for a minimum of five (5) years.
    c.      Each candidate shall have served as an appointed national officer or committee chairman for a minimum of two (2) years.
    d.      No member of the National Council shall serve simultaneously in another capacity as a salaried employee of the Sorority.

**Section 3. Election and Term of Office.**
    a.      The officers of the Sorority shall be elected at each National Convention and shall serve for a term of two (2) years or until their successors are elected and assume office.
    b.      The officers shall be elected by ballot, except when there is but one nominee for an office, the election shall be by acclamation.
    c.      The officers shall assume their duties at the close of National Convention at which elected.
    d.      Elected officers shall serve no more than two (2) consecutive terms in any one office.
    e.      Individuals appointed to fill a vacancy in an elected office shall be eligible to serve two (2) full consecutive terms in that same office. Time served in the appointed term shall not be included in the total amount of time served.

**Section 4. Vacancy.**
In the event of a vacancy in an elected office, the National Council shall appoint a successor to serve until the following National Convention. Individuals appointed to fill a vacancy shall meet all requirements for elected office.

**Section 5. Removal for Cause.**
An elected member of the National Council, when extreme circumstances warrant, may be removed from office by a unanimous vote of the remaining members of the National Council and a majority vote of the Past National Presidents' committee.

**Section 6. Duties.**
    a.      The President shall:
        1.      be the chief executive officer and official representative of the Sorority;
        2.      preside over the regular and special National Conventions and all meetings of the National Council;
        3.      execute such legal documents as may be necessary;
        4.      generally oversee the business and interests of the Sorority;
        5.      appoint standing and/or special committees subject to approval of the National Council if not otherwise provided for in these Bylaws;
        6.      appoint a certified professional and/or professional registered

parliamentarian to serve at National Conventions, subject to the approval of National Council; and

    7.    perform such other duties as prescribed by these Bylaws, the National Council or the National Convention body.

b.    The Vice President for Alumnae shall:

    1.    be in charge of all matters pertaining to the promotion, organization, and general welfare of the alumnae membership;

    2.    supervise the work of the field officers in charge of alumnae chapters;

    3.    perform the duties of the President in her absence or at her request; and

    4.    perform such other duties as prescribed by these Bylaws or the National Council.

c.    The Vice President for Collegiate Chapters shall:

    1.    supervise all matters concerning the conduct and functioning of the collegiate chapters and colonies;

    2.    supervise the work of the field officers in charge of collegiate chapters and colonies;

    3.    perform such other duties as prescribed by these Bylaws or the National Council.

d.    The Vice President for Membership shall:

    1.    oversee the planning, promotion, and organization of all matters pertaining to collegiate recruitment;

    2.    oversee the work of the field officers responsible for collegiate recruitment supervision; and

    3.    perform such other duties as prescribed by these Bylaws or the National Council.

e.    The Vice President for Extension shall:

    1.    oversee the planning, promotion, and organization of all matters pertaining to collegiate chapter extension of the Sorority;

    2.    be responsible for the extension process of colonies including the cultivation, presentation, colonization, and installation;

    3.    oversee the work of the field officers responsible for collegiate extension; and

    4.    perform such other duties as prescribed by these Bylaws or the National Council.

f.    The Vice President for Programming shall:

    1.    be responsible for the development and implementation of educational and social programming for chapters;

    2.    supervise the work of all field officers in the area of program development; and

    3.    perform such other duties as prescribed by these Bylaws or the National Council.

g.    The Vice President for Communication shall:

    1.    be responsible for accurate record keeping of the proceedings of National Conventions and record minutes of National Council meetings;

    2.    attend to the general correspondence of the Grand Chapter and general administration responsibilities of the National Council;

3.    maintain and update all actions and Bylaws and Standing Rules, as adopted by the National Convention;

4.    oversee the communications, public relations, and recognition programs of the Sorority;

5.    ensure that all Sorority communications, including the *Sigma Kappa Triangle*, are consistent and convey the strategic direction of the Sorority; and

6.    perform such other duties as prescribed by these Bylaws or the National Council.

h.    The Vice President for Finance shall:

1.    be responsible for seeing that all funds of the Sorority are collected, deposited and disbursed under the direction of the National Convention and the National Council;

2.    prepare a budget for presentation to the National Council for its approval;

3.    have the financial books and records audited each year by a certified public accountant, furnishing each member of the National Council with a copy of such audit for approval;

4.    prepare a report on the financial condition of the Sorority for the National Convention and/or the National Council; and

5.    perform such other duties as prescribed by these Bylaws or the National Council.

i.    Each member of the National Council shall submit an annual written report.

## B. APPOINTED OFFICERS

**Section 1.**    The appointed officers shall be:

a.    The National Panhellenic Conference Delegate and three (3) Alternate Delegates, Assistant Editors of the *Sigma Kappa Triangle*, an Archivist, the Bylaws Chairman, and Directors. They shall be appointed by the National Council to serve for a period of two (2) years or until their successors are appointed and assume office.

b.    Other chairmen, coordinators, supervisors, and national officers shall be appointed by the National Council to serve for a period of one (1) year or until their successors are appointed and assume office.

## Section 2. Duties of Appointed Officers.

a.    The National Panhellenic Conference (NPC) Delegate shall:

1.    represent the Sorority at all National Panhellenic Conference meetings;

2.    attend to the correspondence of all National Panhellenic Conference matters;

3.    oversee and guide collegiate and alumnae chapters in Panhellenic procedure;

4.    work with the Vice President for Membership in carrying out her duties; and

5.    perform such other duties as may be specifically assigned to her by the National Council.

b.    The National Panhellenic Alternate Delegates shall:

1.    perform such duties as may be specifically assigned to them by

the National Council and/or the National Panhellenic Conference Delegate;

    2.    may attend National Panhellenic Conference meetings when approved by National Council; and

    3.    perform such other duties as prescribed by the National Council.

c.    The Archivist shall:

    1.    supervise the collection of historical memorabilia of the Sorority to be preserved at the National Headquarters of the Sorority; and

    2.    perform such other duties as prescribed by the National Council.

d.    The directors, chairmen, coordinators, supervisors, editors, and national officers shall:

    1.    serve as assistants to the members of National Council. When invited, they may attend one meeting of the National Council per annum; and

    2.    perform such other duties as prescribed by the National Council.

e.    Each appointed officer shall submit an annual written report.

# ARTICLE VII
## NOMINATIONS AND ELECTIONS

**Section 1. Nominating Committee**

a.    Composition.

The Nominating Committee shall consist of one member from each district. The chairman shall be a former National Council member. The committee, as elected, shall serve for the biennium for which elected.

b.    Qualifications.

A member of the Nominating Committee shall:

    1.    have served at least two (2) years as a ~~national officer of~~ Sigma Kappa *volunteer appointed by national council at the national or district level during the past five (5) years;*

    2.    *be a current Sorority volunteer;*

    3.    not be employed by Sigma Kappa;

    4.    be present at the National Convention at which she is elected *unless there are extenuating circumstances as determined by the Nominating Committee;* and

    4.    have attended at least two (2) National Conventions ~~in addition~~ *prior* to the one at which she is elected.

c.    Chairman.

The chairman shall:

    1.    be elected by the past National Council Caucus; and.

    2.    have served at least two (2) full terms as a member of the National Council.

d.    Caucus and Election.

    1.    The election of the Nominating Committee shall take place as

14

early as possible during the National Convention.

2. *Members interested in serving as district representatives on the Nominating Committee for the coming biennium will submit applications to the current Nominating Committee by May 1. The current Nominating Committee will review the applications to ensure qualifications are met and prepare ballots for the caucus of each district. The ballot shall include all eligible candidates. Only candidates on the ballot are eligible to be voted on during the caucus. Candidates that have extenuating circumstances prohibiting their travel to convention may still be placed on the ballot.*

3. A district Nominating Committee member and one (1) alternate Nominating Committee member shall be elected during a caucus of each district. The nominee with the highest number of votes shall be elected the district member and the nominee with the second highest number of votes shall be elected the alternate member.

   a) A district caucus shall consist of all collegiate and alumnae members present at convention from that district.

      1) Delegates representing collegiate and alumnae chapters shall attend the caucus of the district in which their chapter is located.

      2) Other members and delegates shall attend the caucus of the district in which they reside.

      3) All former National Council members shall attend the caucus of former National Council members.

   b) The Collegiate District Director and the Alumnae District Director shall jointly chair their respective district caucus. The Collegiate District Director and Alumnae District Director shall vote should they meet the eligibility requirements, but shall not have a voice. They shall not be eligible for nomination.

   c) Should a director be absent or choose to step down in order to be eligible for nomination, the Nominating Committee Chairman shall appoint her replacement caucus chair from the same district.

   d) Voting privileges in the district caucus shall be extended to those eligible to vote at convention.

4. The chairman of the Nominating Committee and one (1) alternate shall be elected during a caucus of former National Council members. The Past National Presidents' Committee Chairman shall chair this caucus.

e. Duties

1. It shall be the duty of the Nominating Committee to nominate a single slate for each of the eight (8) elected offices to be filled at the next National Convention

2. The chairman will meet with the committee members and alternate members during the National Convention at which they are elected to discuss procedures; each member and alternate member will sign the oath of confidentiality relative to all procedures involved in the nominating process. A breach of

the signed oath of confidentiality shall result in automatic removal from the committee.

3.     The committee may conduct its deliberations by USPS mail, email, conference call, or face-to-face meetings.

4.     The committee shall function as a separate entity during its deliberations; it will have no contact with other members of the Sorority concerning the business of the committee, except as otherwise provided in these Bylaws. The committee may consult the Sorority's parliamentarian, legal counsel, and/or chairman of the Past National Presidents' Committee as necessary.

5.     Each committee member will communicate with the members in her respective district, reminding them of the importance of the process and the November 1 deadline for submission of nominations. All written communications should be copied to the chairman.

6.     Communication with the alternate members by the Nominating Committee chairman concerning the nomination process should include updates on the process. They will be reminded about not disclosing/revealing the names of the individuals recommended for nomination.

f.     Communication and Publications

1.     The Nominating Committee shall solicit recommendations for the various offices in September the year prior to the National Convention through (a) information and forms sent out by the committee to the eligible voting membership, past National Council members, Sigma Kappa Foundation trustees, and National Housing Corporation directors as a courtesy; (b) a form published in the *Sigma Kappa Triangle* and other communication avenues in the Sorority; or (c) other written communication.

2.     The announcements and/or correspondence shall list (a) the qualifications for an officer of the Grand Chapter as found in Article VI of these Bylaws and (b) the eligibility of current National Council members in their respective positions. The announcement shall also include a recommendation form which will provide an opportunity to indicate the specific National Council office for which the member is being recommended and rationale based on the member's qualifications.

3.     The Nominating Committee chairman, in consultation with the Executive Director of the Sorority, will appoint two staff members from National Headquarters to receive all information, including nominations, and prepare it in an appropriate manner to share weekly with the Nominating Committee. These staff members shall sign the oath of confidentiality. Their responsibilities are complete one (1) week after the November 1 deadline for submissions of nominations.

4.     An appropriate mechanism to receive recommendations by National Headquarters shall be established.

5.     All due dates require that materials be postmarked by that date

if received by USPS mail or date-stamped email.

6.    The *Handbook for the Nominating Committee* shall be changed only by a majority vote of the National Council, upon recommendation of the outgoing Nominating Committee, in consultation with the past national presidents committee. Action by the National Council shall be taken no later than the October following the National Convention.

g.    Recommendation Specifics.

1.    Clarification of terms. Members are recommended to the Nominating Committee. Upon recommendation, the member's qualifications are verified by the Nominating Committee. Once the recommended member's qualifications and have been verified and she has agreed to the recommendation, she becomes a candidate. Upon being slated by the Nominating Committee, the candidate becomes a nominee for National Council as presented by the Nominating Committee to the membership.

2.    The recommendation form shall include the qualifications as listed in the Bylaws and shall also provide the opportunity to recommend someone for a specific National Council position(s) and the rationale for the recommendation based on the member's qualifications.

3.    All recommendations are to be submitted to the designated staff person(s) at National Headquarters. An acknowledgement of receipt will be sent by the designated staff person to the individual who submitted the recommendation, with a copy of the acknowledgement to the Nominating Committee members. Any recommendation received by Nominating Committee members shall be forwarded immediately to the designated staff person(s) at National Headquarters for processing.

4.    Recommendations are due to National Headquarters no later than November 1 of the year preceding the National Convention. Recommendations received after the deadline will have an acknowledgement sent to the member making the recommendation indicating that the recommendation is not eligible to be considered; the acknowledgement will be copied to the Nominating Committee members.

5.    As recommendations are received, the alumna who is recommended is sent by mail or email a Sigma Kappa National Council Information Form with a cover letter indicating the due date of December 1. This is sent by the National Headquarters staff member and copied to the Nominating Committee members. The completed Information Form shall be sent to the Nominating Committee chairman and to National Headquarters to distribute to all Nominating Committee members.

6.    Current National Council members must be recommended and complete the National Council Information Form.

7.    The number of recommendations submitted by a voting member is unlimited.

8.    If a member of the Nominating Committee is recommended for National Council office and she wishes to be considered, she will immediately surrender her committee position by notifying the entire Nominating Committee and send all materials to the alternate member from her district. The alternate then fills the committee position for the remainder of the nominating process. Any extenuating circumstances that may occur will be directed to the parliamentarian or chairman of the Past National Presidents' Committee.

9.    A vacancy on the Nominating Committee shall be filled by the respective alternate.

h. Candidate Qualifications

1.    In selecting nominees for the National Council, the following criteria shall be considered:

   a)   Sigma Kappa *Sorority* experience, *including number of years served and positions held at a national or district level within the Sorority;*

   b)   Qualifications for the specific office for which nominated;

   c)   Availability and willingness to carry out the duties of the office for which nominated;

   d)   History of donating to the Sigma Kappa Foundation;

   e)   History of alumnae chapter membership *or payment of national alumnae dues;*

   f)   Non-Sigma Kappa *Sorority* leadership experience, *including experience serving with the Sigma Kappa Foundation or Sigma Kappa National Housing corporation and other professional, social, philanthropic or local organizations.*

2.    The Nominating Committee shall ensure all candidates meet requirements for office prior to the slating process.

3.    Communication from candidates regarding the process shall be directed to the Nominating Committee chairman.

i.    Candidate Interview Process. The Nominating Committee may interview candidates as needed prior to beginning the slating process. The interview will consist of clarification of information on the National Council Information Form, as well as interest in specific positions.

j.    Slating Process

1.    The Nominating Committee, by majority vote, shall slate a single nominee for each office. After the President's position has been slated, the other positions shall be slated in the order listed in the Sigma Kappa Bylaws.

2.    The Nominating Committee chairman shall have a voice but not vote.

3.    The slated nominees shall be asked to serve in specific positions as designated by the committee. The slate and the specific offices shall not change except by majority vote of the entire Nominating Committee.

4.    The consent of the nominee to serve for a specific office shall be secured by the Nominating Committee chairman as expeditiously

as possible. The chairman shall notify the Nominating Committee immediately should a candidate decline a nomination.

5. The Nominating Committee should make every effort to balance the slated council with respect, but not limited, to age, background, and geographical location, taking both a strategic view and historical perspective into account.

6. After the elections at the National Convention, the Nominating Committee Chairman shall notify the Nominating Committee members to destroy and/or delete all Nominating Committee related materials.

k. Announcing the Slate

1. Once all slated candidates have provided consent for nomination, the Nominating Committee chairman will prepare a notification of the official slate and send it to the Nominating Committee, National Council, the slated members, Sigma Kappa Foundation Trustees, past national presidents, National Housing Corporation Board of Directors, and National Headquarters staff.

2. Notification of the slate proposed by the Nominating Committee shall be sent from National Headquarters to the eligible voting membership, past National Council members, Sigma Kappa Foundation Trustees, and National Housing Corporation Directors as a courtesy. It will be placed on the Sigma Kappa website by March 1 in the year of the National Convention. Such notification shall include current pictures and biographies, with an emphasis on Sigma Kappa experience of the candidates. In addition, this notification should include direction and a form on how to submit further nominations for a particular office to the Nominating Committee chairman by April 1 in the year of the National Convention.

3. Following the presentation of the Nominating Committee's slate to the members, any five members, with at least two (2) of the members from outside of the district in which the nominee resides, may submit a nomination by filing the required form with the Nominating Committee Chairman by April 1, who will share this information within 24 hours of receipt with the Nominating Committee. Nominations may be sent via USPS mail or email.

4. The nominee must complete the National Council Information Form by April 10 in the year of the National Convention.

5. Nominations made after the announced slate and qualifications of the individual being nominated shall be presented in the same manner as the Nominating Committee's slate and shall be included in a pre-convention mailing sent by April 15 in the year of the National Convention and in each convention registration packet.

6. Vacancies in the slate after the presentation of the slate to the membership will require the Nominating Committee to present a new candidate for the vacant position.

7. The slate of all candidates shall be introduced during the opening reception and            during the first business meeting at the National Convention.

8. There shall be no nominations from the floor or write in nominations.
9. Election of officers shall be held during a business meeting during the first two (2) full days of each National Convention.
10. Upon notification, nominees shall act in an appropriate and respectful manner and may not solicit votes from the general body prior to convention, at convention, or during the formal business meetings.

# ARTICLE VIII
## CONVENTIONS OF THE GRAND CHAPTER

**Section 1.** The election of the National Council, which is the governing body of the Sorority, shall be vested in a National Convention of the Grand Chapter.

**Section 2.** In the interim between National Conventions, the governance, management, and control of the Sorority shall be vested in and exercised by the National Council, subject to the provisions of the Bylaws and Standing Rules.

**Section 3.** In the event of a catastrophe that renders all members of National Council incapable of acting in the best interest of the Sorority, the following procedure shall be enacted:
   a. The person empowered immediately to act on behalf of the National Council shall be the immediate Past President, who will select four (4) Directors.
   b. The five (5) women, or so many of them as are able and willing to so act, shall serve in a co-relationship until nominating and election procedures for a new National Council can be effected by the national Nominating Committee.
   c. The election of officers shall be by USPS mail or email ballot vote and terms of office shall be through the next scheduled National Convention or until provisions can be made for a special session of the National Convention in accordance with these Bylaws.

**Section 4. Regular National Convention.**
   a. A regular National Convention shall be held biennially or after such interval as shall be determined by National Council.
   b. The time, date, and place shall be determined by the National Council.

**Section 5. Special National Convention.** A special National Convention may be called by unanimous vote of the National Council taken either in a meeting or by mail or may be called upon written request to the President of a majority of the collegiate and alumnae chapters of the Sorority.

**Section 6. Notice.** Written notice of the meeting of any regular or special National Convention shall be given. The National Vice President for Communication shall be responsible for notifying all collegiate and alumnae chapters and all other persons entitled to vote at such National Conventions. Such notice shall state the time, date, and place of the convention and shall be mailed not more than six (6)

nor less than three (3) months prior to the date of the meeting.

**Section 7. Business Meetings.**
   a.  The voting body of the convention shall be comprised of:
       1.  The delegates from each collegiate chapter in good standing consisting of:
           a)  two (2) collegiate members in good standing; and
           b)  one (1) alumna member presently serving on the advisory board.
       2.  The delegates from each alumnae chapter comprised of one (1) delegate for up to each ten (10) members in good standing, but the total number of such delegates shall not exceed three (3). The chapter represented by these delegates must have paid the prescribed annual fee and must be in good standing nationally.
       3.  One (1) alumna member in good standing from each house corporation board.
       4.  Each member of the National Council.
       5.  The delegate and alternate delegates to the National Panhellenic Conference.
       6.  Assistant Editors of the *Sigma Kappa Triangle*.
       7.  All national chairmen.
       8.  Each of the directors.
       9.  All coordinators.
       10. Each of the Past National Presidents of the Grand Chapter.
       11. Such other persons as the National Convention may designate.
   b.  No person may serve as delegate in more than one (1) capacity.
   c.  Only voting members may offer motions and vote, but visitors may have a voice at the discretion of the presiding officer.

**Section 8. Delegate Expenses.**
   a.  Certain National Convention expenses as specified by National Council shall be paid from the national treasury for one (1) delegate from each collegiate and alumnae chapter that has met the conditions established by the National Council for eligibility for such payment.
   b.  The expenses of the National Council and such officers as shall be designated by the National Council to attend the National Convention shall be paid from the national treasury.
   c.  The time and manner of payment of all such expenses shall be determined by the National Council.

**Section 9. Quorum.** A majority of the voting members of the National Convention shall constitute a quorum for the transaction of business at any regular or special meeting.

# ARTICLE IX
# NATIONAL COUNCIL OF THE GRAND CHAPTER

**Section 1. Composition.**
   a.  The National Council shall be comprised of the eight (8) elected

officers of the Grand Chapter. They shall be the only members entitled to offer motions and vote at meetings of the National Council.

b.   The immediate Past President may attend National Council meetings in an advisory capacity only without vote for one (1) year following her tenure as President when invited by the National Council.

c.   The Executive Director of the Sorority and other Sorority staff may attend meetings of the National Council without vote when invited by the National Council.

**Section 2. Duties.**

a.   In the interim between National Conventions, the management and control of the Sorority shall be vested in and exercised by the National Council, subject to the provisions of the Bylaws and Standing Rules.

b.   The National Council shall:

1.   Establish rules and regulations governing collegiate and alumnae chapters and promulgate programs for their development.

2.   Organize a national supervisory counselor system to assist collegiate and a national alumnae relations program to assist alumnae chapters.

3.   Invest and supervise all funds of the Sorority.

4.   Establish and collect such dues and assessments from the members and chapters as shall be necessary to cover the cost of attaining the purpose of the Sorority.

5.   Promote, assist, and personally contribute to the Sigma Kappa Foundation, Inc. The Foundation is administered as prescribed by the Articles of Incorporation and Bylaws of that corporation.

6.   Edit and publish such publications for its members as necessary.

7.   Supervise the management and operation of the National Headquarters.

8.   Employ on a full time salaried basis an Executive Director who will be in charge of the National Headquarters of the Sorority. Such Executive Director may represent Sigma Kappa in any professional association when approved by the National Council.

9.   Appoint such committees as may be prescribed by the National Convention and/or the National Council to serve for a period of one (1) year or until their successors are appointed and assumes office.

10.   Approve all appointments.

11.   Establish or eliminate any office or position for the Sorority that is not provided for in these Bylaws and define the duties of such office when established.

12.   Appoint or employ persons at such compensation and upon such conditions when determined to be appropriate and in the best interest of the Sorority.

13.   Confer a charter of Sigma Kappa upon a group of collegiate women, as prescribed in these Bylaws, by unanimous vote.

14.   By unanimous vote, withdraw a charter of a chapter for

inability to sustain itself or for any other sufficient cause.

15. Grant permission to form an alumnae chapter as prescribed in these Bylaws.

16. Take all other actions deemed necessary to carry out the management and control of the Sorority in the best interests of the Sorority.

**Section 3. Meetings.**

a. Regular: A regular meeting of the National Council shall be held at the time of each National Convention.

b. Interim: Interim meetings shall be held approximately every six (6) months between National Conventions at such time, date, and place as may be determined by the National President upon the advice of the National Council.

c. Special: Special meetings of the National Council may be called by the President or upon written request of two (2) members of the National Council.

d. Notice: Reasonable notice of the time, date, and place of each meeting of the National Council, whether regular or special, shall be sent to each member of the National Council, each collegiate and alumnae chapter, and all national officers and committee chairmen. Notice of any meeting of the National Council may be waived in writing by any member of the National Council, before, at, or after the meeting.

**Section 4. Action Without a Meeting.**

Any action that may be authorized or taken at a meeting of the National Council may be authorized or taken without a meeting or by mail with the affirmative vote and approval of, and in a writing or writings signed by, a majority of the members of National Council entitled to vote, (or such greater percentage as may be required for the particular subject matter of the vote by law or in these Bylaws), effective as of the date of the signature of the last Council member to sign which constitutes a majority (or such greater percentage). Such writing or writings shall be filed with the corporate records held by the Vice President for Communication. Such writing or writings may be signed in counterparts by mail, by facsimile transmission (fax), or by electronic mail (email).

**Section 5. Quorum.**

Four (4) members of the National Council shall constitute a quorum for any regular, interim, or special meeting.

# ARTICLE X
# COMMITTEES

## A. STANDING COMMITTEES

**Section 1. Past National Presidents' Committee.** The Past National Presidents' Committee shall be comprised of all former Presidents of the Grand Chapter, and shall serve as an advisory committee to the National Council, and shall perform such duties as requested by the National Council.

**Section 2. Bylaws Committee**
- a. The National Council shall appoint a Bylaws Committee to serve from the time of appointment until the adjournment of the next National Convention. The National Council may remove and replace any member if it deems necessary.
- b. The committee shall be comprised of three (3) alumnae members who have basic knowledge of parliamentary procedure.
- c. The committee shall consider, edit, and/or correlate Bylaws and Standing Rules amendments mailed to it by February 1 in the year of the National Convention. The Bylaws Committee may originate Bylaws or Standing Rules amendments.
- d. The Bylaws Committee shall send a copy of the proposed amendments to the National Vice President for Communication by March 1 in the year of the National Convention, identifying the proposers, together with the Bylaws Committee's recommendations for action.
- e. The Bylaws committee shall submit the proposed amendments as provided in these Bylaws.
- f. The Bylaws Committee shall perform such other duties as prescribed by the National Council.

**Section 3. Investment Committee**
- a. The National Council shall appoint an Investment Committee to serve for a period of two (2) years or until their successors are appointed and assume office. The National Council may remove and replace any member of the committee if it deems necessary.
- b. The committee shall be comprised of at least five (5) members. The Vice President for Finance shall serve as Chairman. The Executive Director and Director of Finance (National Headquarters staff) shall serve as ex-officio non-voting members. No more than three (3) alumnae voting members shall be appointed upon the recommendation of the Vice President for Finance after approval by National Council. Each of the alumnae members shall have at least one (1) of the following qualifications:
    1. at least two (2) years professional experience in an investment/asset management related field; or
    2. hold a Bachelor's Degree, or higher, in a financial management related area.

    No member of the committee (or member of her immediate family) or any firm with which she or they may be affiliated may serve as an investment advisor, broker, or in any other remunerated capacity for the Sorority.
- c. The Investment Committee will assist the National Council in its responsibility of supervising the investments and finances of Sigma Kappa Sorority.
- d. The duties of the Investment Committee shall be:
    1. to meet on at least a quarterly basis. Such meetings may occur in person or by teleconference; minutes of all meetings shall be recorded and retained by the Chairman;
    2. to recommend to the National Council for appointment, investment counsel. To monitor the performance of appointed investment

24

counsel on a quarterly basis, reporting thereon to the National Council. The report shall include investment counsel's recommendations for any changes to the Sorority's investments;

3. at least annually, review and recommend changes to the Sorority's Investment Objectives and Guidelines. Any such recommendations for change shall be presented to the National Council for approval;

4. to coordinate with investment counsel all changes to investments upon approval of such recommended changes by the National Council; and

5. to perform such other duties consistent with above as may be assigned to the committee by National Council.

## Section 4. Audit Committee

a. The National Council shall appoint an Audit Committee. The National Council may remove and replace any member if it deems necessary.

b. The committee shall be comprised of six (6) members. The National Vice President for Finance, Executive Director, and the Director of Finance (the latter two being National Headquarters staff) shall serve as ex-officio non-voting members. Three (3) alumnae voting members shall be appointed upon the recommendation of the National Vice President for Finance, after approval by the National Council. One (1) of the alumnae members will be appointed chairman of the committee. Each of the three (3) alumnae members shall have at least one (1) of the following qualifications:

1. licensure as a certified public accountant (CPA);
2. a Bachelor's Degree or higher in accounting; or
3. experience working with non-profit entities on their tax returns and financial statements.

The three (3) alumnae members shall not also be members of the investment or finance committees.

c. The Audit Committee will assist the National Council in its responsibility for supervising the finances of the Sorority.

d. The duties of the Audit Committee shall be:

1. to meet annually with the external auditors to review the audit;
2. to review and discuss the external audit and recommend its approval, if appropriate, to the National Council;
3. to recommend changes, if necessary, to the financial documents or to the auditing firm; and
4. to perform such other duties consistent with the above as may be assigned the committee by National Council.

## Section 5. Finance Committee

a. The National Council shall appoint a Finance Committee. The National Council may remove and replace any member if it deems necessary.

b. The committee shall be comprised of at least five (5) members. The National Vice President for Finance, Executive Director, and Director of Finance (the latter two are National Headquarters staff) shall serve as ex-officio voting members. No more than three (3) alumnae voting members shall be appointed upon the recommendation of the

National Vice President for Finance after approval by National Council. One (1) of the alumnae members will be appointed chairman of the committee. Each of the alumnae members shall have at least one (1) of the following qualifications:

1. licensure as a certified public accountant (CPA);
2. a Bachelor's Degree or higher in accounting, finance, or management; or
3. experience working with non-profit entities in a financial capacity.

The alumnae members shall not also be members of the Investment or Audit Committees.

c. The Finance Committee will assist the National Council in its responsibility for supervising the finances of the Sorority.

d. The duties of the Finance Committee shall be as follows:

1. To assist the National Vice President for Finance in the preparation of an annual budget for the Sorority;
2. To assist the National Vice President for Finance in reviewing income and expense reports; and
3. To perform such other duties consistent with the above as may be assigned the committee by National Council.

**Section 6.** Such other committees, standing or special, may be appointed by the National Council. These committees shall serve for a period of one (1) year or until their successors are appointed and assume office or the committee has completed its assigned duties.

## ARTICLE XI
## INSIGNIA AND EMBLEMS

**Section 1.** The official insignia of the Sorority shall consist of: an official badge*, a new member badge*, an Order of the Triangle pin™, a National Council badge™, a National Council emblem™, a recognition pin™, a twenty-five year pin™, a fifty-year pin™, a seventy-five year pin, a mother's pin™, an official seal™, an official banner*, and a coat-of-arms*, which shall meet the specifications as prescribed in the Bylaws. The Sorority's colors and flower shall be as prescribed in the Bylaws. Sigma Kappa badges and emblems including the name Sigma Kappa* and/or the Greek letters ΣK* shall be and remain the property of Sigma Kappa Sorority, a corporation. The National Council emblem is to be in the possession of or worn by a Sigma Kappa only while she is serving on the National Council.

™-denotes Trademark, U.S. Patent and Trademark Office
®- denotes a Registered Trademark, U.S. Patent and Trademark Office

**Section 2.** Ownership of all insignia and emblems including, the name Sigma Kappa and/or its Greek letters ΣK shall be owned by Sigma Kappa Sorority. These insignia and emblems, including the name Sigma Kappa and its Greek letters ΣK shall not be manufactured, created, used, or offered for sale by any person, company, or firm except as specifically authorized in writing and administered by National Council.

26

**Section 3.** The official badge⊕ of the Sorority shall be a small gold or silver pin, triangular in shape with a raised center of maroon bearing the Greek letters ΣK in gold or silver. If the pin is unjeweled, it shall have a scroll edge. If whole jewels are used, no scroll is necessary. All pins shall be of standard size and shall be ordered only through the National Headquarters of the Sorority.

**Section 4.** The new member badge⊕ shall be a small gold pin consisting of the Greek letter Kappa interlaced with a serpent in the form of a letter "s".

**Section 5.** The Order of the Triangle pin™ shall be a small triangle pin with maroon background bearing the letters ΣK in gold and a thin gold border.

**Section 6.** The National Council badge™ shall be a small gold pin, triangular in shape with a raised center of maroon bearing the letters ΣK in gold and a jeweled setting of alternating pearls and diamonds.

**Section 7.** The National Council emblem™ shall be a small gold pin, triangular in shape with a raised center of maroon bearing the letters ΣK in gold and a double row of alternating pearls and diamonds.

**Section 8.** The recognition pin shall be the staggered Greek letters ΣK in gold.

**Section 9.** The twenty-five year pin™ shall be a silver violet surrounded by an open triangle with the numbers 25 in the middle of the violet and the Greek letters ΣK set to the left side of the triangle.

**Section 10.** The fifty-year pin™ shall be a gold circle inscribed with "Fifty Years" and Sigma Kappa.

**Section 11.** The seventy-five year pin shall be a golden violet surrounded by an open triangle with a diamond in the middle of the violet and the Greek letters ΣK set to the left side of the triangle. Presentation may include a display frame or case.

**Section 12.** The mother's pin™ shall be the Greek letters ΣK in a small hollow or filled triangle enclosed in a gold circle, which circle may be either plain or jeweled.

**Section 13.** The colors of the Sorority shall be maroon and lavender.

**Section 14.** The Sorority flower shall be the wild purple violet.

**Section 15.** The official seal™ shall consist of the letters ΣK surmounted by a dove with outspread wings, all surrounded by a serpent in the form of a circle; these shall be enclosed within two circles, the inner one a fine line, the outer wide and with a rope pattern between which at the top shall be the words, "Sigma Kappa" and at the bottom the words, "Founded A.D. 1874".

**Section 16.** The official banner⊕ hanging perpendicularly is indented at the bottom giving it two lateral points. It is maroon superimposed upon a background of

lavender, displaying a hollow triangle enclosing the Greek letters ΣΚ.

**Section 17.** The Coat-of-Arms* of the Sorority shall be as follows:
    **COLOR:** Rays, gold; dove, silver; wreath, alternate maroon and gold; background of shield, maroon; violet and serpent, all gold; band, gold; stars, lavender; scroll, silver; the letters and the motto black.

    **TECHNICAL DESCRIPTION:** Gules, on a bend between; in chief, a rose, and in base, a serpent nowed or, five mullets prupure. Crest; a volant dove argent resplendent.

**Section 18.** Sigma Kappa official badges* shall be the property of the Sorority.

# ARTICLE XII
# FOUNDATION TRUSTEES

**Section 1.** The Board of Trustees of the Sigma Kappa Foundation, Inc. shall be elected as prescribed by the Articles of Incorporation and Bylaws of the Sigma Kappa Foundation, Inc. The National President and National Vice President for Alumnae shall serve as ex-officio voting members of the Foundation Board of Trustees.

# ARTICLE XIII
# PUBLICATIONS AND WEBSITE

**Section 1.** The Sorority shall edit and publish a national magazine and such other publications for its members as may be deemed advisable by the National Council and/or the National Convention of the Grand Chapter.

**Section 2.** The official publication of the Sorority shall be a quarterly magazine called the *Sigma Kappa Triangle*.

**Section 3.** The official website of the Sorority shall be located at www.sigmakappa.org.

# ARTICLE XIV
# INDEMNIFICATION

Any person who is or was made or threatened to be made a party to any legal proceeding by reason or the fact that he or she is or was a member of the National Council, director, officer, agent, or employee of the Sorority, or is or was serving at the request of the Sorority as a trustee, director, officer, employee, or agent or in any other capacity of or in another corporation, or a partnership, joint venture, trust, or other enterprise or by reason of any such action alleged to have been taken or not taken by such person while acting in any such capacity, shall be indemnified by the Sorority to the maximum extent authorized under the laws of the State of Maine.

# ARTICLE XV
## PARLIAMENTARY AUTHORITY

The rules contained in the current edition of *Robert's Rules of Order Newly Revised* shall govern all proceedings of the National Convention of the Grand Chapter, National Council, collegiate chapters, and alumnae chapters, when it is not in conflict with the Bylaws and Standing Rules of the Sorority.

# ARTICLE XVI
## AMENDMENTS

**Section 1.** These Bylaws may be amended at any regular or special National Convention of the Grand Chapter, by a two-thirds (2/3) vote provided:

    a.    A copy of the proposed amendment has been sent to the Bylaws Committee by February 1 in the year of the National Convention; and

    b.    After editing and/or correlating the proposed amendments, the Bylaws Committee shall send a copy of the proposed amendments to the National Vice President for Communication by March 1 in the year of the National Convention.

**Section 2.** The National Vice President for Communication shall send a copy of the proposed amendments to each collegiate chapter, to each alumnae chapter, and to all other convention voting members by April 1 in the year of the National Convention.

**Section 3.** Any proposed amendment shall be signed by:

    a.    Two (2) elected members of the National Council; or

    b.    Two (2) appointed national officers or national chairmen; or

    c.    Two (2) elected officers of a collegiate or alumnae chapter; or

    d.    Any five (5) members in good standing of the Sorority; or

    e.    All three (3) members of the Bylaws Committee.

# ARTICLE XVII
## ADMINISTRATIVE PROCEDURE

Documents or other materials required by these Bylaws to be mailed or sent may be furnished to the recipient(s) via U. S. Postal Service, overnight delivery companies, facsimile transmission (fax), electronic mail (email), or other available and reliable document delivery system or service.

# STANDING RULES

**Rule #1.**     There shall be a permanent archives exhibit at the National Headquarters of the Sorority consisting of the historical memorabilia of the Sorority.

**Rule #2.**     There shall be a leadership conference in non-convention years as designated by National Council.

**Rule #3.**     Any change in a college Panhellenic Constitution or Bylaws shall be submitted to and approved by Sigma Kappa's National Panhellenic Conference Delegate before the college Panhellenic delegate may vote on any change.

**Rule #4.**     Each alumnae chapter shall be a member of and participate in the area alumnae Panhellenic.

~~**Rule #5.**     Each alumnae and collegiate chapter shall participate in a Founders' Day program as close to November 9th as possible.~~

~~**Rule #6.**     Each alumnae chapter shall assist the collegiate chapter assigned by the Alumnae District Director for its area.~~

~~**Rule #7.**     Each alumnae chapter shall have an annual new alumnae induction ceremony for graduating seniors in its area, as well as plan an annual event for collegiate members from its area who are members of out-of-town Sigma Kappa chapters.~~

~~**Rule #8.**     Each alumnae chapter will prepare and distribute an annual newsletter, if possible, to alumnae and collegiate chapters in its area.~~

**Rule #9~~5~~.**     Any printed material regarding the business proceedings of the Sorority distributed before or during the National Convention must be made available to all voting members.

**Rule #10~~6~~.**     Collegiate chapters will be responsible for the Order of the Triangle induction service for their graduating seniors, members assuming alumnae status, and other Sigma Kappa alumnae who may wish to be inducted. Alumnae chapters may perform the Order of the Triangle induction service with approval from the National Council. Inductees must be in good financial standing. The official Order of the Triangle pin™ may be purchased in advance through National Headquarters.

**Rule #11~~7~~.**     The Bylaws Committee shall be authorized to correct Article and Section designations, punctuation, and cross-references, and to make such other technical and conforming changes as may be necessary to reflect the intent of the Sorority in conjunction with the Bylaws and Standing Rules.

**Rule #128.** The Sigma Kappa Foundation, Inc. will utilize a nominating committee process according to their bylaws for the selection for the Board of Trustees. This committee will include three (3) Foundation trustees, three (3) national council members, one (1) National Housing Corporation board of directors member, and two (2) members at large. The final names submitted will be approved by the Board of Trustees of the Sigma Kappa Foundation, Inc. The newly appointed trustees will be presented at national convention for the next biennium.



About Us          Collegiate Life          Alumnae Experience          Foundation          Housing

News & Events          DEIA

Home > Collegiate Life > Membership Responsibilities



# Membership Responsibilities

## Scholarship Policies/Academics

Sigma Kappa recognizes that education is the primary purpose of the collegiate experience and strives to provide resources to all members in reaching their academic goals. Each Sigma Kappa chapter has an active scholarship program that

## Financial Policies

Sigma Kappa Sorority is a not-for-profit corporation and relies on the national fees from its members to finance yearly operating expenses and chapter services. Collegiate members Sigma Kappa through their chapter alumnae members through annual dues paid to

provides motivation and assistance for each member to develop to her fullest academic potential and plan for a successful future.

Each collegiate chapter sets minimum scholastic standards for Initiation, to remain in good standing, and for officer and big sister eligibility. The standard of performance set by the Sigma Kappa *National Policy Handbook* is the maintenance of an average chapter GPA of 3.0 or above the all-women's average on that campus. Individual members must earn a minimum of a 2.5 GPA to remain in good standing, although each chapter has the ability to raise this minimum standard. If a member falls below this minimum, she is provided an Academic Assistance Plan with guidance from a member of the scholarship committee.

# Housing Policies

Through membership in Sigma Kappa, many collegiate members have the opportunity to live in a chapter house, suite or dorm floor with other members of the organization. Sigma Kappa's National Policy Handbook states that all chapter living spaces be in compliance with state and national laws, college/university regulations and Sigma Kappa's National Policy Handbook. When a chapter has a living space, all collegiate members and new members should live in the space when there is space available. Members may petition to not reside in the living space and these exceptions are granted at the chapter level. Only current collegiate members of the chapter in good standing can reside in the chapter living space.

their local alumnae chapter. When any member is 30 days in arrears to the chapter or the corporation board, she shall be automatically suspended. Failure to fulfill her financial obligations by the agreed upon date in her suspension shall result in financial expulsion from the chapter.

# Risk Management

Sigma Kappa has a number of policies designed to reduce the potential for harm to our members and to address situations where issues have occurred. Sigma Kappa acknowledges that our members have many opportunities for social development during their collegiate experience and that some of those experiences could considered risky for the members or others. Sigma Kappa expects that all members will follow Sigma Kappa policy, college/university policy, and all local, state and federal laws. The Sorority expects her members will make informed, reasonable, and responsible choices regarding their personal safety. Our policies include detailed information about risk incidents, hazing, social events, transportation, and practices for self-governance.

# Membership

Sigma Kappa values individuality and diversity in her membership. In our membership selection practices, we recognize the importance of each individual member within an atmosphere of care, respect, and tolerance.  Individuals who consistently live and identify as women may be considered for membership.

Contact Us  |  Privacy Policy  |  Give Now  |  Recommend a Member  |  Shop Sigma Kappa



About Us          Collegiate Life          Alumnae Experience          Foundation          Housing

News & Events          DEIA

Home > Collegiate Life > Membership Responsibilities



# Membership Responsibilities

## Scholarship Policies/Academics

Sigma Kappa recognizes that education is the primary purpose of the collegiate experience and strives to provide resources to all members in reaching their academic goals. Each Sigma Kappa chapter has an active scholarship program that

## Financial Policies

Sigma Kappa Sorority is a not-for-profit corporation and relies on the national fees from its members to finance yearly operating expenses and chapter services. Collegiate members Sigma Kappa through their chapter alumnae members through annual dues paid to

provides motivation and assistance for each member to develop to her fullest academic potential and plan for a successful future.

Each collegiate chapter sets minimum scholastic standards for Initiation, to remain in good standing, and for officer and big sister eligibility. The standard of performance set by the Sigma Kappa *National Policy Handbook* is the maintenance of an average chapter GPA of 3.0 or above the all-women's average on that campus. Individual members must earn a minimum of a 2.5 GPA to remain in good standing, although each chapter has the ability to raise this minimum standard. If a member falls below this minimum, she is provided an Academic Assistance Plan with guidance from a member of the scholarship committee.

# Housing Policies

Through membership in Sigma Kappa, many collegiate members have the opportunity to live in a chapter house, suite or dorm floor with other members of the organization. Sigma Kappa's National Policy Handbook states that all chapter living spaces be in compliance with state and national laws, college/university regulations and Sigma Kappa's National Policy Handbook. When a chapter has a living space, all collegiate members and new members should live in the space when there is space available. Members may petition to not reside in the living space and these exceptions are granted at the chapter level. Only current collegiate members of the chapter in good standing can reside in the chapter living space.

their local alumnae chapter. When any member is 30 days in arrears to the chapter or the corporation board, she shall be automatically suspended. Failure to fulfill her financial obligations by the agreed upon date in her suspension shall result in financial expulsion from the chapter.

# Risk Management

Sigma Kappa has a number of policies designed to reduce the potential for harm to our members and to address situations where issues have occurred. Sigma Kappa acknowledges that our members have many opportunities for social development during their collegiate experience and that some of those experiences could considered risky for the members or others. Sigma Kappa expects that all members will follow Sigma Kappa policy, college/university policy, and all local, state and federal laws. The Sorority expects her members will make informed, reasonable, and responsible choices regarding their personal safety. Our policies include detailed information about risk incidents, hazing, social events, transportation, and practices for self-governance.

# Membership

Sigma Kappa values individuality and diversity in her membership. In our membership selection practices, we recognize the importance of each individual member within an atmosphere of care, respect, and tolerance.  Individuals who consistently live and identify as women may be considered for membership.

# **EXHIBIT D**

Chapter Bylaws of Theta Xi Chapter of
Delta Tau Delta



Eastern Michigan University
Delta Tau Delta - Theta Xi Chapter
Chapter Bylaws

## Preamble

We, the members of Theta Xi Chapter of Delta Tau Delta Fraternity, desiring to establish an internal organization of efficiency, to adopt a definite system of local government, to locate authority and responsibility in the chapter, and to establish rules and regulations necessary and proper for the conduct of local affairs, do hereby establish the following code of bylaws.

## Mission Statement

Delta Tau Delta Theta Xi is a lifelong brotherhood of elite men striving to reach the highest level of academic achievement, community enhancement, and dignified placement among all college organizations.

## Chapter 1: Authority

These rules serve the Fraternity as a general guideline for all parts of the Theta Xi chapter and should be treated as secondary to and supplemental to the National Constitution and Bylaws of Delta Tau Delta Fraternity International.

If these bylaws shall be found in any way to be in conflict with the National Constitution and Bylaws of Delta Tau Delta Fraternity or to the regulations governing fraternities at Eastern Michigan University, the article or section of these bylaws that is held to be in conflict shall be null and void.

These bylaws supersede all prior existing bylaws of Theta Xi Chapter of Delta Tau Delta Fraternity International.

## Chapter 2: Membership

### Section 1

There shall be no criteria of race, color, or creed as qualifications for membership in Theta Xi Chapter.

Any candidate that accepts their Bid, shall be considered affiliated with the chapter can be known as a bid, until the meet the requirements for pledgeship.

During the Bid Ceremony, if a prospective pledge decides to defer his bid, he will have no longer than one calendar year to decide whether to accept, or decline his bid.

### Section 2 - Pledgeship

Candidates who have complied with the requirements of Eastern Michigan University, who have assumed the obligations of pledgeship, and who have been accepted by vote of the active chapter, shall be pledge members of Theta Xi Chapter.

In addition to the requirements set forth in the Constitution, in order to be eligible for initiation, the candidate must have completed satisfactorily the program established by the pledge education committee during the semester that they were pledging.

Pledges may not vote on proposals for membership, rules or the election of chapter officers.

### Section 3 - Active Membership

Members duly initiated or affiliated in accordance with the provisions of the Constitution and Bylaws shall be considered active members of Chapter, so long as they are undergraduate students of Eastern Michigan University.

Every active brother of Theta Xi Chapter shall be required to be an active member of at least one on-campus club or activity. The Vice President may judge which activities qualify, and is responsible for the fulfillment of this requirement. Any decisions made by the Vice President in this regard may be appealed to the Honor Board.

Active brothers of Theta Xi Chapter may vote on all matters brought before the chapter. Eligible voting members of the chapter must be present during the chapter meeting and within good standing to have their votes counted. Any member who is present but does not cast his vote shall be recorded as abstaining.

### Section 4- Alumni Membership

Members duly initiated or affiliated in Theta Xi Chapter, who has graduated from EMU, or who have withdrawn from Eastern Michigan University, shall be alumni members of Theta Xi Chapter.

Alumni members of Theta Xi Chapter shall be entitled to all of the rights, privileges, and immunities of membership, except those of voting in active chapter meetings and holding elective offices in the active chapter.

## Chapter 3: Executive Board

### Section 1 – Officers Amended 8-28-15

The officers of the chapter shall be:
  President
  Executive Vice President
  Treasurer
  Assistant Treasurer
  Secretary
  Guide
  Sergeant at Arms
  Director of Academic Affairs
  Vice President of Recruitment
  Risk Manager
  Pledge Educator
  Director of Membership Development

### Section 2 - Election of Officers

All officers shall be elected annually at the first regular meeting after November 1, and shall assume office no later than 60 days after the election.

To be eligible to be a member of the Executive Board, members must be within good standing in the Chapter, University, have a semesterly grade point average of a 2.70 or above.

Voting for all officers shall be by secret ballot. No other forms of voting may be permitted and this bylaw may not be suspended.

Elections of officers will be at a majority count. The member, who has the majority votes for a position, shall be elected to that position. In case of a tie, there shall be further discussion and a revote till the tie is broken.

### Section 3 - Duties of the Executive Board

The President shall be the chairman of the Executive Board. It shall be the duty of the remaining Executive Board to act as counsel for the Chairman and to assist him in planning, adopting and executing the policies of the Chapter, to serve as the long range planning committee for the Chapter, and to assist the Chairman in creating the agenda for Chapter meetings.

The Executive Board shall determine, formulate, and establish policies by which the Chapter shall be guided in its relationships with other Greek Organizations on the campus.

The Executive Board shall hold weekly meetings throughout the year at a time and place designated by the chairman. The Secretary shall keep record of the proceedings of the committee.

All members of the Executive Board receive the ability to vote.  All votes shall be open votes, and abstentions will be counted as negative votes.

The Secretary shall be jointly responsible with the Historian for overseeing the timely completion of the Annual Achievement Agreement and the Fraternity Awards Packet.

Shall have the authority to create Ad-Hoc committees

## Chapter 4: Finance Board

### Section 1 - Composition

Article VIII, Section 7, of the Constitution declares that the:
President
Executive Vice President
Treasurer
Assistant Treasurer(s)
Member(s)-at-large
Chapter Advisor

### Section 2 - Duties of the Financial Board

The Treasurer shall serve as the chairman of the Finance Committee.

Hold meetings during the first week of every month or when deemed necessary by the Treasurer, and to keep a record of its proceedings.

The Finance Committee must enforce the regulations set forth in the Constitution of Delta Tau Delta regarding finances and:
to conduct a monthly audit of the records of the Treasurer of the chapter,
to establish the chapter budget,
to maintain a sound credit rating for the chapter,
to see that all bills and charges against the chapter are paid promptly,
to require that the Treasurer report the current financial position to the chapter at regular intervals

The Finance Committee shall have the power to authorize the collection, distribution, and expenditure of all chapter funds, to employ and discharge all salaried employees and determine their compensation.

Authorize or refute extra-budget expenditures of the chapter, to make all necessary and proper adjustments of the budget.

Require that all financial reports of the chapter be kept current and in an efficient manner.

Institute proceedings for suspension or expulsion against financially delinquent members.

## Chapter 5: The Honor Board

The Honor Board is responsible for a fair and impartial hearing of all violations by members and pledges of chapter Bylaws rules and code of conduct. Each case shall be deliberated and appropriate sanctions handed down including the recommendation to the undergraduate chapter for the suspension and/or expulsion for due cause in accordance with Article XI of the *Constitution*.

It is recommended that the Honor Board be no fewer than five (5) and no greater than eight (8) members in good standing with the Chapter. A balance shall be maintained between classes. (Each class will have a max of two members on honor board)

The chairman of the Honor Board will be the Sergeant at Arms.

The chairman of the Honor board can appoint any member in good standing and is not currently holding an executive committee position to his Honor Board once he takes up the position. Once a new Chairman takes the position the current members of the Honor Board will no longer hold an Honor Board position unless selected again by the new Chairman. Vacancies shall be filled in accordance with the above-mentioned selection process.

The Honor Board shall meet every two (2) weeks to hear minor infractions of chapter law or within 48 hours of a violation of the Chapter's Code of Conduct or the Member Responsibility Guidelines of the Fraternity.

A bill of complaint may be filed by any member against another for due cause. The President of the Chapter or chairman of the Honor Board may bring charges against any active member or pledge on behalf of the Chapter if necessary.

The Honor Board may hand down any sanction it sees fit regarding restitution for damage or punitive sanctions as well as require the defendant to participate in certain educational programs. The Honor Board may not suspend or expel members from the Chapter, but they may recommend such action to the undergraduate chapter for their deliberation in accordance with Article XI of the *Constitution*.

Any decision by the Honor Board may be appealed at the following Chapter meeting according to the following schedule: A unanimous decision by the Honor Board requires three-fourths (3/4) vote of the chapter to overturn their decision. A simple majority vote requires a two-thirds (2/3) vote of the active Chapter to overturn their decision.

## Chapter 6: Administrative Board

## Section 1 - Composition

The Administrative Board shall be composed of the:
Executive Vice President
Secretary
Social Chair
Alumni Chair
Brotherhood Chair
Fundraising Chair
Philanthropy Chair
Housing Chair

Chaplin Chair
Public Relations Chair

## Section 2- Appointments

All appointments will be made by the Executive Board.

To be eligible for appointment, members must be in good standing with the Chapter, the University, and must submit a letter of intent to the Executive Board.

The Chapter must approve the proposed appointments before any position is filled.

## Section 3 - Duties of the Administrative board

The Vice President of the chapter shall be chairman of the Administrative Board.

The Administrative Board shall hold weekly meetings throughout the year at a time and place designated by the chairman, and prior to the regular meeting of the chapter. It shall be the duty of the corresponding secretary to keep record of the proceedings of the committee.

It shall be the duty of the Administrative Board to execute the programs of the chapter, and to serve as the legislative committee through which all committee business must pass before being brought to the chapter.

All proposed laws, procedures, rules, regulations, and plans adopted by the Administrative Board shall be submitted to the chapter for final approval.


## Chapter 7: Chapter Committees

## Section 1 -- Composition

The administrative committees of Theta Xi Chapter shall be:
Director of Academic Affairs
Pledge Educator
Vice President of Recruitment
Members at large
Ritual Education
Recruitment
Risk and Rules Management
Sergeant at Arms
Risk Manger
Members at large
Fundraising
Philanthropy
Housing

Administrative committees shall consist of no less than three members. The number of members shall be determined by the committee chairman. (Committees will be set up on an as needed basis by semester/year).

## Section 2 - Duties of the Committees

The chairmen of each committee will be headed by their respective Executive Board member or respective Administrative Board chair position.

All standing and administrative programs shall include policies of expectation regarding the participation of all chapter members in events sponsored by that committee as well as repercussions for not complying with said policies.

Prior to enactment, these programs must be approved by their respective administrative committee and a three-fourths vote of the chapter.

The expectations of participation may subsequently be altered at any time during the course of the program; alterations will be subject to the same process of approval by their respective committee and by a three-fourths vote of the chapter.

The President shall have the power to remove any committee chairman or member for just cause, which includes the violation of any of the chapter bylaws, rules, code of conduct, Member Responsibility Guidelines, or for failure to perform the duties of the committee in a satisfactory manner, or for conduct detrimental to the best interests of the committee of which he is a chairman or a member. Appeals may be made to the Honor Board.

FAAR Chairman:

Assist the president and secretary with FAAR submission. Gather information from members and review materials. Submits materials after ensuring completion and correctness of the FAAR.

## Chapter 8: Academics

## Section 1 - Probation

Members who achieve below a 2.25 semesterly or below a 2.5 cumulative GPA will be put on probation.

## Section 2- Suspension

Members who achieve below a 2.00 semesterly or below a 2.25 cumulative GPA will be put up for suspension by the Director of Academic Affairs.

Members who qualify for probation for two consecutive semesters will be put on automatic suspension.

## Chapter 9: Meetings

## Section 1 - Agenda Format

All business meetings of the chapter shall be conducted in the following order:
Opening Ceremonies
Roll Call
Introduction of Visiting Members

Approval of the Agenda
Approval of the Minutes
Reports of Officers
President
Executive Vice President
Vice President of Recruitment
Treasurer
Director of Academic Affairs
Secretary
Guide
Risk Manager
Pledge Educator
Sergeant at Arms
Director of Membership Development
Reports of Committees
Fundraising
Philanthropy
Housing
Report of Chapter Advisor
Miscellaneous Reports
Honor Board
Sports
IFC Delegates
Ad-Hoc Committees
Old Business
New Business
Proposals for Membership
Good Delt
Questions/Comments/Concerns
Closing Ceremonies

## Section 2 - Meeting Types

**Formal Meetings:**
Formal meetings shall be held at intervals not to exceed one a month, and such formal meetings shall be conducted in due ritualistic form with full regalia and paraphernalia.

Formal meetings shall adhere to the agenda strictly

**Regular Meetings:**
The order of business for all regular meetings shall be the same as in Section 1 of this chapter, except that the opening and closing ceremonies shall be omitted. The meetings shall be called to order and adjourned in regular parliamentary procedure.

Regular meetings shall be held weekly during the year at a time and place to be determined by the chapter.

**Special meetings:**
Called by the President or by a petition signed by at least two-thirds of the total active membership of the chapter.

Special meetings called by a petition of the active chapter, a three days' notice must be given to all members of the chapter.

Special meetings may omit most of the agenda and consist of the notable business that it has been arranged for.

## Section 3 - Quorum and Attendance

Two-thirds of the total active membership of the chapter shall constitute as quorum for all business, except as otherwise provided by the Constitution and Bylaws or by the bylaws of the chapter.

Attendance at all meetings shall be compulsory, and any member(s) who shall be absent without the prior excuse of the President shall be subject to a fine in the amount of $10.  Appeals may be made to the Honor Board for absences and if excuse is refuted.

## Section 4 - Chair and Authority

The President of the Chapter is designated chair for all Chapter Meetings.

If the President is unable to attend the meeting, the duties shall fall to the Executive Vice President.  If the Executive Vice President is unable to chair the meeting it will fall to the next position as designated in Chapter 3, Section 1.

The President shall have the power to cancel one meeting each month for just cause and after giving reasonable notice, provided that the maximum interval between formal meetings, as prescribed in Article XII, Section 3, of the Bylaws, is observed.

## Section 5 - Parliamentary Procedure

Robert's Rules of Order shall govern all proceedings of the chapter meetings when applicable.

Matters of Parliamentary Procedure in dispute shall be referred to the Sergeant at Arms, who shall act as parliamentarian of the chapter.

## Chapter 10: Shelter Rules

## Section 1 - Chapter Property

Members or pledges who are found guilty by the Honor Board of negligently destroying or causing any

damage to Chapter property shall be required to replace said property in the event of destruction or to

repair to the original state in the event of damage.

Members or pledges that are found guilty by the Honor Board of willfully destroying chapter property shall be subject to a fine to be levied by the Honor Board, in addition to replacing the property destroyed.

Members and pledges shall be responsible for the clean and neat appearance of the interior and exterior of the Shelter at all times. A fine (not exceeding ten dollars) may be levied on those who neglect this responsibility as deemed by the Housing Corporation.

Members residing in the house shall be further responsible for the clean and neat appearance of the interior and exterior of the Shelter at all times through the completion of chores as assigned by Housing Corporation. Chores shall be assigned weekly after Sunday Chapter meetings. A fine (not exceeding fifteen dollars) may be levied on those who neglect this responsibility as deemed by the Housing Corporation.

A house drawing will occur if the shelter cannot be filled by January 1st. The drawing will include all members of chapter; except those who have previously lived in the house for one full lease term. Drawing will be conducted by the current President of chapter. If a member's name has been drawn but they cannot live in the house due to finances, commuting, or any other event, an appeal hearing will be conducted by the Honor Board alongside the Current Director of Finance. It will be the Housing Corporation's, as well as the president's responsibility to ensure the house will be filled.

**Section 2 - General Rules**

The following members of the Executive Board members shall reside in the shelter:

-President

-Director of Risk Management

-Recruitment Chair

Should the Shelter not reach full occupancy by volunteer basis, members who have not occupied the Shelter shall reside and board in the shelter unless excused by the Honor Board alongside the Current Director of Finance.

Room assignments shall be configured by members residing in the shelter, with priority given in the following order:

-President

-Director of Risk Management

-Recruitment Chair

-Members who have previously resided in The Shelter. The member who has resided in the shelter for a longer period of time will be granted seniority.

-Totem Order

All members and pledges of the chapter not residing in the Shelter shall observe and obey all Shelter rules while in the Shelter. If chapter members choose to not abide by these rules, active members have the right to remove the certain member from the shelter premises. If the actions conducted by the member at hand are repeated, the events will be brought up to the honor board.

Alumni members of the Fraternity or chapter who are visiting the Shelter shall observe and obey all Shelter rules while at the Shelter. If chapter alumni choose to not abide by these rules, active members have the right to remove the certain alumni from the shelter premises. If the actions conducted by the alumni are repeated, the events will be brought up during chapter meetings or Arch Chapter.

Failure to follow shelter rules will result in a honor board hearing which can lead to suspension, expulsion, loss of house privileges, or removal of alumni status.

**Section 3 - Social Rules**

Use or possession of alcohol in or on the Chapter premises, not in accordance with the Member Responsibility Guidelines, shall be punishable by a fine and further disciplinary action to be levied at the discretion of the Honor Board.

Use or possession of illegal drugs or substances in or on the Chapter premises shall be punishable by expulsion.

Members or pledges found guilty of conduct detrimental to the best interest of the Fraternity and/or Chapter shall have a hearing with the Honor Board to determine proper action.

Members and pledges shall maintain proper decorum at all times with respect to the introduction of guests within the Shelter.

In accordance with the Member Responsibility Guidelines, drinking games shall not be permitted on Shelter premises, including all common rooms and private rooms.

Excessive drunkenness by any member or new member will not be tolerated by our Chapter at any location or at any time. Reports of excessive drunkenness shall be handled within 48 hours and shall be handled as follows:

a. The First offense shall result in an Honor Board hearing.

b. The Second offense shall result in a suspension hearing in addition to an automatic $25.00 fine.

c. The Third offense shall result in an expulsion hearing in addition to an automatic $50.00 fine.

Good Samaritan Policy:

If a member assists another person in obtaining immediate and appropriate medical care related to the use of consumption of alcohol, drugs, or to another medical emergency, then that member, as well as those

who are assisted, will not be subject to individual disciplinary action with respect to the incident. This is the case even if the member who is assisting was a contributing factor to that emergency. An individual may benefit from this policy more than once, Though repeated use of this policy may receive stricter scrutiny.

## Chapter 11: House Corporation

The Housing Corporation shall be composed of two housing managers. Housing managers shall be active members in good standing and to be selected by members residing in the house. Housing managers shall be held responsible for the forming and running of all Shelter rules as they see fit and as dictated by the Constitution and Bylaws.

## Chapter 12: Charges and Fees

Room, board, dues, fees, and other charges shall be determined by the Finance Board before the beginning of the fiscal year and shall be payable monthly during the school year in accordance with the provisions of the Constitution and Bylaws of the Fraternity and the bylaws of this chapter.

In addition to fees set by the Finance Board, a $25 parlor fee is required by all members of the chapter who do not reside in the shelter.

The Finance Board shall have the power to levy and collect special assessments to cover operating deficits, in accordance with Article VII, Section 6, of the Bylaws of the Fraternity, which shall be prorated equally among active and pledge members.

Local alumni and others continuously using the Shelter of the Chapter shall be assessed such house fee as may be determined by the Finance Committee.

## Chapter 13: Reading of the Bylaws

### Section 1 - General Assembly

These bylaws shall be reviewed by the Sergeant at Arms to the chapter assembled at the second regular meeting of the chapter following the opening of any school year, and to all newly initiated members within two weeks following initiation.

### Section 2 - Newly Initiated Members

Any amendment made to the existing set of bylaws shall be read at the following chapter in order that all members shall be aware of all existing bylaws.

## Chapter 14: Amendments

**Section 1 - Amendment Process**

These bylaws may be repealed, altered, or amended at a regular meeting of the chapter, provided that such repeal, alteration, or amendment shall be submitted to the Administrative Board for consideration prior to the time that such repeal, alteration, or amendment is to be proposed to a meeting of the chapter.

**Section 2 - Approved by Administrative Board**

If the repeal, alteration, or amendment is approved by the Administrative Board, it shall be referred to the rules committee.
The Rules Committee shall check all amendments carefully for clarity, wording and to insure that it does not conflict with the Constitution and Bylaws of the Fraternity or provisions governing fraternities at Eastern Michigan University.

At the next Chapter meeting a two-thirds vote of approval by the Chapter for the adoption of the resolution will cause the repeal, alteration, or amendment to become a part of these bylaws.

**Section 3 - Not Approved by Administrative Board**

Amendments not receiving the approval of the Administrative Board shall be proposed in the manner described in Sections 2, but shall require a three-fourths vote for final adoption.
Revised on this __27 _ day of ___October___, 2019

# **EXHIBIT E**



# The Constitution and Bylaws of
# Theta Chi Fraternity, Inc.

Revised August 1, 2019

Theta Chi Fraternity
International Headquarters
865 W. Carmel Drive
Carmel, IN 46032

Mailing Address:
PO Box 503
Carmel, IN 46082
Phone: 317-848-1856 – Fax: 317-824-1908

The Constitution and Bylaws
of
Theta Chi Fraternity, Inc.
Table of Contents

Preamble ................................................................................................................................1

Article I Purpose, Scope and Governing Law .........................................................................1

Section 1. Purpose .................................................................................................................1

Section 2. Composition of Fraternity ....................................................................................1

Section 3. Use of Name..........................................................................................................1

Section 4. Governing Documents...........................................................................................2

Article II  Board of Directors ..................................................................................................2

Section 1. Name, Role and Powers .........................................................................................2

Section 2. Composition ..........................................................................................................2

Section 3. Members.................................................................................................................2

Section 6. Vacancies, How Filled ...........................................................................................4

Section 7. Officer Duties and Privileges of Members.............................................................4

Section 8. Meetings ................................................................................................................5

Section 9. Committees ............................................................................................................6

Section 10. The Chief Executive Officer and the International Headquarters Staff ...............7

Section 11. Financial Matters .................................................................................................7

Article III  The International Convention ................................................................................7

Section 1. Site and Date .........................................................................................................7

Section 2. Composition ..........................................................................................................8

Section 3. Powers ...................................................................................................................8

Section 4. Resolutions, Appeals and Amendments .................................................................8

Section 5. Delegates Eligible to be Seated..............................................................................9

Section 6. Penalty for Failure to Attend or Seat Collegiate Delegate .....................................9

Section 7. Manner of Conducting International Convention ..................................................9

Section 8. School of Fraternity Practices ...............................................................................11

Section 9. Local Fraternity Guests .........................................................................................11

Article IV  Establishment and Status of Active Chapters........................................................11

Section 1. Names.....................................................................................................................11

i

Section 2. Expansion ............................................................................................................................. 11

Section 3. Chartering ............................................................................................................................ 11

Section 4. Discipline of Chapters; Probations; Suspension; Revocation of Charter; Re-Installation............ 11

Article V  Organization and Conduct of Active Chapters ............................................................................ 13

Section 1. General ................................................................................................................................ 13

Section 2. Active Chapter Officers ........................................................................................................ 13

Section 3. Election of Active Chapter Officers ...................................................................................... 14

Section 4. Removal of Active Chapter Officers ..................................................................................... 14

Section 6. Duties and Powers of Active Chapter Officers ..................................................................... 15

Section 7. Scheduling of Active Chapter Meetings ............................................................................... 16

Section 8. Conduct of Active Chapter Meetings .................................................................................... 17

Section 9. Active Chapter Finances ...................................................................................................... 18

Section 10. Residence Requirement ..................................................................................................... 18

Section 11. Hazing Prohibited .............................................................................................................. 18

Section 12. Safety and Insurance ......................................................................................................... 18

Section 13. Alcoholic Beverages ........................................................................................................... 18

Section 14. Firearms ............................................................................................................................. 18

Section 15. Thefts ................................................................................................................................. 19

Section 16. Notifications to International Headquarters ....................................................................... 19

Section 17. Auxiliary Organizations ...................................................................................................... 19

Section 18. Limitation on Pledge Period .............................................................................................. 19

Section 19. Minimum Chapter Size ...................................................................................................... 19

Section 20. No Authority to Bind the Fraternity .................................................................................. 19

Article VI  Membership............................................................................................................................... 20

Section 1. Classes................................................................................................................................. 20

Section 2. Membership for Life ............................................................................................................ 20

Section 3. Qualifications for Collegiate Membership ........................................................................... 20

Section 4. Election of Collegiate Members ........................................................................................... 20

Section 5. Qualifications for and Election of Alumnus Members ......................................................... 21

Section 6. Election of Members from Absorbed Entities ..................................................................... 22

Section 7. Transfer of Chapter Membership......................................................................................... 22

Section 8. Honorary Chapter Members ................................................................................................ 23

Section 9. Pledge and Initiation Fees ................................................................................................... 23

Section 10. Theta Chi Chapter .............................................................................................................. 23

Section 11. Determination of Members Status .................................................................................... 24

Section 12. Limitation on Other Memberships ..................................................................................24

Section 13. Suspension and Expulsion Procedures ..........................................................................24

Section 14. Good Standing ..................................................................................................................27

Section 15. Privileges of Membership ...............................................................................................27

Article VII  Indemnification and Insurance ......................................................................................28

Section 1. Indemnification ..................................................................................................................28

Section 2. Insurance .............................................................................................................................28

Article VIII  Publications, Awards, Insignia and Traditions .........................................................29

Section 1. Publications .........................................................................................................................29

Section 2. Awards ..................................................................................................................................29

Section 3. Insignia .................................................................................................................................29

Section 4. Traditions .............................................................................................................................30

Article IX  Miscellaneous .....................................................................................................................31

Section 1. Fiscal Year ...........................................................................................................................31

Section 2. Amendments ........................................................................................................................31

Section 3. Parliamentarian ...................................................................................................................31

# Preamble

Inasmuch as it is the highest duty of man to so order his life that his Creator may call it good and humanity may be the better for his having lived, and since in union there is strength so that a body of men working together for a common cause can accomplish more and greater things than any individual member of that body, making the mutual assistance of brothers thus held together by the everlasting bonds of fellowship of the greatest importance to themselves, their alma mater, their country, and their God - - Hence the following:

# Constitution and Bylaws
## Of
# Theta Chi Fraternity, Inc.

## Article I
## Purpose, Scope and Governing Law

### Section 1. Purpose

The purpose of Theta Chi Fraternity, Inc., a New York Corporation (the "Corporation"), shall be to establish, maintain, govern, improve and promote the welfare of a fraternal order to be known as "Theta Chi Fraternity" (the "Fraternity"), which shall have for its objects: the mutual benefit and assistance of its members; the binding by closer bonds of its members one to another; the rendition of mutual assistance to its members during life and after their death to their dependents; the assisting of needy but deserving young men to obtain a higher education; the fostering of high scholastic achievement among its members; the extending of true charity to those who need such assistance; the promoting of good citizenship; the training and the developing of civic leaders; and, by all means within its power, the inculcation and the extension throughout the land of the highest ideals of honor, charity, tolerance, and true patriotism.

### Section 2. Composition of Fraternity

The Fraternity shall consist of the Corporation, active chapters established and existing from time to time at recognized institutions of higher learning in the United States of America and Canada, Theta Chi Chapter, and the members and Pledges of the Fraternity. No other corporation, association or other body shall be deemed to be a constituent part of the Fraternity, but nothing in this Section shall limit the right and power of one or more members to form any such corporation, association or other entity for assisting the Fraternity or one or more of its active chapters in achieving the objects of the Fraternity.

### Section 3. Use of Name

Except for the entities and individuals identified in the first sentence of Section 2 of this Article I, no entity or individual shall have the right to use the name "Theta Chi Fraternity", or the combined Greek letters for "Theta" and "Chi", or the Coat of Arms of the Fraternity, or any recognizable variant of any of the foregoing, as a part of its name, or to identify itself or himself, or to claim an affiliation with the Fraternity, without the express written permission of this Corporation, which permission may be limited to a stated period of time.

**Section 4. Governing Documents**

The Constitution and Bylaws of Theta Chi Fraternity, Inc. (the "Bylaws") shall be the supreme law of the Fraternity. Except as provided in these Bylaws, the governing law of the Fraternity shall be the resolutions of the International Convention and the resolutions of the Grand Chapter, ranking in that order. Any bylaw, regulation, legislation or resolution of any chapter of the Fraternity in conflict with any of the foregoing shall be null and void. The Ritual of the Fraternity, including all ceremonies provided for therein, as in effect from time to time, shall be deemed incorporated into these Bylaws, and any amendment, alteration or repeal of any portion of said Ritual shall be made only in accordance with Article IX, Section 2, treating the proposed amendment, alteration or repeal as one being made to these Bylaws.

# Article II
# Board of Directors

**Section 1. Name, Role and Powers**

The term Grand Chapter shall mean and refer to the Board of Directors of the Corporation. The Grand Chapter shall be the administrative, executive and judicial head of the Fraternity, and shall have, in addition to the powers expressly provided for elsewhere in these Bylaws, the power to decide all questions concerning the meaning and interpretation of these Bylaws and the Ritual, and the power to adopt such other resolutions, not inconsistent with these Bylaws, the Ritual or resolutions adopted by the International Convention, as shall be necessary or appropriate for the welfare of the Fraternity.

**Section 2. Composition**

The Grand Chapter shall consist of eight alumnus members of the Fraternity each of whose original undergraduate college class shall have been graduated from college or university for at least six years. Except as provided by Section 6 of this Article II, members of the Grand Chapter shall be elected by the International Convention for terms of approximately four years (such terms to expire at the International Convention four years hence), with four of such members being elected at each International Convention, in the manner provided in Section 4 of this Article II. No member of the Grand Chapter shall be eligible to succeed himself more than once, regardless of the manner in which he was first elected to the Grand Chapter or the length of term he may be serving, and no individual shall be eligible for election pursuant to Section 4(e) of this Article II to any term which would entitle him to serve on the Grand Chapter for more than eight years out of any twelve-year period.

**Section 3. Members**

(a) The members of the Grand Chapter shall be known as International President, International Vice President, International Secretary, International Treasurer, International Counselor, International Marshal, International Chaplain, and International Historian, ranking as here listed. The officer titles of individual Grand Chapter members shall be used for ceremonial and historical purposes of the Fraternity. In this regard, with the exception of the specific officer duties enumerated in this Constitution and Bylaws document, the duties of individual members of the Grand Chapter shall be limited to those required by applicable law, the duties associated with service as a director of a nonprofit corporation, and those duties that may be assigned by the Grand Chapter from time to time.

(b) The International President and the International Vice President shall be elected by the International Convention. All other officers shall be appointed by the International President following that election and prior to the installation of the new Grand Chapter.

(c) All officers shall be elected or appointed for a term of approximately two years (such term to expire at the

2

next International Convention).

(d) No individual shall be eligible to be elected to more than two consecutive terms as International President.

## Section 4. Nomination and Election of Members

(a) Nomination of an alumnus member for election to the Grand Chapter may be made by the Grand Chapter or by an active chapter, nominations not being limited to the chapter(s) of which the nominee is a member.

(b) All nominations by an active chapter must be submitted to the Chief Executive Officer not later than ninety (90) days preceding the date for the beginning of an International Convention and not later than April 1 before an International Convention held between July 1 and October 1. Each nominee shall be notified by the Chief Executive Officer, and his consent obtained within thirty (30) days of notification, in order for the nomination to be effective.

(c) The names of all nominees shall be submitted together with a statement of their Fraternity experience by the Chief Executive Officer to all active chapters not later than sixty (60) days prior to the date for the beginning of an International Convention and not later than May 1 before an International Convention held between July 1 and October 1.

(d) No nominations may be considered which are not so proposed, so presented, and so qualified.

(e) In voting for members of the Grand Chapter at the International Convention, each delegate shall vote for four nominees for terms of four years each, except that if, pursuant to Article III, Section 7(c)(1), one delegate has the power to cast two votes on behalf of his chapter, that delegate shall cast two votes for each of four nominees. The four nominees receiving the highest number of votes shall be declared elected if each receives a number of votes which is at least equal to a majority of the total number of valid votes cast divided by the number of nominees to be elected. No ballot shall be counted which does not contain the names of four different nominees.

(f) In the event that less than four nominees receive the required number of votes for election under subsection (e) on the first ballot, those receiving the required vote shall be declared elected and the presiding officer shall then order another ballot, each delegate being required to vote for as many nominees as there remain vacancies to be filled. This process shall be continued until the necessary number has been elected. If on any ballot subsequent to the first no nominee is elected, then prior to the next ballot the presiding officer shall determine the nominee having received the lowest number of votes on that ballot and declare that said nominee is eliminated from the subsequent ballot; provided, however, that if two or more nominees are tied for the lowest number of votes no such elimination shall be made.

(g) Following the completion of the election of Grand Chapter members, the presiding officer shall open the floor for nominations of members of the Grand Chapter (after giving effect to the election just concluded) for International President. When all nominations have been received, each delegate shall vote for one candidate, except that if, pursuant to Article III, Section 7(c)(1), one delegate has the power to cast two votes on behalf of his chapter, that delegate shall cast two votes for one candidate. The nominee receiving the highest number of votes shall be declared elected if he receives a number of votes at least equal to a majority of the total number of valid votes cast for International President. In the event that no nominee receives the required number of votes for election on the first ballot, the presiding officer shall state that there has been no election and announce the names of the two nominees with the greatest number of votes. The delegates shall then vote upon those two nominees, and the required number of votes stated above shall elect.

(h) Following the completion of the election of the International President, the presiding officer shall open the floor for nominations of the remaining members of the Grand Chapter for International Vice President. The process shall be the same as set forth in subsection (g) for the election of the International President.

(i) No member of the Fraternity shall at any time disclose the results of any ballot other than the name or names of the nominees elected or that another ballot is or was necessary in order to complete the election.

3

## Section 5. Removal from Office

No member of the Grand Chapter shall be removed from office before the expiration of his term except for cause, as determined by the Grand Chapter in its sole discretion, based on a three-fourths vote of all members of the Grand Chapter then in office. Any member so removed may appeal to the next International Convention. The affirmative vote of at least three fourths of the total number of votes which all seated delegates at the International Convention are entitled to cast shall be required to overturn action by the Grand Chapter to remove a member of the Grand Chapter from office. Any such successful appeal shall be deemed to remove any individual elected to the Grand Chapter to fill the vacancy created by the removal, but shall not invalidate any action taken by the Grand Chapter or any member thereof following the Grand Chapter vote to remove and prior to the International Convention vote to overturn the removal.

## Section 6. Vacancies, How Filled

(a) When, for any reason, a member of the Grand Chapter leaves office before the expiration of his term, the Grand Chapter shall select a successor who shall serve for the unexpired portion of the vacated term.

(b) Except in the case where the member of the Grand Chapter leaving office is the International President, the International President shall have the power to determine whether the successor shall assume the office vacated by the member leaving office or, with the consent of the member to be displaced, an office lower in rank or an office higher in rank. In the event that the successor is designated to an office other than the office vacated by the member leaving office, the International President shall then designate the displaced member to a new office in the same manner provided for a successor selected pursuant to subsection (a).

(c) In the case where the member of the Grand Chapter leaving office is the International President, the International Vice President shall become the International President and the vacated office shall be considered to be that of International Vice President. The new International President shall then have the power to determine the office to be held by the successor selected pursuant to subsection (a) in the manner provided in subsection (b).

## Section 7. Officer Duties and Privileges of Members

(a) **The International President** shall preside at meetings of the Grand Chapter and at the International Convention. He shall have the privilege of voting in the Grand Chapter, but shall not vote in the International Convention except in case of a tie vote on a matter other than an election under Section 4 of this Article II.

(b) **The International Vice President** shall assist the International President in the discharge of his duties and in case of the absence of the International President shall preside or act in his place.

(c) **The International Secretary** shall keep a record of the proceedings of the Grand Chapter and of the International Convention. He shall be responsible for appropriate correspondence between the Grand Chapter and other organizations within and outside of the Fraternity.

(d) **The International Treasurer**, with the assistance of a Fraternity staff member designated by the Chief Executive Officer, shall oversee the preparation and maintenance of correct and complete records of account showing accurately the financial condition of the Corporation. All fees, notes, securities, and other assets coming into the possession of the Corporation shall be received, accounted for, and placed in safekeeping as the Treasurer or the designated staff member may from time to time prescribe. The Treasurer or the designated staff member shall furnish, whenever requested by the Grand Chapter or the International President, a statement of the financial condition of the Corporation and shall perform the duties usual to such position and such other duties as the Grand Chapter or the International President may prescribe.

(e) **The International Counselor** shall assist Fraternity staff designated by the Chief Executive Officer with the recruitment of volunteers.

4

(f) **The International Marshal** shall serve as Chairman of the Standards Committee provided for in Section 9 of this Article II, and shall perform such other duties as the International President or Grand Chapter may prescribe.

(g) **The International Chaplain** shall assist Fraternity staff designated by the Chief Executive Officer in proposing additions, revisions, or modifications to the Ritual, and shall assist with the performance of the Ritual or any portion thereof at Grand Chapter meetings, the International Convention and other similar events.

(h) **The International Historian** shall assist Fraternity staff in collecting and preserving artifacts and historical items of the Fraternity.

(i) The International President shall appoint a member of the Grand Chapter as Bylaws Officer, who shall be responsible for the study and review of, and proposals to modify, these Bylaws, as directed by the Grand Chapter, and shall serve, in conjunction with any Parliamentarian or Parliamentary Committee established pursuant to Section 3 of Article IX, as the Grand Chapter representative for questions referred by chapters and members regarding the interpretation of these Bylaws.

(j) The members of the Grand Chapter may perform such other duties as the Grand Chapter shall prescribe. Except as provided in subsection (a) of this Section 7, members of the Grand Chapter shall not be eligible to vote at the International Convention. Current and past members of the Grand Chapter shall be entitled to all rights and privileges of presidents of active chapters in the performance of the Ritual, and may preside over meetings of active chapters during visits or at other times.

(k) The reasonable expenses of members of the Grand Chapter shall be paid for attending (A) Grand Chapter meetings, (B) International Conventions, and (C) such other events and functions as shall be approved by the International President, except that reasonable expenses of the International President under this clause (C) shall be approved by the International Treasurer.

(l) All past members of the Grand Chapter shall be members ex-officio for life, with the exception of those members who are removed from office by the Grand Chapter prior to the expiration of their term. The ex-officio members may attend Grand Chapter meetings at their own expense, and participate and advise on discussions and matters being considered, but they shall not be entitled to a vote; provided, however, that the voting members of the Grand Chapter may go into executive session to address certain matters without the presence or participation of ex-officio directors.

## Section 8. Meetings

(a) The Grand Chapter shall meet at such times and places as the International President shall prescribe, provided that in each case the International President or the Chief Executive Officer shall notify all members of the Grand Chapter and all active chapters in advance of the meeting date, but the failure to provide such notice to any chapter shall not invalidate any action taken by the Grand Chapter at such meeting. Any member may, in writing, waive the giving of notice of any meeting to him, and such waiver may be made either before or after the meeting in question. The International President shall call a meeting within thirty (30) days after receiving a request for such meeting from four members of the Grand Chapter. In the absence of the International President or upon his inability or refusal to act, a Grand Chapter meeting may be held upon the call of any four members of the Grand Chapter.

(b) Five members of the Grand Chapter shall constitute a quorum for the transaction of business, except that, if there are less than five members then in office, the remaining members may meet for the purpose of filling vacancies as provided in Section 6 of this Article II. A meeting at which a quorum has been established may continue to transact business notwithstanding the subsequent withdrawal of one or more members with the result that five members are no longer in attendance.

(c) Except where a different vote is expressly required by another section of these Bylaws, a majority vote of those members present at a meeting at which a quorum is present shall be sufficient to approve any action of the Grand Chapter.

(d) At any meeting of the Grand Chapter, one or more or all of the members may participate by speaker telephone or other similar arrangement pursuant to which such member or members may hear, and be

heard by, all other members attending the meeting, and any member so participating shall be deemed to be present for all purposes.

(e) Any action required or permitted to be taken at any meeting of the Grand Chapter, or any committee thereof, may be taken without a meeting if a written consent describing such action is signed by each member of the Grand Chapter or committee member and such written consent is included in the minutes or filed with the Corporation's records reflecting the action taken. Action taken by written consent shall be effective when the last Grand Chapter member or committee member signs the consent, unless the consent specifies a prior or subsequent effective date. A consent signed as described in this Section shall have the effect of a unanimous vote at a meeting of the Grand Chapter and may be described as such in any document. In the case of an electronic written consent, the transmission of the consent must be sent by electronic mail and set forth, or be submitted with, information from which it can reasonably be determined that the transmission was authorized by the applicable member of the Grand Chapter.

(f) Promptly following each meeting of the Grand Chapter, and following each action taken pursuant to subsection (e) of this Section 8, the Chief Executive Officer shall communicate to the active chapters generally, or to such active chapters and such members as may be affected, the pertinent results of said meeting or action, to the extent that such notice is necessary or appropriate, giving due consideration to the confidentiality interests of the Grand Chapter, the individual active chapters, and individual members.

## Section 9. Committees

(a) The Grand Chapter may from time to time maintain a Standards Committee and a Security Committee.

    (1) **The Standards Committee** shall serve as a standards board for the Fraternity, serve in an advisory capacity to the Grand Chapter on standards issues, oversee the investigation of alleged violations by chapters of any of the provisions of these Bylaws, and, in some circumstances, formulate recommendations for any appropriate sanctions and/or remedial actions to address any such violations. The Standards Committee shall be composed of the International Marshal, as Chairman, and the following members to be designated by the International President: a second member of the Grand Chapter, a collegiate member, and two additional alumnus members who are not members of the Grand Chapter or employees of the Corporation. The terms of all members of the Standards Committee shall expire at each International Convention. An employee of the Corporation appointed by the International President shall serve as an ex-officio member of the Standards Committee.

    (2) **The Security Committee** shall have responsibility for making recommendations with respect to safety programs and policies of the Fraternity, and making recommendations regarding insurance programs, coverages, and carriers.

(b) The Grand Chapter may from time to time by resolution create, designate or abolish other committees of the Grand Chapter, each of which shall have such purposes, and such powers, as may be set forth in the original resolution of the Grand Chapter creating the committee or in any subsequent resolution of the Grand Chapter pertaining to that committee.

(c) Except as otherwise specifically provided in these Bylaws or in the resolution creating a committee, the International President shall have the power to designate the chairman of each committee, who shall serve for an indefinite term. The International President, in consultation with the committee chairman, shall appoint the remaining members of the committee, who shall similarly serve for indefinite terms. Each committee shall have at least three members, at least one of whom shall be a then-current member of the Grand Chapter. Notwithstanding the provisions of the foregoing two sentences, the International Advisory Committee shall be composed of all living former International Presidents.

(d) Unless otherwise provided for in these Bylaws or in a resolution of the Grand Chapter pertaining to such committee, a majority of the members then serving on a committee shall constitute a quorum for a meeting of the committee, and the vote of a simple majority of those present at a meeting at which a quorum is present shall be sufficient to approve any action of the committee. Each committee shall determine the number and schedule of meetings to be held.

**Section 10. The Chief Executive Officer and the International Headquarters Staff**

(a) The Grand Chapter is authorized to appoint, for a definite or indefinite term, a Chief Executive Officer, who shall be an alumnus member, to manage and supervise the International Headquarters staff and the day-to-day operations of the Fraternity, consistent with policies established by the Grand Chapter, and to perform such other duties and exercise such other powers as are specified elsewhere in these Bylaws or as may be assigned to him from time to time by the Grand Chapter. The Chief Executive Officer shall receive such compensation as the Grand Chapter may determine. At least annually, the Grand Chapter, during a meeting and with the Chief Executive Officer in attendance, shall conduct a comprehensive review and appraisal of the performance of the Chief Executive Officer in achieving the purposes of the Corporation and the objects of the Fraternity, and shall establish goals for the Chief Executive Officer's future performance.

(b) The Chief Executive Officer is authorized to appoint, for definite or indefinite terms, additional employees of the Corporation, and to establish titles, duties and compensation for such employees, subject to the limitations of the budgets established by the Grand Chapter pursuant to Section 11 of this Article II.

(c) The Chief Executive Officer and all other employees of the Corporation shall be ineligible for election to the Grand Chapter during and for a period of three years after any such individual shall have ended his employment with the Corporation.

(d) The Chief Executive Officer, during his term of office, shall be ex-officio a member of the Grand Chapter without the right to vote.

**Section 11. Financial Matters**

(a) The Grand Chapter shall adopt, and monitor on a regular basis, an annual budget covering the revenues and expenditures of the Corporation. The Chief Executive Officer shall be responsible for implementing and monitoring that portion of the budget pertaining to the operations of the International Headquarters, and shall report promptly to the International Treasurer if he determines that any budgeted category of expenditure has been, or is likely to be, exceeded.

(b) The Grand Chapter shall have the authority to assess an annual Annual Programming and Benefits Fee for each active chapter. The revenue from this Fee will be used for the operations of the Fraternity, and the amount of the Fee may be adjusted annually by the Grand Chapter to provide adequate operational funding for the Fraternity. The amount of the Fee may vary depending upon chapter size, defined as the number of Pledges and collegiate members according to the official records maintained by the International Headquarters, as of April 10th of each year, and the Fee shall be payable on such date as the Grand Chapter shall determine.

# Article III
# The International Convention

**Section 1. Site and Date**

The Grand Chapter shall select the time and place of each International Convention, to be held biennially, giving appropriate consideration to (A) the opportunity for maximum possible collegiate and alumnus member participation, (B) the alternation of sites among various sections of the United States and Canada to the extent that financial considerations permit, and (C) the minimum disturbance to the academic schedules and activities of collegiate members.

## Section 2. Composition

The term "International Convention" shall refer to the business sessions conducted as provided by Section 7 of this Article III. The International Convention shall be composed of the Grand Chapter and one collegiate and one alumnus delegate from each active chapter; provided, however, that only delegates entitled to be seated pursuant to Section 5 of this Article III shall be considered to be part of the Convention.

## Section 3. Powers

The International Convention shall have the power (A) to adopt resolutions concerning matters of interest to the Fraternity, including resolutions to amend, alter or revoke any portion of these Bylaws pursuant to Article IX, Section 2, or to amend, alter or revoke any resolution adopted by the Grand Chapter; (B) to hear and decide any appeals expressly provided for elsewhere in these Bylaws from an action of the Grand Chapter; (C) to elect the members of the Grand Chapter; and (D) to elect the International President and the International Vice President.

## Section 4. Resolutions, Appeals and Amendments

(a) All appeals, amendments to these Bylaws, or other resolutions to be considered by the International Convention must be presented in writing to the Chief Executive Officer by an individual (in the case of an appeal pursuant to Article II, Section 5, by an active chapter or by the Grand Chapter not less than ninety (90) days prior to the opening date of the International Convention, except in the case of a summer Convention, when the final date shall be April 1; provided, however, that, in the case of an appeal of an action taken by the Grand Chapter:

    (1) After the date which is thirty (30) days prior to the date by which presentation to the Chief Executive Officer would otherwise be required by this subsection but,

    (2) Prior to the opening date of the International Convention, presentation shall be deemed timely if made reasonably promptly after the chapter or individual submitting the appeal learns of the Grand Chapter action.

(b) All appeals, amendments to these Bylaws, or other resolutions submitted pursuant to subsection (a) shall be submitted by the Chief Executive Officer to the active chapters not less than sixty (60) days prior to the opening date of the International Convention, except in the case of a summer Convention, when the final date shall be May 1; provided, however, that, in the case of an appeal described in the proviso to subsection (a) of this Section 4, the appeal shall be submitted by the Chief Executive Officer as soon as reasonably practicable.

(c) Any appeal, amendment to these Bylaws, or other resolution not submitted in accordance with subsection (b) may nevertheless be presented to and considered by the International Convention upon the affirmative vote of at least two thirds of the total number of votes which all seated delegates are entitled to cast or upon such lesser affirmative vote as the Grand Chapter shall specify by resolution.

(d) Promptly after the receipt of any item presented under subsection (a) or subsection (c) above, the Chief Executive Officer, in consultation with the Bylaws Officer and any Parliamentarian or Parliamentary Committee designated pursuant to Article IX, Section 3, shall determine whether the item may properly be brought before the International Convention pursuant to these Bylaws and, if so, whether such item is properly characterized as an appeal, an amendment to these Bylaws, or a resolution of the International Convention. Upon such determination, the Chief Executive Officer shall notify the chapter or individual presenting the item of his determination, and shall advise the presenter and the International Convention as to the voting procedures and requirements applicable to the item.

(e) Any presenter wishing to rephrase an item presented with proper technical or clarifying language may do so at any time prior to the vote, provided that such change does not alter the intent and purpose of the original submission.

(f) Any item submitted to the International Convention which constitutes an amendment to these Bylaws shall be approved and shall become effective in accordance with Article IX, Section 2 of these Bylaws. Any

8

item submitted to the International Convention which constitutes an appeal of an action by the Grand Chapter shall be approved and shall become effective as provided in the Section of these Bylaws providing the right to appeal. Any item submitted to the International Convention which constitutes a resolution of the International Convention shall be approved upon the favorable vote of a majority of the votes cast, and shall become effective immediately, unless otherwise provided by the terms of such resolution.

## Section 5. Delegates Eligible to be Seated

(a) Each collegiate delegate shall be a collegiate member of the chapter he represents. Each alumnus delegate shall be an alumnus member or an honorary member of the chapter he represents. Delegates shall be selected in such manner as each active chapter may desire. Their names shall be submitted to the Chief Executive Officer by the active chapter secretary not less than sixty days prior to the date of the opening of the International Convention, except in the case of a summer Convention, in which case the final date for submitting names shall be May 1. In case the names of one or both of the delegates from any chapter are not so submitted, or in the case of the inability of a specified delegate to attend, the Grand Chapter, or its designee for such purpose, may permit the seating of a delegate whose name was not provided to the Chief Executive Officer as specified above, but in the absence of such permission a chapter may not be represented by any delegate whose name was not so provided.

(b) At the beginning of each International Convention, the Chief Executive Officer shall present a list of those chapters which are not in good financial standing with the Grand Chapter. Financial good standing is defined as owing $ 100 or less to the Grand Chapter as of the first day of the month during which the International Convention begins. Delegates from these chapters may be seated only upon full payment of the debt, or with the approval of a Credentials Committee established by the Grand Chapter.

(c) No member currently serving on the Grand Chapter, nor the Chief Executive Officer or any then-current member of the International Headquarters staff, may serve as or be seated as an alumnus delegate.

(d) No collegiate or alumnus delegate from an inactive chapter or from a suspended chapter shall be seated nor will any such chapter be recognized for any purpose except that an inactive chapter will be recognized for the purpose of bringing an appeal pursuant to Article IV, Section 4(e).

## Section 6. Penalty for Failure to Attend or Seat Collegiate Delegate

(a) Any active chapter which fails to have a collegiate member registered for and in attendance at an International Convention shall be automatically placed on probation, and shall pay a fine in such amount as may be set from time to time by resolution of the Grand Chapter unless payment of such fine is waived by the International President upon good cause shown.

(b) Any active chapter which fails to seat a collegiate delegate at an International Convention shall not be eligible to vote in any ratification vote pursuant to Section 2(b) of Article IX arising out of actions taken at that International Convention.

## Section 7. Manner of Conducting International Convention

The International Convention and all matters incidental thereto shall be conducted in accordance with this Section, unless the International President directs otherwise. Any procedural question not addressed by these Bylaws shall be resolved in accordance with the then-most recent edition of Robert's Rules of Order.

(a) **Presiding Officer.** The International Convention shall be called to order by a collegiate delegate of the oldest active chapter having a collegiate delegate seated, or an alternative recommended by the Chief Executive Officer and approved by the Grand Chapter. The collegiate delegate of the newest active chapter having a collegiate delegate seated shall act as First guard. As soon as the delegates are properly seated and the International Convention has been called to order, the alumnus delegate from the oldest active chapter having an alumnus delegate seated shall retire and conduct into the room the members of

the Grand Chapter. The International President shall then take charge of the International Convention, appointing one or more non-delegate alumnus members to act as guards. The International President shall remain in charge of the International Convention until its conclusion, except during the time of the election of members of the Grand Chapter and the International President and the International Vice President, during which time the current members of the Grand Chapter and candidates for the Grand Chapter shall retire and the appointed collegiate delegate shall again preside. During the election, a former member of the Grand Chapter, not a candidate for election, designated by the International President, shall assist the presiding officer in conducting the election. As soon as the election of the members of the Grand Chapter and the International President and the International Vice President is completed, the Grand Chapter (as it was constituted prior to the elections) shall again return and the International President shall again take charge of the meeting.

(b) **Order of business.** The order of business shall be as follows unless otherwise ordered by the International President or the affirmative vote of at least two thirds of the total number of votes which all seated delegates are eligible to cast:

    (1) Calling the International Convention to order by the collegiate delegate of the oldest active chapter having a collegiate delegate seated.

    (2) Entrance of Grand Chapter -- recognition by Grand Honors.

    (3) Opening prayer by International Chaplain.

    (4) Report of Credentials Committee.

    (5) Calling the roll of active chapters by International Secretary, unless Credentials Committee report renders this unnecessary.

    (6) Approval of reports of International President, International Treasurer, Chief Executive Officer and other officers.

    (7) Consideration of Resolutions, presented by chapters in the order of their installation.

    (8) Consideration of other business.

    (9) Election of members of Grand Chapter.

    (10) Election of International President and International Vice President.

    (11) Re-entrance of Grand Chapter -- recognition by Grand Honors.

    (12) Announcement of election results by the collegiate delegate of the oldest active chapter having a collegiate delegate seated.

    (13) Installation of new Grand Chapter.

    (14) Closing prayer by International Chaplain.

    (15) Adjournment.

(c) **Voting; how done.**

    (1) Each collegiate delegate and each alumnus delegate shall have one vote during the International Convention; provided, however, that, in the case of any active chapter for which only a collegiate delegate is seated, or only an alumnus delegate is seated, said delegate shall be entitled to cast two votes.

    (2) Voting shall be by acclamation, by raised hands, by standing, or by secret ballot. The method of voting shall be at the discretion of the presiding officer, except that: (A) voting for members of the Grand Chapter, International President and International Vice President shall be by secret ballot unless in a particular case the number of nominees for Grand Chapter, International President or International Vice President does not exceed the number to be elected, (B) voting on any other matter shall be by secret ballot if the International Convention adopts a resolution to that effect by a majority of all votes cast, and (C) in any situation not covered by clauses (a) and (c) of this subsection (c)(2), voting shall be by standing upon the request of any delegate.

    (3) The International President shall have the privilege of voting in case of a tie on a matter other than an election, but the other members of the Grand Chapter have no vote unless presiding in the absence of the International President.

(d) Only seated delegates and present and past members of Grand Chapter shall be entitled to address Convention business sessions, but the presiding officer may, in his sole discretion, permit others to

address Convention business sessions if he believes that such a step would be likely to assist the Convention's decision-making process.

## Section 8. School of Fraternity Practices

A "School of Fraternity Practices" shall be held in conjunction with each International Convention, and adequate time shall be allowed for its designated curriculum.

## Section 9. Local Fraternity Guests

Representatives of colonies, local fraternities or interest groups may attend the School of Fraternity Practices held in conjunction with the International Convention, but only members of the Fraternity may attend sessions of the International Convention.

# Article IV
# Establishment and Status of Active Chapters

## Section 1. Names

Subject to Section 10 of Article VI, the active chapters shall be named by the letters of the Greek alphabet, with the first chapter being Alpha, until all single letters have been used. The next series of chapters shall use the prefix Alpha, with the first chapter of that series being Alpha Beta, followed by a series using the prefix Beta, with the first chapter of that series being Beta Alpha. Succeeding series of chapters shall have prefixes established in the order of the Greek alphabet. To avoid confusion, chapter names consisting of the same letter used twice, such as Alpha Alpha, shall not be used. The same name shall not be given to more than one chapter, and the name once given to an active chapter at a particular institution shall not be withdrawn from that institution.

## Section 2. Expansion

The Fraternity shall seek to expand by establishing new active chapters and for this purpose the Grand Chapter shall have the authority to establish colonies at four-year accredited, undergraduate educational institutions in accordance with policies, practices and criteria adopted from time to time. Before any colony of the Fraternity shall be established, the Grand Chapter, by resolution, shall approve the group seeking colony status.

## Section 3. Chartering

(a) The procedure for the establishment of new active chapters through the granting of new charters shall be as set forth in this Section 3. The procedure for the re-establishment of an active chapter through re-installation of a chapter whose charter has been revoked shall be as set forth in Section 4(g) of this Article IV.

(b) All petitions for charters shall be submitted to the Grand Chapter for approval, which approval shall require a three-fourths vote of all Grand Chapter members then in office.

(c) The Grand Chapter shall determine the installation date for all new active chapters, as well as the amount of the installation or re-installation fee, which may include the costs of the charter document, gavel, photographs of the Founders of the Fraternity and other similar items.

## Section 4. Discipline of Chapters; Probations; Suspension; Revocation of Charter; Re-Installation

(a) **Probation.**

    (1) The Chief Executive Officer shall have the power, after considering all relevant facts and circumstances, to place a chapter on probation for a period of up to six months, or to impose any lesser sanction, for violation of an applicable law, these Bylaws, or any other Fraternity policy, position statement, practice or procedure. A chapter placed on probation by the Chief Executive Officer shall have the ability to appeal such probation determination to the Standards Committee within thirty (30) days of receiving notice of said probation. The determination of the Standards Committee with respect to any such appeal shall be the final and binding determination.

    (2) The Chief Executive Officer may also recommend any longer period of probation by forwarding such recommendation to the members of the Grand Chapter, and each such Grand Chapter member shall have five business days following receipt of such recommendation to notify the other members that he requests a change in the recommended sanction, or a vote on the recommendation. If no such notification is made, the recommendation of the Chief Executive Officer shall become effective as the act of the Grand Chapter.

    (3) The Grand Chapter also shall be authorized at any time to place an active chapter on probation for any such violation.

    (4) In connection with any such probation, the Chief Executive Officer or the Grand Chapter, as the case may be, may place upon any such chapter any limitation on its activities, not inconsistent with these Bylaws, and may specify any affirmative requirement for the chapter's conduct, that it deems necessary or appropriate.

    (5) The party establishing any probation pursuant to paragraphs (1), (2) or (3) of this Section 4(a) may establish a Probation Committee, consisting of not less than three nor more than seven alumnus members (who need not be members of the chapter in question) for the purpose of guiding the chapter in question during its period of probation, assisting in the recruitment, education and initiation of Pledges, and otherwise facilitating the successful completion of the probation. The party establishing the Probation Committee shall designate the chairman of the Committee, and the affirmative vote of a majority of the members of the Committee present at a meeting at which a quorum is present shall be sufficient for the approval of any Committee action except to expel collegiate members. The Committee shall have the power to interview collegiate members of the chapter in question, and make such other investigation as it deems appropriate. Based on the results of such information and other investigation, and upon any input from the Standards Committee or the International Headquarters, the Committee shall have the power granted to the Grand Chapter pursuant to Section 13(d) of Article VI to suspend collegiate members, and to remove and replace any officers of the chapter in question. Probation Committees shall have the authority to expel collegiate members by a three-fourths vote of all members of the committee.

    (6) If the Grand Chapter determines, in the case of any probation pursuant to paragraphs (1), (2) or (3), that the probation of the chapter in question requires guidance and facilitation but that the creation of a Probation Committee is not feasible or advisable, it may, by resolution, grant to the Chief Executive Officer the powers enumerated in paragraph (5) of this Section 4(a) to suspend collegiate members pursuant to Section 13(d) of Article VI and to remove and replace officers of the chapter in question.

    (7) The Grand Chapter may at any time remove a chapter from any probation, and the Chief Executive Officer may at any time remove a chapter from any probation imposed pursuant to paragraph (1) or (2) of this subsection.

(b) **Limited Orders.** The Chief Executive Officer may issue a Limited Order, which may restrict an active chapter from undertaking, performing or participating in a specific activity or event or from conducting specific chapter operations for a period of up to ten days from the date of the Limited Order, and which shall be delivered to the active chapter president in the most expeditious manner reasonably available.

(c) **Suspension.** The International President shall have the power, upon the written request of the Chief Executive Officer, to temporarily suspend the charter of any active chapter for a stated period not to exceed 60 days. The Grand Chapter shall have the right to suspend the charter of an active chapter, for a

stated period not to exceed 180 days, for violation of an applicable law, these Bylaws, or the terms of any probation previously placed upon the active chapter. Any chapter placed upon suspension shall be given a reasonable time after notification of the suspension to remedy the circumstances giving rise to the suspension and to satisfy any other conditions which may be placed upon the chapter in connection with the suspension before any action is taken by the Grand Chapter pursuant to subsection (d) of this Section 4. A suspended chapter may not extend an invitation to any individual to become a Pledge, or initiate any member, and may conduct only such activities as shall be stated in the original declaration of suspension or thereafter approved by the Grand Chapter. The Grand Chapter shall have the right to lift any suspension placed upon an active chapter prior to its stated expiration.

(d) **Revocation of Charter.** The Grand Chapter, by a three-fourths vote of all members then in office, shall have the right to revoke the charter of any active chapter (1) For material or repeated violation of or failure to comply with any applicable law, these Bylaws, the terms of any probation or suspension previously placed upon the active chapter, or any statement of minimum standards of operation adopted by the Grand Chapter or, (2) As a result of any other condition or circumstance which, in the opinion of the Grand Chapter, prevents the continued viable operation of the active chapter. Following the action of the Grand Chapter to revoke a charter, the affected chapter shall be considered an inactive chapter, and shall not be considered an active chapter for any purpose.

(e) **Appeal of Revocation.** Any action by the Grand Chapter revoking a charter may be appealed to the next International Convention, and the appeal shall be declared sustained upon receiving at least three fourths of the total number of votes which all seated delegates at the International Convention are entitled to cast.

(f) **Safekeeping of Chapter Items.** Upon the revocation of the charter of any active chapter, all records, Ritual Books, minutes and correspondence, and the charter, of the chapter shall be immediately returned to the International Headquarters.

(g) **Re-Installation.** The Grand Chapter, by a three-fourths vote of all members then in office, shall have the right to re-install any inactive chapter, including an inactive chapter of any fraternity merged with or into the Fraternity. In conjunction with a decision whether or not to re-install any such chapter, the Grand Chapter may follow any procedures, impose any conditions, and assess any charges, as if the decision were one to approve a petition for a new charter pursuant to Section 3(A) of this Article IV.

# Article V
# Organization and Conduct of Active Chapters

## Section 1. General

(a) Chapter Bylaws may be adopted and amended from time as an active chapter deems advisable, provided that they in no way conflict with these Bylaws or the Ritual of this Fraternity, or with any resolution of the International Convention or of the Grand Chapter, or with any written directive of the Chief Executive Officer which has been distributed to active chapters.

(b) References in this Article V to "members" shall, unless otherwise specified or unless the context clearly requires otherwise, mean collegiate members of the active chapter in question.

(c) Except as otherwise specifically provided in these Bylaws, the vote to approve a particular active chapter action, and the members eligible to vote concerning such action, shall be determined by reference to the active chapter's Bylaws or otherwise determined by the active chapter.

## Section 2. Active Chapter Officers

The officers of the active chapter shall include a president, vice president, vice president of health and safety, secretary, treasurer, marshal, chaplain, scholarship chairman, recruitment chairman, historian, first guard, and second guard, and shall rank in the order named. Bylaws of active chapters may provide for such other and additional officers as such chapters may desire; provided, however, that additional officers shall be inferior in rank

to those named herein, and none of the officers named shall be eliminated. All officers of the active chapter shall be collegiate members of that active chapter.

## Section 3. Election of Active Chapter Officers

(a) Effective January 1, 2013, Officers of each active chapter shall be elected annually in November of each school year for one-year terms, except when a chapter is granted permission by the Chief Executive Officer to hold elections on an alternative schedule for good cause shown. The term of office of any officer shall expire at the installation of his successor, which shall occur during the month of December, unless otherwise approved by the Chief Executive Officer. No person shall hold two of the offices listed in the first sentence of Section 2 of this Article V when another person holds none, except by the unanimous vote of the chapter.

(b) All officers enumerated in the first sentence of Section 2 of this Article V shall be elected by vote of the chapter. The election of each such officer shall be by ballot at a meeting at which a quorum is present; the nominee receiving the majority of all votes cast being declared elected. In case no person receives such a majority, the president shall immediately state that there has been no election and announce the names of the two candidates with the greatest number of votes, but shall give no other information regarding the ballot. The members shall then vote upon these two names, and a majority shall elect. In case this shall result in no election, the president shall again announce no election, but no other information in regard to the ballot. The election of such officer shall be then postponed to the next regular meeting when the above rules shall again govern. On determination of a successful ballot, the president shall announce the name of the member so elected, but shall give no other information in regard to the ballot. No record of the ballot shall be kept except the name of the member elected.

(c) In the event of the death, resignation or removal of any officer elected pursuant to subsection (B) of this Section 3 for any cause whatsoever, his successor shall be chosen at the next meeting of the chapter in the manner prescribed in subsection (b) above.

(d) Notwithstanding any other provision of this Section 3, in the case of an active chapter on probation pursuant to Section 4(a) of Article IV, active chapter officers may be appointed by a Probation Committee acting pursuant to Section 4(a)(5), or by the Chief Executive Officer pursuant to Section 4(a)(6), in each case after conducting such procedures, and giving such notice, as it or he deems appropriate.

## Section 4. Removal of Active Chapter Officers

(a) Before any elected officer may be removed from his office, at least one-third of the members of the active chapter shall prepare and sign a statement of charges, setting forth their reasons for the proposed removal. This statement of charges shall be submitted to the chapter president. If the chapter president is the officer in question, then the charges shall be submitted to the vice president. The president or other officer shall then schedule a meeting to address the charges in accordance with the procedures specified in this section.

(b) A separate statement of charges, which does not contain the names of the members who signed the statement submitted to the president or vice president, must be given personally to the officer in question at least seven (7) days before the meeting is held regarding the charges. The statement of charges must also contain the day, date, time and place of the meeting. Members of the chapter must be notified of the day, date, time and place of the meeting through the most expeditious form(s) of communication for the chapter.

(c) If the statement of charges cannot be given personally to the officer in question, the statement of charges must be sent by certified mail, or comparable method resulting in a receipt being delivered to the chapter, to the last known address of the officer in question. The letter must be postmarked at least fourteen days before the date of the hearing.

(d) An alumnus member must be present for this meeting.

(e) The chapter president may chair the meeting, or he may ask an alumnus member to chair the meeting. If the chapter president is the officer in question, the vice president may chair the meeting or ask an alumnus member to chair the meeting.

(f) After calling the meeting to order and determining that a quorum of members is present, the chair shall state the nature of the charges without revealing the names of the members who signed the statement. Witnesses may be called to support the charges, and the officer and other members may question the witnesses. The officer in question may then respond to the charges, and may call witnesses on his behalf. Members may ask questions of the officer in question and his witnesses.

(g) The officer in question shall then withdraw from the meeting and the members present shall be given an opportunity to discuss the matter. The officer in question may be recalled to the meeting to answer any questions at the request of any member.

(h) After any additional questions have been asked, the officer in question shall withdraw from the meeting. The members shall then vote as to whether the officer in question should be removed from office. If two thirds of the members present and eligible to vote shall vote to remove the officer from office, he shall be declared removed from office. The chapter secretary shall immediately inform him of the decision. The former officer may enter the meeting, and another member should be elected pursuant to Section 3(b) of this Article V to fill the vacancy created by the removal.

(i) If less than two thirds of the members present and eligible to vote shall vote to remove the officer in question from office, the officer shall remain in office, the matter shall be considered closed, and the officer may not thereafter be charged pursuant to this Section 4 based upon the same actions that brought about the original charges.

(j) Upon completion of the meeting, the presiding officer or alumnus shall, if the officer is removed, prepare a report describing the meeting and outcome and submit the report within seven (7) days to the Chief Executive Officer.

(k) Notwithstanding any other provision of this Section 4, in the case of an active chapter on probation pursuant to Section 4(a) of Article IV, active chapter officers may be removed by a Probation Committee acting pursuant to Section 4(a)(5), or by the Chief Executive Officer pursuant to Section 4(a)(6), in each case after conducting such procedures, and giving such notice, as it or he deems appropriate.

## Section 5. Absence of Active Chapter Officers

In the event of the absence of any officer(s) at the formal opening of any meeting, the president shall appoint a member or members to fill the vacancy or vacancies during the absence of the officer(s). In the event of the absence of the president and vice president, the next highest ranking officer who is present shall preside and shall fill any vacancies as provided above.

## Section 6. Duties and Powers of Active Chapter Officers

(a) **President.** The president shall preside at all meetings of an active chapter, perform all duties expected of the president of a parliamentary body and organization, and have the privilege of voting on all questions and all candidates for admission to membership in the chapter. In the event of a tie vote, if the president or acting president has voted, the motion shall be declared lost. The president shall oversee the general operation of the chapter and the performance of his fellow officers and shall serve as a representative of and spokesman for his chapter. The president shall ensure that all members and Pledges are aware of and have been educated in regards to all policies, practices and rules of Theta Chi Fraternity; he shall ensure that the chapter is at all times in compliance with the requirements of the Safety Standards Manual of Theta Chi Fraternity and that the health and safety of members, Pledges and visitors at chapter functions is safeguarded to the maximum extent possible.

(b) **Vice President.** The vice president shall officiate in the absence of the president with the same powers and privileges as the president. The vice president shall oversee the internal operations of the chapter, supervise all committees and committee chairmen, and assist the president in carrying out his duties and

responsibilities.

(c) **Vice President of Health and Safety.** The vice president of health and safety shall implement programming and practices within the chapter designed to promote the health and safety of members, Pledges, and visitors.

(d) **Secretary.** The secretary shall keep an accurate, complete and impartial record of the meetings and proceedings of the chapter, and shall have custody of these Bylaws, chapter Bylaws, meeting minutes, member records, and other records of the chapter, except for those pertaining to the treasurer or any other officer as specifically provided. He shall be responsible for submitting all required or appropriate fees and forms to the Chief Executive Officer, including all forms and records required by subsections 4(c), 4(e) and 4(h) of Article VI in connection with the registration of Pledges, requests for initiation, and the recording of new initiates. Except as otherwise provided, he shall process and respond to all correspondence from the Chief Executive Officer, any member of the International Headquarters staff, the Grand Chapter, any alumnus member and any other active chapter.

(e) **Treasurer.** The treasurer shall collect all fees, dues, assessments and fines. He shall collect all Pledge registration and initiation fees for the secretary. He shall be responsible for establishing and following a budget for each school year.

(f) **Marshal.** The marshal shall be responsible for the education of Pledges of the chapter. His responsibilities shall include development of the educational program and conduct of the entire educational process, and shall continue until the Pledges have been properly prepared for initiation. He shall assist the treasurer and the secretary in the collection of fees and the filing of forms required by subsections 4(c) and 4(e) in connection with the registration of Pledges and the initiation of members. He shall at all times serve as an example for Pledges and members to follow, and shall make certain that no hazing practices are allowed to take place in the educational program or otherwise, or tolerated under any circumstances. He shall make certain that every Pledge is assigned a collegiate member as a big brother or other mentor to assist him in learning about the Fraternity.

(g) **Chaplain.** The chaplain shall conduct devotional exercises at all appropriate times. He shall be responsible for the proper conduct of the Ritual and for safekeeping of all items used during the Ritual. He shall be responsible for keeping the Ritual books secure and in good condition, but accessible for all members to review. He shall use every opportunity to educate the members about the Ritual.

(h) **Scholarship Chairman.** The scholarship chairman shall design and implement programs to promote, encourage and recognize high academic achievement by members and Pledges, and shall monitor and report on the chapter's scholarship standing from time to time. He shall be responsible for assisting any member or Pledge in obtaining appropriate tutoring or other study assistance.

(i) **Recruitment Chairman.** The recruitment chairman shall conduct the recruitment and bid process, document all relevant actions and activities.

(j) **Historian.** The historian shall maintain written and photographic records of chapter activities, events, occurrences, awards, achievements and honors. He shall keep a permanent record of all collegiate and alumnus members and shall inform the International Headquarters of address changes for such members on a regular basis. He shall seek to obtain, collect and preserve all historical and archival items and materials and keep these in suitable containers or display areas.

(k) **First Guard.** The first guard shall be custodian of the chapter meeting room. He shall guard the door during meetings and admit no one but members of the Fraternity. He shall also assist the chaplain in preparation for and conduct of the Ritual.

(l) **Second Guard.** The second guard shall assist the first guard in the discharge of his duties.

(m) All of the foregoing officers shall share responsibility for the overall compliance of the chapter with these Bylaws, the Ritual, the Bylaws of the chapter, and other applicable rules.

## Section 7. Scheduling of Active Chapter Meetings

(a) Each active chapter shall hold a regular meeting once a week when school is in session, unless for very

urgent reasons such a meeting be impractical. The day and hour of the meeting shall be determined from time to time by vote of the chapter and shall not be changed except with the knowledge of all the collegiate members. If for any reason a regular meeting be omitted, the president shall call a special meeting as soon thereafter as possible to take the place of the meeting omitted.

(b) Special meetings of any chapter may be called by the president at his discretion, and must be called on the request, to the president or the secretary, of members constituting at least one fourth of the collegiate members eligible to vote. Notice of all special meetings shall be given to every collegiate member by the secretary. In case fewer than two thirds of the collegiate members are notified, the meeting shall be postponed. A special meeting held in spite of the fact that fewer than two thirds of the collegiate members have been notified shall be invalid, and any action taken at such meeting shall be void unless ratified at a subsequent regular meeting.

## Section 8. Conduct of Active Chapter Meetings

(a) A majority of the collegiate members of a chapter eligible to vote shall constitute a quorum for the transaction of business, but a smaller number may meet and adjourn. Subject to the provisions of Section 1(a) of this Article V, each chapter, in meeting assembled, has full power to enforce the rules of the chapter.

(b) All questions except those specifically provided for in these Bylaws, resolutions of the International Convention or of the Grand Chapter, or the Bylaws of the chapter, shall be decided by a vote of the collegiate members of the chapter. Members shall vote by use of the working sign or, at the request of a majority of members present, by secret ballot. If secret ballots are used, they shall be destroyed as soon as possible after the vote.

(c) If at a meeting of a chapter any member shall be absent or shall absent himself for any cause, he shall forfeit his right to vote on any question that may come before the chapter at such meeting, and the acts of the meeting shall be valid without his vote; voting by proxy in any manner is prohibited. This shall not be construed to deprive any member of his right to vote on a reconsideration of the same question at a subsequent meeting or upon a reintroduction of the same or a similar question at a subsequent meeting.

(d) The order of business in active chapter meetings, unless suspended by a three-fourths vote of the members present, shall be as follows:

    (1) Opening of the chapter.
        (A) Call to order.
        (B) Duties of officers.
        (C) Calling the roll.
    (2) Reading and approval of the minutes from the most recent meeting.
    (3) Election of officers.
    (4) Installation of officers.
    (5) Initiation of candidates.
    (6) Proposing and voting on names for membership.
    (7) Reading of communications and responses.
    (8) Reports of officers and committees.
    (9) Old business.
    (10) New business.
    (11) Report of the critic and appointment by the president of the next critic.
    (12) Good of the Fraternity.
    (13) Closing of the chapter.
        (A) Collection of Ritual books.
        (B) Closing prayer, followed by music.
        (C) Adjournment.

## Section 9. Active Chapter Finances

(a) At least annually, the treasurer shall prepare and propose, and the chapter shall approve and adopt, a budget for the operations of the chapter, which shall reflect all reasonably foreseeable revenues and expenses of the chapter. The treasurer shall report regularly at meetings of the chapter on the chapter's financial results and financial condition, and shall promptly advise the chapter if it appears that the budget will not be met.

(b) All chapter checking, savings and investment accounts, and all other deposits of chapter funds, shall require the signature of at least two different officers of the chapter for the disbursement of funds.

(c) The treasurer shall, to the maximum extent possible, seek the advice and guidance of a financial advisor to the chapter, any other alumnus member having relevant expertise, and any expert available through the college or university, in the discharge of his duties.

## Section 10. Residence Requirement

All collegiate members shall be required to reside in the chapter house unless the member is married, receiving lodging in connection with employment or otherwise required by his employment to reside outside the chapter house, or living with relatives. If the number of collegiate members exceeds the residential capacity of the chapter house, the active chapter shall decide which members may be excused from this requirement.

## Section 11. Hazing Prohibited

The Fraternity prohibits all physical hazing, paddling, uncalled-for humiliation, and public display in connection with Pledge education and pre-initiatory activities and subscribes to the North-American Interfraternity Conference resolutions which condemn all forms of hazing in connection with Pledge education and pre-initiatory activities. The active chapters shall carry out the Fraternity's policy and conform to this policy, not only to avoid the danger of bringing discredit to the Fraternity and injuring members, Pledges, and the entire fraternity cause, but also to build higher respect for the chapters and the Fraternity in the minds of Pledges and to instill loyalty. The Fraternity prohibits all forms of public initiation, and pre-initiatory and initiation activities shall not be permitted to interfere in any way with the scholastic obligations or class attendance of those involved.

## Section 12. Safety and Insurance

All active chapters and colonies shall comply with all requirements of the Safety Standards Program as set forth in the Safety Standards Manual of Theta Chi Fraternity. Each active chapter and colony shall participate in the International Liability Insurance Program, and shall promptly pay all required fees pertaining thereto as established from time to time by the Grand Chapter.

## Section 13. Alcoholic Beverages

The rules and regulations governing the use of alcoholic beverages in the active chapters and at all Fraternity functions shall be in conformance with the state, federal, and local laws pertaining to same, and with the Safety Standards Manual of Theta Chi Fraternity.

## Section 14. Firearms

The possession, display or use of firearms or similar weapons or explosive devices in a chapter house or lodge, or on chapter property or at any event which an observer would associate with the Fraternity, is strictly prohibited.

## Section 15. Thefts

The theft or unauthorized removal of any item from any chapter house or other chapter facility by another chapter or a member of another chapter shall not be considered a prank, and appropriate disciplinary action will be taken by the Grand Chapter or any other appropriate body.

## Section 16. Notifications to International Headquarters

Any active chapter or colony under investigation, placed on probation or receiving disciplinary sanctions, for any reason, by college or university authorities shall report this to the International Headquarters immediately, and shall provide all details of the reasons for the investigation or sanctions and the names of any individual members charged in the investigation or sanctions.

## Section 17. Auxiliary Organizations

No active chapter or colony shall establish, recognize or support any women's auxiliary organization.

## Section 18. Limitation on Pledge Period

Every chapter shall initiate each Pledge within eight (8) calendar weeks following the formal Pledge Ceremony of said individual or the formal commencement of his Pledge status (such eight week period to be measured without regard to whether the institution at which said chapter is located is or is not in session) unless, prior to the expiration of said eight week period, the chapter shall have certified in writing to the International Headquarters that said Pledge (i) is no longer enrolled as an undergraduate at said institution, (ii) has had his status as a Pledge terminated in accordance with Section 4(f) of Article VI of these Bylaws, (iii) has resigned or withdrawn from his status as a Pledge, or (iv) is ineligible to be initiated under applicable rules of the institution at which the chapter is located.

## Section 19. Minimum Chapter Size

Every chapter shall maintain, as of each April 10, an aggregate number of collegiate members and Pledges at least equal to the lesser of (i) 30 or (ii) the average size of all other chapters existing at the institution where the chapter is located of fraternities that are members of the North-American Interfraternity Conference. This Section shall not apply to any chapter if, and for so long as, there are no other chapters existing at the institution where the chapter is located of fraternities that are members of the North-American Interfraternity Conference.

## Section 20. No Authority to Bind the Fraternity

No individual or group, including chapters, chapter officers, members, advisors, housing corporation, or housing corporation officers, has the authority to bind the Fraternity in any manner, unless such actions are taken pursuant to these bylaws, a delegation of authority by resolution of the Grand Chapter, or employment with the Fraternity. This restriction includes, but is not limited to, any attempt to bind the fraternity to an agreement or promise to indemnify a third-party or accept liability on behalf of any other person or group.

# Article VI
# Membership

## Section 1. Classes

Membership in the Fraternity shall be limited to male persons of good moral character who have been initiated in accordance with these Bylaws and the Ritual, and shall be of two classes: (1) collegiate, being any member who is in academic residence at an institution of college or university education where there exists an active chapter of which the individual is a member, and either (a) has not completed an undergraduate degree or (b) has completed an undergraduate degree, was initiated into Theta Chi Fraternity as a collegiate member, is enrolled in graduate school, has agreed to function as an active chapter member while in Graduate School, and has been accepted as an active chapter member by majority vote of the active chapter; and (2) alumnus, being all other members. A graduate student who was initiated at another active chapter must also follow the transfer of membership procedure outlined in Section 7 of this Article to become a collegiate member of an active chapter at an institution where he attends graduate school. Notice that a graduate student has been admitted to collegiate membership shall be given promptly by the active chapter to the International Headquarters using such form as shall be specified by the International Headquarters. There shall be no other classifications of membership other than collegiate and alumnus, such as "inactive", or "social", or "local".

## Section 2. Membership for Life

Any person joining Theta Chi Fraternity becomes a member for life, except that he may be expelled for cause as provided in Section 13 of this Article VI, and no member of this Fraternity shall, under any circumstances, become a member of any other similar fraternity; provided, however, that the Grand Chapter may, upon petition of any member of the Fraternity, or upon its own motion, release a member, whether collegiate or alumnus, from his membership, and may also waive the prohibition of this Section upon becoming a member of another similar fraternity, in either case upon approval of the Chief Executive Officer. Any individual released from membership pursuant to this Section 2 shall not be permitted to resume membership in the Fraternity unless initiated under Section 4(e) or Section 5(c) of this Article VI after approval of the Chief Executive Officer.

## Section 3. Qualifications for Collegiate Membership

Any male duly enrolled at any institution of college or university education, or branch or campus thereof, at which there is an active chapter of the Fraternity, and in good standing under the rules of that institution, shall be eligible for initiation into the Fraternity as a collegiate member of that active chapter, provided that he is not already a member of another similar fraternity. The Grand Chapter may from time to time determine, by resolution, that an institution of college or university education at which there is an active chapter of the Fraternity is so inextricably linked, integrated or closely affiliated with another institution of college or university education that students enrolled at the latter institution shall be deemed to be enrolled at the former institution for purposes of these Bylaws, including without limitation this Section 3 and Section 1 of this Article VI.

## Section 4. Election of Collegiate Members

(a) Any eligible person not already a member or Pledge of the Fraternity may be proposed as a candidate for collegiate membership in an active chapter, by a motion that the person be invited to become a Pledge. The term "Pledge" is used throughout these Bylaws to refer to an individual who has been invited to become a candidate for collegiate membership, and has accepted that invitation, but has not yet been initiated.

(b) If the motion contemplated by subsection (a) of this Section 4 is approved by a majority of all collegiate members of the active chapter who are eligible to vote on such a motion (or who would be eligible to vote

if present), the individual shall be invited to become a Pledge.

(c) The individual, upon accepting the invitation to become a Pledge, shall complete or have completed for him a Pledge Registration Form, which shall be forwarded, along with the Pledge Fee provided for in Section 9(a) of this Article VI, to the International Headquarters within ten (10) days following the Pledge Ceremony.

(d) When any Pledge is proposed for collegiate membership in an active chapter, a secret ballot shall be taken as to each Pledge so proposed. If three fourths of all collegiate members of the active chapter who are eligible to vote on such a motion (or who would be eligible to vote if present) shall vote in the affirmative, the Pledge shall be invited to become a collegiate member. Any active chapter shall have the power to establish a lower required vote for purposes of this subsection (d) (but not less than a majority of all collegiate members of the active chapter eligible to vote on such a motion (or who would be eligible to vote if present)), but shall not have the power to establish a higher required vote, and any bylaw, rule, resolution or other action purporting to establish a higher vote shall be null and void.

(e) Following the approval of an individual for collegiate membership pursuant to subsection (d), the active chapter shall submit to the International Headquarters a Pledge Initiation Request Form, along with the Initiation Fee provided for in Section 9(b) of this Article VI. Only after this Form and the Initiation Fee have been received and approved by the International Headquarters and notice of the approval has been given to the active chapter by the International Headquarters may the individual be initiated, and the initiation shall be in accordance with the Ritual.

(f) Any active chapter may terminate the status of a Pledge, at any time prior to a favorable vote to initiate pursuant to subsection (d) of this Section 4, by a one-fourth vote of all collegiate members of the active chapter who are eligible to vote on such a motion (or who would be eligible to vote if present). Any active chapter shall have the power to establish a higher required vote for purposes of this subsection (f) (but not more than a majority of all collegiate members of the active chapter eligible to vote on such a motion (or who would be eligible to vote if present)), but shall not have the power to establish a lower required vote, and any bylaw, rule, resolution or other action purporting to establish a lower vote shall be null and void.

(g) The Grand Chapter shall have the power to change voting requirements, on an individual active chapter basis, in any manner necessary to meet the requirements of the institution at which a chapter is located.

(h) Each active chapter shall establish and maintain an accurate roster of its members in accordance with such system and forms as shall be specified by the Chief Executive Officer.

## Section 5. Qualifications for and Election of Alumnus Members

(a) In order to be initiated as an alumnus member of the Fraternity, an individual not already initiated as a collegiate member shall, in addition to meeting the qualifications set forth in Section 1 of this Article VI, qualify under not less than three of the following criteria, and shall not be a member of another similar fraternity:

  (1) He shall be a person of distinction by virtue of outstanding character proven over a long period of time;

  (2) He shall have been the recipient of an earned or honorary degree from a duly recognized college or university;

  (3) He shall be a member of the faculty, staff or board of directors of an institution at which an active chapter exists;

  (4) He shall have demonstrated an unusual degree of interest in and affection for one or more active or inactive chapters;

  (5) He shall be an alumnus of, or enrolled in a graduate school of, an institution at which an active chapter exists;

  (6) He shall be the grandfather, father, step-father, uncle, cousin, brother, or guardian of a Pledge or member;

  (7) He shall be authorized to graduate from a military institution or an institution with an inactive chapter that has an associated commission pursuant to subsection (d) of this Section 5.

(b) Any active chapter or commission wishing to confer alumnus membership upon an individual meeting the criteria of subsection (a) shall submit an application setting forth the individual's qualifications along with the Initiation Fee provided for by Section 9(b) of this Article VI and the appropriate initiation request form.

(c) Upon receipt of any application under subsection (b), the Chief Executive Officer, after conducting such further inquiry as he deems appropriate, shall approve or deny the application. The proposing chapter or commission shall be advised promptly of the result of the decision, and, in the case of a favorable decision, may proceed with initiation of the individual in accordance with these Bylaws.

(d) The Grand Chapter may create for a definite or indefinite period one or more commissions which may be authorized to nominate individuals for alumnus membership in an inactive chapter and/or as members at-large, as stated in the resolution creating the commission. The Grand Chapter may establish additional requirements beyond those enumerated in subsection (a) of this Section 5 for candidates nominated by a commission for alumnus membership. A commission shall be composed of no less than three alumnus members who shall be appointed by the Grand Chapter. A commission may conduct an initiation of alumnus members upon the approval of the Chief Executive Officer pursuant to subsection (c) of this Section 5. The Grand Chapter may terminate or modify the charge of a commission at any time for any reason. Members initiated by commissions associated with inactive chapters shall be entered into the roll of members from said inactive chapter.

## Section 6. Election of Members from Absorbed Entities

(a) Notwithstanding any other provision of this Article VI, a member of a colony, a local fraternity, or a chapter of another national or international fraternity, may, with the approval of the Grand Chapter, be invited to become a member of the Fraternity, either collegiate or alumnus as defined in Section 1 of this Article VI, and may be initiated into the Fraternity at the time that any such colony, local fraternity or chapter of another national or international fraternity is installed or re-installed as an active chapter of the Fraternity, or at any time thereafter.

(b) Prior to the installation or re-installation of the chapter, the president of the group shall submit to the Grand Chapter a list of individuals proposed for initiation in connection with the installation or re-installation. The Grand Chapter shall have complete discretion in deciding which of the members of a colony, local fraternity or chapter of another national or international fraternity being installed as an active chapter of the Fraternity shall be invited to become collegiate or alumnus members of the Fraternity. Upon approval of some or all of said individuals by the Grand Chapter, the group shall promptly remit to the International Headquarters the Initiation Fees provided for by Section 9(b) of this Article VI and the appropriate initiation request forms.

(c) Members of any national or international fraternity merged into or combined with the Fraternity whose chapter is no longer active may, with the approval of the Grand Chapter, be initiated into the Fraternity and shall be alumnus members of the Fraternity at large.

## Section 7. Transfer of Chapter Membership

In the event that any member who has not completed an undergraduate degree transfers to an institution at which there is an active chapter of the Fraternity, he may request a transfer of his membership to that chapter by presenting any available documentation of his good standing to the chapter to which he wishes to transfer his membership. The transferee chapter shall verify the membership status of the individual with the International Headquarters. After the members of the chapter to which the individual wishes to transfer his membership approve the transfer, by a majority vote of all members eligible to vote and attending a meeting at which a quorum is present, he shall be considered a collegiate member of that chapter, although his name shall not be enrolled on the roster as an initiate, but rather shall be enrolled on a separate record for transfers. Notice of the transfer shall be given promptly to the International Headquarters, with a copy to the chapter from which the transfer is being made, using such form as shall be specified by the International Headquarters.

## Section 8. Honorary Chapter Members

(a) Any alumnus or collegiate member who assists with or participates in the installation or re-installation of an active chapter, other than an individual already a member of that chapter, shall automatically become an honorary member of that chapter. The Chief Executive Officer shall be responsible for identifying the individuals covered by this subsection in the case of each installation, and shall have the authority to provide certificates or other similar documentation of honorary chapter membership.

(b) Honorary chapter membership may also be extended by any active chapter at any time, pursuant to procedures to be established by such chapter, to any alumnus member of the Fraternity not already a member of that chapter in recognition of the contributions of said alumnus member to the chapter or to the Fraternity. The chapter shall promptly notify the International Headquarters of all honorary chapter memberships granted under this subsection (b).

(c) All honorary chapter members shall be recorded on one or more separate pages of the roster book required by Section 4(h) of this Article VI.

## Section 9. Pledge and Initiation Fees

(a) Any individual who accepts an offer from an active chapter to become a Pledge shall pay a Pledge Fee in an amount to be established from time to time by the Grand Chapter. Upon payment of the Pledge Fee, each Pledge shall receive a personal copy of The Manual of Theta Chi Fraternity and such other materials as shall be determined by the Chief Executive Officer.

(b) Any individual to be initiated as a member of the Fraternity shall pay an Initiation Fee in an amount to be established from time to time by the Grand Chapter.

(c) Payment of the Initiation Fee shall entitle a member to a collegiate subscription to The Rattle of Theta Chi, a membership certificate, a membership card, and a plain, non-gold badge without further charge.

## Section 10. Theta Chi Chapter

(a) In addition to the alumnus members qualified and admitted to membership pursuant to Sections 5 and 6 of this Article VI, the Grand Chapter shall have the power to select individuals for alumnus membership in Theta Chi Chapter of the Fraternity.

(b) Theta Chi Chapter shall be a constituent part of the Fraternity pursuant to Article I, Section 2 of these Bylaws, but shall not be considered an active chapter for any purposes of these Bylaws.

(c) All members of Theta Chi Chapter shall be alumnus members of the Fraternity.

(d) Membership in Theta Chi Chapter shall be open to any male person of good character who can be expected to be a credit to the Fraternity, and by his conduct and actions can be expected to labor for the advancement, interests and welfare of the Fraternity, but who for reasons acceptable to the Grand Chapter has not previously become a collegiate or alumnus member of the Fraternity.

(e) Members of Theta Chi Chapter can only be elected by an affirmative vote of at least six members of the Grand Chapter. Any member of the Grand Chapter may nominate an individual for membership in Theta Chi Chapter by submitting a form specified by the Chief Executive Officer setting forth the qualifications and other pertinent information concerning the individual.

(f) The initiation fee for membership in Theta Chi Chapter shall be the Initiation Fee in effect for members pursuant to Section 9(b) of this Article VI. The fee shall be payable by the individual unless otherwise directed by the Grand Chapter. Each initiate into Theta Chi Chapter shall be presented with a plain, non-gold badge, a membership card and a membership certificate.

(g) The International President shall establish the time and place of initiation of individuals into Theta Chi Chapter. He shall also appoint or identify the initiation team, which may be composed of collegiate members from one or more chapters, members of the Grand Chapter, the Chief Executive Officer or members of the International Headquarters staff, or other alumnus members. The International President shall charge the initiation team to instruct the initiate in the Ritual of the Fraternity, these

23

Bylaws, and the organization, principles, objectives, history, traditions and purposes of the Fraternity, or to determine that such instruction has been provided.

## Section 11. Determination of Members Status

(a) Any determination required to be made by these Bylaws, by any resolution of the Grand Chapter or of the International Convention, or by any other official document of the Fraternity, as to the membership status of any individual shall be made by reference to records maintained for such purpose by or under the direction and control of the Chief Executive Officer. Except as set forth in subsection (b) of this section, such records shall be conclusive on any question of whether a particular individual is a member or Pledge of this Fraternity, or whether any individual was or was not duly and legally initiated, or was or was not duly suspended or expelled, or any similar question.

(b) The Grand Chapter shall have the power, by three-fourths vote of all members then in office, to cause the Chief Executive Officer to add to, delete from, or otherwise modify the membership records of the Fraternity if it shall determine that such addition, deletion or modification is (1) appropriate in light of evidence then available to the Grand Chapter concerning compliance with rules regarding the acceptance of Pledges and initiation of members, the payment of fees, the filing of forms, and other relevant facts, and (2) fair and equitable under all the circumstances. The Grand Chapter shall, in directing any such addition, deletion or modification, specify the effective date. Any action of the Grand Chapter under this subsection shall be final and not subject to any appeal.

## Section 12. Limitation on Other Memberships

In addition to, and not in limitation of, the prohibition on other memberships contained in Section 2 of this Article VI, no member of the Fraternity shall be initiated into Theta Nu Epsilon, and all members are prohibited from joining, affiliating with, taking an active interest in, or otherwise assisting, Kappa Beta Phi or any collegiate organization of similar ignoble aims or qualification.

## Section 13. Suspension and Expulsion Procedures

(a) Any collegiate or alumnus member who shall violate his obligations to the Fraternity, to the active chapter of which he is a member, or to his fellow chapter members, or who shall by any conduct indicate that he is unworthy to represent, bear the name of or wear the badge of the Fraternity, or who shall violate any of the oaths taken during the Ritual, may be suspended or expelled from membership in the Fraternity pursuant to the procedures specified in this Section. Without limiting the generality of the foregoing, grounds for suspension or expulsion shall include a violation of the limitations on memberships contained in Section 12 of this Article VI; participation in an initiation conducted in violation of subsection (e) of Section 4 of this Article VI; or violation of any financial obligation to an active chapter. Suspension should be imposed in cases where the misconduct is such that a temporary action that provides a path back to good standing is appropriate. Expulsion should be imposed where the misconduct is such that, due either to the severity or repetition of misconduct or other appropriate grounds, action permanently extinguishing the member's association with the Fraternity is appropriate.

(b) **Active Chapter Action.** Any collegiate or alumnus member of a chapter may accuse any other collegiate or alumnus member of that chapter of conduct justifying suspension or expulsion under subsection (a) of this Section 13 by making a statement of the charges, orally or in writing, privately to the president of the chapter. If the accusing member requests action upon the accusation, the president shall follow the following procedures:

    (1) The president shall establish a date, time and place for a meeting to consider the matter, which shall be scheduled as soon as reasonably practicable.

    (2) The president shall notify the accused member in writing, personally served upon the accused member, of the date, time and place of the meeting, at least seven days prior to the time the

meeting is scheduled to begin. The notice of meeting must also contain the specific charges against the accused member so that he may prepare a defense to the accusations if he chooses to do so. If personal service is not feasible, the president shall notify the accused member in writing, by certified mail or similar method resulting in delivery of a receipt to the active chapter, mailed at least fourteen days prior to the meeting to the last known address of the accused member.

(3)   The president shall notify all collegiate members of the active chapter of the date, time and place of the meeting by the most expeditious means, either orally or in writing.

(4)   After the meeting is called to order and a quorum is determined to be present, the president shall state or read the accusations, withholding the name of the member who made the accusations. The meeting may proceed whether or not the accused member attends.

(5)   Witnesses (whether members or non-members) may be called by the president or any member, including the accused member, to testify as to their knowledge of the subject matter of the accusations. Members, including the accused member, may ask questions of any witness.

(6)   The accused member shall have the right to speak on his own behalf. Members may ask questions of the accused member.

(7)   After all witnesses have been heard, the accused member shall withdraw from the meeting. The remaining members shall then ballot upon the motion to suspend and/or expel the accused member. The affirmative vote of a simple majority of all collegiate members of the active chapter eligible to vote under applicable chapter Bylaws and rules (or who would be eligible to vote if present) shall be necessary to sustain a motion to suspend. A three-fourths vote of all collegiate members of the active chapter eligible to vote under applicable chapter Bylaws and rules (or who would be eligible to vote if present) shall be necessary to sustain a motion to expel.

(8)   If two or more members have been accused of the same or related conduct and the hearings of the accusations for such members have been scheduled for a single meeting, all of the accused members shall withdraw from the meeting before members vote on any of the motions, individual votes shall be taken with respect to each member, and no such accused member shall be eligible to vote, for purposes of paragraph 8) above, with respect to a motion relating to any other of the accused members.

(9)   The result of the votes on all resolutions shall be promptly communicated to the accused member, who shall govern himself accordingly.

(10)  No record of the proceeding with respect to an accused member shall be retained unless the motion to suspend/or expel is sustained.

(11)  In the event that the motion to expel is sustained, the active chapter shall promptly send to the International Headquarters a copy of the notice of meeting served in accordance with item 2) above; a complete statement of the original accusations and any written response made by the accused member; a numerical record of the number of all members eligible to vote, the number of members eligible to vote and present for the vote, and the number of such members voting for the motion; a summary of all evidence submitted by all witnesses; and a copy of the minutes of the meeting recording the action of the chapter. Also, if a motion to suspend is sustained, the active chapter shall promptly report the suspension to International Headquarters.

(12)  If, at any time when an individual who has been suspended pursuant to this Section 13(b) continues to be a member, the president of the chapter which has imposed the suspension shall receive a petition signed by more than one third of all collegiate members of the chapter seeking the lifting of said suspension, the president shall call and conduct a meeting in accordance with the provisions of paragraphs (1) through (6), and the first sentence of paragraph (7), of this Section 13(b). At that time, the remaining members shall ballot upon a motion to lift the suspension. The affirmative vote of at least one half of all collegiate members of the active chapter eligible to vote under applicable chapter Bylaws and rules shall be necessary to sustain the motion.

(c)  **Grand Chapter Action**.

(1)   The Chief Executive Officer shall have the authority to summarily suspend any collegiate

member for a period of up to 90 days pending an investigation and hearing of suspected violations of obligations to the Fraternity or these bylaws; such suspension may be appealed in writing and lifted by a majority vote of the Grand Chapter, within 14 days of receiving written notice.

(2) The Grand Chapter shall also have the power to expel any member of the Fraternity who is found to have engaged in conduct constituting grounds for suspension or expulsion as set forth in subsection (a) of this Section 13 when, in its discretion, such action is necessary or appropriate in the best interests of the Fraternity; provided, however, that the accused member in question shall be provided with notice of the allegations against him and an opportunity for a hearing as set forth in this subsection (c).

(3) The Grand Chapter shall have jurisdiction to entertain any recommendation that any member be expelled, whether presented by any member of the Grand Chapter acting on personal knowledge or on information provided by the Chief Executive Officer, any alumnus member, or any other appropriate source.

(4) The Grand Chapter shall first vote to determine if it will entertain a particular recommendation to expel. If the Grand Chapter determines to entertain the recommendation for expulsion, it shall set a date for a meeting to consider the recommendation, and shall cause the Chief Executive Officer to provide not less than thirty days' notice, by certified mail, or similar method resulting in delivery of a receipt to the Chief Executive Officer, to the last known address of the accused member, of the date, time and place of the meeting.

(5) At any meeting at which a recommendation to expel is to be heard, the accused member shall have the right to:

    (A) appear and speak on his own behalf (whether in person or by speaker telephone or other similar arrangement pursuant to which he may hear, and be heard by, all other meeting attendees),

    (B) present witnesses or other evidence,

    (C) ask questions of any other witnesses,

    (D) have read any written statement which the accused member may chose to submit in lieu of appearing at the meeting; provided, however, that the Grand Chapter shall have the right to place reasonable limitations on the number of witnesses and other evidence to be presented.

Any individual making the recommendation to expel, or representing a chapter making the recommendation to expel, shall be entitled to be heard and to present witnesses. The Grand Chapter may request that other specified individuals (whether or not members) having information relating to the recommendation appear at the hearing or submit written statements.

(6) If the International President determines that the circumstances require that a particular recommendation for expulsion, which the Grand Chapter has determined to entertain pursuant to paragraph (3) above, be disposed of in the most expeditious manner possible, he may appoint a committee, consisting of two or more voting members of the Grand Chapter, to conduct the hearing contemplated by paragraphs (3) and (4) above. In such case, all of the provisions of paragraphs (3) and (4) above relating to notice of, and rights of the accused member at, a hearing shall apply to the meeting of the appointed committee to entertain the recommendation, and references to the role of the Grand Chapter at such hearing shall be deemed to be references to the role of the committee. Following the meeting to entertain the recommended expulsion, the appointed committee shall submit a written report to the Grand Chapter, which shall thereafter vote upon the matter as provided in paragraph (6) below.

(7) The affirmative vote of six members of the Grand Chapter shall be necessary to sustain the recommendation to expel. In voting upon the recommendation, the Grand Chapter shall have the power to provide that expulsion will not take effect if the accused meets specified conditions within a specified time.

(d) **Suspension in connection with probation.** In addition to suspensions by action of an active chapter

pursuant to subsection (b)(7) of this Section 13, the Grand Chapter shall have the power to suspend a collegiate member, by a simple majority vote of all members then in office, when (1) the active chapter of which the collegiate member is a member has been placed on probation pursuant to Article IV, Section 4(a), and (2) the Grand Chapter has determined that the continued participation of the member in the activities of the active chapter is inimical to the future of the active chapter. The Grand Chapter shall have the power, for good cause shown, to lift any suspension imposed pursuant to this Section 13(d), at any time when the individual continues to be a member, by a simple majority vote of all members then in office.

(e) **Appeals of certain suspensions.** In the case of any suspension of a collegiate member pursuant to subsection (d) of this Section 13 which is ordered by a Probation Committee pursuant to Section 4(a)(5) of Article IV, or by the Chief Executive Officer pursuant to Section 4(a)(6) of Article IV, the suspended member shall have the right to appeal, within 30 days of receiving notice of his suspension, to the Standards Committee. A simple majority vote of the members of the Standards Committee shall be sufficient to uphold or reverse any such suspension.

(f) **Suspended members.** Any member suspended pursuant to subsection (b)(7) or subsection (d) of this Section 13 shall continue to be considered a member of the Fraternity but shall not participate in any activities of the Fraternity so long as he remains a collegiate member.

(g) **Expelled members.** In the event that an Active Chapter or the Grand Chapter shall approve an expulsion, the Chief Executive Officer may send notice to any Chapters and/or Colonies he shall deem most appropriate advising that the individual, identified by name and chapter, is no longer a member of the Fraternity, and including the date of the action taken. Any individual who has been expelled from membership shall be ineligible to join or in any way affiliate or be associated with any chapter or colony of the Fraternity unless reinstated by the Grand Chapter.

(h) **Appeals of expulsions.** Any expelled individual may appeal his expulsion within 30 days of receiving notice of his expulsion by submitting a written appeal to the Chief Executive Officer. Upon receipt, the Chief Executive Officer shall submit the appeal to the International President. The International President shall first determine whether to assign the review of the appeal to the Grand Chapter or to another committee which shall submit a recommendation to the Grand Chapter upon completion of the its review. A three-fourths vote of all Grand Chapter members in office shall be required to reinstate an expelled individual. In its ruling upon the motion to reinstate, the Grand Chapter shall indicate whether the reinstated members shall be returned to good standing or if he shall continue as a suspended member.

(i) **Reinstatement of Expelled Members.** The Grand Chapter, in its sole discretion, may reinstate an expelled individual outside of the appeals procedures outlined in in subsection (h) of this Section 13 by a unanimous vote of all Grand Chapter members in office.

(j) **Automatic Suspension.** An Active Chapter may include provisions in its bylaws for the automatic suspension of members for failing to maintain academic standards and/or financial delinquencies.  Any such provision in Active Chapter bylaws for automatic suspension pursuant to this subsection (j) must state objective standards by which a member shall incur automatic suspension, must provide for automatic reinstatement once noncompliance with the standard is cured, and require prompt notification of the International Headquarters whenever a member is automatically suspended and again whenever such an automatic suspension is lifted.  Active Chapters may only establish a form of automatic suspension that conforms to the requirements of this subsection (j); no other form of automatic suspension is permitted.

## Section 14. Good Standing

A member is considered to be in good standing unless he is suspended pursuant to this Constitution and Bylaws.

## Section 15. Privileges of Membership

(a) All collegiate members in good standing shall enjoy all of the privileges of membership granted by this Constitution and Bylaws or as may be granted by the International Convention or the Grand Chapter;

they may attend, address, and vote at meetings of their chapter, hold chapter office provided they meet the qualifications to do so, and use the name, letters, and insignia of the Fraternity for personal use.

(b) All alumnus members in good standing shall enjoy all of the privileges of membership granted by this Constitution and Bylaws or as may be granted by the International Convention or the Grand Chapter; they may attend and address meetings of their chapter and use the name, letters, and insignia of the Fraternity for personal use unless specifically prohibited from doing so by the Grand Chapter.

(c) The Grand Chapter may impose restrictions on privileges of membership as outlined in subsection (b) of this Section 15 for one or more alumnus members who were collegiate members of a Chapter at the time its charter was revoked pursuant to Article IV, Section 4 (d).   The Grand Chapter shall have the authority to lift any restrictions imposed pursuant to this subsection (c) for any reason.

(d) All members in good standing shall receive such membership materials and publications as specified by the Grand Chapter.

# Article VII
# Indemnification and Insurance

## Section 1. Indemnification

(a) Every individual who is then serving, or shall have served, as a member of the Grand Chapter or as Chief Executive Officer, and the personal representatives of any of the foregoing, shall, to the full extent permitted by applicable law, be indemnified and held harmless by the Corporation against any and all costs and expenses incurred by him or imposed upon him in connection with or resulting from any action, suit, or proceeding to which he may be made a party by reason of his being or having been a member of the Grand Chapter or the Chief Executive Officer, except in relation to such matters as to which he shall have acted in bad faith or committed willful misconduct in the performance of his duties, in either case as determined by the Grand Chapter. Costs and expenses for which this Section provides indemnification shall include, without limitation, reasonable attorneys' fees, damages, judgments, fines, and reasonable amounts paid in settlement.

(b) Only the Grand Chapter has the authority to agree to defend or indemnify any third-party on behalf of the Fraternity. Notwithstanding the forgoing, the Chief Executive Officer, upon written request by a host institution, shall have the authority, but not the obligation, to add the host institution as an Additional Insured on the Fraternity's general liability policy.

(c) Unless specifically permitted by the Grand Chapter, no individual or group, including, but not limited to, any chapter, chapter member, chapter advisor, volunteer, housing corporation, or housing corporation officer, has the authority to agree to or execute a document that:
    (1) Purports to bind the chapter or the Fraternity to an indemnification provision or agreement; or
    (2) Attempts to limit or eliminate any protection afforded the Fraternity's volunteers under the Federal Volunteer Protection Act, 43 U.S.C. § 14501 or any other applicable state or federal statute that may limit an individual's liability while acting for or on behalf of the Fraternity or any of its chapters.

## Section 2. Insurance

(a) The Corporation shall have the power to purchase and maintain Directors' and Officers' or similar insurance, covering the members of the Grand Chapter and such of the employees of the Corporation as the Grand Chapter deems necessary or appropriate, in such amounts and with such terms as it shall determine.

(b) The Corporation shall maintain Bodily Injury and Property Damage insurance, and Comprehensive Public Liability insurance, protecting the Corporation, the members of the Grand Chapter, the Chief Executive Officer, and members of the International Headquarters staff in such amounts and with such terms as the Grand Chapter shall determine.

(c) Members of the Grand Chapter and all employees of the Corporation shall be bonded, or covered for dishonest acts by insurance or other similar means, for such sums as shall from time to time be fixed by the Grand Chapter.

# Article VIII
## Publications, Awards, Insignia and Traditions

### Section 1. Publications

(a) The official name of the magazine of the Fraternity shall be "The Rattle of Theta Chi".
(b) The Grand Chapter shall cause to be published "The Manual of Theta Chi Fraternity" and "The Safety Standards Manual of Theta Chi Fraternity", compliance with which shall be compulsory in all active chapters.

### Section 2. Awards

The rules and procedures for the Fraternity's awards are set forth in a document entitled "Theta Chi Fraternity Award Descriptions and Procedures" which may not be modified or amended except by resolution adopted by the vote of at least six members of the Grand Chapter.

### Section 3. Insignia

(a) (1) The badge of the Fraternity shall be in the form of a rattlesnake which shall be so fashioned as to form the Greek letter "Theta". Its head shall be in the upper-right hand side near the center of the letter, its tail passing around by the head, behind the neck and half-way down the letter. It shall then come in sight and pass across, forming the bar of the "Theta." The eye of the snake shall be a ruby. This shall be surmounted by two swords placed satyr ways points downward, thus forming the Greek letter "Chi."
(2) Rubies, pearls and diamonds only may be used as ornamentation jewels in the manufacture of the badge, and only in ways approved by the Grand Chapter.
(3) The dies of the badge shall not be used for any purpose other than the manufacture of Fraternity badges, and the official badge shall not be mounted on keys, chains, rings, bar pins, or any other type of jewelry or article. Representations of the badge may be applied to the surface of such items, or clothing, or other items, as the Grand Chapter may approve by resolution.
(4) The badge of the Fraternity may be worn only by a member of the Fraternity who is not under suspension, or by such a member's mother, wife, daughter, sister or acknowledged fiancée.
(5) The badge shall be worn at all times on a collared shirt which is being worn as an inner garment, on the left side, in the vicinity of the heart, and no preparatory, class or other fraternity pin shall be worn exposed in the same locality.
(6) The badge shall be worn at a distinctive angle, with the long axis of the "Theta" bisecting the angle formed by the head and right shoulder. During the third degree of the initiation ceremony of the Ritual, as a part of the ceremony, the standard badge of the Fraternity shall be conferred upon each new member.
(b) The miniature reproduction of the official badge, in gold or gold finish, shall be the official Recognition Pin of the Fraternity.
(c) (1) The official Pledge button shall be a red oval surrounded by and crossed diagonally with  narrow white stripes presenting a close resemblance to the badge of the Fraternity.
(2) The Pledge button shall be worn with appropriate clothing, such as a collared shirt, sweater or more formal attire. It shall always be worn in the vicinity of the heart and, unlike the badge, may be worn on

the lapel of a suit jacket or blazer.

(3) The Pledge button shall be worn only at times and under circumstances where it would be appropriate to wear the badge of the Fraternity, and shall be worn with respect for and understanding of the Fraternity.

(d) There shall be an official Chapter President's Key. Each active chapter shall possess one of these keys, and a key shall be provided for each new active chapter that is installed. The key shall remain in the permanent possession of each active chapter, and shall be in the custody of the chapter president during his term of office.

(e) Each member of the Grand Chapter shall wear an insignia of his office at meetings of the Grand Chapter and at other appropriate Fraternity events, whether or not non-members are present.

(f) The official Theta Chi flag shall be as follows: size - 6x9 feet or 4x6 feet; material - fine wool bunting, doubled and sewed back-to-back; white field, with a 9-inch red border for the 6x9 foot size and a 6-inch red border for the 4x6 foot size; Greek letters "Theta Chi", coiled rattlesnake and "1856" appliqué on both sides in fine French finish felt; canvas heading with grommets.

(g) The official Theta Chi chapter banner shall be as follows: material - fine French finish felt; white background with red border superimposed thereon; Greek letters "Theta Chi", coiled rattlesnake, and "1856" appliquéd in felt and pure silk bonaz machine embroidery; size - 24x36 inches (3 inch border), 32x48 inches (4 inch border), and 36x54 inches (4 1/2 inch border).

(h) The official Theta Chi pennant shall be as follows: material - fine French finish felt; white background at head and red background at point; coiled rattlesnake in red felt appliqué and machine embroidery on the white field, Greek letters "Theta Chi" in white on red field; ribbon ties; size - 18x42 inches or 12x36 inches.

(i) There shall be an official Alumni Key, to be made in 10K yellow gold, consisting of the Greek letters "Theta" and "Chi" superimposed, mounted on a key shank and so made that the key is double-faced, with on one side the Theta being uppermost and on the other side the Chi being uppermost.

(j) (1) Each member may wear a robe at each meeting of the active chapter, such robes to be purchased as each chapter may desire. Each officer and initiate shall wear the appropriate robe during the initiation Ritual.

(2) All robes and insignia shall conform to the standards and specifications established by the Grand Chapter from time to time and maintained on file by the Chief Executive Officer.

(3) The robes of the Fraternity shall be as follows:

(A) Member's robe – military red sateen.

(B) Officer's robe - military red sateen with insignia.

(C) Grand Chapter robe - military red silk poplin, with insignia, band of embroidery on the sleeves and white facing down the front.

(D) Chief Executive Officer's robe - similar to Grand Chapter robe, with insignia.

## Section 4. Traditions

(a) All active chapters shall observe the tenth day of each April as Founders' Day. This anniversary of the establishment of the Fraternity shall be celebrated as each active chapter may deem proper; except that at 9:00 of that evening, if an active chapter is in secret session, it shall stand and, in unison and in low voice, repeat the third oath to the Fraternity; if, however, the observance is a public affair, all activities shall cease for two minutes, from one minute before until one minute past the hour of 9:00 p.m.

(b) "Old Theta Chi" (also known as "It is to Thee, Dear Old Theta Chi") shall be the anthem of the Fraternity and shall be respected accordingly.

(c) The standard Fraternity colors shall be military red and white.

(d) The Objectives of Theta Chi Fraternity have been adopted and established, and shall be observed by chapters and members.

(e) The maxim of the Fraternity shall be as follows: "Alma Mater first, and Theta Chi for Alma Mater".

(f) An inventory shall be made and maintained of all Fraternity memorabilia located in the International

Headquarters.

# Article IX
# Miscellaneous

## Section 1. Fiscal Year

The fiscal year of the Corporation shall be from July 1 through June 30.

## Section 2. Amendments

(a)  These Bylaws may be amended or supplemented either
  (1)  by the affirmative vote of at least two thirds of the total number of all votes which seated delegates at an International Convention are entitled to cast, followed by a ratification by the active chapters of the action of the International Convention conducted in accordance with subsection (b) of this Section; or
  (2)  by a three-fourths vote of all members of the Grand Chapter then in office; provided that no amendment or supplement to these Bylaws shall be adopted by the Grand Chapter if it is contrary to, or inconsistent with, any amendment or supplement previously adopted (subsequent to the 1996 National Convention) pursuant to subsection (a)(1).

(b)  Any amendment or supplement to these Bylaws adopted by an International Convention pursuant to subsection (a)(1) of this Section 2 shall be submitted to the active chapters eligible to vote by the Chief Executive Officer within 60 days after the close of Convention. Such amendment or supplement shall be considered adopted if it receives the affirmative ratifying vote of a majority of the active chapters eligible to vote within a ratification period of 120 days. Any amendment or supplement shall become effective immediately upon the determination by the Chief Executive Officer that the required ratifying vote has been received, or at such later date as may be specified in the adopting resolution of the International Convention.

## Section 3. Parliamentarian

To assist the Grand Chapter in the prompt, consistent and equitable interpretation of these Bylaws, the Grand Chapter may from time to time appoint one or more alumnus members to serve as Parliamentarian or a Parliamentary Committee.

###
END

# **EXHIBIT F**



# THETA CHI FRATERNITY

## Safety Standards Manual

### Education and Policy Manual
### August 1, 2019 Edition

# <u>INTRODUCTION</u>

The purpose of *The Safety Standards Manual* ("Manual") is to provide our collegiate and alumnus members with an outline of expectations regarding activities, behavior, and conduct – as individuals and as chapters. It will also assist chapters in carrying out their responsibilities in administrating a safety program at the chapter level.

The policies stated in this Manual are the International Fraternity's positions on and endorsement of acceptable behavior, safety and discipline within the chapters of Theta Chi Fraternity. Every member should be acquainted with the positions, expectations, and sanctions outlined in this Manual.

Finally, every member should realize that he represents his colony or chapter at all times and in all ways through his behavior.

When necessary, additional guidelines or modifications will be issued for inclusion in this Manual. Chapters are invited to submit suggested changes to the International Headquarters at:

P.O. Box 503
Carmel, IN 46082
Phone: 317-848-1856
Email: ihq@thetachi.org

# CONCEPTS AND PRACTICES

## Delegation of Duties

Although the entire chapter is responsible for implementing and adhering to safety standards, it is the duty of the chapter leadership to ensure that the policies are enforced. Each Chapter and Colony President is required to submit each year to the International Headquarters a Safety Standards Verification Form stating that he and his executive council have read and understand *The Constitution and Bylaws of Theta Chi Fraternity, Inc.*, as well as this *Safety Standards Manual* ("Manual"). The Executive Council's duties are as follows:

☐ Read *the Safety Standards Manual* ("Manual")

☐ Assist the chapter in implementing the safety standards of Theta Chi Fraternity as outlined in this Manual

☐ Be prepared to implement the chapter's emergency management plan

☐ Ensure the investigation of any violation and/or incident and reporting the incident to the alumni corporation officers, chapter advisory board, and the International Headquarters according to the instructions on how to report an incident contained in this Manual

☐ Seek advice as needed from the International Headquarters staff or the institution's Greek life office

☐ Educate the members about the safety standards of Theta Chi Fraternity

☐ Complete the Emergency Management Phone List and distribute it to all members and officers and post the list by telephones in the chapter house

☐ Meet regularly with the Social Chairman and House Manager to ensure compliance with the safety standards

☐ Complete the checklists from this Manual and the Social Event Guide with the other chapter officers to ensure that all chapter social events comply with the safety standards

# Delegation of Duties (Continued)

In conjunction with policy education and enforcement, it is important that the chapter is educated on safety and that the chapter provides a safe environment for its members. The following duties are to be completed by the Vice President of Health and Safety:

☐ Read *A Resource Guide for the Vice President of Health and Safety*

☐ Post an emergency evacuation plan on the back of each room door

☐ Assist the House Manager in developing and maintaining a fire safety and preparedness program that includes fire drills, fire alarm, and fire extinguisher inspections

☐ Assist the House Manager in using the house inspection checklist, which can be found in this Manual, prior to, during, and following occupancy each fall and spring

☐ Ensure that the House Manager and house corporation correct any safety hazards discovered through safety inspections or by other means

☐ At least once annually, organize a separate and distinct chapter educational program covering each of the following topics:
   o Hazing Prevention
   o Suicide Prevention/Intervention
   o Recognizing Depression and Getting Help
   o Responsible Use of Alcohol
   o Drug abuse prevention
   o Sexual Assault/Misconduct Prevention
   o Fire/Life Safety

# STANDARDS OF THETA CHI

## Hazing

Theta Chi is based on the belief that true fraternalism is nurtured in an atmosphere of social and moral responsibility, respect for duly constituted authority, and loyalty to the principles and values of higher education.

Theta Chi is also based on the understanding that while social behavior cannot be legislated, a fraternity without morally sound precepts and practices is not a constructive influence upon college men.

Theta Chi is further based on the belief that a fraternity has a solemn obligation to help develop its pledges , initiates, and alumni, and that this responsibility extends alike to the institutions where the fraternity is represented. This obligation also extends to parents and others who make possible the education of pledges and initiates as well as the communities where chapters are accountable for good citizenship. This obligation is also owed to the college fraternity system of which Theta Chi is a part.

Finally, Theta Chi is based on the firm conviction that one of the most damaging instruments to the fraternity system is the employment of a pledge education program which involves hazing, and that this unproductive and hazardous practice has no place in the fraternity system.

**From Article V, Section 11 of *The Constitution and Bylaws of Theta Chi Fraternity, Inc.***

### Hazing Prohibited

The Fraternity prohibits all physical hazing, paddling, uncalled-for humiliation, and public display in connection with Pledge education and pre-initiatory activities and subscribes to the North-American Interfraternity Conference resolutions which condemn all forms of hazing in connection with Pledge education and pre-initiatory activities. The active chapters shall carry out the Fraternity's policy and conform to this policy, not only to avoid the danger of bringing discredit to the Fraternity and injuring members, pledges, and the entire fraternity cause, but also to build higher respect for the chapters and the Fraternity in the minds of Pledges and to instill loyalty. The Fraternity prohibits all forms of public initiation, and pre-initiatory and initiation activities shall not be permitted to interfere in any way with the scholastic obligations or class attendance of those involved.

# Prohibited Hazing Activities

The following activities are hazing and will not be tolerated. This list is by no means all-inclusive; many other activities could be added. Keep in mind that the intent of the activity is as significant as the activity itself.

- Forced or coerced consumption of any beverage, alcoholic or nonalcoholic, or food
- Forced calisthenics of any type, or at any time
- Paddling, striking or any form of physical abuse
- Any type of abandonment (e.g., kidnaps, "ditches," or "bags")
- Scavenger hunts or treasurer hunts, including hunts for nonexistent items
- Any form of "line-ups" or forced interviews
- Requiring pledges to collect signatures from initiated members
- Prevention or deprivation of sleep or study time
- Duties not shared equally with members (e.g., house clean ups, answering telephones, giving rides, or serving meals)
- Requiring pledges to carry items or objects (e.g., paddles, matches, books, change, bricks, or *The Manual of Theta Chi*)
- Any act of personal servitude
- Verbal harassment
- Requiring or endorsing pranks that violate law or reflect poorly on the chapter (e.g., theft, destruction, or harassment)
- Requiring uncomfortable or inappropriate dress
- Restricting or requiring the use of certain doors, entrances, or public rooms or furniture in the chapter house
- Interrogations and testing that is inconsistent with normal testing of educational material (e.g., threatening or harassing pledges through psychological or verbal intimidation including the use of pledge courts or pledge reviews)
- Requiring inappropriate forms of address or greetings to members when answering the telephone
- Requiring pledges to recite the Creed or Greek alphabet "to a match" or in any other manner that is designed to denigrate or intimidate the pledges
- Misleading pledges to believe that they are brothers or "active"
- Use of blindfolds
- Requiring pledges to recite information, phrases, or spiels with no useful or educational purpose
- Keeping vigil over any object or device

# Alcohol and Other Drugs

In any activity or event sponsored or recognized by a chapter/colony, including those that occur on or off organizational/chapter premises:

1.  The chapter/colony, members and guests must comply with all federal, state, provincial and local laws. No person under the legal drinking age may possess, consume, provide or be provided alcoholic beverages.
2.  The chapter/colony, members and guests must follow federal law regarding illegal drugs and controlled substances. No person may possess, use, provide, distribute, sell, and/or manufacture illegal drugs or other controlled substances while on chapter/organizational premises or at any activity or event sponsored or endorsed by the chapter/colony.
3.  If alcoholic beverages are present, they must either be:
    a.  Provided and sold on a per-drink basis by a licensed and insured third-party vendor (e.g., restaurant, bar, caterer, etc.); or
    b.  Brought by individual members and guests of legal age through a bring your own beverage ("BYOB") system.
4.  Common sources of alcohol, including bulk quantities, which are not being served by a licensed and insured third party vendor, are prohibited (i.e., amounts of alcohol greater than what a reasonable person should consume over the duration of an event).
5.  Alcoholic beverages must not be purchased with chapter/colony funds or funds pooled by members or guests (e.g., admission fees, cover fees, collecting funds through digital apps, etc.).
6.  A chapter/colony must not co-host or co-sponsor, or in any way participate in, an activity or event with another group or entity that purchases or provides alcohol.
7.  A chapter/colony must not co-host or co-sponsor an event with a bar, event promoter, or alcohol distributor; however, a chapter/colony may rent a bar, restaurant, or other licensed and insured third-party vendor to host a chapter/organization event in accordance with law.
8.  Attendance by non-members at any event where alcohol is present must be by invitation only, and the chapter/colony must utilize a guest list system. Attendance at events with alcohol is limited to a 3:1 maximum guest-to-member ratio, and must not exceed local fire or building code capacity of the chapter/colony premises or host venue.
9.  Any event or activity related to the new member joining process (e.g., recruitment, intake, rush, etc.) must be substance free. No alcohol or drugs may be present if the event or activity is related to pledging activities, meetings, or initiation into an organization, including but not limited to "bid night," "big/little" events or activities, "family" events or activities, and any ritual or ceremony.
10. The chapter/colony, members or guests must not permit, encourage, coerce, glorify or participate in any activities involving the rapid consumption of alcohol, such as drinking games.

From Article V, Section 13 of *The Constitution and Bylaws of Theta Chi Fraternity, Inc.*

<u>Alcoholic Beverages</u>

> The rules and regulations governing the use of alcoholic beverages in the active Chapters and at all Fraternity functions shall be in conformance with the state, federal, and local laws pertaining to same, and with the *Safety Standards Manual of Theta Chi Fraternity.*

## POLICY ON ALCOHOL PRODUCTS ABOVE 15% ABV.

Effective February 1, 2019, Theta Chi Fraternity prohibits the presence of alcohol products above 15% ABV in any chapter/colony facility or at any chapter/colony event, except when served by a licensed third-party vendor.

# Sexual Abuse

The members of Theta Chi, while aspiring to lofty morals, regard all men and women as equals worthy of significant respect. It is because of the strict adherence to such morally righteous values that the members of Theta Chi deplore any and all instances of sexual harassment.

Recognizing that sexual harassment is an issue confronting campuses as well as the rest of society, Theta Chi Fraternity will not tolerate sexual harassment or abuse.

Examples of sexual harassment or activities which fall within this definition include: the use of strippers; posters, books, shirts, or advertisements which portray persons in a demeaning way; and the use of persons at recruitment events in a subservient or demeaning fashion. Additionally, Theta Chi Fraternity seeks to:

1. Educate its members about the varied forms which sexual harassment can take
2. Ensure adherence to the Fraternity's ideals by every member
3. Promote human dignity and respect for others
4. Encourage growth and development of our brothers
5. Foster proper attitudes towards sexual roles

The Fraternity will not tolerate or condone sexually abusive behavior on the part of its members, whether physical, mental, or emotional. This is to include any actions that are demeaning to women and/or men including but not limited to date rape, gang rape, or verbal harassment.

# Human Dignity

Theta Chi's position is that every person is due the same amount of respect and dignity no matter what race, creed, color, sex, religion, handicap, or sexual orientation.

No member or pledge should be required, coerced, forced, or influenced in any way to do anything that would be unbecoming of a member of Theta Chi Fraternity.

It follows that any activity or action that would cause a member to lose dignity might involve hazing. As stated in this document, Theta Chi Fraternity is opposed to hazing in any form.

# Good Samaritan Policy

A chapter or individual member that seeks immediate and appropriate medical assistance for a person in need related to the use or consumption of alcohol, drugs, or to another medical emergency, may be eligible for mitigation of potential charges related to violations of organizational policies. To be eligible for this potential mitigation, the chapter or individual member may be required to meet in person or by phone with an International Headquarters staff member or volunteer designated by the Fraternity. A chapter or individual member may benefit from this policy more than once, though repeated use of the policy may receive stricter scrutiny.

# EMERGENCY MANAGEMENT

From time to time a serious accident or illness may occur in a chapter. The following suggestions are made to assist you in responding appropriately to such a situation. The information provided in this Manual should be reviewed with all chapter officers to prepare them for an emergency. Such preparation can save lives and minimize any loss that may occur.

The Chapter President or another designated officer or brother must take charge of every emergency situation involving injury or significant property damage. This does not mean that he cannot consult with other members who may have more expertise or insight, but it does mean that any final decision rests with the President or his designee. In the absence of the President or designated member, a predetermined hierarchy or the hierarchy of officers stated in our Ritual (President, Vice President, Vice President of Health and Safety, Secretary, Treasurer, and Marshal) should be followed in order to determine who is in charge during an emergency situation.

### IN THE EVENT OF A FIRE:
- ☐ Pull the house fire alarm
- ☐ Call 911 and report the event
- ☐ All members should meet in a predetermined area
- ☐ Take a head count and report missing individuals to the fire department
- ☐ Do not allow anyone to return to a burning building
- ☐ As soon as reasonably possible, notify the appropriate campus officials, chapter alumni officers, and the International Headquarters

### IN THE EVENT OF AN EMERGENCY:
(Serious illness or injury)
- ☐ Call 911 and report the emergency
- ☐ Notify the International Headquarters and alumni corporation president
- ☐ Inform members of the Fraternity's procedures during an emergency
- ☐ Close the house and only permit entry to members, law enforcement, emergency personnel, and campus officials
- ☐ Assemble all the members, including pledges, in a group
- ☐ Instruct the members to make no statements to anyone other than law enforcement, emergency personnel, International Headquarters staff, chapter advisory board members, alumni corporation officers, and campus officials during any investigation
- ☐ Instruct the members to direct all inquiries to the Chapter President and/or spokesman

Individual and group counseling is strongly recommended following an emergency crisis situation. There should be people available on campus who can assist in emergency management. The Vice President of Health and Safety should have these resources readily available. Your Greek adviser will be a valuable resource in dealing with any issues following an emergency and he or she should also be able to assist the chapter in finding a counselor if needed.

# EMERGENCY MANAGEMENT PHONE LIST

**Ambulance:** 911

**Fire Department:** 911

**Police:** 911

**International Headquarters:** 317-848-1856
***After hours contact for International Headquarters:  602-888-1856

**Chapter Adviser:** Name:_____ Cell Phone: _____

**Alumni Corporation President:** Name:_____ Cell Phone: _____

**Greek Adviser:** Name:_____ Cell Phone: _____

**Property Insurance Agent:** Name:_____ Cell Phone: _____

When contacting the International Headquarters for an emergency, have the following information available:

- ☐ Name, telephone number, and location of the chapter/colony
- ☐ Name, address, and telephone number of person reporting the incident
- ☐ Name, address, and telephone number of injured persons (if known)
- ☐ Exact time, date, and location of injury or damage
- ☐ Description of the incident
- ☐ Names of any witnesses
- ☐ A list of all of the people or agencies that have been notified

**<u>NOTE</u>:** Obtain the full legal name, home address, and telephone number for any injured person or witness.

Copy this Emergency Management Phone List and provide an updated copy to all of the chapter officers and members. Also, keep an updated list near any telephone and a copy should be placed inside this Manual.

# Special Events

In addition to regular social functions, many chapters often conduct or sponsor special events involving large numbers of people. Examples include a fundraising project for a charity, or alumni events such as Homecoming.

No chapter shall host open parties at which alcohol is present. But even if alcohol is not consumed at a special event, the large number of people usually involved at these activities can create safety risks.

Precautions should be taken for:

- Traffic control
- Crowd control
- Safety of the facility, including fire safety-know the evacuation route(s)
- Risk of injury resulting from any activities or games in which attendees might participate

Also, if an event is held away from the chapter house, an attorney for the chapter should review any contract signed with the property owner.

# Alumni Events

Your chapter will be able to host more successful alumni events if they are planned in association with your alumni corporation. Be sure the corporation officers are familiar with the policies and procedures of this Manual when planning the event. This will help to eliminate any confusion. Additionally, you will want to ensure that the appropriate alumnus members will help to explain and enforce these guidelines with other alumnus members prior to the event.

The alumnus brothers who attend your Homecoming or other event will most likely be above the legal drinking age. Nonetheless, all of the procedures regarding consumption of alcohol and concern for your guests still apply. The chapter may not furnish alcohol to alumni. Ideally, members of your alumni corporation or chapter advisory board will be on hand to greet alumni and deal with any issues that may arise.

If you become concerned about an alumnus who has had too much to drink, seek the help of the local authorities or other alumni to ensure that this brother avoids injury.

# <u>CHAPTER HOUSE SAFETY</u>

A house corporation member should review the chapter property with the House Manager or Vice President of Health and Safety once a semester for a maintenance assessment and to identify opportunities for projects to improve safety for the chapter. If there is an area that does not meet these regulations, the Chapter President should coordinate with the property owner to develop an action plan that ensures that the issue is corrected within a timely manner.

# Fire Safety

At the beginning of each semester, the chapter should make an assessment of fire safety devices and the following procedures:

**Emergency Evacuation Preparedness**
- ☐ All halls, stairways, and other escape routes are free from obstructions/debris
- ☐ All halls, stairways, and other escape routes are well-lit
- ☐ All stairways have secure banisters/railings
- ☐ Fire drills are practiced every six months
  - o Date of last drill: _____
- ☐ A written emergency evacuation plan has been established and is reviewed by members regularly
- ☐ An escape route map is posted in all bedrooms and at the main entrance to the facility
- ☐ Exits and escape routes are clearly marked with lighted signs
- ☐ Interior and exterior doors along escape routes are easily opened without keys or special devices
- ☐ Self-closing fire doors are present to reduce potentially rapid-spreading fire
- ☐ Fire doors remain closed and are kept clear of door stops or obstructions
- ☐ Exterior exit doors open outwards/exteriorly

**Fire Detection System and Fire Extinguishers**
- ☐ A working smoke/carbon monoxide detector is installed in each room
- ☐ The facility is fully protected by a hard-wired, automatic fire detection/alarm system that is linked to an alarm monitoring agency (which can alert the fire department)
- ☐ The system has been serviced and tested by a licensed contractor within the last year
  - o Date of last inspection: _____
- ☐ Manual fire alarm pull boxes are in all hallways and next to all exits
- ☐ If smoke detectors are battery operated, detectors are tested monthly and batteries are changed every six months
  - o Date of last battery change: _____
- ☐ An emergency lighting system is present
- ☐ Emergency lighting system is tested monthly
  - o Date of last test: _____
- ☐ There is one fire extinguisher for every 3,000 square feet of the building, or there is at least one extinguisher on each floor
- ☐ Fire extinguishers are in the kitchen and laundry room
- ☐ Fire extinguisher locations are accessible and clearly marked

☐ Fire extinguishers are checked monthly and fully charged
  o Date of last monthly inspection: _____
☐ Fire extinguishers are inspected annually by licensed professional
  o Date of last annual inspection: _____

**Sprinkler System (if applicable)**
☐ Fire sprinklers are installed (recommended)
☐ All sprinkler heads are free from obstruction
☐ The sprinkler system has been inspected by a licensed contractor within the last year (some states require inspections every 6 months)
  o Date of last inspection: _____

**Electrical**
☐ All circuits are correctly fused and grounded
☐ There is no evidence of temporary wiring or tampering
☐ Electrical covers are in place with none broken
☐ A "no multiple plug/appliance" policy is in effect and enforced
☐ The use of extension cords is restricted, especially with high voltage appliances
☐ Power lines to the facility are clear of obstructions such as tree limbs
☐ Grounded Fault Interrupters are functional and installed in bathrooms, kitchens, and other wet areas

**Kitchen**
☐ All cooking areas and equipment are protected by a fire hood extinguishing system
☐ The fire hood extinguishing system has been serviced within the last six months by a licensed professional
  o Date of last service/inspection: _____
☐ Removable grease filters are cleaned regularly (daily)
☐ The kitchen is well-supervised, cleaned daily, and operated in a sanitary manner

**Furnace and Water Heater**
☐ The furnace and water heater are located in a separate, fully-enclosed room
☐ All doors to the room close and latch properly
☐ The room is free of combustible materials
☐ Equipment has been inspected within the last year by a licensed contractor
  o Date of last inspection: _____
☐ An emergency shut-off is installed and is labeled and accessible

**Storage**
☐ Fuels, flammable liquids, and other explosives are prohibited and not stored in the building
☐ Gas-powered motors are prohibited and not stored or operated in the building
☐ All cleaning supplies, paint and other chemicals are stored in a secure, well-ventilated area

**Security**
- ☐ Facility access is restricted to members only by key, electronic keyed entry (recommended), or code
- ☐ There is adequate exterior lighting
- ☐ There is a specific person (i.e. House Manager) responsible for securing the facility at a specific time each evening
- ☐ The property is secured and supervised during periods of vacancy (i.e. student breaks)
- ☐ Campus security/local police patrol the property regularly for increased security, especially during periods of vacancy

**Other Building Maintenance**
- ☐ The roof is in good condition with no leaks
  - ○ Last roof inspection by licensed contractor: _____
- ☐ All interior and exterior walls are in good condition; there are no holes in the drywall
- ☐ All interior and exterior doors and windows are in good condition; doors/windows close and latch
- ☐ Gutters are attached securely and are unobstructed, discharging water away from facility
- ☐ Floor surfaces are free of slip, trip and fall hazards
- ☐ Non-slip surfaces are provided in entrances, bathrooms, stairwells, exit areas, kitchen, fire escapes, and other areas
- ☐ Laundry dryer filters are cleaned regularly
- ☐ Areas behind the dryer and washer are clear of lint and debris
- ☐ Floors and walls are clean throughout the building
- ☐ Trash is removed from the building daily
- ☐ Exterior exit doors are kept free from obstruction, including snow and ice

**Other House Policies**
- ☐ The use and storage of firearms, bows, and other weapons is prohibited in the facility and elsewhere on the property
- ☐ Smoking is prohibited inside
- ☐ If smoking is allowed inside:
  - It is confined to designated areas and is prohibited in bedrooms
  - Ashtrays with large lips are used
  - Butts are collected in metal containers
- ☐ Roof access is prohibited
- ☐ Emergency phone numbers are clearly posted at each phone

**Inspection**
- ☐ Campus/City fire marshal has inspected the building within last six months
  - ○ Date of last inspection: _____
- ☐ A self-inspection is performed monthly
- ☐ Procedures are in place for correcting code violations or other deficiencies

# Water Features

Temporary self-constructed swimming pools, bodies of water, whether self-constructed or professionally constructed, or any other temporary water feature (including "slip-and-slides" and similar features) are prohibited for use on chapter/colony property or at any chapter/colony-sponsored or co-sponsored event.

# **<u>EXHIBIT G</u>**

